# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| **KELLY BLAND, individually and on behalf** | § | |
| **of all others similarly situated,** | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| **v.** | § | **Case No. 4:24-cv-00994-P** |
| | § | |
| **OUR WORLD ENERGY, LLC, and** | | |
| **SUNSCI MEDIA, LLC,** | § | |
| | § | |
| *Defendants* | § | |

## APPENDIX IN SUPPORT OF DEFENDANT
## OUR WORLD ENERGY, LLC'S MOTION TO DISMISS

NOW COMES, Defendant Our World Energy, LLC and files this Appendix in Support of Its

Motion to Dismiss Plaintiff's Complaint Under Rule 12(b)(6).

| **EXHIBIT** | **DESCRIPTION** | **APP NO.** |
|---|---|---|
| A | Affidavit of Alicia O'Neill | App. 1 - 4 |
| A-1 | Sales Service Agreement between Our World Energy, LLC. And SunSci Media LLC dated March 25, 2024 | App. 5 - 35 |
| A-2 | Sub Dealer Agreement between Our World Energy, LLC and EDJ Enterprises Inc. dated April 10, 2024 and | App. 36 - 81 |
| A-3 | Cease and Desist Notification dated December 31, 2024 | App. 82 - 99 |

Respectfully submitted,

*/s/Caleb B. Bulls*
Michael D. Anderson
State Bar No. 24031699
michael.anderson@kellyhart.com
Caleb B. Bulls
State Bar No. 24082749
caleb.bulls@kellyhart.com
**KELLY HART & HALLMAN, LLP**
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Phone: (817) 332-2500
Facsimile: (817) 878-9280

***Attorneys for Defendant Our World Energy***

## CERTIFICATE OF SERVICE

On December 31, 2024, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court.  I hereby certify that I have served the following counsel of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

Andrew Roman Perrong, Esq.
**PERRONG LAW, PLLC**
2657 Mount Carmel Avenue
Glenside, Pennsylvania 19038

Anthony Paronich
**PARONICH LAW, P.C.**
350 Lincoln Street, Suite 2400
Hingham, Massachusetts 02043

*/s/Caleb B. Bulls*
Caleb B. Bulls

**Exhibit A**

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | |
|---|---|
| **KELLY BLAND, individually and on behalf** §<br>**of all others similarly situated,** §<br>§<br>*Plaintiff*, §<br>§<br>**v.** §<br>§<br>**OUR WORLD ENERGY, LLC, and** §<br>**SUNSCI MEDIA, LLC,** §<br>§<br>*Defendants* §<br> | **Case No. 4:24-cv-00994-P** |

---

### AFFIDAVIT OF ALICIA O'NEILL

STATE OF ~~XXXXXX~~ Florida   §

COUNTY OF ~~XXXXXXX~~ Nassau   §

Before me, the undersigned authority, on this day personally appeared Alicia O'Neill who, after being duly sworn, testifies as follows:

1.      "My name is Alicia O'Neill. I am over the age of twenty-one years, have never been convicted of a felony, and am fully competent to testify to, and have personal knowledge of, the matters set forth in this Affidavit.

2.      "I am the Finance, Accounting, Strategy & Legal Program Manager for Defendant Our World Energy ("OWE"). OWE is a limited liability company that was formed in the State of Arizona. OWE has always maintained its headquarters in the greater Phoenix, Arizona area. Presently, the address of OWE's headquarters is 8716 W. Ludlow Dr., Suite 6, Peoria, Arizona 85381.

3.      "OWE's business consists of installing state-of-the-art, locally-manufactured solar panels that are designed to save end consumers money. For business development purposes, OWE contracts with independent contractors to perform lead generation and sales development services. Whenever OWE contracts with an independent contractor for lead generation or sales development services, OWE enters into a "Sales Service Agreement for Independent Contractor" or "Sub Dealer Agreement" with the respective contractor (together, the "Independent Contractor Agreements").

4.      "As set forth therein, the Independent Contractor Agreements (i) define the relationship between OWE and the contractor as an independent contractor relationship and not as an agency or employee relationship; (ii) prohibit the contractor from holding itself out as

---

OWE's agent or employee; (iii) require the contractor to comply with federal and state laws, including do-not-call laws; (iv) were based on an initial one-year term, to be renewed automatically every year; (v) allow either party to terminate the agreement on thirty days' notice; (vi) require the contractor to bear its own expenses; and (vii) contain a forum selection clause that requires any lawsuit that relates to the Independent Contractor Agreements to be brought in Arizona.

5.      "OWE does not control the means, methods or manners in which the contractors perform their lead generation or sales development services. To that end, OWE does not maintain control over which potential customers the contractors should pursue or how the contractors should contact those individuals (other than not to violate federal or state laws). It is the contractor's decision who to contact, how to contact them, and how best to pursue any given lead. OWE does not participate in that process. OWE does not have any contact with a potential customer unless and until they have agreed to purchase OWE's services or products.

6.      "To the extent that the independent contractor successfully generates a lead with a potential customer, OWE and the customer then enter into a separate agreement that defines and governs the relationship between OWE and the customer. The OWE-customer agreements typically contain a forum selection clause that requires any dispute between OWE and the customer to be brought in Arizona.

7.      "On March 25, 2024, OWE entered into a *Sales Service Agreement for Independent Contractor* with Defendant SunSci Media, LLC (the "SunSci Agreement"). A true and correct copy of the SunSci Agreement is attached hereto as Exhibit A-1. The SunSci Agreement included all of the provisions that OWE typically requires its independent contractors to agree to, including the provisions that (i) define the relationship between OWE and the contractor as an independent contractor relationship and not as an agency or employee relationship; (ii) prohibit the contractor from holding itself out as OWE's agent or employee; (iii) require the contractor to comply with federal and state laws, including do-not-call laws; (iv) were based on an initial one-year term, to be renewed automatically every year; (v) allow either party to terminate the agreement on thirty days' notice; (vi) require the contractor to bear its own expenses; and (vii) contain a forum selection clause that requires any lawsuit that relates to the SunSci Agreement to be brought in Arizona. Consistent with the terms of the SunSci Agreement, OWE has never allowed SunSci to exercise authority on OWE's behalf and has never held SunSci out as OWE's employee or agent at any point in time.

8.      "An individual named John Whitmore was SunSci's principal contact with OWE. OWE has never employed Mr. Whitmore, has never provided him with a phone number or an e-mail address to conduct business, and has never authorized Mr. Whitmore to hold himself out as an employee or agent of OWE or otherwise authorized Mr. Whitmore to act on OWE's behalf.

9.      "From the time that OWE and SunSci entered into the SunSci Agreement until this lawsuit was filed, OWE did not receive a single complaint from any individual that claimed that SunSci had violated the Telephone Consumer Protection Act (the "TCPA"), including but not limited to any complaints that SunSci had contacted any individual on the federal do-not-call registry. In fact, OWE did not know that SunSci had potentially contacted any individual on the federal do-not-call registry until this lawsuit was filed. OWE did not believe that SunSci would

---

**AFFIDAVIT OF ALICIA O'NEILL**                                                    **PAGE | 2**

contact any individual on the do-not-call registry in light of the provision in the SunSci Agreement that required strict compliance with do-not-call laws.

10.    "Further, from the time that the parties entered into the SunSci Agreement to present, SunSci did not successfully generate a single lead that resulted in the sale of OWE products or services. In other words, OWE has not received any benefit in connection with its relationship with SunSci. Those facts notwithstanding, OWE terminated its relationship with SunSci shortly after this lawsuit was filed.

11.    "On or around April 9, 2024, OWE entered into a *Sub Dealer Agreement* with EDJ Enterprises (the "EDJ Agreement"). A true and correct copy of the EDJ Agreement is attached hereto as Exhibit A-2. The EDJ Agreement included all of the provisions that OWE typically requires its independent contractors to agree to, including the provisions that (i) define the relationship between OWE and the contractor as an independent contractor relationship and not as an agency or employee relationship; (ii) prohibit the contractor from holding itself out as OWE's agent or employee; (iii) require the contractor to comply with federal and state laws, including do-not-call laws; (iv) were based on an initial one-year term, to be renewed automatically every year; (v) allow either party to terminate the agreement on thirty days' notice; (vi) require the contractor to bear its own expenses; and (vii) contain a forum selection clause that requires any lawsuit that relates to the EDJ Agreement to be brought in Arizona. Consistent with the terms of the EDJ Agreement, OWE has never allowed EDJ Enterprises to exercise authority on OWE's behalf and has never held EDJ Enterprises out as OWE's employee or agent at any point in time.

12.    "An individual named Eric DeJohn was EDJ Enterprises' principal contact with OWE. OWE has never employed Mr. DeJohn, has never provided him with a phone number or an e-mail address to conduct business, and has never authorized Mr. DeJohn to hold himself out as an employee or agent of OWE or otherwise authorized Mr. DeJohn to act on OWE's behalf.

13.    "From the time that OWE and EDJ Enterprises entered into the EDJ Agreement until this lawsuit was filed, OWE did not receive a single complaint from any individual that claimed that EDJ Enterprises had violated the TCPA, including but not limited to any complaints that EDJ Enterprises had contacted any individual on the federal do-not-call registry. In fact, OWE did not know that EDJ Enterprises had potentially contacted any individual on the federal do-not-call registry until this lawsuit was filed. OWE did not believe that EDJ Enterprises would contact any individual on the do-not-call registry in light of the provision in the EDJ Agreement that required strict compliance with do-not-call laws.

14.    "Further, from the time that the parties entered into the EDJ Agreement to present, EDJ did not successfully generate a single lead that resulted in the sale of OWE products or services. In other words, OWE has not received any benefit in connection with its relationship with EDJ Enterprises. As a result of the allegations that have been made in this lawsuit, OWE has notified EDJ Enterprises that it is investigating the circumstances that led to EDJ Enterprises allegedly placing phone calls to Plaintiff Kelly Bland ("Plaintiff"). OWE has requested that EDJ Enterprises cease and desist from making any calls to people on the Do Not Call list. A true and correct copy of the notification to EDJ Enterprises is attached hereto as Exhibit A-3.

---

15.    "I have reviewed the *Original Complaint* that Plaintiff filed in this lawsuit. In the Original Complaint, Plaintiff identified a series of phone calls that she received that violate the TCPA. For each call, Plaintiff identified the phone number that made the call. The phone numbers that Plaintiff identified in her Complaint are: (i) 817-600-4140; (ii) 828-406-3717; (iii) 585-304-0286; (iv) 972-737-1329; and (v) 972-476-3998. I have cross-referenced those phone numbers against the phone numbers that OWE owns and operates. As a result of that process, I confirmed that none of the phone numbers that Plaintiff identified in her Original Complaint are owned or operated by OWE."

"Further, affiant sayeth not.

_Alicia O'Neill_
Alicia O'Neill

STATE OF FLORIDA, COUNTY OF NASSAU

SUBSCRIBED AND SWORN TO BEFORE ME on this ___31st___ day of December, 2024.

ID produced:
DRIVER LICENSE

ALEKSANDR KOZLOV
Notary Public - State of Florida
Commission # HH 461002
Expires on November 2, 2027

Aleksandr Kozlov

Notary Public, State of ~~Arizona~~ Florida

Notarized remotely online using communication technology via Proof.

---

**AFFIDAVIT OF ALICIA O'NEILL**                                                **PAGE | 4**

## Sales Service Agreement for Independent Contractor

This Sales Service Agreement for Independent Contractor (the "Agreement") is made and entered into by and between Our World Energy, LLC. having an address of 20809 N 19th Ave Suite 1, Phoenix, AZ 85027 ("OWE"), and ___Sunsci Media LLC___, ("Contractor"). having an address of ___65 Merrimon Ave, Asheville, nc, 28801___, both of which are collectively referred to herein as the "Parties" or, individually, as the "Party."

### RECITALS

**A.    WHEREAS**, OWE is in the business of marketing, advertising, and selling residential solar energy systems, and other equipment used to store, generate and transfer electricity, and providing services with respect thereto (collectively, the "Services"); and

**B.    WHEREAS**, Contractor is in the business of providing services relating to solar energy systems (the "Services"); 

**C.    WHEREAS**, OWE desires to engage Contractor, and Contractor desires to be engaged by OWE, to provide the Services pursuant to the terms and conditions of this Agreement; and

**D.    WHEREAS**, the Parties desire that this Agreement supersede and replace any prior agreements entered into between the parties;

**NOW, THEREFORE**, in consideration of the mutual promises, covenants and conditions contained herein, in reliance upon the representations and warranties set forth herein, and for other good and valuable consideration, the Parties hereto agree as follows:

### AGREEMENT

**1.    DEFINITIONS AND RULES OF INTERPRETATION:**

   **(a)    Definitions.**  Any capitalized term used but not defined in this Agreement shall have the meaning ascribed to such term in <u>Exhibit A</u>.

**2.    THE SERVICES:**

   **(a)    Conditions Precedent**.  Before Contractor may commence any Services on behalf of OWE, the following conditions precedent must first be satisfied to the satisfaction of OWE (in its sole and absolute discretion):  (i) complete execution of this Agreement by all Parties and delivery of a fully executed copy of this Agreement to OWE; (ii) delivery to OWE by Contractor of all licenses, certificates, and other documents required under this Agreement; (iii) completion of the new contractor checklist and delivery to OWE of any and all materials, information, documentation required thereunder; and (iv) completion of any and all required training under the

2

Initials 

terms of this Agreement. This Agreement will not be in force and Contractor will not be entitled to any of the benefits hereunder, unless and until said Conditions Precedent have been met.

**(b)** <u>**Services.**</u> Beginning on the Effective Date and at all times throughout the Term, Contractor agrees to provide the Services set forth in <u>Schedule 1</u> hereto for and on behalf of OWE solely in the designated territory in strict compliance with the terms of this Agreement, the customer agreements, and applicable law. Contractor will have no authority to, and shall not, provide any Services or take any other actions with respect to the Products outside of the Territory. OWE, in its sole and absolute discretion, may amend <u>Schedule 1</u> at any time after 7 days written notice to Contractor. After expiration of the notice period, the amended/revised <u>Schedule 1</u> will become effective and binding on the parties and is hereby expressly made subject to the terms and conditions of this Agreement.

**(c)** <u>**Business Representative.**</u> Contractor will act as the business representative for Contractor and shall be the primary point of contact with OWE and manage the day-to-day relationship between Contractor and OWE. Any required notices hereunder shall be delivered as required herein.

**(d)** <u>**Status as Independent Contractor.**</u> Nothing contained in this Agreement shall be construed as creating a joint venture, partnership, employment or franchise relationship between the Parties, and no Party shall have the right, power or authority to create any obligations or duty, express or implied, on behalf of the other Party. Contractor's status under this Agreement is that of an independent contractor and shall in no way be deemed to be any other status, including (without limitation) that of an agent or employee of OWE or its Affiliates. Contractor shall not refer to itself, hold itself out as, or knowingly permit any person to believe Contractor is anything other than an independent contractor, including (without limitation): agent, Affiliate, employee, partner, or franchisee of OWE. OWE may, in its sole and absolute discretion, (i) contract for services with other parties even though they may be similar or identical to the Services hereunder, inside or outside the Territory; (ii) sell the Products through any other person; and (iii) offer pricing, terms, conditions, or other benefits to other persons different from or superior to those offered to Contractor hereunder.

**3.** **PAYMENT FOR SERVICES:**

**(a)** <u>**Fees and Payments.**</u> Upon Contractor satisfying all Requirements set forth herein, OWE shall pay to Contractor the Fees described on <u>Schedule 2</u>, subject to OWE's right of set-off described herein. In connection with each payment, OWE will deliver to Contractor a Fee Statement and Contractor shall be responsible for any and all taxes relating to or arising out of this Agreement (including any transaction privilege, general excise, use, sales or other transaction-based taxes on the Fees or any other payment hereunder). Any Fee to Contractor is contingent upon Contractor's prior satisfaction of each condition precedent, representation, and warranty under this Agreement.

**(b)** <u>**Requirements.**</u> The Requirements described in <u>Schedule 1</u> and elsewhere in this Agreement are and at all times shall remain subject to OWE's policies and procedures that may apply to the Customers, the Services, the Work, or any Project. From time to time, OWE may (in its sole and absolute discretion) change, modify, eliminate, or add to the Requirements. If OWE

3

Initials 

makes any changes to the Requirements, then OWE shall notify Contractor in writing and use commercially reasonable efforts to provide Contractor with written notice prior to implementation of such changes.

      **(c)**    <u>**Verification and Rejection.**</u>  Contractor acknowledges and agrees that OWE will independently verify and determine whether all Requirements are satisfied by Contractor prior to any payment of Fees under this Agreement.  In the event OWE discovers that any Requirement was not satisfied by Contractor, then OWE may, in its sole and absolute discretion, withhold and set-off any applicable amount from the Fees owed to Contractor.  Upon the request of Contractor, OWE will provide to Contractor an explanation for any such rejection.

      **(d)**    <u>**Payment Dispute.**</u>  Any and all disputes concerning any payment of Fees must be delivered in writing to OWE no later than thirty (30) calendar days after the date of the applicable Fee Statement or payment.  If Contractor fails to deliver a notice of any dispute within such time period, then Contractor will be (i) deemed to have accepted the Fee Statement and related payments as complete and accurate; and (ii) forever barred from bringing any claim or suit for miscalculation or underpayment of Fees or any payment of moneys by OWE with respect to such Fee Statement and payments.

      **(e)**    <u>**Right to Set-Off.**</u>  Contractor hereby agrees that OWE may set-off, withhold, or otherwise deny payment against any and all unpaid amounts owed by OWE to Contractor in an amount equal to (i) the aggregate amount of any damages OWE or any of its Representatives has suffered or incurred as a result of Contractor's violation of any term of this Agreement; and (ii) any amounts owed by Contractor to OWE for any reason, including Contractor's duty to indemnify OWE under this Agreement, in each case as reasonably determined and the amounts reasonably estimated by OWE in good faith.  In the event OWE incorrectly sets-off, withholds, or denies payment in a manner not permitted by this Agreement, then OWE agrees it shall promptly correct such mistake and make appropriate payment to Contractor.

**4.**    **REPRESENTATIONS, WARRANTIES, AND COVENANTS OF CONTRACTOR:** As of the Effective Date and at all times throughout the Term, Contractor will and does hereby (i) represent and warrant to OWE and its Representatives; and (ii) covenants, agrees, and shall do the following:

      **(a)**    <u>**Organization, Power, and Qualification.**</u>  (i) Contractor is and shall remain qualified and licensed to perform the Services and do business and is in good standing in every jurisdiction where such qualification and licensing is required; (ii) Contractor has and shall maintain the full right, power and authority to enter into this Agreement and all other documents to be delivered in connection herewith, to grant the rights and licenses granted under this Agreement and to perform its obligations hereunder and thereunder; and (iii) the execution of this Agreement and all other documents to be delivered in connection herewith by the person whose signature is set forth at the end hereof has been and will continue to be duly authorized by all necessary action of Contractor.

      **(b)**    <u>**Fully informed.**</u>  Prior to executing this Agreement, Contractor has had the opportunity to ask OWE any and all questions Contractor may have in relation to the Services, the Fee, this Agreement, Contractor's obligations hereunder, and the contemplated relationship

4

Initials 

between the Parties.  Contractor hereby acknowledges and represents that Contractor has had an opportunity to retain legal counsel to advise and review this Agreement.

(c)    **Enforceability.**  This Agreement and any other documents delivered by Contractor to OWE hereunder constitute the legal, valid and binding obligations of Contractor, enforceable in accordance with their respective terms.

(d)    **No Conflict.**  The execution, delivery and performance by Contractor of this Agreement and any other documents delivered by Contractor to OWE in connection with this Agreement, and the consummation of the transactions contemplated hereby and thereby, do not and will not conflict with or result in any breach of any of the provisions of, constitute a default under, result in a violation of, result in the creation of any Lien upon any Customer, Customer Agreement, or any of the Services, give any third party the right to accelerate any obligation under, or require any authorization, consent, approval, exemption or other action by or notice to, any court, other governmental body, or other third party under, the provisions of Contractor's governing documents or any indenture, mortgage, loan agreement, lease or other agreement or instrument to which Contractor or any entity that is an Affiliate or Representative of Contractor is a party or to which any of Contractor's respective properties are subject, or any Law, judgment or decree to which Contractor is subject.

(e)    **Licensure and Registration.**  Contractor currently holds, and will continue to maintain at all times throughout the Term, any and all licenses, certificates, consents, certifications, waivers, permits, registrations, orders, approvals and other authorizations of any governmental or regulatory body necessary for Contractor to conduct its business, generally, and provide the Services required by this Agreement, and/or required by applicable law.  Contractor has provided to OWE true and correct copies of the licenses set forth herein, and evidence of registration, all of which are current, in good standing, and not subject to any investigation, enforcement action, or other disputes with the applicable licensing authority.  Contractor agrees that Contractor shall update, maintain, and not let expire any of the licenses.

(f)    **Litigation and Judgments.**  There is no outstanding criminal or administrative matter, order, writ, injunction, fine, citation, penalty, decree or unsatisfied judgment of any court, or any claims or litigation pending or threatened against Contractor which may affect in any way Contractor's ability to perform the duties and obligations under this Agreement or the Services required by this Agreement.  Neither is Contractor a party to, or the subject of, or threatened with, any claim, suit, action, arbitration, investigation, audit, administrative or other proceeding of any character which may affect in any way Contractor's ability to perform the duties and obligations under this Agreement or the Services required by this Agreement.  Contractor has no knowledge of any facts or circumstances which could result in a valid claim, suit, action, audit, investigation or proceeding against Contractor.

(g)    **No Adverse Actions and Release of Claims.**  Contractor has no knowledge (based on due inquiry) of any facts or circumstances which could result in a claim, suit, action, audit, investigation, or proceeding by Contractor against OWE or any of its Representatives or Affiliates. Contractor hereby irrevocably and unconditionally releases, acquits, and forever discharges OWE and its Representatives from any and all claims, actions, causes of action, rights, demands, debts, obligations, or damages of whatever nature or kind, known or unknown, at law or in equity (each

5

Initials  *SMC*

a "Claim"), which Contractor or its Representatives have, may have, or may have had, against OWE and its Representatives, or one or more of them, arising or occurring prior to the Effective Date of this Agreement. Contractor further covenants and agrees not to initiate or participate individually or as a member of a class in any action, litigation, appeal, proceeding, charge or complaint before any local, state or federal agency or court against OWE or any of its Representatives pertaining to any Claim arising out of or by reason of any actions, omissions, transactions, or events occurring prior to the Effective Date of this Agreement except as may be required by court order.

(h) **Solvency.** Contractor is solvent and able to pay its outstanding debts as they mature. Contractor will not be rendered insolvent by performing its Services under the Agreement. Contractor agrees that it will maintain its solvency at all times throughout the Term and not initiate any bankruptcy proceedings, nor permit any bankruptcy proceedings (whether voluntary or involuntary) to be initiated on its behalf.

(i) **Compliance with Laws.** Contractor is and will continue to comply in all respects with all applicable state and federal law in providing the Services under this Agreement and all other aspects of this Agreement and Contractor's operations thereunder. Contractor is in compliance and, at all times throughout the Term, shall continue to comply in all respects with (i) Applicable Laws; (ii) the Code of Conduct; (iii) this Agreement; and (iv) the Customer Agreement.

(j) **Conduct and Practices.** Contractor has read and understands the Code of Conduct included herewith at <u>Exhibit B</u> and agrees to strictly comply with the Code of Conduct (as may be revised from time to time by OWE in its sole and absolute discretion) at all times throughout the Term. Contractor agrees that it shall (i) perform the Services and all other obligations under this Agreement and the Customer Agreements in accordance with the highest standards of professional and ethical conduct, with the degree of care and skill exercised by persons providing similar services under similar circumstances; and (ii) will not take any action or fail to take any action that could in any way damage or impugn the brand, reputation, or integrity of OWE or its Representatives or Affiliates.

(k) **Accurate and Complete Information.** Any and all information, documents, instruments, certificates, exhibits, schedules, and all other materials furnished, provided, or delivered by Contractor to OWE at any time in connection with this Agreement or the transactions contemplated by this Agreement does not and will not include any untrue statement of a material fact or any omission of a material fact necessary to make the statements of facts contained therein, in light of the circumstances under which they are made, not misleading. Contractor shall never mislead, misstate, misrepresent, engage in any deceptive activity with respect to any Customer or any Representative of OWE.

(l) **Territory.** Contractor will provide the Services only in the permitted Territory.

(m) **Insurance**. As of the Effective Date and at all times through the Term of this Agreement, Contractor has and agrees to maintain and carry, at its own expense, in full force and effective all types and amounts of insurance required by applicable law.

Initials 

**(n)** <u>Records.</u>  Contractor shall prepare and maintain accurate books and records ("Records") of:  (i) all written materials used in connection with its Services and other obligations hereunder; (ii) Contractor's current address and telephone number; (iii) documentation concerning all Customers, the products marketed, promoted, and sold to such Customers; (iv) information and documentation that Contractor is required to maintain pursuant to applicable law; (v) all correspondence and written materials relating to any license; (vi) all correspondence and written materials provided by or to any government agency relating to the Services, this Agreement, any Customer, or any Customer Agreement; and (vii) all other information necessary and helpful to permit OWE to determine and verify Contractor's compliance with this Agreement, the Customer Agreements, and applicable law. Contractor shall retain the Records for such time as required by applicable law.

**(o)** <u>No Default.</u>  Contractor is not in breach of and has not breached any obligation under this Agreement and no contractor default has occurred or is continuing in any respect.

**(p)** <u>Compliance Reviews.</u>  Upon the reasonable request of OWE, Contractor will (i) provide, or make copies available to OWE for review, any and all Records; (ii) deliver to OWE true and correct copies of all applicable policies and procedures; (iii) make yourself available to OWE to be interviewed; and (iv) allow OWE and its Representatives to observe, inspect, shadow, or otherwise review the conduct of Contractor in their performing of the Services and any other obligation under the Agreement (collectively, a "Review").  OWE will, to the maximum extent possible, limit all Reviews to customary business hours and use commercially reasonable efforts to minimize any disruption to Contractor.  If any mistake, violation, discrepancy, or issue is identified or disclosed as a result of a Review, then Contractor shall (as soon as reasonably practicable) rectify, resolve, and cure such concern to reasonable satisfaction of OWE.  Any failure by Contractor to cooperate in any Review and/or timely resolve any concerns identified in a Review, in each case as determined by OWE in its sole and absolute discretion, shall be a contractor default under this Agreement.

**(q)** <u>Instructions and Further Assurances.</u>  Upon the request of OWE, Contractor shall immediately (i) comply with any and all instructions and requests of OWE or its Representatives in relation to the Services, (ii) cease any activity under this Agreement; and (iii) provide any information, deliver any documents or other materials, sign any documents or instruments in furtherance of this Agreement.

**(r)** <u>Information Security.</u>  As of the Effective Date and at all times throughout the Term, Contractor has and will continue to implement appropriate and reasonable administrative, physical, and technical safeguards designed to: ensure the security and confidentiality of Confidential Information, including the private personal information of any Customer or employee of any Party ("Personal Information"; and together with Confidential Information, "Information").  Contractor will ensure that it has security policies and procedures that protect and safeguard all Information in its possession, custody, or control, including the exchange and transmission of any Information by and between Contractor and OWE.  Contractor has and will continue to (i) use the highest quality of technology and data security software and mechanisms to protect against anticipated threats or hazards to the security or integrity of the Information; (ii) protect against unauthorized access to, use, or breach of the Information; and (iii) detect, prevent, and mitigate the risk of identity theft.  Contractor will not disclose any Information to a third party except as

Initials SML

permitted under this Agreement, the Customer Agreement, and applicable law. Contractor shall respond promptly and thoroughly respond to any request of OWE for information concerning the information security measures implemented by Contractor. In the event Contractor discovers or is made aware of a breach involving any Information, Contractor shall, at its sole cost and expense: (1) notify OWE in writing within forty-eight (48) hours of discovery of such disclosure or breach; (2) take all such actions as may be necessary or requested by OWE to address the breach, minimize the disclosure and problem, and mitigate against the risks associated therewith; and (3) cooperate in all respects with OWE to notify affected individuals and government agencies as may be required by applicable law.

      (s)    **Marketing, Publicity, and Trademarks.** Contractor shall be required to comply with the Marketing Requirements set forth on <u>Exhibit C</u>.

      (t)    **Reporting.** Contractor shall immediately inform and provide notice to OWE upon the occurrence of any of the following: (i) receipt by Contractor of a complaint from any Customer; (ii) after becoming aware of any material dispute, threat of dispute, or Claim by any Customer; (iii) any investigation, inquiry, demand, subpoena, or other regulatory process initiated by any government authority in relation to any Customer, any Customer Agreement, the Services, any license of Contractor, this Agreement, or any other activities of Contractor related to this Agreement; and (iv) any actual or threatened expiration, suspension, revocation, or enforcement action with respect to any license of Contractor. Contractor understands that upon receipt of such notice, OWE will be entitled, in its sole and absolute discretion, to immediately perform a Review in accordance with this Agreement.

      (u)    **Representatives.** As of the Effective Date, and at all times throughout the Term, Contractor represents, warrants, and covenants that prior to permitting, suffering, or allowing any Representative to perform any of the Services or any other obligation of Contractor in connection with this Agreement, that each of the following conditions are satisfied and true and correct in all respects: (i) each Representative is a citizen of the United States or is legally permitted to work therein; (ii) Contractor has performed a criminal history background check and confirmed that such individual has not been convicted of a felony or any crime of moral turpitude in the prior seven (7) years; (iii) Contractor has given training and verified the Representatives understand all aspects of this Agreement, the Code of Conduct, Applicable Law, and the Customer Agreements; (iv) each Representative has all necessary Licenses required by Applicable Law, the Customer Agreement, and this Agreement; (v) OWE has received a true, correct, complete, and signed Representative Certificate for each Representative; (vi) all Representatives will correctly identify themselves as agents of Contractor and never as an agent or contractor of OWE; (vii) all Representatives will comport themselves in a polite and cooperative manner when dealing with any and all Customers; (viii) Contractor shall timely pay any and all wages to employees or other amounts due and owing under any contract; (ix) Contractor will notify OWE immediately, in writing, of any Representatives who have been terminated or subject to any disciplinary action; and (x) Contractor will ensure that all Representatives are covered under Contractor's Insurance, including any applicable social benefit Laws such as workers' compensation and applicable state disability insurance. Nothing in this Section 4(u) shall create a relationship between OWE and any

8



Representative of Contractor, including any employment or agency relationship. OWE reserves the right, in its sole and absolute discretion, to terminate, disassociate, remove, or deny access to any Representative of Contractor, at any time, for any reason.

    **(v)**    <u>**No Subcontractors.**</u>  Other than the subcontractors listed in this Agreement or specifically authorized by OWE in writing after the Effective Date (each, an "Approved Subcontractor"), Contractor shall not use any person, entity, group, association, subcontractor, or any other Representative in the performance of the Services or any of its obligations under this Agreement unless such person is a natural person and an agent of Contractor. Other than Approved Subcontractors, Contractor shall not and shall ensure none of its Representatives solicits, entices, or contracts with any third-party to perform any aspect of the Services or any other obligation of Contractor in this Agreement. Contractor acknowledges and agrees that it shall be fully responsible for the acts, omissions, breaches of this Agreement, and violations of law of all Representatives, Approved Subcontractors, or any other person or entity performing any activities on behalf of Contractor. Contractor hereby agrees to indemnify, defend, and hold OWE harmless for the acts and omissions of all of its Representatives, including all Approved Subcontractors.

    **(w)**    <u>**Telephone and Text Messaging Communications.**</u>  To the extent that Contractor engages in any activity involving telephone or text messaging communication with a Consumer, Contractor agrees that it will first obtain the express written consent of each consumer before it initiates any communication over or through the telephone or text messaging. Contractor agrees that it will strictly comply with all applicable laws, including Federal and state do-not-call laws. Contractor will strictly comply with OWE's written policies and procedures regarding the foregoing. Contractor will never use an automatic telephone dialing system to call or send a text message to any Consumer unless first approved in a writing by OWE.

    **(x)**    <u>**Liens.**</u>  Contractor agrees that it will not file a Lien and it will not permit any of its Representatives to file a Lien, on or against any jobsite, Customer's property, the System, OWE, or any of OWE's Affiliates. If any Lien is filed in violation of this Agreement, then Contractor agrees that it will indemnify, defend, and hold harmless for any and all Losses incurred by OWE, Customer, or any other affected party. As a condition of OWE's obligation to make any payment to Contractor under this Agreement, including pursuant to any Work Order, Contractor shall execute and deliver to OWE one or more Lien release and waivers on a acceptable to OWE (each, a "Lien Waiver"). OWE may withhold any and all payments under this Agreement to the extent Contractor fails to deliver a Lien Waiver as required hereunder or reasonably requested by OWE. Within five (5) Business Days following payment by OWE for a Work Order (subject to OWE's setoff rights under this Agreement), Contractor shall deliver to OWE an Unconditional Waiver and Release Upon Final Payment, on a form acceptable to OWE.

**5.**    **RESTRICTIVE COVENANTS:**  Each of the restrictive covenants set forth in <u>Exhibit D</u> shall apply to Contractor and OWE, as applicable.

**6.**    **REPRESENTATIONS, WARRANTIES, AND COVENANTS OF OWE:** On the Effective Date and throughout the Term of this Agreement, OWE hereby represents, warrants, and covenants as follows:

Initials 

**(a)** **Organization, Power and Qualification.** (i) OWE is a limited liability company duly organized, validly existing, and in good standing in the jurisdiction of its formation; (ii) OWE is qualified and licensed to do business and is in good standing in every jurisdiction where such qualification and licensing is required; (iii) OWE has the full right, power and authority to enter into this Agreement and the other documents to be delivered in connection herewith, to grant the rights and licenses granted hereunder and thereunder and to perform its obligations under this Agreement and the other documents to be delivered in connection herewith; and (iv) the execution of this Agreement by the person whose signature is set forth at the end hereof and thereof has been duly authorized by all necessary action of OWE.

**(b)** **Authorization; No Breach.** The execution, delivery and performance of this Agreement, and any other documents delivered by OWE to Contractor hereunder, and the consummation of the transactions contemplated herein and therein, have been duly authorized by all necessary action on the part of OWE. This Agreement and any other documents delivered by OWE to Contractor hereunder constitute legal, valid and binding obligations of OWE, enforceable in accordance with their respective terms. The execution, delivery and performance by OWE of this Agreement and any other documents delivered by OWE to Contractor hereunder, and the consummation of the transactions contemplated hereby and thereby, do not and will not conflict with or result in any breach of any of the provisions of, constitute a default under, result in a violation of, give any third party the right to accelerate any obligation under, or require any authorization, consent, approval, exemption or other action by or notice to, any court, other governmental body, or other third party under, the provisions of OWE's governing documents or any indenture, mortgage, loan agreement, lease or other agreement or instrument to which OWE is a party or to which any of OWE's respective properties are subject, or any applicable law, judgment or decree to which OWE is subject.

**(c)** **Licensure and Registrations.** OWE currently holds, and will continue to maintain during the Term, any and all Licenses necessary for it to conduct its business.

**(d)** **Compliance with Laws.** OWE has complied and will continue to comply, in all material respects, with applicable law.

**(e)** **Support.** OWE will (i) provide training and training materials for Contractor; (ii) provide Contractor with access to information technology of OWE necessary to perform the Services; and (iii) provide Contractor with customer and account management support during normal business hours.

## 7. TERM AND TERMINATION

**(a)** **Term.** This Agreement shall commence as of the Effective Date and shall continue for a period of one year, which will automatically extend for successive periods of the same length (each, a "Renewal Term"), subject to the early termination rights of either Party set forth in this Agreement (the "Term"). Either Party may terminate this Agreement for convenience upon thirty (30) calendar days' prior written notice to the other Party. OWE may terminate this Agreement immediately upon the occurrence of a Contractor Default.

Initials 

**(b)**    **Contractor Defaults.**    Each of the following shall be considered a "Contractor Default" under the terms of this Agreement: (i) Contractor or any Representative failing to maintain in good standing any required License or other government approval required to perform the Services; (ii) Contractor's material breach of this Agreement that remains uncured after ten (10) calendar days prior written notice; (iii) Contractor's or its Representative's fraud, willful misconduct or gross negligence in performance of its obligations under this Agreement; (iv) Contractor files a petition in bankruptcy or is adjudicated bankrupt or insolvent, or makes an assignment for the benefit of creditors, or an arrangement pursuant to any bankruptcy or insolvency law, or discontinues or dissolves its business, or if a receiver is appointed for such Party or for such Party's business and such event is not discharged within thirty (30) calendar days of such appointment; (v) in the event of any change in the ownership or legal form of Contractor's organization, Contractor attempts to make or makes any assignment of the rights under this Agreement, or the sale, consolidation, or merger of Contractor's organization with, or into, another person or entity; or (vi) a material adverse change in the financial condition or creditworthiness of Contractor as determined by OWE in its reasonable discretion.

**(c)**    **Remedies.**    Upon the occurrence of a Contractor Default, OWE may (in its sole and absolute discretion) exercise any of the following remedies: (i) immediately suspend Contractor's access to any and all software used by Contractor; (ii) terminate this Agreement; (iii) withhold any amounts due and owing by OWE to Contractor hereunder, and offset, to the extent of any damages and expenses of OWE resulting from, or relating to, such Contractor Default; (iv) demand that Contractor pay Liquidated Damages; and/or (v) exercise any other remedy available to OWE under applicable law.

**(d)**    **Contractor's Obligations upon Expiration or Termination.**    Upon the expiration (or earlier termination of this Agreement) or notice of termination, Contractor shall immediately (i) cease to perform any of the Services; (ii) cease to represent itself as affiliated in any way with OWE; (iii) cease the marketing, promotion, selling, or acquiring of new customers in relation to the Products for or on behalf of OWE; (iv) return to OWE any and all documents and tangible materials (including any copies thereof) containing, reflecting, incorporating, or based on any information provided or made available to Contractor by OWE; and (v) cease and terminate all use of any kind whatsoever of OWE trademarks or other copyrighted and/or protected materials.

**(e)**    **Survival of Terms.**    All terms and conditions set forth in this Agreement, which by their terms, are intended to, or in order to give proper effect to their intent should, survive the termination or expiration of this Agreement, shall survive such termination and expiration.

**(f)**    **Cumulative Remedies.**    All rights and remedies provided in this Agreement are cumulative and not exclusive, and the exercise by either Party of any right or remedy does not preclude the exercise of any other rights or remedies that may now or subsequently be available at law, in equity, by statute, in any other agreement between the Parties, or otherwise.

**(g)**    **Equitable Remedies.**    Contractor acknowledges and agrees that (i) a breach or threatened breach by Contractor of any of the obligations under the Agreement, including (without limitation) the Restrictive Covenants set forth on Exhibit D, would give rise to irreparable harm to OWE and its Affiliates for which monetary damages would not be an adequate remedy; (ii) in the event of a breach or a threatened breach by Contractor of any such obligations, OWE shall, in

11

Initials  SMl

addition to any and all other rights and remedies that may be available to OWE at law, at equity, or otherwise in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance, and any other relief that may be available from a court of competent jurisdiction, without any requirement to post a bond or other security, and without any requirement to prove actual damages or that monetary damages will not afford an adequate remedy; and (iii) Contractor shall be liable for all costs, expenses and fees (including court costs and attorneys' fees) in connection with any action instituted by OWE or any of its Affiliates seeking to remedy, enforce its rights, and/or enjoin any violation of this Agreement. Contractor acknowledges and agrees that it will not oppose or otherwise challenge the appropriateness of equitable relief or the entry by a court of competent jurisdiction of an order granting equitable relief, in either case, consistent with the terms of this paragraph.

## 8.     GENERAL PROVISIONS:

(a)     **Indemnification.**  Contractor shall indemnify, defend, and hold harmless OWE and its Affiliates, their respective Representatives, designees and their successors and assigns (collectively, the "OWE Indemnified Parties", and each, a "OWE Indemnified Party"), from and against, any and all losses, damages, liabilities, deficiencies, claims, actions, judgments, settlements, interest, awards, fees, penalties, fines, costs (including costs for experts and investigations), or expenses of whatever kind, including attorneys' fees, fees and the costs of enforcing any right to indemnification under this Agreement, and the cost of pursuing any insurance providers (collectively "Losses"), incurred by any OWE Indemnified Party, relating to, arising out of, or resulting from:  (i) any act or omission by Contractor; (ii) any breach of the Agreement by Contractor; (iii) any negligence or willful misconduct by Contractor; (iv) any actual or threatened violation of applicable law by Contractor; (v) any infringement, misuse, or misappropriation of any intellectual property of another person; and (vi) any failure by Contractor to obtain and maintain at all times in good standing all required licenses.  Contractor's duty to indemnify hereunder includes the duty to indemnify OWE Indemnified Parties for all Losses incurred by any OWE Indemnified Party in connection with the matter that is the subject of the indemnification.

(b)     **Drug Testing.**  Contractor acknowledges and agrees that it may be required to submit to random drug and/or alcohol screening test while performing the Services under this Agreement.  Contractor agrees that, upon the request of OWE, Contractor will promptly, without notice, submit to testing for the use of drugs, alcohol and/or controlled substances.  Contractor agrees that the results of any blood and/or urine sample test results may be revealed to OWE for its use and evaluation.  Contractor acknowledges and understands that any refusal by Contractor to submit to such testing can be grounds for immediate termination.  Additionally, a positive test result from any drug and/or alcohol test may be grounds for immediate termination.

(c)     **Assignment.**  Contractor's obligations under this Agreement may not be assigned or transferred to any other person, firm, or corporation without the prior written consent of OWE.

(d)     **Limitation of Liability.**  Except for Contractor's indemnification obligations under this Agreement, and/any breach or violation of the restrictive covenants set forth in this Agreement by Contractor, and/or a Party's gross negligence or willful misconduct, in no event shall either Party, its Affiliates, or their respective Representatives be liable for:  consequential, indirect,

12

Initials ⟦SML⟧

incidental, special, exemplary, punitive, or enhanced damages, lost profits or revenues or diminution in value, arising out of or relating to any breach of this Agreement, regardless of (1) whether such damages were foreseeable, (2) whether or not it was advised of the possibility of such damages, and (3) the legal or equitable theory upon which the claim is based, and notwithstanding the failure of any agreed or other remedy of its essential purpose. Except for OWE's gross negligence or willful misconduct, to the maximum extent permitted under applicable law, OWE's aggregate liability arising out of or relating to this Agreement, whether arising out of or relating to breach of contract, tort, or otherwise, shall not exceed the total of the amounts actually paid by OWE to Contractor pursuant to this Agreement.

      **(e)**    **Notices.**  All notices, requests, demands, and other communications required or permitted to be given under this Agreement by any Party shall be in writing delivered to the following addresses:

      IF for OWE:
      OURWORLDENERGY, LLC
      7720 W. Encinas Lane
      Phoenix, AZ 85043

      IF for Contractor: (please enter your name and mailing address)

Name:   Sunsci Media LLC
Address:  65 Merrimon Ave #1244
         Asheville, nc,28801

or to such other address as any Party may designate from time to time by written notice to the other Party. Each such notice, request, demand, or other communication shall be deemed given and effective, as follows: (i) if sent by hand delivery, upon delivery; (ii) if sent by first-class U.S. Mail, postage prepaid, upon the earlier to occur of receipt or three (3) Business Days after deposit in the U.S. Mail; (iii) if sent by a recognized prepaid overnight courier service, one (1) day after the date it is given to such service; (iv) if sent by facsimile, upon receipt of confirmation of successful transmission by the facsimile machine; and (v) if sent by email, upon acknowledgement of receipt.

      **(f)**    **Expenses.**  Each Party will bear the costs and expenses incurred by such Party in negotiating and executing this Agreement. Unless otherwise provided herein or agreed to in writing by OWE, Contractor will be responsible for all costs related to the Services, Work, equipment, uniforms, training, project management, call centers, customer care, information technology systems, software, and all other of its obligations under this Agreement.

      **(g)**    **Work Product/Intellectual Property.**  Contractor hereby agrees to grant, release, and assign to OWE, all right, title, and interest in all copyrights, patents, trade secrets, and other intellectual property arising out of the Services, including, but not limited to, all patentable and non-patentable inventions, discoveries, ideas, processes, and materials, created under this Agreement; that is, for avoidance of uncertainty, all products or inventions created by Contractor arising from or reasonably related to Contractor's Services under this Agreement, shall be and become irrevocably the property of OWE. Upon written notice by OWE, Contractor will provide,

13

Initials 

execute, and return to OWE whatever documents, information, and materials are in Contractor's possession or reasonably available to Contractor to enable OWE to protect its copyrights, patents, trade secrets, and other intellectual property rights in any materials produced as a result of this Agreement. Any equipment, software (including relevant passwords and codes), parking or other passes, badges, or key cards that were provided to Contractor by OWE for use under the terms of this Agreement will also be returned to OWE within five (5) business days after termination of this Agreement.

**(h)** **Confidential Information:** Contractor acknowledges that during the term of this Agreement, Contractor will have access to various trade secrets, inventions, processes, information, records, and products owned by OWE and/or used by OWE in connection with the operation of its business including, without limitation, customer lists, accounts, software and procedures. Contractor agrees that Contractor will not disclose any of these materials or information, directly or indirectly, or use any of them in any manner, either during the term of this Agreement or at any time thereafter, except as required in the course of this Agreement with OWE for OWE's benefit.

**(i)** **Warranties and Liabilities of Contractor.** In performing the Services under this Agreement, Contractor shall only use authorized materials created by or for use by OWE, and shall not use the copyrighted works of third-parties. Contractor shall defend, indemnify and hold OWE harmless from liability that OWE is exposed to as a result of Contractor knowingly or unknowingly using unauthorized materials in the performance of the Services under this Agreement.

**(j)** **Binding Effect.** This Agreement shall be binding upon, and inure to the benefit of, the Parties to this Agreement and their respective heirs, executors, administrators, agents, representatives, successors, assigns, beneficiaries, trustees, family members, and affiliates (meaning any family relation of or entity owned or controlled by the preceding entity or individuals).

**(k)** **Waiver.** No breach of any provision hereof can be waived unless in writing by the Party against whom enforcement of the waiver is sought. Waiver of any one breach of any provision(s) hereof shall not be deemed to be a waiver of any other breach of the same or any other provision(s) hereof. Failure on the part of any Party hereto to complain of any act or failure to act of any other Party or to declare any Party in default hereunder, irrespective of how long such failure continues, shall not constitute a waiver of the rights of such Party hereunder.

**(l)** **Severability.** If any provision of this Agreement is ultimately held to be invalid, illegal, or unenforceable, the validity, legality, and enforceability of the remaining provisions shall not be in any way affected or impaired thereby.

**(m)** **Amendments and Waivers.** This Agreement may be amended, amended and restated, supplemented, or modified only by an instrument in writing signed by all of the Parties. Each Exhibit (including the Information Sheet) may be amended, modified, and/or supplemented at any time by OWE by delivering a revised written Information Sheet or Exhibit to Contractor (including via email) (each, a "Revised Exhibit"). Each Revised Exhibit shall be effective and binding upon Contractor and OWE after seven (7) calendar days of its delivery, unless such

Initials _SML_

Revised Exhibit has a specifically-identified later effective date. After the effectiveness thereof, the Revised Exhibit shall (i) supersede the prior applicable Exhibit then in-effect; and (ii) apply to all Qualified Customers and Projects that achieve Install Complete. From time to time, OWE may, in its sole and absolute discretion, modify in whole or in part <u>Schedule 1</u> without the consent of or notice to Contractor or any of its Representatives. With respect to OWE, only the individuals with the title of Chief Executive Officer, Chief Financial Officer, Chief Revenue Officer, or Chief Legal Officer are authorized to execute any Amendment. Contractor acknowledges and agrees that any purported amendment, instrument, or other writing intended to modify or supplement in any way this Agreement signed by any person other than those listed individuals shall be unenforceable and nonbinding against OWE.

(n) **Applicability and Incorporation of Schedules and Exhibits.** Each of the Exhibits and Schedules referenced herein are hereby incorporated by reference and shall each and collectively form an integral part of this Agreement.

(o) **Entire Agreement.** This Agreement, along with each of the Exhibits and Schedules, which have been expressly incorporated herein, constitute the entire agreement among the Parties and supersede all prior oral and written negotiations, communications, discussions and correspondence pertaining to the subject matter hereof.

(p) **Choice of Law.** This Agreement shall be construed in accordance with, and be governed by, the laws of the State of Arizona.

(q) **Submission to Jurisdiction.** Each Party irrevocably consents and agrees that any action, proceeding, or other litigation by or against the other Party with respect to any claim or cause of action based upon or arising out of or related to this Agreement, shall be brought and tried exclusively in the federal or state courts located in the State of Arizona, and any such legal action or proceeding may be removed to the aforesaid courts. By execution and delivery of the Agreement, each Party accepts, for itself and in respect of its property, generally and unconditionally, the exclusive jurisdiction of the aforesaid courts. Each Party hereby irrevocably waives (i) any objection which it may now or hereafter have to the laying of venue with respect any such action, proceeding, or litigation arising out of or in connection with this Agreement brought in the aforesaid courts; and (ii) any right to stay or dismiss any such action, proceeding, or litigation brought before the aforesaid courts on the basis of forum nonconveniens. Each Party further agrees that personal jurisdiction over it may be affected by service of process by certified mail, postage prepaid, addressed as provided in Section 8(e) of this Agreement, and when so made shall be as if served upon it personally within the State of Arizona.

(r) **Jury Waiver.** TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, EACH PARTY HEREBY WAIVES ITS RIGHTS TO A TRIAL BY JURY WITH RESPECT TO ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF OR RELATED TO THIS AGREEMENT, IN ANY ACTION, PROCEEDING OR OTHER LITIGATION OF ANY TYPE BROUGHT BY ANY PARTY AGAINST THE OTHER PARTY, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS, OR OTHERWISE. EACH PARTY HEREBY AGREES THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE TRIED BY A COURT TRIAL WITHOUT A JURY. WITHOUT LIMITING THE

15

Initials 

DocuSign Envelope ID: 999AA3AD-7675-4E96-9292-ED89FD44766A

FOREGOING, THE PARTIES FURTHER AGREE THAT THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY IS WAIVED BY OPERATION OF THIS SECTION AS TO ANY ACTION, COUNTERCLAIM OR OTHER PROCEEDING WHICH SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY OF THIS AGREEMENT, OR ANY PROVISION HEREOF. THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS, OR MODIFICATIONS TO THIS AGREEMENT.

**(s)** **Force Majeure.** Upon the occurrence and during the continuance of a Force Majeure Event, a Party will be excused from performance and shall not be considered to be in breach or default with respect to any obligation hereunder; so long as: (i) such Party gives the other Party prompt written notice describing the details of the Force Majeure Event as soon as is reasonably practicable after becoming aware of the occurrence of the Force Majeure Event; (ii) the suspension of performance is of no greater scope and of no longer duration than is reasonably required by the Force Majeure Event; (iii) no obligations of affected Party that arose before the occurrence of the Force Majeure Event causing the suspension of performance shall be excused as a result of such Force Majeure Event, unless and only to the extent that the performance of such obligations is impaired by the Force Majeure Event; (iv) the Party uses diligent best efforts to overcome or mitigate the effects of the Force Majeure Event; and (v) when the Party is able to resume performance of its obligations under this Agreement, such Party shall give the other Party written notice to that effect and shall promptly resume performance hereunder. Notwithstanding the foregoing, a Party will not be relieved of any obligation to pay money in connection with this Agreement, including (without limitation): payment of any Fee by OWE, payment of any Liquidated Damage or reimbursement by Contractor, or any indemnification obligation of either Party.

**(t)** **No presumption Against the Drafter.** The Parties have cooperated in the drafting and preparation of this Agreement. In any construction to be made of this Agreement, no presumption shall arise to any Party by virtue of participation in the drafting hereof.

**(u)** **Advice of Counsel.** The Parties to this Agreement acknowledge and represent that they have consulted with legal counsel of their choosing, or they have had the opportunity to consult with legal counsel of their choosing, before executing this Agreement, that they understand the meaning of this Agreement, and that they expressly consent that this Agreement shall be given full force and effect according to each and all of its express terms and provisions, including, without limitation, those relating to the release of unknown and unsuspected claims, demands, and causes of action.

**(v)** **Counterparts.** The Parties may execute this Agreement in counterparts, and when each Party has signed and delivered one such counterpart or copy thereof, each counterpart or copy shall be deemed an original and, when taken together with the other signed counterparts or copies, shall constitute one integrated contract, which shall be binding upon and effective as to all Parties. PDF signatures of the Parties shall have the same effect as original signatures.

**(w)** **Attorneys' Fees and Costs.** The Parties understand and agree that in the event a dispute arises between the parties relating, in any way, to this Agreement or the performance of

16

Initials ___

the Agreement, including issues of interpretation or claimed breach, then the prevailing party in such proceeding shall be entitled to an award of reasonable attorneys' fees and costs, including expert witness fees and costs, relating to that litigation.

**(x)**     **Waiver.**     No waiver of any provision of this Agreement shall be effective unless made in writing and signed by the waiving Party. The failure of either Party to require the performance of any term or obligation of this Agreement, or the waiver by either Party of any breach of this Agreement, shall not prevent any subsequent enforcement of such term or obligation or be deemed a waiver of any subsequent breach.

**[SIGNATURES ON NEXT PAGE]**

17

Initials 

IN WITNESS WHEREOF, both OWE and Contractor have hereunto accepted and executed this Agreement as of the date indicated below.

**CONTRACTOR**

Dated: _3/25/2024_____

By: _Sunsci Media LLC_____

**OUR WORLD ENERGY, LLC**

Dated: _3/25/2024_____

By: _Josh Morton_____

Print Name: _Josh Morton_____

Its: _Director of Business Development_____

18

Initials

**EXHIBIT A**

**DEFINITIONS & RULES OF INTERPRETATION**

## 1.    DEFINITIONS

1.1. "*Affiliate*" means, with respect to either Party, a person or entity that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Party. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such person or entity, whether through the ownership of voting securities, by contract or otherwise.

1.2. "*Agreement*" means this Sales Service Agreement for Independent Contractor, collectively with the NDA, all Exhibits and Schedules, and all other documents incorporated herein by reference.

1.3. "*Applicable Law*" means any statute, law, ordinance, regulation, Prudent Industry Practices, rule, code, constitution, treaty, common law, governmental order, or other requirement or rule of law of any governmental authority, including (without limitation): (i) Federal and state privacy, data security and credit reporting laws, such as the Fair Credit Reporting Act, 15 U.S.C. 1681 et seq., and Regulation V, 12 C.F.R. § 1022.1 *et seq.*; (ii) Federal and state unfair, deceptive or abusive acts and practices laws, such as the Dodd-Frank Act, 12 U.S.C. § 5531 *et seq.* and the Federal Trade Commission Act, 15 U.S.C. § 45 *et seq.*; (iii) Federal and state telecommunications laws, such as the Telephone Consumer Protection Act, 47 U.S.C.§ 227 *et seq.* and implementing regulations, 16 C.F.R. § 310.1 et seq. and 47 C.F.R. § 64.1200; (iv) Federal and state email communication laws, such as the CAN-SPAM Act, 15 U.S.C. § 7701 *et seq.* and implementing regulations, 16 C.F.R. § 316.1 *et seq.* and 47 C.F.R. § 64.3100 *et seq.*; (v) Federal and state advertising and marketing laws, such as the Federal Trade Commission Act, 15 U.S.C. § 41, *et seq.* and associated FTC Guides and Policy Statements; (vi) Federal and state electronic transactions laws and electronic contracting laws, such as state Uniform Electronic Transactions Acts and the Electronic Signatures in Global and National Commerce Act, 15 U.S.C. § 7001 *et seq.*; (vii) the SEIA Solar Business Code; (viii) Direct Marketing Association's Business Code Articles 47 and 48; (ix) Federal and state home improvement and solar disclosure laws, such as California's Business and Professions Code § 7159 *et seq.*; and (x) Federal and state door-to-door solicitation laws, such as 16 CFR Part 429 *et seq.*

1.4. "*Authority Having Jurisdiction*" or "*AHJ*" means a Government Authority responsible for issuance of Permits.

1.5. "*Business Day*" means any day, other than a U.S. Federal Holiday or a day on which banking institutions in the State of Arizona are authorized or obligated by Applicable Law or executive order to be closed.

1.6. "*Code of Conduct*" means those policies and procedures of OWE, attached hereto as Exhibit B, as may be modified from time to time by OWE in its sole and absolute discretion.

1.7. "*Competitor*" means any person or entity that provides products and/or services that are substantially similar to or competitive with those offered or provided by OWE or any of its Affiliates at any time during the Restricted Period, including (without limitation) companies, persons, or entities in the business of selling (i) residential and commercial photovoltaic or solar thermal products or services; (ii) residential or commercial energy storage and battery products

19

Initials 

and services; (iii) energy management and home automation; (iv) electric vehicle chargers and services; (v) demand response and other distributed energy resources; and (vi) residential and commercial security and protection related products and services, collectively with any Affiliates, contractors, or dealers of any of the foregoing.

1.8. "*Consumer*" means any natural person, including (without limitation): a Customer, an Eligible Customer, and a Qualified Customer.

1.9. "*Customer*" means each natural person to whom Contractor markets, promotes, solicits, and/or offers for sale the Products, whether or not such person qualifies as a Qualified Customer or executes a Customer Agreement.

1.10. "*Customer Agreements*" means OWE's standard form of Power Purchase Agreement, Solar System Lease Agreement, System Purchase Agreement, Ancillary Products Agreement, Maintenance Services Agreement, or other agreements between OWE and a Qualified Customer, in each case, as may be modified from time to time by OWE in its sole and absolute discretion.

1.11. "*Eligible Customer*" means a natural person that meets all of the following criteria: (i) over eighteen (18) years of age; (ii) is a United States citizen; (iii) own the house upon which the System will be Installed; (iv) such house is a single family detached house and is not part of a multi-family dwelling; (v) such house is located in the Territory; (vi) has broadband internet available at the house; (vii) the structure, roof, and electrical distribution systems of the house are in good condition and capable of supporting the System; (viii) Contractor has no reason to believe that such person will not satisfactorily passed all credit underwriting criteria of OWE and its financing partners; (ix) the house does not use electricity to heat a swimming pool; and (x) is not a Rejected Customer; provided that OWE may revise the required eligibility requirements for a Customer at any time in its sole and absolute discretion.

1.12. "*Equipment*" means Major Equipment, BOS Components, the Products, and any other material, hardware, or component part of a System or a Project.

1.13. "*Fees*" means those amounts owed to Contractor set forth on Schedule 2, as may be reduced by any amount owed by Contractor to OWE, including (without limitation): liquidated damages, reimbursements, repaid advances, and indemnification obligations.

1.14. "*Force Majeure Event*" means the occurrence of any act or event beyond the reasonable control of the Party affected that prevents the affected Party from performing its obligations under this Agreement, in full or part, if such act or event is beyond the reasonable control of, and not the result of the acts or omissions of, the affected Party and such Party has been unable to overcome such act or event with the exercise of due diligence (including the expenditure of reasonable sums), to the extent caused by flood, earthquake, named storm, fire, lightning, epidemic, war, riot, sabotage, terrorism, or acts of god. Notwithstanding the foregoing, Force Majeure Events shall not include labor strikes or shortages, inclement weather, mechanical or equipment failures, supply shortages or delays, imposition of taxes, tariffs, or other charges, change in Applicable Law or requirements of Government Authorities, or the acts or omissions of a Customer.

1.15. "*Governmental Authority*" means any federal, commonwealth, state, or local regulatory agency or other governmental agency or authority having jurisdiction over a Party, a Representative of a Party, a consumer, a Customer, Qualified Customer, or the transactions contemplated by this Agreement or the Customer Agreement.

1.16. "*Install*", "*Installed*", or "*Install Complete*" means with respect to a System and Project (i) the System, all Products, and related components are fully and physically installed; (ii) the System is interconnected to the Property's electrical system; (iii) the System has passed the

Initials 

Commissioning Protocol; (iv) the System is communicating with OWE's remote monitoring platform; (v) all Deliverables have been provided to OWE; and (vi) the Project complies in all respects with the Specifications.

1.17. "*Lead*" means an Eligible Customer that has expressed interested in purchasing one or more of the Products, first generated by Contractor in performing the Services under this Agreement, and provided to OWE

1.18. "*Lien*" means any lien, mortgages, pledge, security interest, restriction, prior assignment, claim, any and all other encumbrances of every kind or character, including the claims of any bank, creditor, or taxing authority.

1.19. "*Liquidated Damage*" or "*LD*" means the payment of money by Contractor upon the occurrence of a specified event or the lapse of time, including (without limitation): delay liquidated damages, termination fees, and other amounts specified on Schedule 1 and Schedule 2.

1.20. "*Maintenance Services Agreement*" means OWE's standard form solar system maintenance services agreement, between OWE and a Qualified Customer, as may be modified from time to time by OWE in its sole and absolute discretion.

1.21. "*Marketing Requirements*" means that certain OWE Branding and Marketing Guidelines (as more particularly described on Exhibit C), as may be updated from time to time by OWE in its sole and absolute discretion.

1.22. "*New Contractor Checklist*" means the checklist found on the OWE Dealer Portal; provided that OWE may revise the checklist items at any time in its sole and absolute discretion.

1.23. "*Party*" means each of OWE and Contractor.

1.24. "*Permit*" means an electrical, building, or other permit or approval required and issued by an AHJ in relation to installation of a System or any Product.

1.25. "*Power Purchase Agreement*" or "*PPA*" means OWE's standard form of solar power purchase agreement, between OWE and a Qualified Customer, as may be modified from time to time by OWE in its sole and absolute discretion.

1.26. "*Products*" means a System and such other products made available by OWE to a Customer from time to time, including (without limitation): (i) electrical service upgrades; (ii) structural upgrades; (iii) reroofing; (iv) battery storage systems; and (v) electric vehicle chargers; provided that OWE may revise the eligible Products at any time in its sole and absolute discretion.

1.27. "*Project*" means the System, other Products, and Customer Agreement for a particular Customer at a specific Property.

1.28. "*Project Document*" means all required documentation other than a Customer Agreement required to install, inspect, commission, receive PTO, and activate a Project, including (without limitation): permits, HOA approval, net metering agreements, interconnection agreements, inspection notices, rebate forms, incentive forms, tax credit forms, and SREC documentation.

1.29. "*Property*" means the real property upon which the System and other Products will be installed, identified in the applicable Customer Agreement.

1.30. "*Prudent Industry Practices*" means, with respect to each System and Project, (a) the highest and most prudent standards of performance within the residential solar photovoltaic power generation industry in the relevant Territory and throughout the United States; and (b) those practices, methods, acts, equipment, specifications and standards of safety and performance, of which there may be more than one, and as the same may change from time to time, as are used in operating solar energy systems of a type and size similar to the Systems and in the same geographic region as the System that, at a particular time, by highest performing and most prudent participants

21

Initials _SML_

in the solar industry that, at a particular time, in the exercise of reasonable judgment in light of the facts known or that reasonably should have been known at the time a decision was made, would be expected to accomplish the desired result in a manner consistent with Applicable Law, standards, equipment manufacturer's recommendations, reliability, safety, environmental protection, efficiency, economy and expedition.

1.31. "*Qualified Customer*" means an Eligible Customer that (i) meets the minimum credit score and other underwriting criteria that is required by OWE in its sole and absolute discretion; and (ii) is not a Rejected Customer; provided that OWE may revise the qualifications required of a Customer at any time in its sole and absolute discretion.

1.32. "*Reimbursements*" means any and all amounts owed by Contractor to OWE relating to or arising from (i) costs incurred by OWE that should have been paid by Contractor; or (ii) amounts paid by OWE to Contractor that it did not earn, in each case pursuant to the terms of this Agreement, including (without limitation): the repayment of any Advances and all Reimbursements described on Schedule 2.

1.33. "*Rejected Customer*" means a customer that (i) fails to satisfy any of the requirements of a Eligible Customer at the time of originated, submitted, or for which payment was requested by Contractor; (ii) fails to satisfy any of the requirements of a Qualified Customer at the time of originated, submitted, or for which payment was requested by Contractor; (iii) is originated, submitted by Contractor, or for which Contractor requests payment during a time when Contractor was in breach of the Agreement or a Contractor Default had occurred; (iv) the Customer Information is inaccurate, incomplete, unavailable, or disconnected; (v) the Customer is already a Customer of OWE; (vi) the Customer is a duplicate of a Customer previously provided by Contractor; and/or (vii) the Credit Authorization, the Customer Agreement, the Project Documents, or any other Deliverable is incomplete or completed incorrectly; provided that OWE may revise the reason or cause for rejection of a Customer at any time in its sole and absolute discretion.

1.34. "*Representatives*" means, with respect to a Party, such Party's and its Affiliates' employees, officers, directors, managers, equity holders, agents, attorneys, contractors, third-party advisors, successors, and permitted assigns.

1.35. "*Representative Certificate*" means the Form of Representative Certificate found on the OWE Dealer Portal; provided that OWE may revise the form or Representative Certificate at any time in its sole and absolute discretion.

1.36. "*Requirements*" means any and all terms, conditions, conditions precedent, and other requirements required of Contractor in connection with any lead, Customer, or Project, including (without limitation) the requirements described and defined on Schedule 1; provided that OWE may revise the Requirements at any time in its sole and absolute discretion.

1.37. "*Services*" means the obligations of Contractor under this Agreement as described in this Agreement and Schedule 1.

1.38. "*Set-Off*" means any amount owed by Contractor to OWE under this Agreement that OWE sets-off, deducts, or withholds from any payment by OWE to Contractor, pursuant to Section 3(e).

1.39. "*Signed Customer Agreement*" means a Customer Agreement that (i) all fields are accurately completed by the Qualified Customer and Contractor (as applicable); (ii) all initials, checkboxes, and signatures have been completed by the Qualified Customer; (iii) the applicable licensed Representative of Contractor signed the Customer Agreement; and (iv) the applicable representative of OWE has countersigned the Customer Agreement.

Initials SML

1.40. "*Software*" means the software, computer systems, and other electronic tools owned or provided by OWE, including the Sales Tools, the D&E Tools, and the Install Tools.

1.41. "*Solar System Lease Agreement*" or "*Lease*" means OWE's standard form of solar system lease agreement, between OWE and a Qualified Customer, as may be modified from time to time by OWE in its sole and absolute discretion.

1.42. "*System*" means a photovoltaic system comprised of Major Equipment and BOS Components.

1.43. "*System Size*" means, with respect to a System, the nameplate capacity of such System represented in Watts.

1.44. "*Territory*" has the meaning set forth on the first page set forth above.

1.45. "*Trademarks*" means all trademarks, trade names, corporate names, company names, business names, fictitious business names, Internet domain names, service marks, certification marks, collective marks, logos, other source or business identifiers, designs and general intangibles of OWE, including (without limitation): "One World Energy", "Our World Energy", and "OWE".

1.46. "*Watt*" means watts DC STC or nameplate rating of the applicable System or Solar Panel.

1.47. "*Work Order*" means a request for Work by OWE including a NTP, on OWE's standard form, which may be transmitted via e-mail or other electronic means to Contractor.

## 2.    RULES OF INTERPRETATION.

2.1. Except as otherwise expressly provided in this Agreement, each Party hereby agrees and acknowledges that the following rules of interpretation shall apply to this Agreement: (i) the singular includes the plural and the plural includes the singular; (ii) the word "or" is not exclusive; (iii) a reference to a law or governmental rule includes any amendment or modification to such law or rule, and all regulations, rulings and other laws promulgated under such law or rule; (iv) a reference to a person includes its successors and permitted assigns; (v) the words "include", "includes", and "including" are not limiting; (vi) the words "hereof," "herein", "hereunder", "hereby", and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement; and (vii) the words "will" and "shall" are used interchangeably with the same meaning. Article, Section and paragraph headings and the footers have been inserted in this Agreement as a matter of convenience for reference only, such are not a part of this Agreement, and shall not be used in the interpretation of any provision of this Agreement.

2.2. The provisions this Agreement, all Exhibits and Schedules, including any amendments thereto, and any other instruments or documents referenced or incorporated herein shall, to the maximum extent possible, be interpreted consistently, and in a manner as to supplement each other and avoid any conflict between them. However, in the event of a conflict or inconsistency, the following order of precedence shall apply: (i) amendments to this Agreement executed by the Parties pursuant to this Agreement; (ii) the Agreement; (iii) all other Schedules and Exhibits hereto; and (iv) any written communications (including e-mail) after the Effective Date.

Initials 

# EXHIBIT B

## CODE OF CONDUCT

At all times, Contractor must strictly comply with this Code of Conduct. OWE reserves the right to amend, supplement, or in any way modify this Code of Conduct at any time in its sole and absolute discretion. Any violation of this Code of Conduct by Contractor shall constitute a Contractor Default.

1.  **RECORDS RETENTION.** Contractor must maintain copies of all pertinent information relating to the Services, including any record of a Customer, and provide said copies/information promptly to OWE to hold for a period of not less than three (3) years. Contractor must comply with all applicable laws concerning records and document retention.

2.  **DATA AND CYBER SECURITY.** Contractor must protect, safeguard, and keep confidential all information concerning any customer, OWE, or any of OWE's employees, agents, or other independent contractors. In the event of any data breach, Contractor must immediately notify OWE.

3.  **TRAINING.** Contractor must successfully complete all required training to the satisfaction of OWE on the content and requirements of the Agreement, the Services, this Code of Conduct, and applicable law. As and when requested by OWE, Contractor must provide copies of training certificates for review.

4.  **ANTICORRUPTION.** Contractor must comply with all applicable anticorruption and antibribery laws such as the United States Foreign Corrupt Practices Act. Contractor must never pay or receive a bribe or receive or provide anything of value to any person (including government officials) in order to improperly influence such person.

5.  **MARKETING GUIDELINES.** Contractor must not use OWE's name, logo, or any trademark without the express written permission of OWE's Marketing and Legal Departments. Any change to marketing materials previously approved must be submitted to Finance Company for approval.

6.  **TELEMARKETING REQUIREMENTS.** Contractor must comply with all laws and registration requirements relating to telemarketing, including do-not-call requirements. Contractor is not permitted to (a) make any unsolicited call or send text messages to a cell phone number; or (b) make any call through an automated dialer (including any telephony technology that is capable of autodialing).

7.  **SEIA BUSINESS CODE.** Contractor must comply with the Solar Energy Industries Association (SEIA) Business Code, available at https://www.seia.org/initiatives/seia-solar-business-code.

Initials 

8.  **ETHICS STANDARDS.**  Contractor must strictly comply with OWE's Ethics Standards:

8.1.  <u>Creating a False Account</u>.  You may not create a false account of any kind.  This includes creating an account under a fictitious name or the name of someone who has not expressly agreed to have an account created in their name.  All customer agreements must be signed by the homeowner.  The homeowner's spouse or domestic partner may also sign a PPA, Lease or Cash SPA, but only if the homeowner also signs.  No person who is not a homeowner or homeowner's spouse may sign a customer agreement.

8.2.  <u>Notice of Cancellation</u>.  You must orally notify customers that they have the right to cancel the contract as required by state and federal law.  In doing so, you may not state that the contract is "not binding" or anything to that effect; the contract is binding unless the customer exercises his or her right to cancel.

8.3.  <u>Misrepresentations Regarding Relationships with Utilities</u>.  You may not say or do anything that may reasonably cause a customer to believe you or OWE is affiliated with a utility company.  You do not work for or in partnership with any utility.  Other than net metering and interconnection, there is no relationship between OWE and a utility company.

8.4.  <u>Forgery</u>.  You may not sign a customer agreement or check a signature box in a customer agreement on a customer's behalf.  Checking a signature box for a customer, or leading them to believe it means something it doesn't, is the same as forging their signature.  Similarly, you may not knowingly allow any person to sign or check a signature box in a customer agreement on behalf of another person.

8.5.  <u>Running Customer Credit Without Consent</u>.  Obtaining a consumer report can negatively impact a customer's credit and, consequently, should only be done with a customer's express authorization, appropriate for the circumstances (or other circumstances expressly approved by OWE).  You must never allow another person, even a spouse or partner, to authorize a credit check on behalf of someone else.

8.6.  <u>Providing False Information</u>.  You may not provide false or inaccurate information concerning any customer in order to progress an account. You must use the customer's correct email address and may not use personal or company devices to access that account.  If a customer does not have an email address, they must create one on their own device and be capable of accessing it without our assistance.  It is also unethical to submit incorrect usage, utility, or payment information.

8.7.  <u>Contract Terms</u>.  You may not promise customers anything that contradicts the terms of their agreement, including any promise concerning: (a) energy production (except in a lease); (b) a customer's ability to terminate the agreement after the system is installed; and/or (c) the cost to remove the system temporarily.  You may

Initials 

not enter into side deals with customers that are not memorialized in written agreements approved by OWE. And nothing is free!

8.8.    <u>Sharing Confidential Information</u>. You may not share confidential information with anyone outside of OWE or allow anyone to do work on your behalf without the prior written consent of OWE. This includes allowing anyone to access OWE's information technology systems using our log-in information.

8.9.    <u>Misrepresentations Regarding Competition and Utilities</u>. You may not make untrue or misleading statements about a competitor or a utility company. For example, you may not represent that a utility's or competitor's rates will increase without data to support your claim and approval by OWE.

8.10.   <u>Elderly Customers</u>. You need to treat elderly customers (individuals over 65 years old) with extra care to ensure that they understand OWE's products and services. This includes not taking advantage of an older customer's inexperience with or lack of access to technology, or unfamiliarity with utility rates and usage.

8.11.   <u>Sales Presentation Language</u>. You cannot speak with any consumer in any language other than English and Spanish. If you would like to use Spanish in your sales presentation, then you must use a Spanish customer agreement. The same is true for English speaking customers.

8.12.   <u>Savings</u>. You may not promise any customers that they will save money through any of the products OWE offers. As a result, we must be extremely careful when discussing potential savings with consumers. You may not say or do anything to make a consumer believe that they are guaranteed to save money. OWE does not promise the availability of or eligibility for any local, state, or federal incentives or tax credits.

**9.**    **AMENDMENTS AND MODIFICATIONS.**  This Exhibit may be modified at any time by OWE by delivering a revised exhibit to Contractor to its then-current e-mail address on file with OWE. Such revised exhibit shall be effective and binding upon Contractor and OWE after seven (7) calendar days of its delivery, unless such revised exhibit has a specifically-identified later effective date.

Initials 

**Exhibit C**

**MARKETING REQUIREMENTS**

At all times throughout the Term, Contractor shall strictly comply with the requirements set forth in this Exhibit (collectively, the "Marketing Requirements").

1.  **RELATIONSHIP WITH OWE.**  At all times throughout the Term, Contractor shall disclose in a clear and conspicuous manner the independent contractor relationship between OWE and Contractor in a manner consistent with the terms of this Agreement. Contractor shall ensure that each Consumer and Customer understands the independent contractor relationships between Contractor and OWE.

2.  **GENERAL MARKETING**.  All marketing materials used by Contractor must comply in all respects with this Agreement, the Code of Conduct, the SEIA Business Code, and all applicable law.  In addition, Contractor agrees that it shall, at all times throughout the Term, strictly adhere to OWE's marketing guidelines and practices.

3.  **OWE MATERIALS.**  Contractor and all of its Representatives are required to use only the written marketing materials prepared and provided by OWE.  Contractor shall not (i) use any other written marketing materials; (ii) remove any logos, copyrights, or other markings from OWE Materials; or (iii) modify, alter, or in any way change the OWE Materials.

4.  **TRADEMARKS.**  Contractor acknowledges and agrees that it has no interest in any OWE-related trademarks and that OWE will remain the sole and exclusive owner of all right, title, and interest in the trademarks.  Contractor acknowledges and agrees that Contractor's use of the trademarks, and any goodwill in the trademarks resulting from Contractor's use, will inure solely to the benefit of OWE and will not create any right, title or interest for Contractor in such marks.  Contractor shall not contest, oppose, or challenge ownership of the Trademarks.

5.  **INTERNET-BASED MARKETING.**  Contractor agrees that it will not bid on any OWE-branded key words in connection with any internet search, social media, or display advertising campaign (whether alone or in combination).

6.  **LIABILITY; INDEMNIFICATION; CONTRACTOR DEFAULTS.**  Contractor acknowledges and agrees that it shall be strictly liable for its failure to comply with all terms of these Marketing Requirements.  Contractor shall indemnify, defend, and hold OWE harmless for any and all claims, lawsuits, losses, lost profits, or damages that may arise from, relate to, or are in any way caused by the acts or omissions of Contractor arising from this Exhibit.  Any violation of these Marketing Guidelines shall constitute a Contractor Default.

Initials 

7.      **AMENDMENTS AND MODIFICATIONS.**  This Exhibit may be modified at any time by OWE by delivering a revised exhibit to Contractor to its then-current e-mail address on file with OWE.  Such revised exhibit shall be effective and binding upon Contractor and OWE after seven (7) calendar days of its delivery, unless such revised exhibit has a specifically-identified later effective date.

Initials 

DocuSign Envelope ID: 999AA3AD-7675-4E96-9292-ED89FD44766A

**Exhibit D**

**RESTRICTIVE COVENANTS**

1.    **DEFINITIONS.**  The following terms used herein, including in the preamble and recitals, shall have the following meanings:

1.1.    "*Competitor*" means any person or entity that provides products and/or services that are substantially similar to or competitive with those offered or provided by OWE or any of its Affiliates at any time during the Restricted Period, including (without limitation) companies, persons, or entities in the business of selling (i) residential and commercial photovoltaic or solar thermal products or services; (ii) residential or commercial energy storage and battery products and services; (iii) energy management and home automation; (iv) electric vehicle chargers and services; (v) demand response and other distributed energy resources; and (vi) residential and commercial security and protection related products and services, collectively with any Affiliates, contractors, or dealers of any of the foregoing.

1.2.    "*Confidential Information*" means any and all information (whether written, electronic, or oral) furnished at any time by a Disclosing Party or its Representatives to a Receiving Party or its Representatives and all analyses, compilations, forecasts, studies or other documents (whether written or electronic) prepared by a Receiving Party or its Representatives which contain or reflect any such information; provided, however, the following shall not be considered "Confidential Information" for purposes hereof:  (1) information that was already in Receiving Party's possession by legitimate means prior to receipt from Disclosing Party, (2) information that is or becomes publicly available provided, that, the source of such information or material was not bound by a contractual, legal or fiduciary obligation of confidentiality to the Receiving Party or any other party with respect thereto, or other than as a result of a disclosure by Receiving Party or its Representatives in violation of this Agreement, (3) information that is independently developed by Receiving Party or its Representatives without reference to or use of other elements of the Confidential Information, (4) information that is generally made available by Disclosing Party to third parties without restriction, and (5) information that is provided by Disclosing Party to Receiving Party with express prior written approval that such Confidential Information is approved for public dissemination.

1.3.    "*Disclosing Party*" means a Party or its Representative that sends (by any means) any Confidential Information to Receiving Party.

1.4.    "*Receiving Party*" means that Party or its Representatives to whom any Confidential Information is sent by a Disclosing Party.

1.5.    "*TPO Services*" means the Services performed by Contractor under the Agreement relating to or arising from Customers that have or will enter into Customer Agreements.

Initials 

## 2. CONFIDENTIALITY.

2.1. <u>Obligations of Receiving Party</u>.

2.1.1. Each Receiving Party shall: (i) keep and safeguard all the Confidential Information as confidential; (ii) not disclose any Confidential Information in any manner whatsoever, except as required by applicable law pursuant to <u>Section 3</u> below; and (iii) not use any Confidential Information for its own financial gain or benefit.

2.1.2. Notwithstanding the foregoing, a Receiving Party may reveal the Confidential Information to its Representatives (i) who are informed by Receiving Party of the confidential nature of the Confidential Information; and (ii) who agree to strictly abide by the terms of this Agreement, or are under a duty of confidentiality to the Receiving Party no less strict than the terms of this Agreement.

2.1.3. Each Party shall cause its Representatives to observe the terms of this Agreement. Neither Party may remove any proprietary, copyright, confidential, trade secret or other legend from any of the other Party's Confidential Information.

2.2. <u>Required Disclosures</u>. In the event that a Receiving Party is requested or required by a court of competent jurisdiction (whether by interrogatory, request for information or documents, subpoena, deposition, court order, or other process) to disclose any Confidential Information (the "Required Disclosure"), Receiving Party shall, to the extent permitted by applicable law, provide prompt written notice to Disclosing Party concerning such Required Disclosure. If Receiving Party determines that such notice is permitted by law, Receiving Party shall cooperate with Disclosing Party in seeking an appropriate protective order. If the Required Disclosure is required by applicable law, then Receiving Party shall ensure that no additional Confidential Information than strictly necessary is disclosed in complying with any such request or requirement. In any event, Receiving Party will not oppose any action by Disclosing Party to obtain an appropriate protective order, injunction, or other reliable assurance that confidential treatment will be accorded the Confidential Information.

2.3. <u>Destruction or Erasure of Confidential Information</u>. To the fullest extent permitted by applicable law, and to the extent reasonably practicable, Receiving Party agrees that it will, upon Disclosing Party's written request:

2.3.1. Promptly destroy all copies of the written Confidential Information in Receiving Party's possession and provide written notice of such destruction to Disclosing Party in writing;

Initials 

2.3.2. Take reasonable steps to delete, erase, and remove electronic Confidential Information in Receiving Party's computer systems and provide written notice of such deletion and removal to Disclosing Party in writing; and/or

2.3.3. Promptly deliver to Disclosing Party, at Receiving Party's sole expense, all copies of the written Confidential Information in Receiving Party's possession.

Receiving Party shall be permitted to retain copies of the Confidential Information to the extent required to comply with any law or court order to which Receiving Party is subject. Notwithstanding anything to the contrary contained herein, any Confidential Information, or copy or portion thereof, that is retained by a Receiving Party shall be maintained in accordance with the confidentiality obligations of this Agreement for so long as such Confidential Information is held.

2.4. <u>United States Securities Laws</u>. Contractor hereby acknowledges that it is aware that the United States securities laws prohibit any person who has material non-public information concerning OWE from purchasing or selling securities of OWE (including options, warrants, or other derivative or synthetic securities that derive their value based on other securities of OWE) and from communicating such information to any other person under circumstances in which it is reasonably foreseeable that such person, including, without limitation, any of its Representatives, is likely to purchase or sell such securities. Contractor agrees that, to the extent that it has actually received Confidential Information pursuant to this Agreement that constitutes material non-public information, it will not trade any securities of OWE while in possession of such information and that it will not use any Confidential Information in contravention of the United States securities laws.

3. **NON-DISPARAGEMENT.** Neither Party will make any statement (whether truthful or not) to another person or entity that could in any way adversely affect the reputation, brand, or image of the other Party.

4. **NO REMARKETING.** At all times during the Restricted Period and throughout the Territory, Contractor will not (whether directly or indirectly, either through itself or any Representative) after providing a Customer to OWE (i) sell, remarket, attempt to sell or remarket, or offer to another person a Lead, a Qualified Customer, or the Project; or (ii) sell, promote, solicit interest, or refer any other product or service of another person to a Qualified Customer other than the Products.

5. **NON-SOLICITATION.** Without the prior written consent of OWE, at all times during the Term and for six (6) months thereafter, Contractor shall not, directly or indirectly, for any reason whatsoever: (a) solicit, sell, promote, or induce, or attempt to solicit, sell, promote, or induce any Customer to terminate, cancel, not renew a contract, or in any way cease to do business with OWE; (b) solicit, induce, or attempt to solicit or induce any employee of OWE to terminate their employment with OWE; (c) induce, solicit, or in any

Initials [SML]

way cause any dealer, lead gen provider, or contractor that Contractor knows or has reason to know provides such services to OWE to terminate, cancel, or not renew (in whole or in part) its relationship with OWE; or (d) any retail store owner or operator, home builder, or other channel partner to terminate, cancel, or not renew (in whole or in part) its relationship with OWE.

6.     **REMEDIES.**    Contractor hereby acknowledges and agrees that any action taken by Contractor or its Representatives in violation of these Restrictive Covenants set forth on this Exhibit D would result in substantial damages to OWE and/or its Representatives, and that such damages would be difficult to determine as a result of the direct and indirect harm to OWE, its Representatives, and their respective businesses.    Contractor further acknowledges and agrees that any breach or violation of this Exhibit D by Contractor or any of its Representatives will result in irreparable harm to OWE, its Representatives, and their respective business interests and goodwill.

7.     **NON-EXCLUSIVITY OF OWE.**    Nothing in this Agreement shall restrict the right of OWE to engage, directly or indirectly, in the same activities as Contractor, whether for its own account or otherwise.

8.     **SEVERABILITY.**    Each of the Parties hereby expressly acknowledge and agree that all restrictive covenants set forth in this Exhibit D should be enforced to the maximum extent permitted by applicable law.    In the event that any time period, scope, or term of any provision in this Exhibit D is declared by a court of competent jurisdiction to exceed the maximum time period, scope, or term that such court deems enforceable, then such court shall reduce the time period, scope, or term to the maximum time period, scope, or term permitted by Applicable Law.

9.     **AMENDMENTS AND MODIFICATIONS.** This Exhibit may be modified at any time by OWE by delivering a revised exhibit to Contractor to its then-current e-mail address on file with OWE.    Such revised exhibit shall be effective and binding upon Contractor and OWE after seven (7) calendar days of its delivery, unless such revised exhibit has a specifically identified later effective date.

Initials 

**Sub Dealer Agreement**

This Sub Dealer Agreement (the "Agreement") is made and entered into by and between One World Energy, LLC d/b/a Our World Energy ("OWE"), and <u>EDJ Enterprises Inc</u> ("Vendor"), both of which are collectively referred to herein as the "Parties" or, individually, as the "Party." This Agreement is effective as of the Parties' signatures hereto (the "Effective Date").

**RECITALS**

**A.     WHEREAS,** OWE holds a license through the Registrar of Vendors to perform residential and commercial electrical work under license number 326134 and has the experience and expertise to perform residential and commercial electrical installations for residential solar systems;

**B.     WHEREAS,** Vendor desires to obtain the benefit of the services and experience of OWE in the installation of electrical systems for residential solar systems Vendor sells; and

**C.     WHEREAS,** the Parties desire that this Agreement supersede and replace any prior agreements entered into between the parties;

**NOW, THEREFORE,** in consideration of the mutual promises, covenants and conditions contained herein, in reliance upon the representations and warranties set forth herein, and for other good and valuable consideration, the Parties hereto agree as follows:

**AGREEMENT**

1.     **DEFINITIONS AND RULES OF INTERPRETATION.**

   (a)     **Definitions.** Any capitalized term used but not defined in this Agreement shall have the meaning ascribed to such term in Schedule 1.

2.     **THE SERVICES:**

   (a)     **Conditions Precedent**. Before Vendor may commence any Services on behalf of OWE, the following conditions precedent must first be satisfied to the satisfaction of OWE (in its sole and absolute discretion):  (i) complete execution of this Agreement by all Parties and delivery of a fully executed copy of this Agreement to OWE; (ii) delivery to OWE by Vendor of all licenses, certificates, and other documents required under this Agreement; (iii) completion of the new Vendor checklist and delivery to OWE of any and all materials, information, documentation required thereunder; and (iv) completion of any and all required training under the terms of this Agreement. This Agreement will not be in force and Vendor will

not be entitled to any of the benefits hereunder, unless and until said Conditions Precedent have been met.

(b)     **Services.** Both Parties hereto agree further that a monthly meeting between Vendor and Dealer Relations Manager will occur at a mutually convenient time for both Parties to discuss the progression of Vendor's growth.

(c)     **Status as Independent Contractor.** Nothing contained in this Agreement shall be construed as creating a joint venture, partnership, employment or franchise relationship between the Parties, and no Party shall have the right, power or authority to create any obligations or duty, express or implied, on behalf of the other Party. Vendor's status under this Agreement is that of an independent Vendor and shall in no way be deemed to be any other status, including (without limitation) that of an agent or employee of OWE or its Affiliates. Vendor shall not refer to itself, hold itself out as, or knowingly permit any person to believe Vendor is anything other than an independent Vendor, including (without limitation): agent, Affiliate, employee, partner, or franchisee of OWE. OWE may, in its sole and absolute discretion, (i) contract for services with other parties even though they may be similar or identical to the Services hereunder, inside or outside the Territory; (ii) sell the Products through any other person; and (iii) offer pricing, terms, conditions, or other benefits to other persons different from or superior to those offered to Vendor hereunder.

3.     **PAYMENT FOR SERVICES:**

(a)     **Fees and Payments.** See Exhibit A.

(b)     **Requirements.** The Requirements described in the Exhibits and elsewhere in this Agreement are and at all times shall remain subject to OWE's policies and procedures that may apply to the Customers, the Services, the Work, or any Project. From time to time, OWE may (in its sole and absolute discretion) change, modify, eliminate, or add to the Requirements. If OWE makes any changes to the Requirements, then OWE shall notify Vendor in writing and use commercially reasonable efforts to provide Vendor with written notice prior to implementation of such changes.

(c)     **Verification and Rejection.** Vendor acknowledges and agrees that OWE will independently verify and determine whether all Requirements are satisfied by Vendor prior to any payment of Fees under this Agreement. In the event OWE discovers that any Requirement was not satisfied by Vendor, then OWE may, in its sole and absolute discretion, withhold and set-off any applicable amount from the Fees owed to Vendor. Upon the request of Vendor, OWE will provide to Vendor an explanation for any such rejection.

(d)     **Payment Dispute.** Any and all disputes concerning any payment of Fees must be delivered in writing to OWE no later than thirty (30) calendar days after the date of the applicable Fee Statement or payment. If Vendor fails to deliver a notice of any dispute within such time period, then Vendor will be (i) deemed to have accepted the Fee Statement and related

payments as complete and accurate; and (ii) forever barred from bringing any claim or suit for miscalculation or underpayment of Fees or any payment of moneys by OWE with respect to such Fee Statement and payments.

(e)  **Right to Set-Off.**  Vendor hereby agrees that OWE may set-off, withhold, or otherwise deny payment against any and all unpaid amounts owed by OWE to Vendor in an amount equal to (i) the aggregate amount of any damages OWE or any of its Representatives has suffered or incurred as a result of Vendor's violation of any term of this Agreement; and (ii) any amounts owed by Vendor to OWE for any reason, including Vendor's duty to indemnify OWE under this Agreement, in each case as reasonably determined and the amounts reasonably estimated by OWE in good faith.  In the event OWE incorrectly sets-off, withholds, or denies payment in a manner not permitted by this Agreement, then OWE agrees it shall promptly correct such mistake and make appropriate payment to Vendor.

(f)  **Security Interest.**  Vendor hereby grants to OWE a first priority security interest in all (i) leads, prospective customers, customer lists, Customers, Customer Agreements, Eligible Customers, Qualified Customers, and Rejected Customers; (ii) work, tools, supplies, equipment, and other materials used, supplied by, or furnished to Vendor or any of its Representatives in connection with the Services contemplated by this Agreement; and (iii) any property relating thereto, including (in each case), any proceeds of the foregoing, either existing as of the Effective Date or arising at any point throughout the Term.  Vendor hereby authorizes OWE to take any action it deems required to perfect such security interest and Vendor agrees it shall take such further action as reasonably requested by OWE in connection with perfecting its security interest.

**4.    REPRESENTATIONS, WARRANTIES, AND COVENANTS OF VENDOR:**  As of the Effective Date and at all times throughout the Term, Vendor will and does hereby (i) represent and warrant to OWE and its Representatives; and (ii) covenants, agrees, and shall do the following:

(a)  **Organization, Power, and Qualification.**  (i) Vendor is and shall remain qualified and licensed to perform the Services and do business and is in good standing in every jurisdiction where such qualification and licensing is required; (ii) Vendor has and shall maintain the full right, power and authority to enter into this Agreement and all other documents to be delivered in connection herewith, to grant the rights and licenses granted under this Agreement and to perform its obligations hereunder and thereunder; and (iii) the execution of this Agreement and all other documents to be delivered in connection herewith by the person whose signature is set forth at the end hereof has been and will continue to be duly authorized by all necessary action of Vendor.

(b)  **Fully informed.**  Prior to executing this Agreement, Vendor has had the opportunity to ask OWE any and all questions Vendor may have in relation to the Services, the Fee, this Agreement, Vendor's obligations hereunder, and the contemplated relationship between the Parties.  Vendor hereby acknowledges and represents that Vendor has had an opportunity to retain legal counsel to advise and review this Agreement.

(c)     **Enforceability.** This Agreement and any other documents delivered by Vendor to OWE hereunder constitute the legal, valid and binding obligations of Vendor, enforceable in accordance with their respective terms.

(d)     **No Conflict.**   The execution, delivery and performance by Vendor of this Agreement and any other documents delivered by Vendor to OWE in connection with this Agreement, and the consummation of the transactions contemplated hereby and thereby, do not and will not conflict with or result in any breach of any of the provisions of, constitute a default under, result in a violation of, result in the creation of any Lien upon any Customer, Customer Agreement, or any of the Services, give any third party the right to accelerate any obligation under, or require any authorization, consent, approval, exemption or other action by or notice to, any court, other governmental body, or other third party under, the provisions of Vendor's governing documents or any indenture, mortgage, loan agreement, lease or other agreement or instrument to which Vendor or any entity that is an Affiliate or Representative of Vendor is a party or to which any of Vendor's respective properties are subject, or any Law, judgment or decree to which Vendor is subject.

(a)          (e)     **Licensure and Registration.**   Vendor currently holds and will continue to maintain at all times throughout the Term, any and all licenses, certificates, consents, certifications, waivers, permits, registrations, orders, approvals and other authorizations of any governmental or regulatory body necessary for Vendor to conduct its business, generally, and provide the Services required by this Agreement, and/ or required by applicable law.   Vendor has provided to OWE true and correct copies of the licenses set forth herein, and evidence of registration, all of which are current, in good standing, and not subject to any investigation, enforcement action, or other disputes with the applicable licensing authority.   Vendor agrees that Vendor shall update, maintain, and not let expire any of the licenses.

(f)     **Litigation and Judgments.**   There is no outstanding criminal or administrative matter, order, writ, injunction, fine, citation, penalty, decree or unsatisfied judgment of any court, or any claims or litigation pending or threatened against Vendor which may affect in any way Vendor's ability to perform the duties and obligations under this Agreement or the Services required by this Agreement.   Neither is Vendor a party to, or the subject of, or threatened with, any claim, suit, action, arbitration, investigation, audit, administrative or other proceeding of any character which may affect in any way Vendor's ability to perform the duties and obligations under this Agreement or the Services required by this Agreement.   Vendor has no knowledge of any facts or circumstances which could result in a valid claim, suit, action, audit, investigation or proceeding against Vendor.

(g)     **No Adverse Actions and Release of Claims.**   Vendor has no knowledge (based on due inquiry) of any facts or circumstances which could result in a claim, suit, action, audit, investigation, or proceeding by Vendor against OWE or any of its Representatives or Affiliates. Vendor hereby irrevocably and unconditionally releases, acquits, and forever discharges OWE

and its Representatives from any and all claims, actions, causes of action, rights, demands, debts, obligations, or damages of whatever nature or kind, known or unknown, at law or in equity (each a "Claim"), which Vendor or its Representatives have, may have, or may have had, against OWE and its Representatives, or one or more of them, arising or occurring prior to the Effective Date of this Agreement. Vendor further covenants and agrees not to initiate or participate individually or as a member of a class in any action, litigation, appeal, proceeding, charge or complaint before any local, state or federal agency or court against OWE or any of its Representatives pertaining to any Claim arising out of or by reason of any actions, omissions, transactions, or events occurring prior to the Effective Date of this Agreement except as may be required by court order.

(h)    **Solvency.** Vendor is solvent and able to pay its outstanding debts as they mature. Vendor will not be rendered insolvent by performing its Services under the Agreement. Vendor agrees that it will maintain its solvency at all times throughout the Term and not initiate any bankruptcy proceedings, nor permit any bankruptcy proceedings (whether voluntary or involuntary) to be initiated on its behalf.

(i)    **Compliance with Laws.** Vendor is and will continue to comply in all respects with all applicable state and federal law in providing the Services under this Agreement and all other aspects of this Agreement and Vendor's operations thereunder. Vendor is in compliance and, at all times throughout the Term, shall continue to comply in all respects with (i) Applicable Laws; (ii) the Code of Conduct; (iii) this Agreement; and (iv) the Customer Agreement.

(j)    **Conduct and Practices.** Vendor has read and understands the Code of Conduct included herewith at Exhibit C and agrees to strictly comply with the Code of Conduct (as may be revised from time to time by OWE in its sole and absolute discretion) at all times throughout the Term. Vendor agrees that it shall (i) perform the Services and all other obligations under this Agreement and the Customer Agreements in accordance with the highest standards of professional and ethical conduct, with the degree of care and skill exercised by persons providing similar services under similar circumstances; and (ii) will not take any action or fail to take any action that could in any way damage or impugn the brand, reputation, or integrity of OWE or its Representatives or Affiliates.

(k)    **Accurate and Complete Information.** Any and all information, documents, instruments, certificates, exhibits, schedules, and all other materials furnished, provided, or delivered by Vendor to OWE at any time in connection with this Agreement or the transactions contemplated by this Agreement does not and will not include any untrue statement of a material fact or any omission of a material fact necessary to make the statements of facts contained therein, in light of the circumstances under which they are made, not misleading. Vendor shall never mislead, misstate, misrepresent, engage in any deceptive activity with respect to any Customer or any Representative of OWE.

(l)    **Territory.** Vendor will provide the Services only in the permitted Territory.

**(m)    Insurance**.  As of the Effective Date and at all times through the Term of this Agreement, Vendor has and agrees to maintain and carry, at its own expense, in full force and effective all types and amounts of insurance required by applicable law and as set forth in Schedule 2.

**(n)    Records.**  Vendor shall prepare and maintain accurate books and records ("Records") of:  (i) all written materials used in connection with its Services and other obligations hereunder; (ii) Vendor's current address and telephone number; (iii) documentation concerning all Customers, the products marketed, promoted, and sold to such Customers; (iv) information and documentation that Vendor is required to maintain pursuant to applicable law; (v) all correspondence and written materials relating to any license; (vi) all correspondence and written materials provided by or to any government agency relating to the Services, this Agreement, any Customer, or any Customer Agreement; and (vii) all other information necessary and helpful to permit OWE to determine and verify Vendor's compliance with this Agreement, the Customer Agreements, and applicable law. Vendor shall retain the Records for such time as required by applicable law.

**(o)    No Default.**  Vendor is not in breach of and has not breached any obligation under this Agreement and no Vendor default has occurred or is continuing in any respect.

**(p)    Compliance Reviews.**  Upon the reasonable request of OWE, Vendor will (i) provide, or make copies available to OWE for review, any and all Records; (ii) deliver to OWE true and correct copies of all applicable policies and procedures; (iii) make yourself available to OWE to be interviewed; and (iv) allow OWE and its Representatives to observe, inspect, shadow, or otherwise review the conduct of Vendor in their performing of the Services and any other obligation under the Agreement (collectively, a "Review").  OWE will, to the maximum extent possible, limit all Reviews to customary business hours and use commercially reasonable efforts to minimize any disruption to Vendor.  If any mistake, violation, discrepancy, or issue is identified or disclosed as a result of a Review, then Vendor shall (as soon as reasonably practicable) rectify, resolve, and cure such concern to reasonable satisfaction of OWE.  Any failure by Vendor to cooperate in any Review and/or timely resolve any concerns identified in a Review, in each case as determined by OWE in its sole and absolute discretion, shall be a Vendor default under this Agreement.

**(q)    Instructions and Further Assurances.**  Upon the request of OWE, Vendor shall immediately (i) comply with any and all instructions and requests of OWE or its Representatives in relation to the Services, (ii) cease any activity under this Agreement; and (iii) provide any information, deliver any documents or other materials, sign any documents or instruments in furtherance of this Agreement.

**(r)    Information Security.**  As of the Effective Date and at all times throughout the Term, Vendor has and will continue to implement appropriate and reasonable administrative, physical, and technical safeguards designed to: ensure the security and confidentiality of

Confidential Information, including the private personal information of any Customer or employee of any Party ("Personal Information"; and together with Confidential Information, "Information"). Vendor will ensure that it has security policies and procedures that protect and safeguard all Information in its possession, custody, or control, including the exchange and transmission of any Information by and between Vendor and OWE. Vendor has and will continue to (i) use the highest quality of technology and data security software and mechanisms to protect against anticipated threats or hazards to the security or integrity of the Information; (ii) protect against unauthorized access to, use, or breach of the Information; and (iii) detect, prevent, and mitigate the risk of identity theft. Vendor will not disclose any Information to a third party except as permitted under this Agreement, the Customer Agreement, and applicable law. Vendor shall respond promptly and thoroughly respond to any request of OWE for information concerning the information security measures implemented by Vendor. In the event Vendor discovers or is made aware of a breach involving any Information, Vendor shall, at its sole cost and expense: (1) notify OWE in writing within forty-eight (48) hours of discovery of such disclosure or breach; (2) take all such actions as may be necessary or requested by OWE to address the breach, minimize the disclosure and problem, and mitigate against the risks associated therewith; and (3) cooperate in all respects with OWE to notify affected individuals and government agencies as may be required by applicable law.

(s)     **Marketing, Publicity, and Trademarks.**  Vendor shall be required to comply with the Marketing Requirements set forth on <u>Exhibit D</u>.

(t)     **Reporting.**  Vendor shall immediately inform and provide notice to OWE upon the occurrence of any of the following: (i) receipt by Vendor of a complaint from any Customer; (ii) after becoming aware of any material dispute, threat of dispute, or Claim by any Customer; (iii) any investigation, inquiry, demand, subpoena, or other regulatory process initiated by any government authority in relation to any Customer, any Customer Agreement, the Services, any license of Vendor, this Agreement, or any other activities of Vendor related to this Agreement; and (iv) any actual or threatened expiration, suspension, revocation, or enforcement action with respect to any license of Vendor. Vendor understands that upon receipt of such notice, OWE will be entitled, in its sole and absolute discretion, to immediately perform a Review in accordance with this Agreement.

(u)     **Representatives.**  As of the Effective Date, and at all times throughout the Term, Vendor represents, warrants, and covenants that Vendor shall not use any person, entity, group, association, subVendor, individual, Vendor or any other representative in the performance of the Services or any of Vendor's obligations under this Agreement. Vendor acknowledges and agrees that it shall be fully responsible for its acts, omissions, breaches of this Agreement, and violations of law and hereby agrees to indemnify, defend, and hold OWE harmless for its acts and omissions, including negligence, arising out of Vendor's performance of its duties and obligations under this Agreement.

(v)     **No SubVendors.**  Other than the subVendors listed on <u>Schedule 3</u> or specifically authorized by OWE in writing after the Effective Date (each, an *"Approved SubVendor"*), Vendor

shall not use any person, entity, group, association, subVendor, or any other Representative in the performance of the Services or any of its obligations under this Agreement unless such person is a natural person and an agent of Vendor. Other than Approved SubVendors, Vendor shall not and shall ensure none of its Representatives solicits, entices, or contracts with any third-party to perform any aspect of the Services or any other obligation of Vendor in this Agreement. Vendor acknowledges and agrees that it shall be fully responsible for the acts, omissions, breaches of this Agreement, and violations of law of all Representatives, Approved SubVendors, or any other person or entity performing any activities on behalf of Vendor. Vendor hereby agrees to indemnify, defend, and hold OWE harmless for the acts and omissions of all of its Representatives, including all Approved SubVendors.

(w) **Telephone and Text Messaging Communications.** To the extent that Vendor engages in any activity involving telephone or text messaging communication with a Consumer, Vendor agrees that it will first obtain the express written consent of each consumer before it initiates any communication over or through the telephone or text messaging. Vendor agrees that it will strictly comply with all applicable laws, including Federal and state do-not-call laws. Vendor will strictly comply with OWE's written policies and procedures regarding the foregoing. Vendor will never use an automatic telephone dialing system to call or send a text message to any Consumer unless first approved in a writing by OWE.

(x) **Liens.** Vendor agrees that it will not file a Lien and it will not permit any of its Representatives to file a Lien, on or against any jobsite, Customer's property, the System, OWE, or any of OWE's Affiliates. If any Lien is filed in violation of this Agreement, then Vendor agrees that it will indemnify, defend, and hold harmless for any and all Losses incurred by OWE, Customer, or any other affected party. As a condition of OWE's obligation to make any payment to Vendor under this Agreement, including pursuant to any Work Order, Vendor shall execute and deliver to OWE one or more Lien release and waivers on the form found on the OWE Dealer Portal, or otherwise acceptable to OWE (each, a "*Lien Waiver*"). OWE may withhold any and all payments under this Agreement to the extent Vendor fails to deliver a Lien Waiver as required hereunder or reasonably requested by OWE. Within five (5) Business Days following payment by OWE for a Work Order (subject to OWE's setoff rights under this Agreement), Vendor shall deliver to OWE an Unconditional Waiver and Release Upon Final Payment, on a form acceptable to OWE.

**5.    RESTRICTIVE COVENANTS:** Each of the restrictive covenants set forth in Exhibit E shall apply to Vendor and OWE, as applicable.

**6.    REPRESENTATIONS, WARRANTIES, AND COVENANTS OF OWE:** On the Effective Date and throughout the Term of this Agreement, OWE hereby represents, warrants, and covenants as follows:

(b)         (a)    **Organization, Power and Qualification.** (i) OWE is a limited liability company duly organized, validly existing, and in good standing in the

jurisdiction of its formation; (ii) OWE is qualified and licensed to do business and is in good standing in every jurisdiction where such qualification and licensing is required; (iii) OWE has the full right, power and authority to enter into this Agreement and the other documents to be delivered in connection herewith, to grant the rights and licenses granted hereunder and thereunder and to perform its obligations under this Agreement and the other documents to be delivered in connection herewith; and (iv) the execution of this Agreement by the person whose signature is set forth at the end hereof and thereof has been duly authorized by all necessary action of OWE.

(b)     **Authorization; No Breach.**    The execution, delivery and performance of this Agreement, and any other documents delivered by OWE to Vendor hereunder, and the consummation of the transactions contemplated herein and therein, have been duly authorized by all necessary action on the part of OWE. This Agreement and any other documents delivered by OWE to Vendor hereunder constitute legal, valid and binding obligations of OWE, enforceable in accordance with their respective terms. The execution, delivery and performance by OWE of this Agreement and any other documents delivered by OWE to Vendor hereunder, and the consummation of the transactions contemplated hereby and thereby, do not and will not conflict with or result in any breach of any of the provisions of, constitute a default under, result in a violation of, give any third party the right to accelerate any obligation under, or require any authorization, consent, approval, exemption or other action by or notice to, any court, other governmental body, or other third party under, the provisions of OWE's governing documents or any indenture, mortgage, loan agreement, lease or other agreement or instrument to which OWE is a party or to which any of OWE's respective properties are subject, or any applicable law, judgment or decree to which OWE is subject.

(c)     **Licensure and Registrations.**    OWE currently holds, and will continue to maintain during the Term, any and all Licenses necessary for it to conduct its business.

(d)     **Compliance with Laws.**    OWE has complied and will continue to comply, in all material respects, with applicable law.

(e)     **Support.**    OWE will (i) provide training and training materials for Vendor; (ii) provide Vendor with access to information technology of OWE necessary to perform the Services; and (iii) provide Vendor with customer and account management support during normal business hours.

7.    **TERM AND TERMINATION**

(a)     **Term.**    This Agreement shall commence as of the Effective Date and shall continue for a period of one year, which will automatically extend for successive periods of the same length (each, a "Renewal Term"), subject to the early termination rights of either Party set forth in this Agreement (the "Term"). Either Party may terminate this Agreement for convenience upon thirty (30) calendar days' prior written notice to the other Party. OWE may

terminate this Agreement immediately upon the occurrence of a Vendor Default. In the event this Agreement is terminated for whatever reason, OWE shall be allowed, at its option, to withhold any and all commissions owed to Vendor until PTO has been completed.

      **(b)**    **Vendor Defaults.** Each of the following shall be considered a "Vendor Default" under the terms of this Agreement: (i) Vendor failing to maintain in good standing any required license or other government approval required to perform the Services; (ii) Vendor's material breach of this Agreement that remains uncured after ten (10) calendar days prior written notice; (iii) Vendor's fraud, willful misconduct or gross negligence in performance of its obligations under this Agreement; (iv) Vendor's failure to pass a drug test pursuant to OWE's rights hereunder to perform said testing; or (v) Vendor's attempt to make or makes any assignment of the rights under this Agreement.

      **(c)**    **Remedies.** Upon the occurrence of a Vendor Default, OWE may (in its sole and absolute discretion) exercise any of the following remedies: (i) immediately suspend Vendor's access to any and all software used by Vendor; (ii) terminate this Agreement; (iii) withhold any amounts due and owing by OWE to Vendor hereunder, and offset, to the extent of any damages and expenses of OWE resulting from, or relating to, such Vendor Default; (iv) demand that Vendor pay Liquidated Damages; and/or (v) exercise any other remedy available to OWE under applicable law.

      **(d)**    **Vendor's Obligations upon Expiration or Termination.** Upon the expiration (or earlier termination of this Agreement) or notice of termination, Vendor shall immediately (i) cease to perform any of the Services; (ii) cease to represent itself as affiliated in any way with OWE; (iii) cease the marketing, promotion, selling, or acquiring of new customers in relation to the Products for or on behalf of OWE; (iv) return to OWE any and all documents and tangible materials (including any copies thereof) containing, reflecting, incorporating, or based on any information provided or made available to Vendor by OWE; and (v) cease and terminate all use of any kind whatsoever of OWE trademarks or other copyrighted and/or protected materials.

      **(e)**    **Survival of Terms.** All terms and conditions set forth in this Agreement, which by their terms, are intended to, or in order to give proper effect to their intent should, survive the termination or expiration of this Agreement, shall survive such termination and expiration.

      **(f)**    **Cumulative Remedies.** All rights and remedies provided in this Agreement are cumulative and not exclusive, and the exercise by either Party of any right or remedy does not preclude the exercise of any other rights or remedies that may now or subsequently be available at law, in equity, by statute, in any other agreement between the Parties, or otherwise.

      **(g)**    **Equitable Remedies.** Vendor acknowledges and agrees that (i) a breach or threatened breach by Vendor of any of the obligations under the Agreement, including (without limitation) the Restrictive Covenants set forth on Exhibit E, would give rise to irreparable harm to OWE and its Affiliates for which monetary damages would not be an adequate remedy; (ii) in the event of a breach or a threatened breach by Vendor of any such obligations, OWE shall, in

addition to any and all other rights and remedies that may be available to OWE at law, at equity, or otherwise in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance, and any other relief that may be available from a court of competent jurisdiction, without any requirement to post a bond or other security, and without any requirement to prove actual damages or that monetary damages will not afford an adequate remedy; and (iii) Vendor shall be liable for all costs, expenses and fees (including court costs and attorneys' fees) in connection with any action instituted by OWE or any of its Affiliates seeking to remedy, enforce its rights, and/or enjoin any violation of this Agreement. Vendor acknowledges and agrees that it will not oppose or otherwise challenge the appropriateness of equitable relief or the entry by a court of competent jurisdiction of an order granting equitable relief, in either case, consistent with the terms of this paragraph.

**(h)** **Liquidated Damages**: If Vendor fails to comply substantially with the terms and conditions of the Non-Solicitation Paragraph within this Agreement, Contractor, at its option and as its sole remedy, may terminate this Agreement and obtain $15,000 from Vendor as Contractor's liquidated damages. The $15,000 liquidated damages amount will be on a per breach basis such that Vendor will pay to Contractor as liquidated damages $15,000 for each time it breached the Non-Solicitation Paragraph within this Agreement.

THE PARTIES AGREE THAT THE ACTUAL DAMAGES INCURRED BY CONTRACTOR FOR VENDOR'S BREACH OF THE NON-SOLICITATION PROVISION ARE DIFFICULT TO ESTIMATE IN ADVANCE AND THAT $15,000 PER BREACH CONSTITUTES A REASONABLE ESTIMATE OF CONTRACTOR'S DAMAGES FOR A BREACH BY VENDOR AND SHALL CONSTITUE CONTRACTOR'S LIQUIDATED DAMAGES AND NOT A PENALTY. CONTRACTOR HEREBY EXPRESSLY WAIVES ALL OTHER CLAIMS FOR DAMAGES OR RELIEF AT LAW OR IN EQUITY FOR BREACH OF THE NON-SOLICITATION PROVISION AND AGREES THAT CONTRACTOR'S SOLE AND EXCLUSIVE REMEDY FOR VENDOR'S BREACH OF THE NON-SOLICITATION PROVISION UNDER THIS CONTRACT SHALL BE OBTAINING THE LIQUIDATED DAMAGES PROVIDED ABOVE.

**8.** **GENERAL PROVISIONS:**

**(a)** **Indemnification.** Vendor shall indemnify, defend, and hold harmless OWE and its Affiliates, their respective Representatives, designees and their successors and assigns (collectively, the "OWE Indemnified Parties", and each, a "OWE Indemnified Party"), from and against, any and all losses, damages, liabilities, deficiencies, claims, actions, judgments, settlements, interest, awards, fees, penalties, fines, costs (including costs for experts and investigations), or expenses of whatever kind, including attorneys' fees, fees and the costs of enforcing any right to indemnification under this Agreement, and the cost of pursuing any insurance providers (collectively "Losses"), incurred by any OWE Indemnified Party, relating to, arising out of, or resulting from:  (i) any act or omission by Vendor; (ii) any breach of the Agreement by Vendor; (iii) any negligence or willful misconduct by Vendor; (iv) any actual or

threatened violation of applicable law by Vendor; (v) any infringement, misuse, or misappropriation of any intellectual property of another person; and (vi) any failure by Vendor to obtain and maintain at all times in good standing all required licenses.   Vendor's duty to indemnify hereunder includes the duty to indemnify OWE Indemnified Parties for all Losses incurred by any OWE Indemnified Party in connection with the matter that is the subject of the indemnification.

Moreover, without limiting the foregoing subsection 8(a), the Parties hereby agree that, in the event of a dispute of any kind against OWE arising out of any act or omission by Vendor, including negligence, willful or grossly negligent act, or otherwise, in addition to the foregoing defense and indemnity provision, OWE will also be permitted to withhold commissions from Vendor in an amount representative of the amount in dispute and use the withheld commission to pay and/or resolve any pending dispute.   Any funds withheld that are not used to resolve the pending dispute will be promptly turned over to Vendor after the dispute is resolved.

(b)   **Drug Testing.**   Vendor acknowledges and agrees that it may be required to submit to random drug and/or alcohol screening test while performing the Services under this Agreement. Vendor agrees that, upon the request of OWE, Vendor will promptly, without notice, submit to testing for the use of drugs, alcohol and/or controlled substances.   Vendor agrees that the results of any blood and/or urine sample test results may be revealed to OWE for its use and evaluation.   Vendor acknowledges and understands that any refusal by Vendor to submit to such testing can be grounds for immediate termination.   Additionally, a positive test result from any drug and/or alcohol test may be grounds for immediate termination.

(c)   **Assignment.**   Vendor's obligations under this Agreement may not be assigned or transferred to any other person, firm, or corporation without the prior written consent of OWE.

(d)   **Limitation of Liability.**   Except for Vendor's indemnification obligations under this Agreement, and/any breach or violation of the restrictive covenants set forth in this Agreement by Vendor, and/or a Party's gross negligence or willful misconduct, in no event shall either Party, its Affiliates, or their respective Representatives be liable for:   consequential, indirect, incidental, special, exemplary, punitive, or enhanced damages, lost profits or revenues or diminution in value, arising out of or relating to any breach of this Agreement, regardless of (1) whether such damages were foreseeable, (2) whether or not it was advised of the possibility of such damages, and (3) the legal or equitable theory upon which the claim is based, and notwithstanding the failure of any agreed or other remedy of its essential purpose.   Except for OWE's gross negligence or willful misconduct, to the maximum extent permitted under applicable law, OWE's aggregate liability arising out of or relating to this Agreement, whether arising out of or relating to breach of contract, tort, or otherwise, shall not exceed the total of the amounts actually paid by OWE to Vendor pursuant to this Agreement.

1.      (e)   **Notices.**   All notices, requests, demands, and other communications required or permitted to be given under this Agreement by any Party shall be in writing delivered to the following addresses:

IF for OWE:

ONE WORLD ENERGY, LLC D/B/A OUR WORLD ENERGY

20809 N. 19th Ave, Suite 1

Phoenix, AZ 85027

IF for Vendor: (please enter your name and mailing address)

Name:    EDJ Enterprises Inc

Address: 1340 Gulf Blvd

       Clearwater, FL 33767

or to such other address as any Party may designate from time to time by written notice to the other Party. Each such notice, request, demand, or other communication shall be deemed given and effective, as follows: (i) if sent by hand delivery, upon delivery; (ii) if sent by first-class U.S. Mail, postage prepaid, upon the earlier to occur of receipt or three (3) Business Days after deposit in the U.S. Mail; (iii) if sent by a recognized prepaid overnight courier service, one (1) day after the date it is given to such service; (iv) if sent by facsimile, upon receipt of confirmation of successful transmission by the facsimile machine; and (v) if sent by email, upon acknowledgement of receipt.

      **(f)**     **Work Product/Intellectual Property.**   Vendor hereby agrees to grant, release, and assign to OWE, all right, title, and interest in all copyrights, patents, trade secrets, and other intellectual property arising out of the Services, including, but not limited to, all patentable and non-patentable inventions, discoveries, ideas, processes, and materials, created under this Agreement; that is, for avoidance of uncertainty, all products or inventions created by Vendor arising from or reasonably related to Vendor's Services under this Agreement, shall be and become irrevocably the property of OWE. Upon written notice by OWE, Vendor will provide, execute, and return to OWE whatever documents, information, and materials are in Vendor's possession or reasonably available to Vendor to enable OWE to protect its copyrights, patents, trade secrets, and other intellectual property rights in any materials produced as a result of this Agreement. Any equipment, software (including relevant passwords and codes), parking or other passes, badges, or key cards that were provided to Vendor by OWE for use under the terms of this Agreement will also be returned to OWE within five (5) business days after termination of this AGREEMENT.

      **(g)**     **Confidential Information:**   Vendor acknowledges that during the term of this Agreement, Vendor will have access to various trade secrets, inventions, processes, information, records, and products owned by OWE and/or used by OWE in connection with the operation of its business including, without limitation, customer lists, accounts, software and procedures. Vendor agrees that Vendor will not disclose any of these materials or information, directly or indirectly, or use any of them in any manner, either during the term of this Agreement or at any time thereafter, except as required in the course of this Agreement with OWE for OWE's benefit.

**(h)** **Warranties and Liabilities of Vendor.** In performing the Services under this Agreement, Vendor shall only use authorized materials created by or for use by OWE, and shall not use the copyrighted works of third-parties. Vendor shall defend, indemnify and hold OWE harmless from liability that OWE is exposed to as a result of Vendor knowingly or unknowingly using unauthorized materials in the performance of the Services under this Agreement.

**(i)** **Expenses.** Each Party will bear the costs and expenses incurred by such Party in negotiating and executing this Agreement. Unless otherwise provided herein, Vendor will be responsible for all costs related to the Services, Work, equipment, uniforms, training, project management, call centers, customer care, information technology systems, software, and all other of its obligations under this Agreement.

**(j)** **Binding Effect.** This Agreement shall be binding upon, and inure to the benefit of, the Parties to this Agreement and their respective heirs, executors, administrators, agents, representatives, successors, assigns, beneficiaries, trustees, family members, and affiliates (meaning any family relation of or entity owned or controlled by the preceding entity or individuals).

**(k)** **Waiver.** No breach of any provision hereof can be waived unless in writing by the Party against whom enforcement of the waiver is sought. Waiver of any one breach of any provision(s) hereof shall not be deemed to be a waiver of any other breach of the same or any other provision(s) hereof. Failure on the part of any Party hereto to complain of any act or failure to act of any other Party or to declare any Party in default hereunder, irrespective of how long such failure continues, shall not constitute a waiver of the rights of such Party hereunder.

**(l)** **Severability.** If any provision of this Agreement is ultimately held to be invalid, illegal, or unenforceable, the validity, legality, and enforceability of the remaining provisions shall not be in any way affected or impaired thereby.

**(m)** **Amendments.** This Agreement may be amended or modified only by an instrument in writing, signed by all the Parties.

**(n)** **Applicability and Incorporation of Schedules and Exhibits.** Each of the Exhibits referenced herein is hereby incorporated by reference and shall each and collectively form an integral part of this Agreement.

**(o)** **Entire Agreement.** This Agreement constitutes the entire agreement among the Parties and supersedes all prior oral and written negotiations, communications, discussions and correspondence pertaining to the subject matter hereof.

**(p)** **Choice of Law.** This Agreement shall be construed in accordance with, and be governed by, the laws of the State of Arizona.

**(q)** **No presumption Against the Drafter.** The Parties have cooperated in the drafting and preparation of this Agreement. In any construction to be made of this Agreement, no presumption shall arise to any Party by virtue of participation in the drafting hereof.

**(r)** **Submission to Jurisdiction.** Each Party irrevocably consents and agrees that any action, proceeding, or other litigation by or against the other Party with respect to any claim or cause of action based upon or arising out of or related to this Agreement, shall be brought and tried exclusively in the federal or state courts located in the State of Arizona, and any such legal action or proceeding may be removed to the aforesaid courts. By execution and delivery of the Agreement, each Party accepts, for itself and in respect of its property, generally and unconditionally, the exclusive jurisdiction of the aforesaid courts. Each Party hereby irrevocably waives (i) any objection which it may now or hereafter have to the laying of venue with respect any such action, proceeding, or litigation arising out of or in connection with this Agreement brought in the aforesaid courts; and (ii) any right to stay or dismiss any such action, proceeding, or litigation brought before the aforesaid courts on the basis of forum *nonconveniens*. Each Party further agrees that personal jurisdiction over it may be affected by service of process by certified mail, postage prepaid, addressed as provided in Section 8(e) of this Agreement, and when so made shall be as if served upon it personally within the State of Arizona.

**(s)** **Jury Waiver.** TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, EACH PARTY HEREBY WAIVES ITS RIGHTS TO A TRIAL BY JURY WITH RESPECT TO ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF OR RELATED TO THIS AGREEMENT, IN ANY ACTION, PROCEEDING OR OTHER LITIGATION OF ANY TYPE BROUGHT BY ANY PARTY AGAINST THE OTHER PARTY, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS, OR OTHERWISE. EACH PARTY HEREBY AGREES THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE TRIED BY A COURT TRIAL WITHOUT A JURY. WITHOUT LIMITING THE FOREGOING, THE PARTIES FURTHER AGREE THAT THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY IS WAIVED BY OPERATION OF THIS SECTION 8(s) AS TO ANY ACTION, COUNTERCLAIM OR OTHER PROCEEDING WHICH SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY OF THIS AGREEMENT, OR ANY PROVISION HEREOF. THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS, OR MODIFICATIONS TO THIS AGREEMENT.

**(t)** **Advice of Counsel.** The Parties to this Agreement acknowledge and represent that they have consulted with legal counsel of their choosing, or they have had the opportunity to consult with legal counsel of their choosing, before executing this Agreement, that they understand the meaning of this Agreement, and that they expressly consent that this Agreement shall be given full force and effect according to each and all of its express terms and provisions, including, without limitation, those relating to the release of unknown and unsuspected claims, demands, and causes of action.

**(u)**   **Counterparts.**   The Parties may execute this Agreement in counterparts, and when each Party has signed and delivered one such counterpart or copy thereof, each counterpart or copy shall be deemed an original and, when taken together with the other signed counterparts or copies, shall constitute one integrated contract, which shall be binding upon and effective as to all Parties.  PDF signatures of the Parties shall have the same effect as original signatures.

**(v)**   **Attorneys' Fees and Costs.**   The Parties understand and agree that in the event a dispute arises between the parties relating, in any way, to this Agreement or the performance of the Agreement, including issues of interpretation or claimed breach, then the prevailing party in such proceeding shall be entitled to an award of reasonable attorneys' fees and costs, including expert witness fees and costs, relating to that litigation.

**(w)**   **Force Majeure.**   Upon the occurrence and during the continuance of a Force Majeure Event, a Party will be excused from performance and shall not be considered to be in breach or default with respect to any obligation hereunder; so long as: (i) such Party gives the other Party prompt written notice describing the details of the Force Majeure Event as soon as is reasonably practicable after becoming aware of the occurrence of the Force Majeure Event; (ii) the suspension of performance is of no greater scope and of no longer duration than is reasonably required by the Force Majeure Event; (iii) no obligations of affected Party that arose before the occurrence of the Force Majeure Event causing the suspension of performance shall be excused as a result of such Force Majeure Event, unless and only to the extent that the performance of such obligations is impaired by the Force Majeure Event; (iv) the Party uses diligent best efforts to overcome or mitigate the effects of the Force Majeure Event; and (v) when the Party is able to resume performance of its obligations under this Agreement, such Party shall give the other Party written notice to that effect and shall promptly resume performance hereunder. Notwithstanding the foregoing, a Party will not be relieved of any obligation to pay money in connection with this Agreement, including (without limitation): payment of any Fee by OWE, payment of any Liquidated Damage or reimbursement by Vendor, or any indemnification obligation of either Party.

IN WITNESS WHEREOF, both OWE and Vendor have hereunto accepted and executed this Agreement as of the date indicated below.

[SIGNATURES ON NEXT PAGE]

APP. 051

**DEALER**

Dated: 4/9/2024

By: _____

Print Name: Eric DeJohn

Its: Owner- EDJ Enterprises


**ONE WORLD ENERGY, LLC**
**D/B/A OUR WORLD ENERGY**

Dated: 4/10/2024

By: _Joshua Morton_____

Print Name: Joshua Morton

Its: Director of Business Development



## Schedule 1

### DEFINITIONS & RULES OF INTERPRETATION

1. **DEFINITIONS**.

1.1. "*Account Deductions*" means the Account deductions found on the OWE Dealer Portal; provided that OWE may revise the list of deduction items at any time in its sole and absolute discretion.

1.2. "*Advances*" has the meaning set forth on Exhibit B, and generally means a payment of all or a portion of a Fee by OWE to Vendor before it is completely earned by the Vendor. All payments to a Vendor prior to final completion of all Services and Work with respect of a Projectshall be deemed an Advance.

1.3. "*Affiliate*" means, with respect to either Party, a person or entity that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Party. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the engagement and policies of such person or entity, whether through the ownership of voting securities, by contract or otherwise.

1.4. "*Agreement*" means this Sub Dealer Agreement, collectively with the NDA, all Exhibits and Schedules attached hereto, and all other documents incorporated herein by reference.

1.5. "*Ancillary Services Agreement*" "*Ancillary Products Agreement*", "*ASA*", or "*APA*" means OWE's standard form ancillary services or products agreement, between OWE and a Qualified Customer, as may be modified from time to time by OWE in its sole and absolute discretion.

1.6. "*Applicable Law*" means any statute, law, ordinance, regulation, Prudent Industry Practices, rule, code, constitution, treaty, common law, governmental order, or other requirementor rule of law of any governmental authority, including (without limitation): (i) Federal and state privacy, data security and credit reporting laws, such as the Fair Credit Reporting Act, 15 U.S.C. 1681 et seq., and Regulation V, 12 C.F.R. § 1022.1 *et seq.*; (ii) Federal and state unfair, deceptiveor abusive acts and practices laws, such as the Dodd-Frank Act, 12 U.S.C. § 5531 *et seq.* and the Federal Trade Commission Act, 15 U.S.C. § 45 *et seq.*; (iii) Federal and state telecommunications laws, such as the Telephone Consumer Protection Act, 47 U.S.C.§ 227 *et seq.* and implementing regulations, 16 C.F.R. § 310.1 et seq. and 47 C.F.R. § 64.1200; (iv) Federal and state email communication laws, such as the CAN-SPAM Act, 15 U.S.C. § 7701 *et seq.* and implementing regulations, 16 C.F.R. § 316.1 *et seq.* and 47 C.F.R. § 64.3100 *et seq.*; (v)Federal and state advertising and marketing laws, such as the Federal Trade Commission Act, 15

U.S.C. § 41, *et seq.* and associated FTC Guides and Policy Statements; (vi) Federal and state electronic transactions laws and electronic contracting laws, such as state

1



Uniform Electronic Transactions Acts and the Electronic Signatures in Global and National Commerce Act, 15 U.S.C. § 7001 *et seq.*; (vii) the SEIA Solar Business Code; (viii) Direct Marketing Association's Business Code Articles 47 and 48; (ix) Federal and state home improvement and solar disclosure laws, such as California's Business and Professions Code § 7159 *et seq.*; and (x) Federal and state door-to-door solicitation laws, such as 16 CFR Part 429 *et seq.*

1.7. "*Authority Having Jurisdiction*" or "*AHJ*" means a Government Authority responsible for issuance of Permits.

1.8. "*Bailed Inventory Amount*" means the costs and expenses incurred by OWE in relation to or arising out of the procurement of the Inventory and the bailment thereof to Vendor, including (without limitation): costs of goods, transportation costs, delivery costs, tariffs, taxes, insurance costs, allocated overhead, and allocated general and administrative costs.

1.9. "*BOS Components*" means all wires, conduit, cables, junction boxes, flashing, sealants, cable management, and other components that are not part of the Major Equipment.

1.10. "*Business Day*" means any day, other than a U.S. Federal Holiday or a day on which banking institutions in the State of Arizona are authorized or obligated by Applicable Law or executive order to be closed.

1.11. "*Business Representative*" means the individual appointed by each Party pursuant to Section 2(c) as set forth on Schedule 2.

1.12. "*Change Order*" means change request by OWE, relating to a previously agreed Work Order, on OWE's standard form.

1.13. "*Code of Conduct*" means those policies and procedures of OWE, attached hereto as Exhibit A, as may be modified from time to time by OWE in its sole and absolute discretion.

1.14. "*Commissioning Protocol*" has the meaning set forth on Exhibit C.

1.15. "*Competitor*" means any person or entity that provides products and/or services that are substantially similar to or competitive with those offered or provided by OWE or any of its Affiliates at any time during the Restricted Period, including (without limitation) companies, persons, or entities in the business of selling (i) residential and commercial photovoltaic or solar thermal products or services; (ii) residential or commercial energy storage and battery products and services; (iii) energy management and home automation; (iv) electric vehicle chargers and services; (v) demand response and other distributed energy resources; and (vi) residential and commercial security and protection related products and services, collectively with any Affiliates, Vendors, or dealers of any of the foregoing.

1.16. "*Completion Certificate*" means the Form of Completion Certificate found on the OWE Dealer Portal; provided that OWE may revise the form or Completion Certificate at any time in its sole and absolute discretion.

1.17. "*Consumer*" means any natural person, including (without limitation): a

2



Customer, an Eligible Customer, and a Qualified Customer.

1.18. "*Contract Price*" has the meaning set forth in the applicable SPA.

1.19. "*Vendor Operations Manual*" means that certain OWE Vendor Operations Manual, as may be updated from time to time by OWE in its sole and absolute discretion.

1.20. "*Credit Authorization*" means (i) in the case of a PPA Project or Lease Project, OWE's standard form of credit authorization form, as may be modified from time to time by OWE in its sole and absolute discretion; and (ii) in the case of a Loan-SPA Project, the applicable financing party's standard form of credit authorization form, as may be modified from time to time by such financing party in its sole and absolute discretion.

1.21. "*Customer*" means each natural person to whom Vendor markets, promotes, solicits, and/or offers for sale the Products, whether or not such person qualifies as a Qualified Customer or executes a Customer Agreement.

1.22. "*Customer Agreements*" means OWE's standard form of Power Purchase Agreement, Solar System Lease Agreement, System Purchase Agreement, Ancillary Products Agreement, Maintenance Services Agreement, or other agreements between OWE and a Qualified Customer, in each case, as may be modified from time to time by OWE in its sole and absolute discretion.

1.23. "*Customer Information*" means the contract information and personal details concerning a Customer, including (without limitation): full legal name, date of birth, property address for the Project, mailing address, e-mail address, telephone number, and other information that may be requested by OWE from time to time.

1.24. "*D&E SOP*" means that certain OWE Design and Engineering Standard Operating Procedures Manual, as may be updated from time to time by OWE in its sole and absolute discretion.

1.25. "*Defect*" means any issue, problem, oversight, or failure in the Work, in the Equipment, in the Inventory, or any other aspect of the Services provided by Vendor that does not strictly comply at any time throughout the Warranty Period with (i) the Specifications; (ii) the Requirements; (iii) Applicable Law; (iv) this Agreement; (v) the Customer Agreement; (vi) any Permit; or (vii) causes any component or all of a System or a Project to fail to operate in the manner intended.

1.26. "*Deliverables*" has the meaning set forth on Exhibit C; provided that OWE may revise the required Deliverables at any time in its sole and absolute discretion.

1.27. "*Eligible Customer*" means a natural person that meets all of the following criteria:

(i) over eighteen (18) years of age; (ii) is a United States citizen; (iii) own the house upon which the System will be Installed; (iv) such house is a single family detached house and is not part of a multi-family dwelling; (v) such house is located in the Territory; (vi) has broadband internet available at the house; (vii) the structure, roof, and electrical distribution systems of the house are in good condition and capable of

3



supporting the System; (viii) Vendor has no reason to believe that such person will not satisfactorily passed all credit underwriting criteria of OWE and its financing partners; (ix) the house does not use electricity to heat a swimming pool; and (x) is not a Rejected Customer; provided that OWE may revise the required eligibility requirements for a Customer at any time in its sole and absolute discretion.

1.28. "*Eligible Lead*" means a Lead of an Eligible Customer.

1.29. "*EPC Fee*" means the value of the System based on its attributes, as determined by OWE in its sole and absolute discretion.

1.30. "*Equipment*" means Major Equipment, BOS Components, the Products, and any other material, hardware, or component part of a System or a Project.

1.31. "*Fees*" means those amounts owed to Vendor set forth on Exhibit B, as may be reduced by any amount owed by Vendor to OWE, including (without limitation): Liquidated Damages, Bailed Inventory Amounts, Reimbursements, repaid Advances, and indemnification obligations.

1.32. "*Fee Statement*" has the meaning set forth in Exhibit B.

1.33. "*FIN*" or "*Final Inspection Notice*" means a final inspection notice or similar notices or approvals issued by a Government Authority that demonstrates that the design, engineering, installation, and commissioning of the System and all other components of the Project satisfy all Permit requirements, pass the inspection, and comply with Applicable Law.

1.34. "*Force Majeure Event*" means the occurrence of any act or event beyond the reasonable control of the Party affected that prevents the affected Party from performing its obligations under this Agreement, in full or part, if such act or event is beyond the reasonable control of, and not the result of the acts or omissions of, the affected Party and such Party has been unable to overcome such act or event with the exercise of due diligence (including the expenditure of reasonable sums), to the extent caused by flood, earthquake, named storm, fire, lightning, epidemic, war, riot, sabotage, terrorism, or acts of god. Notwithstanding the foregoing, Force Majeure Events shall not include labor strikes or shortages, inclement weather, mechanical or equipment failures, supply shortages or delays, imposition of taxes, tariffs, or other charges, change in Applicable Law or requirements of Government Authorities, or the acts or omissions of a Customer.

1.35. "*Governmental Authority*" means any federal, commonwealth, state, or local regulatory agency or other governmental agency or authority having jurisdiction over a Party, a Representative of a Party, a consumer, a Customer, Qualified Customer, or the transactions contemplated by this Agreement or the Customer Agreement.

1.36. "*Initial Term*" has the meaning set forth on the first page set forth above.

1.37. "*In-Service Date*" means the date upon which all of the following shall have occurred (i) the Project is fully Installed; (ii) the Project has received all Permits and approvals required by any Government Agency; (iii) the Project has passed inspection by the applicable AHJ; (iv) the System has passed all startup

4



and performance tests, including the Commissioning Protocol and has been Verified as Operational; and (v) the Project has received its PTO Letter from the applicable utility; (vi) the System has been turned on and begun to produce energy; and

(vii) if applicable, billing for the Customer has commenced.

1.38. "*Install*", "*Installed*", or "*Install Complete*" means with respect to a System and Project (i) the System, all Products, and related components are fully and physically installed; (ii) the System is interconnected to the Property's electrical system; (iii) the System has passed the Commissioning Protocol; (iv) the System is communicating with OWE's remote monitoring platform; (v) all Deliverables have been provided to OWE; and (vi) the Project complies in all respects with the Specifications.

1.39. "*Install SOP*" means that certain OWE Installation Standard Operating Procedures Manual, as may be updated from time to time by OWE in its sole and absolute discretion.

1.40. "*Lead*" means an Eligible Customer that has expressed interested in purchasing one or more of the Products, first generated by Vendor in performing the Services under thisAgreement, and provided to OWE

1.41. "*Lien*" means any lien, mortgages, pledge, security interest, restriction, prior assignment, claim, any and all other encumbrances of every kind or character, including the claims of any bank, creditor, or taxing authority.

1.42. "*Liquidated Damage*" or "*LD*" means the payment of money by Vendor upon the occurrence of a specified event or the lapse of time, including (without limitation): delay liquidated damages, termination fees, and other amounts specified on Exhibit B and Exhibit C.

1.43. "*Maintenance Services Agreement*" means OWE's standard form solar systemmaintenance services agreement, between OWE and a Qualified Customer, as may be modified from time to time by OWE in its sole and absolute discretion.

1.44. "*Marketing Guidelines*" means that certain OWE Branding and Marketing Guidelines (as more particularly described on Schedule 4), as may be updated from time to time by OWE in its sole and absolute discretion.

1.45. "*MSA*" has the same meaning as "Agreement."

1.46. "*New Vendor Checklist*" means the checklist found on the OWE Dealer Portal; provided that OWE may revise the checklist items at any time in its sole and absolute discretion.

1.47. "*NTP*" has the meaning set forth on Exhibit C.

1.48. "*O&M SOP*" means that certain OWE Operations and Maintenance Standard Operating Procedures Manual, as may be updated from time to time by OWE in its sole and absolute discretion.

1.49. "*Party*" means each of OWE and Vendor.

1.50. "*Permit*" means an electrical, building, or other permit or approval required and issued by an AHJ in relation to installation of a System or any Product.

5



1.51. "*Permit Approved*" means the issuance by the applicable government authority of all electrical, building, and other permits and approvals required to install a System or other Products and their receipt by OWE.

1.52. "*Power Purchase Agreement*" or "*PPA*" means OWE's standard form of solar power purchase agreement, between OWE and a Qualified Customer, as may be modified from time to time by OWE in its sole and absolute discretion.

1.53. "*Products*" means a System and such other products made available by OWE to a Customer from time to time, including (without limitation): (i) electrical service upgrades; (ii) structural upgrades; (iii) reroofing; (iv) battery storage systems; and (v) electric vehicle chargers; provided that OWE may revise the eligible Products at any time in its sole and absolute discretion.

1.54. "*Project*" means the System, other Products, and Customer Agreement for a particular Customer at a specific Property.

1.55. "*Project Document*" means all required documentation other than a Customer Agreement required to install, inspect, commission, receive PTO, and activate a Project, including (without limitation): permits, HOA approval, net metering agreements, interconnection agreements, inspection notices, rebate forms, incentive forms, tax credit forms, and SREC documentation.

1.56. "*Property*" means the real property upon which the System and other Products will be installed, identified in the applicable Customer Agreement.

1.57. "*Prudent Industry Practices*" means, with respect to each System and Project, (a) the highest and most prudent standards of performance within the residential solar photovoltaic power generation industry in the relevant Territory and throughout the United States; and (b) those practices, methods, acts, equipment, specifications and standards of safety and performance, of which there may be more than one, and as the same may change from time to time, as are used in operating solar energy systems of a type and size similar to the Systems and in the same geographic region as the System that, at a particular time, by highest performing and most prudent participants in the solar industry that, at a particular time, in the exercise of reasonable judgment in light of the facts known or that reasonably should have been known at the time a decision was made, would be expected to accomplish the desired result in a manner consistent with Applicable Law, standards, equipment manufacturer's recommendations, reliability, safety, environmental protection, efficiency, economy and expedition.

1.58. "*PTO Letter*" means the permission to operate granted by the applicable utility or its equivalent.

1.59. "*Qualified Customer*" means an Eligible Customer that (i) meets the minimum credit score and other underwriting criteria that is required by OWE in its sole and absolute discretion; and (ii) is not a Rejected Customer; provided that OWE may revise the qualifications required of a Customer at any time in its sole and absolute discretion.

1.60. "*Qualified Lead*" means a Lead of a Qualified Customer.

6



1.61. "*Reimbursements*" means any and all amounts owed by Vendor to OWE relating to or arising from (i) costs incurred by OWE that should have been paid by Vendor; or (ii) amounts paid by OWE to Vendor that it did not earn, in each case pursuant to the terms of this Agreement, including (without limitation): the repayment of any Advances and all Reimbursements described on Exhibit B.

1.62. "*Rejected Customer*" means a customer that (i) fails to satisfy any of the requirements of a Eligible Customer at the time of originated, submitted, or for which payment was requested by Vendor; (ii) fails to satisfy any of the requirements of a Qualified Customer at the time of originated, submitted, or for which payment was requested by Vendor; (iii) is originated, submitted by Vendor, or for which Vendor requests payment during a time when Vendor was in breach of the Agreement or a Vendor Default had occurred; (iv) the Customer Information is inaccurate, incomplete, unavailable, or disconnected; (v) the Customer is already a Customer of OWE; (vi) the Customer is a duplicate of a Customer previously provided by Vendor; and/or (vii) the Credit Authorization, the Customer Agreement, the Project Documents, or any other Deliverable is incomplete or completed incorrectly; provided that OWE may revise the reason or cause for rejection of a Customer at any time in its sole and absolute discretion.

1.63. "*Representatives*" means, with respect to a Party, such Party's and its Affiliates' employees, officers, directors, managers, equity holders, agents, attorneys, Vendors, third-party advisors, successors, and permitted assigns.

1.64. "*Representative Certificate*" means the Form of Representative Certificate found on the OWE Dealer Portal; provided that OWE may revise the form or Representative Certificate at any time in its sole and absolute discretion.

1.65. "*Requirements*" means any and all terms, conditions, conditions precedent, Deliverables, and other requirements required of Vendor in connection with any Lead, Customer, or Project, including (without limitation) the requirements described and defined on Exhibit C; provided that OWE may revise the Requirements at any time in its sole and absolute discretion.

1.66. "*Restricted Period*" has the meaning set forth on Exhibit D.

1.67. "*SEIA Solar Business Code*" means the Solar Energy Industries Association's Solar Business Code (*available at* https://www.seia.org/initiatives/seia-solar-business-code).

1.68. "*Services*" means the obligations of Vendor under this Agreement as described on Exhibit C.

1.69. "*Set-Off*" means any amount owed by Vendor to OWE under this Agreement that OWE sets-off, deducts, or withholds from any payment by OWE to Vendor, pursuant to Section 3(e).

1.70. "*Signed Credit Authorization*" means a Credit Authorization that (i) all fields are accurately completed by the Qualified Customer, not the Vendor; and (ii) all initials, checkboxes, and signatures have been completed by the Qualified Customer.



1.71. "*Signed Customer Agreement*" means a Customer Agreement that (i) all fields are accurately completed by the Qualified Customer and Vendor (as applicable); (ii) all initials, checkboxes, and signatures have been completed by the Qualified Customer; (iii) the applicable licensed Representative of Vendor signed the Customer Agreement; and (iv) the applicable representative of OWE has countersigned the Customer Agreement.

1.72. "*Signed Project Documents*" means any and all Project Documents that (i) all fields are accurately completed by the Qualified Customer, Vendor, or OWE (as applicable); (ii) all initials, checkboxes, and signatures have been completed by the Qualified Customer, Vendor, or OWE (as applicable); and (iii) the applicable licensed representative of Vendor or OWE has signed each Project Document (as applicable).

1.73. "*Software*" means the software, computer systems, and other electronic tools owned or provided by OWE, including the Sales Tools, the D&E Tools, and the Install Tools.

1.74. "*Solar System Lease Agreement*" or "*Lease*" means OWE's standard form of solar system lease agreement, between OWE and a Qualified Customer, as may be modified from time to time by OWE in its sole and absolute discretion.

1.75. "*Solar System Purchase Agreement*" or "*SPA*" means OWE's standard form of solar system purchase agreement, between OWE and a Qualified Customer, as may be modified from time to time by OWE in its sole and absolute discretion.

1.76. "*SOP*" means one or more of OWE's standard operating procedures, including, but not limited to, the Vendor Operations Manual, Marketing Guidelines, D&E SOP, the Install SOP, and the O&M SOP.

1.77. "*Specifications*" means any applicable SOP.

1.78. "*System*" means a photovoltaic system comprised of Major Equipment and BOS Components.

1.79. "*System Size*" means, with respect to a System, the nameplate capacity of such System represented in Watts.

1.80. "*Territory*" has the meaning set forth on the first page set forth above.

1.81. "*Trademarks*" means all trademarks, trade names, corporate names, company names, business names, fictitious business names, Internet domain names, service marks, certification marks, collective marks, logos, other source or business identifiers, designs and general intangibles of OWE, including (without limitation): "One World Energy", "Our World Energy", and "OWE".

1.82. "*Watt*" means watts DC STC or nameplate rating of the applicable System or Solar

Panel.

1.83. "*Work Order*" means a request for Work by OWE including a NTP, on OWE's

standard form, which may be transmitted via e-mail or other electronic means to Vendor.

**2.      RULES OF INTERPRETATION.**

8



2.1. Except as otherwise expressly provided in this Agreement, each Party hereby agrees and acknowledges that the following rules of interpretation shall apply to this Agreement: (i) the singular includes the plural and the plural includes the singular; (ii) the word "or" is not exclusive; (iii) a reference to a law or governmental rule includes any amendment or modification to such law or rule, and all regulations, rulings and other laws promulgated under such law or rule; (iv) a reference to a person includes its successors and permitted assigns; (v) the words "include", "includes", and "including" are not limiting; (vi) the words "hereof," "herein", "hereunder", "hereby", and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement; and (vii) the words "will" and "shall" are used interchangeably with the same meaning. Article, Section and paragraph headings and the footers have been inserted in this Agreement as a matter of convenience for reference only, such are not a part of this Agreement, and shall not be used in the interpretation of any provision of this Agreement.

2.2.    The provisions this Agreement, all Exhibits and Schedules, including any amendments thereto, and any other instruments or documents referenced or incorporated herein shall, to the maximum extent possible, be interpreted consistently, and in a manner as to supplement each other and avoid any conflict between them. However, in the event of a conflict or inconsistency, the following order of precedence shall apply: (i) amendments to this Agreement executed by the Parties pursuant to Section 8(h); (ii) the Agreement; (iii) all other Schedules and Exhibits hereto; and (iv) any written communications (including e-mail) after the Effective Date.

### Schedule 2

### INSURANCE REQUIREMENTS

At all times throughout the Restricted Period and for three (3) years thereafter, Vendor shall obtain and maintain, and shall cause of its Representatives (including subVendors (if any)) to obtain and maintain, at its sole cost and expense, insurance meeting the following requirements, in each case in form, substance, and amount acceptable to OWE (in its sole and absolute discretion):

1. **INSURANCE TYPES AND AMOUNTS.**
    1.1. Compliance with Applicable Law. Insurance of the type and in minimum amount required by Applicable Law.
    1.2. Workers' Compensation. Workers' compensation and employers' liabilities insurances in amounts not less than $1,000,000.



1.3. Commercial General Liability Insurance. Commercial general liability insurance in amounts not less than $1,000,000 per occurrence and $2,000,000 in the aggregate, covering all of Vendor's operations, including (without limitation): premises and operations liability, products and completed operations liability, blanket contractual liability, personal injury liability, bodily injury and "broad form" property damage coverage, blanket contractual liability, explosion, collapse and underground hazard coverage. Commercial General Liability, including products and completed operations, shall be maintained for a minimum of three (3) years following the Term.

1.4. Property and Casualty Insurance. Property and casualty insurance covering (a) Seller's tools and equipment; (b) each Project during the Warranty Period in an amount equal to the EPC Fee for each Project; and (c) if applicable, one hundred fifty percent (150%) of the Inventory Maximum.

1.5. Excess Umbrella Liability. Excess umbrella liability insurance with a single limit of at least $5,000,000 per occurrence and in the aggregate, in excess of the limits of insurance provided above. Coverage shall be "following form" of the underlying general liability policy.

1.6. Professional Liability. Professional liability (errors and omissions) insurance with a limit of not less than $1,000,000 per occurrence and in $2,000,000 the aggregate. If the policy shall be written on a "claims-made basis" then the policy shall include (1) retroactive date that is no later than the Effective Date, and (2) any time a policy is written on a "claims-made basis" is not renewed or the retroactive date changed Vendor shall obtain or cause to obtain the broadest "tail" or extended reporting coverage commercially available.

2. **INSURANCE REQUIREMENTS.**

2.1. General. Each insurance policy shall meet all the following minimum requirements:

2.1.1. be with companies licensed to do business in each state in the Territory;

2.1.2. be with companies with financial ratings not lower than A-VII in AM Best's Insurance Guide;

2.1.3. be of a form, substance, and content satisfactory to OWE (in its sole and absolute discretion);

2.1.4. be written on a per occurrence basis (other than Professional Liability Insurance);

2.1.5. provide that not less than thirty (30) calendar days' prior written notice be given to OWE before any such policies are canceled or substantially changed to reduce the insurance provided thereby; and

2.1.6. be primary and noncontributory as respects any claims, losses or liability arising directly or indirectly from Seller's operations

10

APP. 063



2.2. <u>Waiver of Subrogation</u>. Each policy shall contain express waivers and endorsements providing that each insurer and underwriter waives all of its rights of recovery by subrogation, by or through Vendor, or otherwise against OWE or any of OWE's Representatives.

2.3. <u>Liability Insurance</u>. Commercial General Liability, Business Automobile Liability and Umbrella Liability policies shall include a severability of interest clause with cross-liability included.

2.4. <u>Deductibles</u>. Any deductible or self-insured retention shall be the responsibility of Vendor.

2.5. <u>Liability of Vendor</u>. The limits of insurance or applicable deductibles shall not limit the liability of Vendor or relieve Vendor of any liability or financial responsibility.

**3.    EVIDENCE OF INSURANCE.**

3.1. Prior to the commencement of any Work or the performance of any Services by Vendor, Vendor shall deliver to OWE certificate(s) of insurance, signed by an authorized insurance company representative, evidencing Vendor's compliance with this Schedule 3.

3.2. Except for Workers' Compensation Insurance and Professional Liability Insurance, each insurance policy of Vendor required hereunder shall name OWE and its Representatives as additional insureds for the Work, the Services, and all other obligations performed under or incidental to the Agreement.

3.3. Property Insurance and Builders' Risk Insurance policies shall name OWE as loss

payee.

**4.    FAILURE TO MAINTAIN**. Vendor understands and agrees that in the event that it or any of its Representatives fails to maintain any insurance required by this Schedule 2, then OWE may (but shall not be required to) obtain such insurance on behalf of Vendor or its Representatives and all premiums, deductibles, and other expenses incurred or payable by OWE in relation thereto shall be paid immediately by Vendor upon demand by OWE and/or OWE may set-off all such amounts pursuant to Section 3(e).

**5.    AMENDMENTS AND MODIFICATIONS**. Pursuant to Section 8(g) of the Agreement, this Schedule 2 may be modified at any time by OWE by delivering a Revised Exhibit to Vendor to its then-current e-mail address on file with OWE. Such Revised Exhibit shall be effective and binding upon Vendor and OWE after seven (7) calendar days of its delivery, unless such Revised Exhibit has a

11



specifically identified later effective date.

### **Schedule 3**

### **APPROVED**

### **SUBVENDORS**

| SubVendor Name: | State of Formation: | Tax ID No.: | Address: | License No.: | License State: | Issuing Agency for License |
|---|---|---|---|---|---|---|
| **NONE** | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

APP. 065



OUR WORLD

## Exhibit A

## FEES AND PAYMENTS

**1.    Payment Details**.

1.1.  <u>Calculation of Payments.</u> Vendor acknowledges and agrees that OWE will calculate the Fees payable to Vendor net of amounts owed by Vendor to OWE, including (without limitation): Liquidated Damages, Reimbursements, repaid Advances, and indemnification obligations.

1.2.  <u>Payment Amount.</u> Because OWE holds the appointment as an authorized dealer for solar manufacturers, the Parties hereby expressly agree that OWE will receive from the manufacturer the total payment for any sales completed by Vendor (the "Payment") and further agree to the following compensation structure for all work performed by Vendor under this Agreement:

1.3  Upon receipt of payment, OWE will hold back as a baseline rate the amount of $ <u>see pricing</u> per watt installed by OWE plus any applicable Adders pursuant to the Adders Sheet attached hereto as Exhibit A. OWE will provide Vendor three (3) days written notice prior to any changes to Exhibit A.

2.    In connection with each payment, OWE will deliver to Vendor a Fee Statement and Vendor shall be responsible for any and all taxes relating to or arising out of this Agreement (including any transaction privilege, general excise, use, sales or other transaction- based taxes on the Fees or any other payment hereunder). Any Fee to Vendor is contingent upon Vendor's prior satisfaction of each condition precedent, representation, and warranty under this Agreement.  In addition, the Parties agree that OWE will have the right to withhold any commissions owed to Vendor and, instead, make payments directly to Vendor's sales representatives from those commission in the event Vendor fails to make timely payments to its sales representatives.

1.3.  <u>Requirements.</u> In order to request payment for any Project, Vendor must completeeach of the following to the satisfaction of OWE:

1.3.1. *All Prior Milestones:* Vendor has satisfied all prior Milestones.
1.3.2. *Deliverables:* Vendor has provided to OWE all of the Deliverables.
1.3.3. *Representations:* In representing completion of a Milestone, Vendor alsorepresents and warrants that (i) the MSA is in full force and effect; (ii) Vendor is not in breach of

13



any obligation under the MSA; (iii) all representations and warranties in the MSA and related documents are true and correct in all respects; (iv) all Deliverables are complete and accurate; and (v) the Customer is a Qualified Customer and is not in breach of any obligation under the Customer Agreement.

    1.3.4. *Payment Request:* Vendor has submitted a Payment Request to OWE (if applicable).

    1.4. <u>Timing of Payment</u>. For each Payment Request that satisfies all Requirements in a calendar week, OWE will pay to Vendor the Fees attributable thereto on the following Friday, or if such Friday is not a Business Day, then the next Business Day.

    1.5. <u>Fee Statement</u>. In connection with each payment, OWE will deliver to Vendor an itemized statement of the Fees paid for each Project, the deductions for items such as Set-Offs, and Liquidated Damages, and any applicable taxes in relation therewith (each, a "*Fee Statement*").

    1.6. <u>Set-Off, Reimbursements, Liquated Damages</u>. Notwithstanding any of the forgoing, OWE may (in its sole and absolute discretion) set off, withhold, or otherwise deny payment against any and all unpaid amounts owed by OWE to Vendor for the following reasons:

    1.6.1. *General Set-Off:* For costs, expenses, and other liabilities pursuant to the Parties Agreement;

    1.6.2. *Delay LDs:* For Vendor's failure to achieve a Milestone before the applicable Deadline, then Vendor will be required to pay to OWE the applicable Delay LD described below;

    1.6.3. *Reimbursement:* For Vendor's failure to achieve a Milestone before the applicable Deadline, then Vendor will be required to pay to OWE the Reimbursements for Advances and Fees described below; and

    1.6.4. *Termination LD:* In the event of a termination of a Customer Agreement attributable to or arising from Vendor's acts or omissions, then Vendor will be required to pay to OWE the applicable Termination LD described below.

    1.6.5. *Cancellation Fees:* OWE may (in its sole and absolute discretion) set off, withhold, or otherwise deny payment against any and all unpaid amounts owed by OWE to Vendor, for an amount equal to OWE's costs incurred for any cancelled Customer.

    1.6.6. *System Removal Fees:* In the event a system needs to be removed from a Customer's home, for whatever reason, Vendor will be charged a $5.00 per watt fee ("Removal Fee"). The Removal Fee charge noted herein is in the discretion of OWE and will turn on whether OWE and Customer are able to create a satisfactory experience for Customer.

14



1.7. <u>Reasonableness of LDs and Reimbursements</u>. The Parties hereby acknowledge and agree that each of the Delay LD, the Reimbursement, the Termination LD, and the Cancellation Fees ie estimate of the actual damages that would be incurred by OWE under such circumstances and in no event do such liquidated damages or reimbursements constitute a penalty. These remedies shall be considered cumulative and OWE shall be entitled to all other rights, remedies, and relief under this Agreement and Applicable Law.

1.8. <u>Effect upon Termination</u>. In the event of any termination of this Agreement, regardless of the reason therefor or the Party initiating such termination, subject to OWE's right to off-set herein, Vendor shall be entitled to receive payment for only those Projects that achieved Welcome Call prior to the effective date of the termination.

2. **Payment Schedule of Vendor Fees.** Fees will be released to Vendor in accordance with the following payment schedule:

   1. 50% of the commission fee, up to $ 2,000 _____ will be released to Vendor the Friday following NTP.
   2. Balance of the commission fee will be released to Vendor the Friday following installation of Client's system.
   3. In no event will OWE pay more than 50% of total commissions in the pipeline. If the pipeline falls below 50% commissions, then commissions will be held back.

3. **Cancellations and Vendor Fulfillment to Job:** In the event of any reversal of funding to OWE, all paid commissions associated with the reversal of such funding will be debited against Vendor's future compensation. Nonetheless, OWE is not responsible for paying Vendor the full amount of any commission until OWE has received funding from the Client for the install. In the event of a client cancellation, Vendor shall refund any funding received as compensation plus 100% of any incurred costs (Plans, permit, MPU, etc.). Refund may be held back from future earning in OWE's sole discretion. Moreover, any charge back made by the installer will be the full responsibility of Vendor and not OWE. Additionally, any draws on projects provided to Vendor will be withdrawn, if there are delays on a project beyond the installer timelines and the installer elects to claw the money back.

4. **Amendments.** The Vendor Fee Schedule set forth herein are subject further to the additional terms and conditions of the Adders Schedule, which is included below and is expressly incorporated herein. The Adders Schedule reflects



additional costs and expenses that may impact Vendor's Fee Schedule. During the terms of this Agreement, the Adders Schedule as well as this Vendor Fee Schedule may be revised from time to time and is, therefore, subject to change. **THESE REVISIONS TO THE ADDERS SCHEDULE MAY IMPACT A VENDOR'S COMMISSION AND VENDOR AGREES TO BE FULLY RESPONSIBLE**

**FOR ANY CHANGES IN THE ADDERS SCHEDULE**. Nonetheless, Vendor hereby expressly agrees to be bound by the Adders Schedule and future revisions thereto, as applicable. Vendor represents and warrants that it has had a chance to fully review the Adders Schedule and this provision, seek advice of counsel regarding same, and expressly agrees to the terms of the Adders Schedule, as revised from time to time, and this provision.

### Adders Schedules

The foregoing charts are intended to simply highlight typical Adders that may apply to a Vendor's transactions; however, the above charts DO NOT include all potential Adders that may apply to a particular transaction and, as such, Vendor hereby acknowledges and agrees that additional Adders may be applicable for a given transaction which may reduce Vendor's overall compensation for a given transaction. Vender hereby acknowledges and agrees that Adder prices shown below do not reflect final amount and that prices are subject to change. Please reach out to your dealer relations manager for an updated list and prices.

16

APP. 069



**Exhibit B**

**VENDOR OBLIGATIONS**

Throughout the Term, Vendor agrees that it will strictly comply with all of the following
obligations set forth in this Exhibit B. In addition, Vendor shall train and instruct its employees, agents, and Affiliates to strictly comply with all Vendor Obligations. Vendor acknowledges and agrees that it shall be liable for any of the acts or omissions of any employee, agent, or Affiliate in relation to or arising out this Agreement, the Services, and/or these Vendor Obligations.

1. **GENERAL OBLIGATIONS.**
   1.1. Understand, train all employees on, and comply with the OWE Code of Conduct;
   1.2. Comply in all respects with Applicable Law;
   1.3. Comply in all respects with the terms and conditions of the Customer Agreement;

and
   1.4. Comply in all respects with the terms, conditions, and requirements of the Sub

Dealer Agreement.

2. **AMENDMENTS AND MODIFICATIONS.** This Exhibit B may be modified at any time by OWE by delivering a Revised Exhibit to Vendor to its then-current e-mail address on file with OWE. Such Revised Exhibit shall be effective and binding upon Vendor and OWE after seven (7) calendar days of its delivery, unless such Revised Exhibit has a specifically-identified later effective date.

3. **LEAD GENERATION SERVICES.** Vendor agrees to strictly comply with and perform the following "*Lead Gen Services*":
   3.1. Required Obligations. Vendor will act as an authorized lead generator for OWE. Vendor will be required to perform the following functions:
      3.1.1. All aspects of marketing, advertising, lead generation, solicitation, selling, and closing of Qualified Customers;
      3.1.2. Vendor shall ensure that all Customers, including all Qualified Customers, understand all terms of the Customer Agreements, the Products, and the relationship between Vendor and OWE;
      3.1.3. Obtain a Signed Credit Authorization and a Signed Customer Agreement for each Project; and
      3.1.4. Account management of Qualified Customers through Customer support as and when requested by OWE throughout the Restricted Period.

18



4. **SALES DEALER SERVICES**. Vendor agrees to strictly comply with and perform the following "*Dealer Services*":

4.1. Required Obligations. Vendor will act as an authorized Sales Dealer for OWE. Vendor will be required to perform the following functions:

4.1.1. All Lead Generation Services;

4.1.2. Vendor shall ensure that all Customers, including all Qualified Customers, understand all terms of the Customer Agreements, the Products, and the relationship between Vendor and OWE;

4.1.3. Account management of Qualified Customers through PTO; and

4.1.4. Customer support as and when requested by OWE throughout the Restricted Period.

4.2. Prohibited Activities. Vendor will not perform any of the following services or engage in any of the following activities:

4.2.1. design or engineering services in relation to a Project;

4.2.2. installation and construction services in relation to a Project;

4.2.3. interact in any way with any permitting authority or electric utility inrelation to a Project; and

4.2.4. submit and/or apply for any rebate, incentive, SREC, tax credit, or other environmental attribute in relation to a Project.

4.3. Sales Tools. Vendor shall be required to use and strictly adhere to the requirements ofOWE's software tools and systems in all aspects of its sales activities (*e.g.,* NEO and Doors; collectively, the "*Sales Tools*"). Vendor acknowledges and agrees that OWE may modify its Sales Tools from time to time, including both functionality and steps required, without notice to Vendor. For the avoidance of doubt, OWE may (in its sole and absolute discretion) amend, modify, alter, or in any way change the Customer Agreements, Project Documents, and other steps and required documentation in the Sales Tools.

## Exhibit C

## CODE OF CONDUCT

At all times, Vendor must strictly comply with this Code of Conduct. OWE reserves the right to amend, supplement, or in any way modify this Code of Conduct at any time in its sole and absolute discretion. Any violation of this Code of Conduct by Vendor shall constitute a Vendor Default.

1. **RECORDS RETENTION.** Vendor must maintain copies of all pertinent information relating to the Services, including any record of a Customer, and provide said copies/ information promptly to OWE to hold for a period of not less than three (3) years. Vendor must comply with all applicable laws

19



concerning records and document retention.

2. **DATA AND CYBER SECURITY.** Vendor must protect, safeguard, and keep confidential all information concerning any customer, OWE, or any of OWE's employees, agents, or other independent Vendors. In the event of any data breach, Vendor must immediately notify OWE.

3. **TRAINING.** Vendor must successfully complete all required training to the satisfaction of OWE on the content and requirements of the Agreement, the Services, this Code of Conduct, and applicable law. As and when requested by OWE, Vendor must provide copies of training certificates for review.

4. **ANTICORRUPTION.** Vendor must comply with all applicable anticorruption and antibribery laws such as the United States Foreign Corrupt Practices Act. Vendor must never pay or receive a bribe or receive or provide anything of value to any person (including government officials) in order to improperly influence such person.

5. **MARKETING GUIDELINES.** Vendor must not use OWE's name, logo, or any trademark without the express written permission of OWE's Marketing and Legal Departments. Any change to marketing materials previously approved must be submitted to OWE for approval.

6. **TELEMARKETING REQUIREMENTS.** Vendor must comply with all laws and registration requirements relating to telemarketing, including do-not-call requirements. Vendor is not permitted to (a) make any unsolicited call or send text messages to a cell phone number; or (b) make any call through an automated dialer (including any telephony technology that is capable of autodialing).

7. **SEIA BUSINESS CODE.** Vendor must comply with the Solar Energy Industries Association (SEIA) Business Code, available at https://www.seia.org/initiatives/seia- solar-business-code.

8. **ETHICS STANDARDS.** Vendor must strictly comply with OWE's Ethics Standards:

   8.1.   Creating a False Account. You may not create a false account of any kind. This includes creating an account under a fictitious name or the name of someone who has not expressly agreed to have an account created in their name. All customer agreements must be signed by the homeowner. The homeowner's spouse or domestic partner may also sign a PPA, Lease or Cash SPA, but only if the homeowner also signs. No person who is not a homeowner or homeowner's spouse may sign a customer agreement.

20



**8.2.** <u>Notice of Cancellation</u>. You must orally notify customers that they have the right to cancel the contract as required by state and federal law. In doing so, you may not state that the contract is "not binding" or anything to that effect; the contract is binding unless the customer exercises his or her right to cancel.

**8.3.** <u>Misrepresentations Regarding Relationships with Utilities</u>. You may not say or do anything that may reasonably cause a customer to believe you or OWE is affiliated with a utility company. You do not work for or in partnership with any utility. Other than net metering and interconnection, there is no relationship between OWE and a utility company.

**8.4.** <u>Forgery</u>. You may not sign a customer agreement or check a signature box in a customer agreement on a customer's behalf. Checking a signature box for a customer, or leading them to believe it means something it doesn't, is the same as forging their signature. Similarly, you may not knowingly allow any person to sign or check a signature box in a customer agreement on behalf of another person.

**8.5.** <u>Running Customer Credit Without Consent</u>. Obtaining a consumer report can negatively impact a customer's credit and, consequently, should only be done with a customer's express authorization, appropriate for the circumstances (or other circumstances expressly approved by OWE). You must never allow another person, even a spouse or partner, to authorize a credit check on behalf of someone else.

**8.6.** <u>Providing False Information</u>. You may not provide false or inaccurate information concerning any customer in order to progress an account. You must use the customer's correct email address and may not use personal or company devices to access that account. If a customer does not have an email address, they must create one on their own device and be capable of accessing it without our assistance. It is also unethical to submit incorrect usage, utility, or payment information.

**8.7.** <u>Contract Terms</u>. You may not promise customers anything that contradicts the terms of their agreement, including any promise concerning: (a) energy production (except in a lease); (b) a customer's ability to terminate the agreement after the system is installed; and/or (c) the cost to remove the system temporarily. You may not enter into side deals with customers that are not memorialized in written agreements approved by OWE. And nothing is free!

**8.8.** <u>Sharing Confidential Information</u>. You may not share confidential

21



information with anyone outside of OWE or allow anyone to do work on your behalf without the prior written consent of OWE. This includes allowing anyone to access OWE's information technology systems using our log-in information.

**8.9.** <u>Misrepresentations Regarding Competition and Utilities</u>. You may not make untrue or misleading statements about a competitor or a utility company. For example, you may not represent that a utility's or competitor's rates will increase withoutdata to support your claim and approval by OWE.

**8.10.** <u>Elderly Customers</u>. You need to treat elderly customers (individuals over 65 years old) with extra care to ensure that they understand OWE's products and services. This includes not taking advantage of an older customer's inexperience with or lack of access to technology, or unfamiliarity with utility rates and usage.

**8.11.** <u>Sales Presentation Language</u>. You cannot speak with any consumer in any language other than English and Spanish. If you would like to use Spanish in your sales presentation, then you must use a Spanish customer agreement. The same is true for English speaking customers.

**8.12.** <u>Savings</u>. You may not promise any customers that they will save money through any of the products OWE offers. As a result, we must be extremely careful when discussing potential savings with consumers. You may not say or do anything to make a consumer believe that they are guaranteed to save money. OWE does not promise the availability of or eligibility for any local, state, or federal incentives or tax credits.

9. **AMENDMENTS AND MODIFICATIONS.** This Exhibit may be modified at any time by OWE by delivering a revised exhibit to Vendor to its then-current e-mail address on file with OWE. Such revised exhibit shall be effective and binding upon Vendor and OWE after seven (7) calendar days of its delivery, unless such revised exhibit has a specifically-identified later effective date.

## Exhibit D

## MARKETING REQUIREMENTS

At all times throughout the Term, Vendor shall strictly comply with the requirements set forth in this Exhibit (collectively, the "Marketing Requirements").

1. **RELATIONSHIP WITH OWE.** At all times throughout the Term, Vendor shall

22



disclose in a clear and conspicuous manner the independent Vendor relationship between OWE and Vendor in a manner consistent with the terms of this Agreement. Vendor shall ensure that each Consumer and Customer understands the independent Vendor relationships between Vendor and OWE.

2. **GENERAL MARKETING.** All marketing materials used by Vendor must comply in all respects with this Agreement, the Code of Conduct, the SEIA Business Code, and all applicable law. In addition, Vendor agrees that it shall, at all times throughout the Term, strictly adhere to OWE's marketing guidelines and practices.

3. **OWE MATERIALS.** Vendor and all of its Representatives are required to use only the written marketing materials prepared and provided by OWE. Vendor shall not (i) use any other written marketing materials; (ii) remove any logos, copyrights, or other markings from OWE Materials; or (iii) modify, alter, or in any way change the OWE Materials.

4. **TRADEMARKS.** Vendor acknowledges and agrees that it has no interest in any OWE- related trademarks and that OWE will remain the sole and exclusive owner of all right, title, and interest in the trademarks. Vendor acknowledges and agrees that Vendor's use of the trademarks, and any goodwill in the trademarks resulting from Vendor's use, will inure solely to the benefit of OWE and will not create any right, title or interest for Vendor in such marks. Vendor shall not contest, oppose, or challenge ownership of the Trademarks.

5. **INTERNET-BASED MARKETING.** Vendor agrees that it will not bid on any OWE- branded key words in connection with any internet search, social media, or display advertising campaign (whether alone or in combination).

6. **LIABILITY; INDEMNIFICATION; VENDOR DEFAULTS.** Vendor acknowledges and agrees that it shall be strictly liable for its failure to comply with all terms of these Marketing Requirements. Vendor shall indemnify, defend, and hold OWE harmless for any and all claims, lawsuits, losses, lost profits, or damages that may arise from, relate to,

or are in any way caused by the acts or omissions of Vendor arising from this Exhibit. Any violation of these Marketing Guidelines shall constitute a Vendor Default.

7. **AMENDMENTS AND MODIFICATIONS.** This Exhibit may be modified at any time by OWE by delivering a revised exhibit to Vendor to its then-current e-mail address on file with OWE. Such revised exhibit shall be effective and binding upon Vendor and OWE after seven (7) calendar days of its delivery, unless such

23



revised exhibit has a specifically-identified later effective date.

## Exhibit E

## RESTRICTIVE COVENANTS

1.  **DEFINITIONS.**    The following terms used herein, including in the preamble and recitals, shall have the following meanings:

1.1.    "*Competitor*" means any person or entity that provides products and/or services that are substantially similar to or competitive with those offered or provided by OWE or any of its Affiliates at any time during the Restricted Period, including (without limitation) companies, persons, or entities in the business of selling (i) residential and commercial photovoltaic or solar thermal products or services; (ii) residential or commercial energy storage and battery products and services; (iii) energy management and home automation; (iv) electric vehicle chargers and services; (v) demand response and other distributed energy resources; and (vi) residential and commercial security and protection related products and services, collectively with any Affiliates, Vendors, or dealers of any of the foregoing.

1.2.    "*Confidential Information*" means any and all information (whether written, electronic, or oral) furnished at any time by a Disclosing Party or its Representatives to a Receiving Party or its Representatives and all analyses, compilations, forecasts, studies or other documents (whether written or electronic) prepared by a Receiving Party or its Representatives which contain or reflect any such information; provided, however, the following shall not be considered "Confidential Information" for purposes hereof: (1) information that was already in Receiving Party's possession by legitimate means prior to receipt from Disclosing Party, (2) information that is or becomes publicly available provided, that, the source of such information or material was not bound by a contractual, legal or fiduciary obligation of confidentiality to the Receiving Party or any other party with respect thereto, or other than as a result of a disclosure by Receiving Party or its Representatives in violation of this Agreement,
(3) information that is independently developed by Receiving Party or its Representatives without reference to or use of other elements of the Confidential Information, (4) information that is generally made available by Disclosing Party to third parties without restriction, and (5) information that is provided by Disclosing Party to Receiving Party with express prior written approval that such Confidential Information is approved for public

24



dissemination.

1.3.  "**Disclosing Party**" means a Party or its Representative that sends (by any means) any Confidential Information to Receiving Party.

1.4.  "**Receiving Party**" means that Party or its Representatives to whom any Confidential Information is sent by a Disclosing Party.

1.5.  "**TPO Services**" means the Services performed by Vendor under the Agreement relating to or arising from Customers that have or will enter into Customer Agreements.

2.  **CONFIDENTIALITY.**

2.1.  <u>Obligations of Receiving Party</u>.

2.1.1.  Each Receiving Party shall: (i) keep and safeguard all the Confidential Information as confidential; (ii) not disclose any Confidential Information in any manner whatsoever, except as required by applicable law pursuant to <u>Section 3</u> below; and (iii) not use any Confidential Information for its own financial gain or benefit.

2.1.2.  Notwithstanding the foregoing, a Receiving Party may reveal the Confidential Information to its Representatives (i) who are informed by Receiving Party of the confidential nature of the Confidential Information; and (ii) who agree to strictly abide by the terms of this Agreement, or are under a duty of confidentiality to the Receiving Party no less strict than the terms of this Agreement.

2.1.3.  Each Party shall cause its Representatives to observe the terms of this Agreement. Neither Party may remove any proprietary, copyright, confidential, trade secret or other legend from any of the other Party's Confidential Information.

2.2.  <u>Required Disclosures</u>. In the event that a Receiving Party is requested or required by a court of competent jurisdiction (whether by interrogatory, request for information or documents, subpoena, deposition, court order, or other process) to disclose any Confidential Information (the "Required Disclosure"), Receiving Party shall, to the extent permitted by applicable law, provide prompt written notice to Disclosing Party concerning such Required Disclosure. If Receiving Party determines that such notice is

25



permitted by law, Receiving Party shall cooperate with Disclosing Party in seeking an appropriate protective order. If the Required Disclosure is required by applicable law, then Receiving Party shall ensure that no additional Confidential Information than strictly necessary is disclosed in complying with any such request or requirement. In any event, Receiving Party will not oppose any action by Disclosing Party to obtain an appropriate protective order, injunction, or other reliable assurance that confidential treatment will be accorded the Confidential Information.

2.3.    <u>Destruction or Erasure of Confidential Information</u>. To the fullest extent permitted by applicable law, and to the extent reasonably practicable, Receiving Party agrees that it will, upon Disclosing Party's written request:

2.3.1.  Promptly destroy all copies of the written Confidential Information in Receiving Party's possession and provide written notice of such destruction to Disclosing Party in writing;

2.3.2.  Take reasonable steps to delete, erase, and remove electronic Confidential Information in Receiving Party's computer systems and provide written notice of such deletion and removal to Disclosing Party in writing; and/or

2.3.3.  Promptly deliver to Disclosing Party, at Receiving Party's sole expense, all copies of the written Confidential Information in Receiving Party's possession.

Receiving Party shall be permitted to retain copies of the Confidential Information to the extent required to comply with any law or court order to which Receiving Party is subject. Notwithstanding anything to the contrary contained herein, any Confidential Information, or copy or portion thereof, that is retained by a Receiving Party shall be maintained in accordance with the confidentiality obligations of this Agreement for so long as such Confidential Information is held.

2.4.    <u>United States Securities Laws</u>. Vendor hereby acknowledges that it is aware that the United States securities laws prohibit any person who has material non-public information concerning OWE from purchasing or selling securities of OWE (including options, warrants, or other derivative or synthetic securities that derive their value based on other securities of OWE) and from communicating such information to any other person under circumstances in which it is reasonably foreseeable that such person, including, without limitation, any of its Representatives, is likely to purchase or sell such securities. Vendor agrees that, to the extent that it

26



or violation of this <u>Exhibit E</u> by Vendor or any of its Representatives will result in irreparable harm to OWE, its Representatives, and their respective business interests and goodwill. If there is a violation of the No-hire Clause with Vendor, as noted in section 5 above in this Exhibit E, there will be $150,000 charge per person.

7. **NON-EXCLUSIVITY OF OWE.** Nothing in this Agreement shall restrict the right of OWE to engage, directly or indirectly, in the same activities as Vendor, whether for its own account or otherwise.

8. **SEVERABILITY.** Each of the Parties hereby expressly acknowledge and agree that all restrictive covenants set forth in this <u>Exhibit E</u> should be enforced to the maximum extent permitted by applicable law. In the event that any time period, scope, or term of any provision in this <u>Exhibit E</u> is declared by a court of competent jurisdiction to exceed the maximum time period, scope, or term that such court deems enforceable, then such court

shall reduce the time period, scope, or term to the maximum time period, scope, or term permitted by Applicable Law.

9. **AMENDMENTS AND MODIFICATIONS.** This Exhibit may be modified at any time by OWE by delivering a revised exhibit to Vendor to its then-current e-mail address on file with OWE. Such revised exhibit shall be effective and binding upon Vendor and OWE after seven (7) calendar days of its delivery, unless such revised exhibit has a specifically-identified later effective date.

10. **NON-CIRCUMVENTION.** Vender hereby expressly acknowledges and agrees that, during the term of the Parties Agreement, Vender, itself or through its sales partners, will not work directly with OWE's financing partners, suppliers, or other of OWE's strategic partners, without the express written permission of OWE.

[SIGNATURES ON NEXT PAGE]

28



has actually received Confidential Information pursuant to this Agreement that constitutes material non-public information, it will not trade any securities of OWE while in possession of such information and that it will not use any Confidential Information in contravention of the United States securities laws.

3.  **NON-DISPARAGEMENT.** Neither Party will make any statement (whether truthful or not) to another person or entity that could in any way adversely affect the reputation, brand, or image of the other Party.

4.  **NO REMARKETING.** At all times during the Restricted Period and throughout the Territory, Vendor will not (whether directly or indirectly, either through itself or any Representative) after providing a Customer to OWE (i) sell, remarket, attempt to sell or remarket, or offer to another person a Lead, a Qualified Customer, or the Project; or (ii) sell, promote, solicit interest, or refer any other product or service of another person to a Qualified Customer other than the Products.

5.  **NON-SOLICITATION.** For a period of three (3) years, Vendor shall not, directly or indirectly, for any reason whatsoever: (a) solicit, sell, promote, or induce, or attempt to solicit, sell, promote, or induce any Customer to terminate, cancel, not renew a contract, or in any way cease to do business with OWE; (b) solicit, induce, or attempt to solicit or induce any employee of OWE to terminate their employment with OWE; (c) induce, solicit, or in any way cause any dealer, lead gen provider, or Vendor that Vendor knows or has reason to know provides such services to OWE to terminate, cancel, or not renew (in whole or in part) its relationship with OWE; or (d) any retail store owner or operator, home builder, or other channel partner to terminate, cancel, or not renew (in whole or in part) its relationship with OWE; (d) engage with any retail store owner or operator, home builder, or other channel partner to terminate, cancel, or not renew (in whole or in part) its relationship with OWE; or (e) engage with any inbound communication, including but not limited to email, phone, mail, or in-person, where another person or entity approaches Vendor seeking employment, i.e., No-hire Clause with Vendor, whereby the result would be employment during the three (3) years as set forth herein.

6.  **REMEDIES.** Vendor hereby acknowledges and agrees that any action taken by Vendor or its Representatives in violation of these Restrictive Covenants set forth on this <u>Exhibit</u> <u>E</u> would result in substantial damages to OWE and/or its Representatives, and that such damages would be difficult to determine as a result of the direct and indirect harm to OWE, its Representatives, and their respective businesses. Vendor further acknowledges and agrees that any breach

27



Dated: 4/9/2024 _____

By: _____
DocuSigned by:
17B272C217EA466...

Print Name: EDJ Enterprises Inc _____

Its: Owner- EDJ Enterprises _____


**ONE WORLD ENERGY, LLC D/B/A OUR WORLD ENERGY**

Dated: 4/10/2024 _____

By: _Joshua Morton_____
DocuSigned by:
77E5027FC072424...

Print Name: Our World Energy _____

Its: Director of Business Development ___

APP. 081

Exhibit
A-3

**Rebehka Lopez**

| | |
|---|---|
| **From:** | Alicia O'Neill  <aoneill@ourworldenergy.com> |
| **Sent:** | Tuesday, December 31, 2024 12:28 PM |
| **To:** | eric.worldenergy@gmail.com |
| **Cc:** | OWE Legal |
| **Subject:** | Cease and Desist Notice |
| **Attachments:** | Legal - Summons - Kelly Bland.pdf |

Dear Mr. DeJohn,

Attached to this email, please find a lawsuit filed by a woman in Texas named Kelly Bland against Our World Energy. In the lawsuit, Ms. Bland alleges that you initiated phone calls to her in violation of the Telephone Consumer Protection Act (see paragraphs 34-36).

As you know, the agreement between OWE and EDJ Enterprises requires strict compliance with federal and state laws, including do-not-call regulations. These allegations are being taken seriously. Effective immediately, we are instructing you to **cease and desist any communications or solicitations that could potentially violate the TCPA or other applicable laws.**

If you believe you were authorized to contact Ms. Bland or that she provided prior consent, please provide supporting evidence to me at your earliest convenience, OWE will review this matter thoroughly.

Please confirm receipt of this email and your understanding of the directive to cease and desist. Let me know if you have any questions regarding this notice.



**Alicia O'Neill**
Finance, Accounting, Strategy, &
Legal Program Manager
Our World Energy

✉ aoneill@ourworldenergy.com

📞 (623) 253-8286

📍 8716 W Ludlow Dr, Suite 6
Peoria, AZ 85381

🔗 **ourworldenergy.com**

APP. 082

AO 440 (Rev. 12/09)  Summons in a Civil Action

**RECEIVED**

NOV  5 2024

# UNITED STATES DISTRICT COURT

for the

Northern District of Texas

| | |
|---|---|
| Bland | ) |
| _____ | ) |
| *Plaintiff* | ) |
| v. | ) |
| Our World Energy LLC et al | ) |
| _____ | ) |
| *Defendant* | ) |

Civil Action No.  4:24-cv-00994-P

### SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  Our World Energy LLC


A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

> Andrew Roman Perrong
> Perrong Law LLC
> 2657 Mt. Carmel Ave
> Glenside, PA 19038
> 215-225-5529
> Fax: 888-329-0305

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____10/29/2024_____

s/ M. Wills

*Signature of Clerk or Deputy Clerk*

Case 4:24-cv-00994-P   Document 5   Filed 10/29/24   Page 2 of 2   PageID 25

RECEIVED

NOV 5 2024

AO 440 (Rev. 12/09)  Summons in a Civil Action (Page 2)

Civil Action No.  4:24-cv-00994-P

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❐  I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❐  I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❐  I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❐  I returned the summons unexecuted because _____ ; or

❐  Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $ ____0.00____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:




APP. 084

RECEIVED
Nov 5 2024

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS

KELLY BLAND, individually and on
behalf of all others similarly situated,

                     Plaintiff,

    v.

OUR WORLD ENERGY LLC
AND
SUNSCI MEDIA LLC

                Defendants.

Case No. 24-994

**JURY TRIAL DEMANDED**

## PLAINTIFF'S CLASS ACTION COMPLAINT

Plaintiff Kelly Bland ("Ms. Bland"), by her undersigned counsel, for this class action complaint against Defendants Our World Energy LLC and SunSCI Media LLC as well as their present, former and future direct and indirect parent companies, subsidiaries, affiliates, agents and related entities, alleges as follows:

### I.    INTRODUCTION

1.    <u>Nature of Action</u>: "Telemarketing calls are intrusive. A great many people object to these calls, which interfere with their lives, tie up their phone lines, and cause confusion and disruption on phone records. Faced with growing public criticism of abusive telephone marketing practices, Congress enacted the Telephone Consumer Protection Act of 1991. Pub. L. No. 102-243, 105 Stat. 2394 (1991) (codified at 47 U.S.C. § 227). As Congress explained, the law was a response to Americans 'outraged over the proliferation of intrusive, nuisance calls to their homes from telemarketers,' *id.* § 2(6), and sought to strike a balance between '[i]ndividuals' privacy rights, public safety interests, and commercial freedoms,' *id.* § 2(9)." *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 649 (4th Cir. 2019).

RECEIVED
NOV 5 2024

2.      "[T]he law opted for a consumer-driven process that would allow objecting individuals to prevent unwanted calls to their homes. The result of the telemarketing regulations was the national Do-Not-Call registry. *See* 47 C.F.R. § 64.1200(c)(2). Within the federal government's web of indecipherable acronyms and byzantine programs, the Do-Not-Call registry stands out as a model of clarity. It means what it says. If a person wishes to no longer receive telephone solicitations, he can add his number to the list. The TCPA then restricts the telephone solicitations that can be made to that number. *See id.*; 16 C.F.R. § 310.4(b)(iii)(B) ('It is an abusive telemarketing act or practice and a violation of this Rule for a telemarketer to . . . initiat[e] any outbound telephone call to a person when . . . [t]hat person's telephone number is on the "do-not-call" registry, maintained by the Commission.'). . . . [P]rivate suits can seek either monetary or injunctive relief. [47 U.S.C. § 227(c)(5)]. . . . This private cause of action is a straightforward provision designed to achieve a straightforward result. Congress enacted the law to protect against invasions of privacy that were harming people. The law empowers each person to protect his own personal rights. Violations of the law are clear, as is the remedy. Put simply, the TCPA affords relief to those persons who, despite efforts to avoid it, have suffered an intrusion upon their domestic peace." *Id.* at 649-50.

3.      Plaintiff, individually and as class representative for all others similarly situated, brings this action against Defendants for violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA") for making telemarketing calls to numbers on the National Do Not Call Registry, including her own.

4.      Because telemarketing campaigns generally place calls to thousands or even millions of potential customers *en masse*, Plaintiff brings this action on behalf of a proposed

APP. 086

RECEIVED

NOV 5 2024

nationwide class of other persons who received illegal telemarketing calls from or on behalf of Defendants.

## II.    PARTIES

5.   Plaintiff Bland is an individual who resides in the Northern District of Texas.

6.   Defendant Our World Energy LLC is an Arizona-based solar sales and installation company that sells its solar services regionally, including in Texas.

7.   Defendant SunSCI Media LLC is a North Carolina LLC with its principal place of business in North Carolina. Our World, hired this defendant to place illegal telemarketing calls on its behalf.

## III.    JURISDICTION AND VENUE

8.   <u>Jurisdiction.</u> This Court has federal-question subject matter jurisdiction over Plaintiff's TCPA claims pursuant to 28 U.S.C. § 1331 because the TCPA is a federal statute. 47 U.S.C. § 227; *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372 (2012).

9.   <u>Personal Jurisdiction:</u> This Court has personal jurisdiction over Defendants. The Court has specific personal jurisdiction over Defendant Our World Energy LLC and SunSCI Media LLC because they directed their illegal conduct into Texas for the purposes of selling solar to Texans using illegal robocalls directed to Texas area codes.

10.  <u>Venue:</u> Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiff's claims—namely, the illegal telemarketing at issue—were sent into this District.

## IV.    FACTS

### A.    The Enactment of the TCPA and its Regulations

11.      In 1991, Congress enacted the TCPA in response to a growing number of consumer complaints regarding certain telemarketing practices.

RECEIVED
NOV 5 2024

12. Section 227(c) of the TCPA requires the FCC to "initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1).

13. The National Do Not Call Registry allows consumers to register their telephone numbers and thereby indicate their desire not to receive telephone solicitations at those numbers. *See* 47 C.F.R. § 64.1200(c)(2).

14. A listing on the Registry "must be honored indefinitely, or until the registration is cancelled by the consumer or the telephone number is removed by the database administrator." *Id.*

15. The TCPA and implementing regulations prohibit the initiation of telephone solicitations to residential telephone subscribers to the Registry and provides a private right of action against any entity that makes those calls, or "on whose behalf" such calls are made. 47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(c)(2).

**B. Unsolicited Telemarketing to Plaintiff**

16. Plaintiff Bland is, and at all times mentioned herein was, a "person" as defined by 47 U.S.C. § 153(39).

17. Plaintiff Bland's telephone number, (817) XXX-XXXX, is a non-commercial telephone number that is used for residential purposes.

18. Plaintiff Bland uses the telephone number for her own personal, residential, and household needs and reasons.

19. Plaintiff Bland does not use the number for business reasons or business use.

APP. 088

RECEIVED

NOV 5 2024

20.    The number is a residential telephone line because it is assigned to a telephone exchange service for consumers and is not assigned to a telephone exchange service for businesses.

21.    Plaintiff Bland's number has been on the National Do Not Call Registry for years since she registered it on the Registry prior to receiving the calls at issue.

22.    Despite that, on April 4, 2024, an individual rang Ms. Bland's doorbell seeking to solicit her for solar energy.

23.    Ms. Bland was out shopping and was not home at the time.

24.    The Plaintiff received a call around the same time from 817-600-4140 at 12:05j and a text message from the same number at 12:08j stating that an individual named "Hyrum" with "Our World Energy" was at the Plaintiff's house for a solar consultation.

25.    Neither the Plaintiff nor anyone residing at her household had scheduled or requested such an appointment.

26.    Thereafter, the Plaintiff received a missed call from 828-406-3717 at 12:10j.

27.    The Plaintiff received yet another call from the 828-406-3717 number, and the Plaintiff answered.

28.    During that call, Plaintiff spoke with an individual named "John Whitmore" who stated that he was calling from Defendant Our World Energy and stated that he wanted to seek the Plaintiff to come to her door and speak with the individual at her door about solar.

29.    Being that the Plaintiff had not requested such a visit, the Plaintiff asked for more information, to which Mr. Whitmore responded that another company, SunSCI Media, had indicated that the Plaintiff may be interested in solar panels and had requested Defendant Our World to pay her a visit.

RECEIVED
NOV 5 2024

30.     The Plaintiff indicated that she was not interested and to place her number on Our World's Do Not Call list, but the calls nevertheless continued.

31.     Specifically, on May 2, 2024, the Plaintiff received a call from an individual stating that they were calling from the illegally and fictitiously named "Common Green Solar" from the caller ID 585-304-0286 at 19:29j. The caller attempted to sell the Plaintiff solar panels, but otherwise refused to identify itself beyond this fake name.

32.     It is believed and therefore averred that "Common Green Solar" is a fictitious name that is illegally used by defendant SunSCI to obfuscate its identity and the true source of the illegal calling conduct.

33.     During that call, to identify the caller and the source of the illegal call and for no other reason, the Plaintiff provided the unique, fictitious name "Jazmine Sullivan."

34.     The following day, May 3, 2024, the Plaintiff received a call from the caller ID 972-737-1329 from an individual named "Eric DeJohn" from Defendant Our World Energy, seeking to speak with "Jazmine Sullivan" about purchasing solar panels.

35.     Further solidifying Defendant Our World as the source of the call on May 3, Mr. DeJohn provided Our World's website during the call and later sent the Plaintiff an email from his company email.

36.     Mr. DeJohn called back on May 6, 2024 to follow up, and the Plaintiff stated that she was not interested and to stop calling.

37.     Ms. Bland subsequently sent correspondence to both Our World and SunSCI in order to attempt to ascertain why she was called illegally.

38.     Defendant Our World ignored her.

APP. 090

RECEIVED

NOV 5 2024

39.     Defendant SunSCI hurriedly tried to pick the Plaintiff off by sending her a proposed, non-Rule 408 settlement offer of $1,500. Plaintiff, of course, did not accept this offer.

40.     When the Plaintiff did not accept the offer, SunSci called the Plaintiff on June 10, 2024 from the caller ID 972-476-3998. During that call, which again started out by stating that the individual was "Daniel" from "Common Green Solar," quickly devolved into a vulgar call, with Daniel stating, "One of our experts will give you a call in thirty minutes, all right? . . . He will open your legs and call you in thirty minutes."

41.     For more than twenty years, the FCC has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In re Rules and Regulations Implementing the Telephone Consumer Protection Act*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

42.     In 2008, the FCC likewise held that a company on whose behalf a telephone call is made bears the responsibility for any violations.

43.     The FCC has instructed that sellers such as Our World may not avoid liability by outsourcing telemarketing to third parties, such as SunSCI:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment, limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain effective relief. As the FTC noted, because "sellers may have thousands of 'independent' marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy."

*In re DISH Network, LLC*, 28 FCC Rcd. 6574, 6588 ¶ 37 (2013) (footnotes and alteration marks omitted).

RECEIVED
NOV 5 2024

44.     In 2013, the FCC held that a corporation or other entity that contracts out its telephone marketing "may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers." *Id.* at 6574 ¶ 1.

45.     Our World is liable for telemarketing calls placed by SunSCI and transferred or sold to Our World and its agents to generate customers for Our World and its agents, including the Plaintiff.

46.     Indeed, Our World's relationship with Defendant SunSCI contains numerous hallmarks of agency.

47.     For example, prior to this suit, SunSCI attempted to act as agent on Our World's behalf by attempting to settle with Plaintiff for conduct also involving Our World.

48.     The aforementioned vulgar call also demonstrate that Our World failed to supervise SunSCI or enforce its compliance with applicable laws and regulations.

49.     Our World could also have eliminated the illegal conduct and risk of TCPA violations complained of herein by refraining using lead generator like SunSCI, but it did not.

50.     Our World was interested in selling its products and services via door to door sales man, so it turned to lead generators like SunSCI that could make phone calls and conduct other forms of reconnaissance on potential customers, vet potential clients, and only sell them the interested ones.

51.     To do so, Our World hired SunSCI to orchestrate an *en masse* telemarketing campaign.

52.     Our World controlled the day-to-day activities of SunSCI by providing the specific criteria for the leads it would accept and required SunSCI to adhere to those criteria.

APP. 092

RECEIVED
NOV 5 2024

53.     Defendants continued to market to Plaintiff, despite numerous indications both to Our World and SunSCI that she was not interested and did not want any further calls.

54.     As such, Our World controlled the content of SunSCI's telemarketing.

55.     Plaintiff's multiple requests not to be called should have been communicated both to Our World and SunSCI, and vice-versa, but were not.

56.     Finally, Our World could have terminated SunSCI.

57.     It did not.

58.     By virtue of identifying the leads that they would accept and directing the conduct and other indicia of the calls at issue described above, Our World directed SunSCI and the content of the communications that SunSCI would use in their calling.

59.     A reasonable seller like Our World whose telemarketers and agents are making calls would investigate into the reasons why their lead vendors are sending their employees to houses of purportedly "interested" customers, particularly when such customers are not home.

60.     A reasonable seller like Our World whose telemarketers and agents are making calls would also investigate into the reasons why their agents and telemarketers would be calling numbers on the National Do Not Call Registry and, moreover, individuals who already stated that they no longer wished to receive calls from Our World or SunSCI.

61.     Indeed, Our World could have investigated if the leads it received were genuine or if they were on the National Do Not Call Registry.

62.     It did not.

63.     Our World hired SunSCI without a proper investigation and did not terminate them when they were informed of SunSCI's illegal calling conduct.

64.     As such, they knowingly ratified SunSCI's conduct.

9

RECEIVED
NOV 5 2024

65.     Our World also ratified SunSCI's conduct because, with knowledge of Plaintiff's complaints against Our World and do not call requests, they accepted the Plaintiff's lead a second time and continued to market to Plaintiff.

66.     Our World accepted the Plaintiff's lead and then utilized it for a benefit by continuing to promote its services to her after she made clear she did not want the calls.

67.     The 2013 FCC ruling holds that called parties may obtain "evidence of these kinds of relationships . . . through discovery, if they are not independently privy to such information." *In re DISH Network*, 28 FCC Rcd. 6592-93 ¶ 46. Evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id.* at 6593 ¶ 46.

68.     Plaintiff's privacy has been violated by the above-described telemarketing calls.

69.     Plaintiff never provided her consent or requested these calls.

70.     The aforementioned calls to the Plaintiff were unwanted.

71.     The calls were non-consensual encounters.

72.     Plaintiff and all members of the Class, defined below, have been harmed by the acts of Defendants because their privacy has been violated and they were annoyed and harassed. In addition, the calls occupied their telephone lines, rendering them unavailable for legitimate communication, including while driving, working, and performing other critical tasks.

## V.     CLASS ACTION ALLEGATIONS

73.     <u>Class Definition</u>. Pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3), Plaintiff brings this case on behalf of the Class (the "Class") defined as follows:

> **National Do Not Call Registry Class**: All persons in the United States whose (1) telephone numbers were on the National Do Not Call Registry for at least 31

10

days, (2) but who received more than one telemarketing call from or on behalf of SunSCI or Our World, (3) within a 12-month period, (4) at any time in the period that begins four years before the date of filing this Complaint to trial.

74.     Excluded from the Class are counsel, Defendants, any entities in which Defendants have a controlling interest, Defendants' agents and employees, any judge to whom this action is assigned, and any member of such judge's staff and immediate family.

75.     The Class, as defined above, is identifiable through telephone records and telephone number databases.

76.     The potential members of the Class likely number at least in the hundreds because of the *en masse* nature of telemarketing calls.

77.     Individual joinder of these persons is impracticable.

78.     Additionally, the disposition of the claims in a class action will provide substantial benefit to the parties and the Court in avoiding a multiplicity of identical suits.

79.     Plaintiff is a member of the Class and will fairly and adequately represent and protect the interests of the Class as she has no interests that conflict with any of the class members.

80.     Plaintiff and all members of the Class have been harmed by the acts of Defendants, including, but not limited to, the invasion of their privacy, annoyance, waste of time, and the intrusion on their telephone that occupied it from receiving legitimate communications.

81.     This class action complaint seeks injunctive relief and money damages.

82.     There are numerous questions of law and fact common to Plaintiffs and members of the Class. These common questions of law and fact include, but are not limited to, the following:

11

APP. 095

RECEIVED

NOV 5 2024

    a.      Whether Our World is vicariously liable for the actions of SunSCI, and the corresponding liability as between them;

    b.      whether Defendants systematically made multiple telephone calls to members of the National Do Not Call Registry Class;

    c.      whether Defendants made calls to Plaintiff and members of the National Do Not Call Registry Class without first obtaining prior express written consent to make the calls; and

    d.      whether members of the Class are entitled to treble damages based on the willfulness of Defendants' conduct.

83.    Plaintiff's claims are typical of the claims of the Class, as they arise out of the same common course of conduct by Defendants and are based on the same legal and remedial theories.

84.    Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the Class, she will fairly and adequately protect the interests of the Class, and she is represented by counsel skilled and experienced in class actions, including TCPA class actions.

85.    Common questions of law and fact predominate over questions affecting only individual class members, and a class action is the superior method for fair and efficient adjudication of the controversy. The only individual question concerns identification of class members, which will be ascertainable from records maintained by Defendants and/or their agents.

86.    A class action is the superior method for the fair and efficient adjudication of this controversy. Class-wide relief is essential to compel Defendants to comply with the TCPA. The

RECEIVED

NOV 5 2024

interests of individual members of the Class in individually controlling the prosecution of

separate claims against Defendants are small because the damages in an individual action for

violation of the TCPA are small. Management of these claims is likely to present significantly

more difficulties than are presented in many class claims. Class treatment is superior to multiple

individual suits or piecemeal litigation because it conserves judicial resources, promotes

consistency and efficiency of adjudication, provides a forum for small claimants, and deters

illegal activities. There will be no significant difficulty in the management of this case as a class

action.

87.     Defendants have acted on grounds generally applicable to the Class, thereby

making final injunctive relief and corresponding declaratory relief with respect to the Class

appropriate on a class-wide basis. Moreover, on information and belief, Plaintiff alleges that the

telephone solicitation calls made by Defendants and/or their affiliates, agents, and/or other

persons or entities acting on Defendants' behalf that are complained of herein are substantially

likely to continue in the future if an injunction is not entered.

### FIRST CAUSE OF ACTION
**Telephone Consumer Protection Act**
**Violations of 47 U.S.C. § 227(c)(5) & 47 C.F.R. § 64.1200(c)**
**(On Behalf of Plaintiff and the National Do Not Call Registry Class)**

88.     Plaintiff repeats the prior allegations of this Complaint and incorporates them by

reference herein.

89.     The foregoing acts and omissions of Defendants and/or their affiliates, agents,

and/or other persons or entities acting on Defendants' behalf constitute numerous and multiple

violations of the TCPA, 47 U.S.C. § 227, by making telemarketing calls, except for emergency

purposes, to Plaintiffs and members of the National Do Not Call Registry Class despite their

numbers being on the National Do Not Call Registry.

APP. 097

RECEIVED

NOV 5 2024

90. Defendants' violations were negligent, willful, or knowing.

91. As a result of Defendants', and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf, violations of the TCPA, 47 U.S.C. § 227, Plaintiff and members of the National Do Not Call Registry Class are presumptively entitled to an award of between $500 and $1,500 in damages for each call made.

92. Plaintiff and the members of the National Do Not Call Registry Class are also entitled to and do seek injunctive relief prohibiting Defendants and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf from making telemarketing calls to telephone numbers registered on the National Do Not Call Registry, except for emergency purposes, in the future.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of the Class, prays for the following relief:

A. Certification of the proposed Class;

B. Appointment of Plaintiff as representative of the Class;

C. Appointment of the undersigned counsel as counsel for the Class;

D. An order enjoining Defendants and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf from making telemarketing calls to numbers on the National Do Not Call Registry, absent an emergency circumstance;

E. An award to Plaintiff and the Class of damages, as allowed by law; and

F. Orders granting such other and further relief as the Court deems necessary, just, and proper.

APP. 098

RECEIVED

NOV 5 2024

## VI.       DEMAND FOR JURY

Plaintiff demands a trial by jury for all issues so triable.

RESPECTFULLY SUBMITTED AND DATED this October 16, 2024.

/s/ Andrew Roman Perrong
Andrew Roman Perrong, Esq.
Perrong Law LLC
2657 Mount Carmel Avenue
Glenside, Pennsylvania 19038
Phone: 215-225-5529 (CALL-LAW)
Facsimile: 888-329-0305
a@perronglaw.com

/s/ Anthony Paronich
Anthony Paronich
Email:  anthony@paronichlaw.com
PARONICH LAW, P.C.
350 Lincoln Street, Suite 2400
Hingham, MA 02043
Telephone:  (617) 485-0018
Facsimile:  (508) 318-8100

*Attorneys for Plaintiff and the Proposed Class*

15