**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **KELLY BLAND, individually and on behalf of all others similarly situated,** | § § § | |
| **Plaintiff,** | § § | |
| **v.** | § § | **Case No. 4:24-cv-00994-P** |
| **OUR WORLD ENERGY, LLC, and EDJ ENTERPRISES, INC.,** | § § | |
| **Defendants** | § § § | |

---

**APPENDIX IN SUPPORT OF NOTICE OF DEFECT IN AFFIDAVIT SUPPORTING MOTION TO DISMISS**

---

Defendant Our World Energy, LLC files this Appendix in Support of Notice of Defect in Affidavit Supporting Motion to Dismiss:

| **EXHIBIT** | | **DESCRIPTION** | **APP NO.** |
|---|---|---|---|
| A | | Affidavit of Caleb B. Bulls | App. 1 - 2 |
| B | | Affidavit of Alicia O'Neill | App. 3 - 4 |
| | B-1 | Sub Dealer Agreement, dated April 9, 2024 | App. 5 - 50 |
| | B-2 | Sub Dealer Agreement, dated January 9, 2025 | App. 51 - 96 |

Respectfully submitted,

*/s/Caleb B. Bulls*
Michael D. Anderson
State Bar No. 24031699
michael.anderson@kellyhart.com
Caleb B. Bulls
State Bar No. 24082749
caleb.bulls@kellyhart.com
**KELLY HART & HALLMAN, LLP**
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Phone: (817) 332-2500
Facsimile: (817) 878-9280

*Attorneys for Defendant Our World Energy*

## CERTIFICATE OF SERVICE

On April 18, 2025, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court.  I hereby certify that I have served the following counsel of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

Andrew Roman Perrong, Esq.
**PERRONG LAW, PLLC**
2657 Mount Carmel Avenue
Glenside, Pennsylvania 19038

Anthony Paronich
**PARONICH LAW, P.C.**
350 Lincoln Street, Suite 2400
Hingham, Massachusetts 02043

*/s/Caleb B. Bulls*
Caleb B. Bulls

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| **KELLY BLAND, individually and on behalf of all others similarly situated,** | § § § | |
| *Plaintiff,* | § § | |
| v. | § § | **Case No. 4:24-cv-00994-P** |
| **OUR WORLD ENERGY, LLC, and EDJ ENTERPRISES, INC.,** | § § § | |
| *Defendants* | § § | |

## AFFIDAVIT OF CALEB B. BULLS

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF TARRANT | § |

Before me, the undersigned authority, on this day personally appeared Caleb B. Bulls who, after being duly sworn, testifies as follows:

1.     "My name is Caleb B. Bulls. I am over the age of twenty-one years, have never been convicted of a felony, and am fully competent to testify to, and have personal knowledge of, the matters set forth in this Affidavit. To the best of my knowledge, the matters set forth in this Affidavit are true and correct.

2.     "I represent Defendant Our World Energy, LLC ("OWE") in the above-captioned and -numbered lawsuit.

3.     "On February 11, 2025, OWE filed a *Motion to Dismiss Plaintiff's First Amended Complaint* (the "Motion to Dismiss"). In support of the Motion to Dismiss, OWE submitted the Affidavit of Alicia O'Neill. Attached to Ms. O'Neill's Affidavit was a *Sub Dealer Agreement* between OWE and Co-Defendant EDJ Enterprises, Inc. ("EDJ"). The agreement attached to Ms. O'Neill's affidavit was dated April 9, 2024, and it was the same agreement that was attached to an Affidavit that Ms. O'Neill previously executed on December 31, 2024 in connection with OWE's motion to dismiss Plaintiff Kelly Bland's ("Plaintiff") *Original Complaint.*

4.     "While the Motion to Dismiss has been pending, the parties began to engage in discovery. In connection with that, OWE collected documents that were potentially responsive to discovery requests that Plaintiff had propounded. On April 14, 2025, OWE forwarded the documents that it had collected to me so that I could review the documents for privilege and responsiveness and then produce the documents. The documents were then loaded into Kelly Hart

& Hallman's litigation document management system.  After I reviewed the documents, I had questions about two statements that Ms. O'Neill had attested to in her February 11, 2025 Affidavit. Accordingly, I reached out to OWE to discuss my findings with them.  Following that discussion, I determined that two statements in Ms. O'Neill's February 11, 2025 Affidavit needed to be clarified or corrected.  I have worked with OWE to clarify and correct those statements as soon as has been reasonably practicable."

"Further, affiant sayeth not."



Caleb B. Bulls

SUBSCRIBED TO AND SWORN BEFORE ME on this 18th day of April, 2025.

BRANDI LEIGH SPILLERS
Notary Public
STATE OF TEXAS
Notary ID # 134565727
My Comm. Exp. September 19, 2027

Notary Public, State of Texas

**Exhibit B**

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| **KELLY BLAND, individually and on behalf of all others similarly situated,** | § § § | |
| *Plaintiff,* | § § | |
| **v.** | § § | **Case No. 4:24-cv-00994-P** |
| **OUR WORLD ENERGY, LLC, and EDJ ENTERPRISES, INC.,** | § § § § | |
| *Defendants* | § § | |

## AFFIDAVIT OF ALICIA O'NEILL

STATE OF <u>Arizona</u> §
§
COUNTY OF <u>Maricopa</u> §

       Before me, the undersigned authority, on this day personally appeared Alicia O'Neill who, after being duly sworn, testifies as follows:

       1.    "My name is Alicia O'Neill.  I am over the age of twenty-one years, have never been convicted of a felony, and am fully competent to testify to, and have personal knowledge of, the matters set forth in this Affidavit.  To the best of my knowledge, the statements set forth in this Affidavit are true and correct.

       2.    "I am the Finance, Accounting, Strategy & Legal Program Manager for Defendant Our World Energy, LLC ("OWE').  On December 31, 2024, I signed an affidavit (the "December 31st Affidavit") in connection with OWE's *Motion to Dismiss Plaintiff's Complaint*. Attached to the Affidavit was a true and correct copy of a 2024 agreement (the "2024 Agreement") between OWE and EDJ Enterprises, Inc. ("EDJ").  EDJ is one of OWE's vendors. The 2024 Agreement was entered into on or around April 9, 2024.  A true and correct copy of the 2024 Agreement is attached hereto as Exhibit B-1.  At the time I signed the affidavit on December 31, 2024, the 2024 Agreement was the operative agreement between OWE and EDJ.

       3.    "On or around January 9, 2025, OWE and EDJ entered into a new agreement (the "2025 Agreement").  A true and correct copy of the 2025 Agreement is attached hereto as Exhibit B-2.  The 2025 Agreement contained two differences from the 2024 Agreement.  First, the 2025 Agreement included a provision related to a new part of the Telephone Consumer Protection Act known as the one-to-one consent rule that was to be effective in 2025.  This change was reflected on Section 6 of Exhibit C to the 2025 Agreement.  The other change related to an interest component that vendors would be required to pay OWE for amounts that were

outstanding.  This change was reflected on Section 4 of Exhibit A of the 2025 Agreement.  There were no other substantive changes from the 2024 Agreement.[1]

4.      "On February 11, 2025, I executed a new affidavit (the "February 11th Affidavit") in connection with OWE's *Motion to Dismiss Plaintiff's First Amended Complaint*.  Whenever I executed the February 11th Affidavit, I had forgotten that OWE had made small changes to the 2024 Agreement.  Thus, the 2024 Agreement was attached to the February 11th Affidavit, and I did not reference the 2025 Agreement in the February 11th Affidavit.

5.      "In my affidavits, I also stated that OWE had not provided an individual associated with SunSci Media, LLC (John Whitmore) with an e-mail address.  Those statements were not correct.  OWE did provide Mr. Whitmore with an e-mail address.  OWE typically does not provide its contractors or vendors with e-mail addresses, and I incorrectly assumed that was the case with respect to Mr. Whitmore."

"Further, affiant sayeth not."

*Alicia O'Neill*                                    04/17/2025
_____
Alicia O'Neill

SIGNED AND SWORN TO BEFORE ME on this  17  day of April, 2025.

Mayra J Franco
_____
Notary Public            Florida            Miami-Dade

MAYRA J FRANCO
Notary Public - State of Florida
Commission # HH582907
Expires on August 14, 2028

Notarized remotely online using communication technology via Proof.

---

[1] The 2025 Agreement added a definition of "Milestones."  Other than that, the only other changes were page formatting changes.

## Sub Dealer Agreement

This Sub Dealer Agreement (the "Agreement") is made and entered into by and between One World Energy, LLC d/b/a Our World Energy ("OWE"), and <u>EDJ Enterprises Inc</u> ("Vendor"), both of which are collectively referred to herein as the "Parties" or, individually, as the "Party." This Agreement is effective as of the Parties' signatures hereto (the "Effective Date").

## RECITALS

**A.    WHEREAS,** OWE holds a license through the Registrar of Vendors to perform residential and commercial electrical work under license number 326134 and has the experience and expertise to perform residential and commercial electrical installations for residential solar systems;

**B.    WHEREAS,** Vendor desires to obtain the benefit of the services and experience of OWE in the installation of electrical systems for residential solar systems Vendor sells; and

**C.    WHEREAS**, the Parties desire that this Agreement supersede and replace any prior agreements entered into between the parties;

**NOW, THEREFORE**, in consideration of the mutual promises, covenants and conditions contained herein, in reliance upon the representations and warranties set forth herein, and for other good and valuable consideration, the Parties hereto agree as follows:

## AGREEMENT

1.    **DEFINITIONS AND RULES OF INTERPRETATION.**

    (a)    <u>Definitions.</u> Any capitalized term used but not defined in this Agreement shall have the meaning ascribed to such term in <u>Schedule 1.</u>

2.    **THE SERVICES:**

        (a)    <u>Conditions Precedent</u>.  Before Vendor may commence any Services on behalf of OWE, the following conditions precedent must first be satisfied to the satisfaction of OWE (in its sole and absolute discretion):   (i) complete execution of this Agreement by all Parties and delivery of a fully executed copy of this Agreement to OWE; (ii) delivery to OWE by Vendor of all licenses, certificates, and other documents required under this Agreement; (iii) completion of the new Vendor checklist and delivery to OWE of any and all materials, information, documentation required thereunder; and (iv) completion of any and all required training under the terms of this Agreement.  This Agreement will not be in force and Vendor will

not be entitled to any of the benefits hereunder, unless and until said Conditions Precedent have been met.

(b) <u>**Services.**</u> Both Parties hereto agree further that a monthly meeting between Vendor and Dealer Relations Manager will occur at a mutually convenient time for both Parties to discuss the progression of Vendor's growth.

(c) <u>**Status as Independent Contractor.**</u> Nothing contained in this Agreement shall be construed as creating a joint venture, partnership, employment or franchise relationship between the Parties, and no Party shall have the right, power or authority to create any obligations or duty, express or implied, on behalf of the other Party. Vendor's status under this Agreement is that of an independent Vendor and shall in no way be deemed to be any other status, including (without limitation) that of an agent or employee of OWE or its Affiliates. Vendor shall not refer to itself, hold itself out as, or knowingly permit any person to believe Vendor is anything other than an independent Vendor, including (without limitation): agent, Affiliate, employee, partner, or franchisee of OWE. OWE may, in its sole and absolute discretion, (i) contract for services with other parties even though they may be similar or identical to the Services hereunder, inside or outside the Territory; (ii) sell the Products through any other person; and (iii) offer pricing, terms, conditions, or other benefits to other persons different from or superior to those offered to Vendor hereunder.

3. **PAYMENT FOR SERVICES:**

(a) <u>**Fees and Payments.**</u> See Exhibit A.

(b) <u>**Requirements.**</u> The Requirements described in the Exhibits and elsewhere in this Agreement are and at all times shall remain subject to OWE's policies and procedures that may apply to the Customers, the Services, the Work, or any Project. From time to time, OWE may (in its sole and absolute discretion) change, modify, eliminate, or add to the Requirements. If OWE makes any changes to the Requirements, then OWE shall notify Vendor in writing and use commercially reasonable efforts to provide Vendor with written notice prior to implementation of such changes.

(c) <u>**Verification and Rejection.**</u> Vendor acknowledges and agrees that OWE will independently verify and determine whether all Requirements are satisfied by Vendor prior to any payment of Fees under this Agreement. In the event OWE discovers that any Requirement was not satisfied by Vendor, then OWE may, in its sole and absolute discretion, withhold and set-off any applicable amount from the Fees owed to Vendor. Upon the request of Vendor, OWE will provide to Vendor an explanation for any such rejection.

(d) <u>**Payment Dispute.**</u> Any and all disputes concerning any payment of Fees must be delivered in writing to OWE no later than thirty (30) calendar days after the date of the applicable Fee Statement or payment. If Vendor fails to deliver a notice of any dispute within such time period, then Vendor will be (i) deemed to have accepted the Fee Statement and related

payments as complete and accurate; and (ii) forever barred from bringing any claim or suit for miscalculation or underpayment of Fees or any payment of moneys by OWE with respect to such Fee Statement and payments.

(e) **Right to Set-Off.**  Vendor hereby agrees that OWE may set-off, withhold, or otherwise deny payment against any and all unpaid amounts owed by OWE to Vendor in an amount equal to (i) the aggregate amount of any damages OWE or any of its Representatives has suffered or incurred as a result of Vendor's violation of any term of this Agreement; and (ii) any amounts owed by Vendor to OWE for any reason, including Vendor's duty to indemnify OWE under this Agreement, in each case as reasonably determined and the amounts reasonably estimated by OWE in good faith.  In the event OWE incorrectly sets-off, withholds, or denies payment in a manner not permitted by this Agreement, then OWE agrees it shall promptly correct such mistake and make appropriate payment to Vendor.

(f) **Security Interest.**  Vendor hereby grants to OWE a first priority security interest in all (i) leads, prospective customers, customer lists, Customers, Customer Agreements, Eligible Customers, Qualified Customers, and Rejected Customers; (ii) work, tools, supplies, equipment, and other materials used, supplied by, or furnished to Vendor or any of its Representatives in connection with the Services contemplated by this Agreement; and (iii) any property relating thereto, including (in each case), any proceeds of the foregoing, either existing as of the Effective Date or arising at any point throughout the Term.  Vendor hereby authorizes OWE to take any action it deems required to perfect such security interest and Vendor agrees it shall take such further action as reasonably requested by OWE in connection with perfecting its security interest.

4.     **REPRESENTATIONS, WARRANTIES, AND COVENANTS OF VENDOR:**  As of the Effective Date and at all times throughout the Term, Vendor will and does hereby (i) represent and warrant to OWE and its Representatives; and (ii) covenants, agrees, and shall do the following:

(a) **Organization, Power, and Qualification.**     (i) Vendor is and shall remain qualified and licensed to perform the Services and do business and is in good standing in every jurisdiction where such qualification and licensing is required; (ii) Vendor has and shall maintain the full right, power and authority to enter into this Agreement and all other documents to be delivered in connection herewith, to grant the rights and licenses granted under this Agreement and to perform its obligations hereunder and thereunder; and (iii) the execution of this Agreement and all other documents to be delivered in connection herewith by the person whose signature is set forth at the end hereof has been and will continue to be duly authorized by all necessary action of Vendor.

(b) **Fully informed.**     Prior to executing this Agreement, Vendor has had the opportunity to ask OWE any and all questions Vendor may have in relation to the Services, the Fee, this Agreement, Vendor's obligations hereunder, and the contemplated relationship between the Parties.  Vendor hereby acknowledges and represents that Vendor has had an opportunity to retain legal counsel to advise and review this Agreement.

DocuSign Envelope ID: 2524AADD-A8E4-4ED3-9AA6-C40DE269C809

**(c)** **Enforceability.**  This Agreement and any other documents delivered by Vendor to OWE hereunder constitute the legal, valid and binding obligations of Vendor, enforceable in accordance with their respective terms.

**(d)** **No Conflict.**    The execution, delivery and performance by Vendor of this Agreement and any other documents delivered by Vendor to OWE in connection with this Agreement, and the consummation of the transactions contemplated hereby and thereby, do not and will not conflict with or result in any breach of any of the provisions of, constitute a default under, result in a violation of, result in the creation of any Lien upon any Customer, Customer Agreement, or any of the Services, give any third party the right to accelerate any obligation under, or require any authorization, consent, approval, exemption or other action by or notice to, any court, other governmental body, or other third party under, the provisions of Vendor's governing documents or any indenture, mortgage, loan agreement, lease or other agreement or instrument to which Vendor or any entity that is an Affiliate or Representative of Vendor is a party or to which any of Vendor's respective properties are subject, or any Law, judgment or decree to which Vendor is subject.

(a)          **(e)** **Licensure and Registration.**  Vendor currently holds and will continue to maintain at all times throughout the Term, any and all licenses, certificates, consents, certifications, waivers, permits, registrations, orders, approvals and other authorizations of any governmental or regulatory body necessary for Vendor to conduct its business, generally, and provide the Services required by this Agreement, and/or required by applicable law.  Vendor has provided to OWE true and correct copies of the licenses set forth herein, and evidence of registration, all of which are current, in good standing, and not subject to any investigation, enforcement action, or other disputes with the applicable licensing authority.  Vendor agrees that Vendor shall update, maintain, and not let expire any of the licenses.

**(f)** **Litigation and Judgments.**    There is no outstanding criminal or administrative matter, order, writ, injunction, fine, citation, penalty, decree or unsatisfied judgment of any court, or any claims or litigation pending or threatened against Vendor which may affect in any way Vendor's ability to perform the duties and obligations under this Agreement or the Services required by this Agreement.  Neither is Vendor a party to, or the subject of, or threatened with, any claim, suit, action, arbitration, investigation, audit, administrative or other proceeding of any character which may affect in any way Vendor's ability to perform the duties and obligations under this Agreement or the Services required by this Agreement.  Vendor has no knowledge of any facts or circumstances which could result in a valid claim, suit, action, audit, investigation or proceeding against Vendor.

**(g)** **No Adverse Actions and Release of Claims.**  Vendor has no knowledge (based on due inquiry) of any facts or circumstances which could result in a claim, suit, action, audit, investigation, or proceeding by Vendor against OWE or any of its Representatives or Affiliates. Vendor hereby irrevocably and unconditionally releases, acquits, and forever discharges OWE

and its Representatives from any and all claims, actions, causes of action, rights, demands, debts, obligations, or damages of whatever nature or kind, known or unknown, at law or in equity (each a "Claim"), which Vendor or its Representatives have, may have, or may have had, against OWE and its Representatives, or one or more of them, arising or occurring prior to the Effective Date of this Agreement. Vendor further covenants and agrees not to initiate or participate individually or as a member of a class in any action, litigation, appeal, proceeding, charge or complaint before any local, state or federal agency or court against OWE or any of its Representatives pertaining to any Claim arising out of or by reason of any actions, omissions, transactions, or events occurring prior to the Effective Date of this Agreement except as may be required by court order.

(h)    **Solvency.** Vendor is solvent and able to pay its outstanding debts as they mature. Vendor will not be rendered insolvent by performing its Services under the Agreement. Vendor agrees that it will maintain its solvency at all times throughout the Term and not initiate any bankruptcy proceedings, nor permit any bankruptcy proceedings (whether voluntary or involuntary) to be initiated on its behalf.

(i)    **Compliance with Laws.** Vendor is and will continue to comply in all respects with all applicable state and federal law in providing the Services under this Agreement and all other aspects of this Agreement and Vendor's operations thereunder. Vendor is in compliance and, at all times throughout the Term, shall continue to comply in all respects with (i) Applicable Laws; (ii) the Code of Conduct; (iii) this Agreement; and (iv) the Customer Agreement.

(j)    **Conduct and Practices.** Vendor has read and understands the Code of Conduct included herewith in Exhibit C and agrees to strictly comply with the Code of Conduct (as may be revised from time to time by OWE in its sole and absolute discretion) at all times throughout the Term. Vendor agrees that it shall (i) perform the Services and all other obligations under this Agreement and the Customer Agreements in accordance with the highest standards of professional and ethical conduct, with the degree of care and skill exercised by persons providing similar services under similar circumstances; and (ii) will not take any action or fail to take any action that could in any way damage or impugn the brand, reputation, or integrity of OWE or its Representatives or Affiliates.

(k)    **Accurate and Complete Information.** Any and all information, documents, instruments, certificates, exhibits, schedules, and all other materials furnished, provided, or delivered by Vendor to OWE at any time in connection with this Agreement or the transactions contemplated by this Agreement does not and will not include any untrue statement of a material fact or any omission of a material fact necessary to make the statements of facts contained therein, in light of the circumstances under which they are made, not misleading. Vendor shall never mislead, misstate, misrepresent, engage in any deceptive activity with respect to any Customer or any Representative of OWE.

(l)    **Territory.** Vendor will provide the Services only in the permitted Territory.

DocuSign Envelope ID: 2524AADD-A8E4-4ED3-9AA6-C40DE269C809

(m)    **Insurance**.  As of the Effective Date and at all times through the Term of this Agreement, Vendor has and agrees to maintain and carry, at its own expense, in full force and effective all types and amounts of insurance required by applicable law and as set forth in Schedule 2.

(n)    **Records.**  Vendor shall prepare and maintain accurate books and records ("Records") of:  (i) all written materials used in connection with its Services and other obligations hereunder; (ii) Vendor's current address and telephone number; (iii) documentation concerning all Customers, the products marketed, promoted, and sold to such Customers; (iv) information and documentation that Vendor is required to maintain pursuant to applicable law; (v) all correspondence and written materials relating to any license; (vi) all correspondence and written materials provided by or to any government agency relating to the Services, this Agreement, any Customer, or any Customer Agreement; and (vii) all other information necessary and helpful to permit OWE to determine and verify Vendor's compliance with this Agreement, the Customer Agreements, and applicable law. Vendor shall retain the Records for such time as required by applicable law.

(o)    **No Default.**  Vendor is not in breach of and has not breached any obligation under this Agreement and no Vendor default has occurred or is continuing in any respect.

(p)    **Compliance Reviews.**  Upon the reasonable request of OWE, Vendor will (i) provide, or make copies available to OWE for review, any and all Records; (ii) deliver to OWE true and correct copies of all applicable policies and procedures; (iii) make yourself available to OWE to be interviewed; and (iv) allow OWE and its Representatives to observe, inspect, shadow, or otherwise review the conduct of Vendor in their performing of the Services and any other obligation under the Agreement (collectively, a "Review").  OWE will, to the maximum extent possible, limit all Reviews to customary business hours and use commercially reasonable efforts to minimize any disruption to Vendor.  If any mistake, violation, discrepancy, or issue is identified or disclosed as a result of a Review, then Vendor shall (as soon as reasonably practicable) rectify, resolve, and cure such concern to reasonable satisfaction of OWE.  Any failure by Vendor to cooperate in any Review and/or timely resolve any concerns identified in a Review, in each case as determined by OWE in its sole and absolute discretion, shall be a Vendor default under this Agreement.

(q)    **Instructions and Further Assurances.**  Upon the request of OWE, Vendor shall immediately (i) comply with any and all instructions and requests of OWE or its Representatives in relation to the Services, (ii) cease any activity under this Agreement; and (iii) provide any information, deliver any documents or other materials, sign any documents or instruments in furtherance of this Agreement.

(r)    **Information Security.**  As of the Effective Date and at all times throughout the Term, Vendor has and will continue to implement appropriate and reasonable administrative, physical, and technical safeguards designed to: ensure the security and confidentiality of

Confidential Information, including the private personal information of any Customer or employee of any Party ("Personal Information"; and together with Confidential Information, "Information"). Vendor will ensure that it has security policies and procedures that protect and safeguard all Information in its possession, custody, or control, including the exchange and transmission of any Information by and between Vendor and OWE. Vendor has and will continue to (i) use the highest quality of technology and data security software and mechanisms to protect against anticipated threats or hazards to the security or integrity of the Information; (ii) protect against unauthorized access to, use, or breach of the Information; and (iii) detect, prevent, and mitigate the risk of identity theft. Vendor will not disclose any Information to a third party except as permitted under this Agreement, the Customer Agreement, and applicable law. Vendor shall respond promptly and thoroughly respond to any request of OWE for information concerning the information security measures implemented by Vendor. In the event Vendor discovers or is made aware of a breach involving any Information, Vendor shall, at its sole cost and expense: (1) notify OWE in writing within forty-eight (48) hours of discovery of such disclosure or breach; (2) take all such actions as may be necessary or requested by OWE to address the breach, minimize the disclosure and problem, and mitigate against the risks associated therewith; and (3) cooperate in all respects with OWE to notify affected individuals and government agencies as may be required by applicable law.

(s)     **Marketing, Publicity, and Trademarks.** Vendor shall be required to comply with the Marketing Requirements set forth on Exhibit D.

(t)     **Reporting.** Vendor shall immediately inform and provide notice to OWE upon the occurrence of any of the following: (i) receipt by Vendor of a complaint from any Customer; (ii) after becoming aware of any material dispute, threat of dispute, or Claim by any Customer; (iii) any investigation, inquiry, demand, subpoena, or other regulatory process initiated by any government authority in relation to any Customer, any Customer Agreement, the Services, any license of Vendor, this Agreement, or any other activities of Vendor related to this Agreement; and (iv) any actual or threatened expiration, suspension, revocation, or enforcement action with respect to any license of Vendor. Vendor understands that upon receipt of such notice, OWE will be entitled, in its sole and absolute discretion, to immediately perform a Review in accordance with this Agreement.

(u)     **Representatives.** As of the Effective Date, and at all times throughout the Term, Vendor represents, warrants, and covenants that Vendor shall not use any person, entity, group, association, subVendor, individual, Vendor or any other representative in the performance of the Services or any of Vendor's obligations under this Agreement. Vendor acknowledges and agrees that it shall be fully responsible for its acts, omissions, breaches of this Agreement, and violations of law and hereby agrees to indemnify, defend, and hold OWE harmless for its acts and omissions, including negligence, arising out of Vendor's performance of its duties and obligations under this Agreement.

(v)     **No SubVendors.** Other than the subVendors listed on Schedule 3 or specifically authorized by OWE in writing after the Effective Date (each, an "*Approved SubVendor*"), Vendor

DocuSign Envelope ID: 2524AADD-A8E4-4ED3-9AA6-C40DE269C809

shall not use any person, entity, group, association, subVendor, or any other Representative in the performance of the Services or any of its obligations under this Agreement unless such person is a natural person and an agent of Vendor. Other than Approved SubVendors, Vendor shall not and shall ensure none of its Representatives solicits, entices, or contracts with any third-party to perform any aspect of the Services or any other obligation of Vendor in this Agreement. Vendor acknowledges and agrees that it shall be fully responsible for the acts, omissions, breaches of this Agreement, and violations of law of all Representatives, Approved SubVendors, or any other person or entity performing any activities on behalf of Vendor. Vendor hereby agrees to indemnify, defend, and hold OWE harmless for the acts and omissions of all of its Representatives, including all Approved SubVendors.

(w)    **Telephone and Text Messaging Communications.**    To the extent that Vendor engages in any activity involving telephone or text messaging communication with a Consumer, Vendor agrees that it will first obtain the express written consent of each consumer before it initiates any communication over or through the telephone or text messaging.  Vendor agrees that it will strictly comply with all applicable laws, including Federal and state do-not-call laws. Vendor will strictly comply with OWE's written policies and procedures regarding the foregoing. Vendor will never use an automatic telephone dialing system to call or send a text message to any Consumer unless first approved in a writing by OWE.

(x)    **Liens.**  Vendor agrees that it will not file a Lien and it will not permit any of its Representatives to file a Lien, on or against any jobsite, Customer's property, the System, OWE, or any of OWE's Affiliates. If any Lien is filed in violation of this Agreement, then Vendor agrees that it will indemnify, defend, and hold harmless for any and all Losses incurred by OWE, Customer, or any other affected party. As a condition of OWE's obligation to make any payment to Vendor under this Agreement, including pursuant to any Work Order, Vendor shall execute and deliver to OWE one or more Lien release and waivers on the form found on the OWE Dealer Portal, or otherwise acceptable to OWE (each, a "*Lien Waiver*"). OWE may withhold any and all payments under this Agreement to the extent Vendor fails to deliver a Lien Waiver as required hereunder or reasonably requested by OWE. Within five (5) Business Days following payment by OWE for a Work Order (subject to OWE's setoff rights under this Agreement), Vendor shall deliver to OWE an Unconditional Waiver and Release Upon Final Payment, on a form acceptable to OWE.

**5.    RESTRICTIVE COVENANTS:** Each of the restrictive covenants set forth in <u>Exhibit E</u> shall apply to Vendor and OWE, as applicable.

**6.    REPRESENTATIONS, WARRANTIES, AND COVENANTS OF OWE:** On the Effective Date and throughout the Term of this Agreement, OWE hereby represents, warrants, and covenants as follows:

(b)                (a)    **Organization, Power and Qualification.**  (i) OWE is a limited liability company duly organized, validly existing, and in good standing in the

jurisdiction of its formation; (ii) OWE is qualified and licensed to do business and is in good standing in every jurisdiction where such qualification and licensing is required; (iii) OWE has the full right, power and authority to enter into this Agreement and the other documents to be delivered in connection herewith, to grant the rights and licenses granted hereunder and thereunder and to perform its obligations under this Agreement and the other documents to be delivered in connection herewith; and (iv) the execution of this Agreement by the person whose signature is set forth at the end hereof and thereof has been duly authorized by all necessary action of OWE.

**(b)** **Authorization; No Breach.** The execution, delivery and performance of this Agreement, and any other documents delivered by OWE to Vendor hereunder, and the consummation of the transactions contemplated herein and therein, have been duly authorized by all necessary action on the part of OWE. This Agreement and any other documents delivered by OWE to Vendor hereunder constitute legal, valid and binding obligations of OWE, enforceable in accordance with their respective terms. The execution, delivery and performance by OWE of this Agreement and any other documents delivered by OWE to Vendor hereunder, and the consummation of the transactions contemplated hereby and thereby, do not and will not conflict with or result in any breach of any of the provisions of, constitute a default under, result in a violation of, give any third party the right to accelerate any obligation under, or require any authorization, consent, approval, exemption or other action by or notice to, any court, other governmental body, or other third party under, the provisions of OWE's governing documents or any indenture, mortgage, loan agreement, lease or other agreement or instrument to which OWE is a party or to which any of OWE's respective properties are subject, or any applicable law, judgment or decree to which OWE is subject.

**(c)** **Licensure and Registrations.** OWE currently holds, and will continue to maintain during the Term, any and all Licenses necessary for it to conduct its business.

**(d)** **Compliance with Laws.** OWE has complied and will continue to comply, in all material respects, with applicable law.

**(e)** **Support.** OWE will (i) provide training and training materials for Vendor; (ii) provide Vendor with access to information technology of OWE necessary to perform the Services; and (iii) provide Vendor with customer and account management support during normal business hours.

**7.** **TERM AND TERMINATION**

**(a)** **Term.** This Agreement shall commence as of the Effective Date and shall continue for a period of one year, which will automatically extend for successive periods of the same length (each, a "Renewal Term"), subject to the early termination rights of either Party set forth in this Agreement (the "Term"). Either Party may terminate this Agreement for convenience upon thirty (30) calendar days' prior written notice to the other Party. OWE may

DocuSign Envelope ID: 2524AADD-A8E4-4ED3-9AA6-C40DE269C809

terminate this Agreement immediately upon the occurrence of a Vendor Default.  In the event this Agreement is terminated for whatever reason, OWE shall be allowed, at its option, to withhold any and all commissions owed to Vendor until PTO has been completed.

**(b)** <u>**Vendor Defaults.**</u>  Each of the following shall be considered a "Vendor Default" under the terms of this Agreement:  (i) Vendor failing to maintain in good standing any required license or other government approval required to perform the Services; (ii) Vendor's material breach of this Agreement that remains uncured after ten (10) calendar days prior written notice; (iii) Vendor's fraud, willful misconduct or gross negligence in performance of its obligations under this Agreement; (iv) Vendor's failure to pass a drug test pursuant to OWE's rights hereunder to perform said testing; or (v) Vendor's attempt to make or makes any assignment of the rights under this Agreement.

**(c)** <u>**Remedies.**</u>  Upon the occurrence of a Vendor Default, OWE may (in its sole and absolute discretion) exercise any of the following remedies:  (i) immediately suspend Vendor's access to any and all software used by Vendor; (ii) terminate this Agreement; (iii) withhold any amounts due and owing by OWE to Vendor hereunder, and offset, to the extent of any damages and expenses of OWE resulting from, or relating to, such Vendor Default; (iv) demand that Vendor pay Liquidated Damages; and/or (v) exercise any other remedy available to OWE under applicable law.

**(d)** <u>**Vendor's Obligations upon Expiration or Termination.**</u>  Upon the expiration (or earlier termination of this Agreement) or notice of termination, Vendor shall immediately (i) cease to perform any of the Services; (ii) cease to represent itself as affiliated in any way with OWE; (iii) cease the marketing, promotion, selling, or acquiring of new customers in relation to the Products for or on behalf of OWE; (iv) return to OWE any and all documents and tangible materials (including any copies thereof) containing, reflecting, incorporating, or based on any information provided or made available to Vendor by OWE; and (v) cease and terminate all use of any kind whatsoever of OWE trademarks or other copyrighted and/or protected materials.

**(e)** <u>**Survival of Terms.**</u>  All terms and conditions set forth in this Agreement, which by their terms, are intended to, or in order to give proper effect to their intent should, survive the termination or expiration of this Agreement, shall survive such termination and expiration.

**(f)** <u>**Cumulative Remedies.**</u>  All rights and remedies provided in this Agreement are cumulative and not exclusive, and the exercise by either Party of any right or remedy does not preclude the exercise of any other rights or remedies that may now or subsequently be available at law, in equity, by statute, in any other agreement between the Parties, or otherwise.

**(g)** <u>**Equitable Remedies.**</u>  Vendor acknowledges and agrees that (i) a breach or threatened breach by Vendor of any of the obligations under the Agreement, including (without limitation) the Restrictive Covenants set forth on <u>Exhibit E</u>, would give rise to irreparable harm to OWE and its Affiliates for which monetary damages would not be an adequate remedy; (ii) in the event of a breach or a threatened breach by Vendor of any such obligations, OWE shall, in

addition to any and all other rights and remedies that may be available to OWE at law, at equity, or otherwise in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance, and any other relief that may be available from a court of competent jurisdiction, without any requirement to post a bond or other security, and without any requirement to prove actual damages or that monetary damages will not afford an adequate remedy; and (iii) Vendor shall be liable for all costs, expenses and fees (including court costs and attorneys' fees) in connection with any action instituted by OWE or any of its Affiliates seeking to remedy, enforce its rights, and/or enjoin any violation of this Agreement. Vendor acknowledges and agrees that it will not oppose or otherwise challenge the appropriateness of equitable relief or the entry by a court of competent jurisdiction of an order granting equitable relief, in either case, consistent with the terms of this paragraph.

**(h)** **Liquidated Damages**: If Vendor fails to comply substantially with the terms and conditions of the Non-Solicitation Paragraph within this Agreement, Contractor, at its option and as its sole remedy, may terminate this Agreement and obtain $15,000 from Vendor as Contractor's liquidated damages. The $15,000 liquidated damages amount will be on a per breach basis such that Vendor will pay to Contractor as liquidated damages $15,000 for each time it breached the Non-Solicitation Paragraph within this Agreement.

THE PARTIES AGREE THAT THE ACTUAL DAMAGES INCURRED BY CONTRACTOR FOR VENDOR'S BREACH OF THE NON-SOLICITATION PROVISION ARE DIFFICULT TO ESTIMATE IN ADVANCE AND THAT $15,000 PER BREACH CONSTITUTES A REASONABLE ESTIMATE OF CONTRACTOR'S DAMAGES FOR A BREACH BY VENDOR AND SHALL CONSTITUE CONTRACTOR'S LIQUIDATED DAMAGES AND NOT A PENALTY. CONTRACTOR HEREBY EXPRESSLY WAIVES ALL OTHER CLAIMS FOR DAMAGES OR RELIEF AT LAW OR IN EQUITY FOR BREACH OF THE NON-SOLICITATION PROVISION AND AGREES THAT CONTRACTOR'S SOLE AND EXCLUSIVE REMEDY FOR VENDOR'S BREACH OF THE NON-SOLICITATION PROVISION UNDER THIS CONTRACT SHALL BE OBTAINING THE LIQUIDATED DAMAGES PROVIDED ABOVE.

**8.** **GENERAL PROVISIONS:**

**(a)** **Indemnification.** Vendor shall indemnify, defend, and hold harmless OWE and its Affiliates, their respective Representatives, designees and their successors and assigns (collectively, the "OWE Indemnified Parties", and each, a "OWE Indemnified Party"), from and against, any and all losses, damages, liabilities, deficiencies, claims, actions, judgments, settlements, interest, awards, fees, penalties, fines, costs (including costs for experts and investigations), or expenses of whatever kind, including attorneys' fees, fees and the costs of enforcing any right to indemnification under this Agreement, and the cost of pursuing any insurance providers (collectively "Losses"), incurred by any OWE Indemnified Party, relating to, arising out of, or resulting from:   (i) any act or omission by Vendor; (ii) any breach of the Agreement by Vendor; (iii) any negligence or willful misconduct by Vendor; (iv) any actual or

threatened violation of applicable law by Vendor; (v) any infringement, misuse, or misappropriation of any intellectual property of another person; and (vi) any failure by Vendor to obtain and maintain at all times in good standing all required licenses. Vendor's duty to indemnify hereunder includes the duty to indemnify OWE Indemnified Parties for all Losses incurred by any OWE Indemnified Party in connection with the matter that is the subject of the indemnification.

Moreover, without limiting the foregoing subsection 8(a), the Parties hereby agree that, in the event of a dispute of any kind against OWE arising out of any act or omission by Vendor, including negligence, willful or grossly negligent act, or otherwise, in addition to the foregoing defense and indemnity provision, OWE will also be permitted to withhold commissions from Vendor in an amount representative of the amount in dispute and use the withheld commission to pay and/or resolve any pending dispute. Any funds withheld that are not used to resolve the pending dispute will be promptly turned over to Vendor after the dispute is resolved.

**(b)    Drug Testing.** Vendor acknowledges and agrees that it may be required to submit to random drug and/or alcohol screening test while performing the Services under this Agreement. Vendor agrees that, upon the request of OWE, Vendor will promptly, without notice, submit to testing for the use of drugs, alcohol and/or controlled substances. Vendor agrees that the results of any blood and/or urine sample test results may be revealed to OWE for its use and evaluation. Vendor acknowledges and understands that any refusal by Vendor to submit to such testing can be grounds for immediate termination. Additionally, a positive test result from any drug and/or alcohol test may be grounds for immediate termination.

**(c)    Assignment.** Vendor's obligations under this Agreement may not be assigned or transferred to any other person, firm, or corporation without the prior written consent of OWE.

**(d)    Limitation of Liability.** Except for Vendor's indemnification obligations under this Agreement, and/any breach or violation of the restrictive covenants set forth in this Agreement by Vendor, and/or a Party's gross negligence or willful misconduct, in no event shall either Party, its Affiliates, or their respective Representatives be liable for: consequential, indirect, incidental, special, exemplary, punitive, or enhanced damages, lost profits or revenues or diminution in value, arising out of or relating to any breach of this Agreement, regardless of (1) whether such damages were foreseeable, (2) whether or not it was advised of the possibility of such damages, and (3) the legal or equitable theory upon which the claim is based, and notwithstanding the failure of any agreed or other remedy of its essential purpose. Except for OWE's gross negligence or willful misconduct, to the maximum extent permitted under applicable law, OWE's aggregate liability arising out of or relating to this Agreement, whether arising out of or relating to breach of contract, tort, or otherwise, shall not exceed the total of the amounts actually paid by OWE to Vendor pursuant to this Agreement.

1.    **(e)    Notices.** All notices, requests, demands, and other communications required or permitted to be given under this Agreement by any Party shall be in writing delivered to the following addresses:

IF for OWE:
ONE WORLD ENERGY, LLC D/B/A OUR WORLD ENERGY
20809 N. 19th Ave, Suite 1
Phoenix, AZ 85027

IF for Vendor: (please enter your name and mailing address)

Name: EDJ Enterprises Inc

Address: 1340 Gulf Blvd

Clearwater, FL 33767

or to such other address as any Party may designate from time to time by written notice to the other Party.  Each such notice, request, demand, or other communication shall be deemed given and effective, as follows: (i) if sent by hand delivery, upon delivery; (ii) if sent by first-class U.S. Mail, postage prepaid, upon the earlier to occur of receipt or three (3) Business Days after deposit in the U.S. Mail; (iii) if sent by a recognized prepaid overnight courier service, one (1) day after the date it is given to such service; (iv) if sent by facsimile, upon receipt of confirmation of successful transmission by the facsimile machine; and (v) if sent by email, upon acknowledgement of receipt.

(f)    **Work Product/Intellectual Property.**    Vendor hereby agrees to grant, release, and assign to OWE, all right, title, and interest in all copyrights, patents, trade secrets, and other intellectual property arising out of the Services, including, but not limited to, all patentable and non-patentable inventions, discoveries, ideas, processes, and materials, created under this Agreement; that is, for avoidance of uncertainty, all products or inventions created by Vendor arising from or reasonably related to Vendor's Services under this Agreement, shall be and become irrevocably the property of OWE.  Upon written notice by OWE, Vendor will provide, execute, and return to OWE whatever documents, information, and materials are in Vendor's possession or reasonably available to Vendor to enable OWE to protect its copyrights, patents, trade secrets, and other intellectual property rights in any materials produced as a result of this Agreement.   Any equipment, software (including relevant passwords and codes), parking or other passes, badges, or key cards that were provided to Vendor by OWE for use under the terms of this Agreement will also be returned to OWE within five (5) business days after termination of this AGREEMENT.

(g)    **Confidential Information:**    Vendor acknowledges that during the term of this Agreement, Vendor will have access to various trade secrets, inventions, processes, information, records, and products owned by OWE and/or used by OWE in connection with the operation of its business including, without limitation, customer lists, accounts, software and procedures. Vendor agrees that Vendor will not disclose any of these materials or information, directly or indirectly, or use any of them in any manner, either during the term of this Agreement or at any time thereafter, except as required in the course of this Agreement with OWE for OWE's benefit.

**App. 017**

DocuSign Envelope ID: 2524AADD-A8E4-4ED3-9AA6-C40DE269C809

**(h)    Warranties and Liabilities of Vendor.**    In performing the Services under this Agreement, Vendor shall only use authorized materials created by or for use by OWE, and shall not use the copyrighted works of third-parties. Vendor shall defend, indemnify and hold OWE harmless from liability that OWE is exposed to as a result of Vendor knowingly or unknowingly using unauthorized materials in the performance of the Services under this Agreement.

**(i)    Expenses.**    Each Party will bear the costs and expenses incurred by such Party in negotiating and executing this Agreement. Unless otherwise provided herein, Vendor will be responsible for all costs related to the Services, Work, equipment, uniforms, training, project management, call centers, customer care, information technology systems, software, and all other of its obligations under this Agreement.

**(j)    Binding Effect.**    This Agreement shall be binding upon, and inure to the benefit of, the Parties to this Agreement and their respective heirs, executors, administrators, agents, representatives, successors, assigns, beneficiaries, trustees, family members, and affiliates (meaning any family relation of or entity owned or controlled by the preceding entity or individuals).

**(k)    Waiver.**    No breach of any provision hereof can be waived unless in writing by the Party against whom enforcement of the waiver is sought.  Waiver of any one breach of any provision(s) hereof shall not be deemed to be a waiver of any other breach of the same or any other provision(s) hereof.   Failure on the part of any Party hereto to complain of any act or failure to act of any other Party or to declare any Party in default hereunder, irrespective of how long such failure continues, shall not constitute a waiver of the rights of such Party hereunder.

**(l)    Severability.**    If any provision of this Agreement is ultimately held to be invalid, illegal, or unenforceable, the validity, legality, and enforceability of the remaining provisions shall not be in any way affected or impaired thereby.

**(m)    Amendments.**    This Agreement may be amended or modified only by an instrument in writing, signed by all the Parties.

**(n)    Applicability and Incorporation of Schedules and Exhibits.**    Each of the Exhibits referenced herein is hereby incorporated by reference and shall each and collectively form an integral part of this Agreement.

**(o)    Entire Agreement.** This Agreement constitutes the entire agreement among the Parties and supersedes all prior oral and written negotiations, communications, discussions and correspondence pertaining to the subject matter hereof.

**(p)    Choice of Law.**    This Agreement shall be construed in accordance with, and be governed by, the laws of the State of Arizona.

(q)    **No presumption Against the Drafter.** The Parties have cooperated in the drafting and preparation of this Agreement.  In any construction to be made of this Agreement, no presumption shall arise to any Party by virtue of participation in the drafting hereof.

(r)    **Submission to Jurisdiction.** Each Party irrevocably consents and agrees that any action, proceeding, or other litigation by or against the other Party with respect to any claim or cause of action based upon or arising out of or related to this Agreement, shall be brought and tried exclusively in the federal or state courts located in the State of Arizona, and any such legal action or proceeding may be removed to the aforesaid courts. By execution and delivery of the Agreement, each Party accepts, for itself and in respect of its property, generally and unconditionally, the exclusive jurisdiction of the aforesaid courts. Each Party hereby irrevocably waives (i) any objection which it may now or hereafter have to the laying of venue with respect any such action, proceeding, or litigation arising out of or in connection with this Agreement brought in the aforesaid courts; and (ii) any right to stay or dismiss any such action, proceeding, or litigation brought before the aforesaid courts on the basis of forum *nonconveniens*. Each Party further agrees that personal jurisdiction over it may be affected by service of process by certified mail, postage prepaid, addressed as provided in Section 8(e) of this Agreement, and when so made shall be as if served upon it personally within the State of Arizona.

(s)    **Jury Waiver.** TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, EACH PARTY HEREBY WAIVES ITS RIGHTS TO A TRIAL BY JURY WITH RESPECT TO ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF OR RELATED TO THIS AGREEMENT, IN ANY ACTION, PROCEEDING OR OTHER LITIGATION OF ANY TYPE BROUGHT BY ANY PARTY AGAINST THE OTHER PARTY, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS, OR OTHERWISE. EACH PARTY HEREBY AGREES THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE TRIED BY A COURT TRIAL WITHOUT A JURY. WITHOUT LIMITING THE FOREGOING, THE PARTIES FURTHER AGREE THAT THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY IS WAIVED BY OPERATION OF THIS SECTION 8(s) AS TO ANY ACTION, COUNTERCLAIM OR OTHER PROCEEDING WHICH SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY OF THIS AGREEMENT, OR ANY PROVISION HEREOF. THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS, OR MODIFICATIONS TO THIS AGREEMENT.

(t)    **Advice of Counsel.** The Parties to this Agreement acknowledge and represent that they have consulted with legal counsel of their choosing, or they have had the opportunity to consult with legal counsel of their choosing, before executing this Agreement, that they understand the meaning of this Agreement, and that they expressly consent that this Agreement shall be given full force and effect according to each and all of its express terms and provisions, including, without limitation, those relating to the release of unknown and unsuspected claims, demands, and causes of action.

DocuSign Envelope ID: 2524AADD-A8E4-4ED3-9AA6-C40DE269C809

    **(u)**    <u>**Counterparts.**</u>    The Parties may execute this Agreement in counterparts, and when each Party has signed and delivered one such counterpart or copy thereof, each counterpart or copy shall be deemed an original and, when taken together with the other signed counterparts or copies, shall constitute one integrated contract, which shall be binding upon and effective as to all Parties. PDF signatures of the Parties shall have the same effect as original signatures.

    **(v)**    <u>**Attorneys' Fees and Costs.**</u>   The Parties understand and agree that in the event a dispute arises between the parties relating, in any way, to this Agreement or the performance of the Agreement, including issues of interpretation or claimed breach, then the prevailing party in such proceeding shall be entitled to an award of reasonable attorneys' fees and costs, including expert witness fees and costs, relating to that litigation.

    **(w)**    <u>**Force Majeure.**</u>   Upon the occurrence and during the continuance of a Force Majeure Event, a Party will be excused from performance and shall not be considered to be in breach or default with respect to any obligation hereunder; so long as: (i) such Party gives the other Party prompt written notice describing the details of the Force Majeure Event as soon as is reasonably practicable after becoming aware of the occurrence of the Force Majeure Event; (ii) the suspension of performance is of no greater scope and of no longer duration than is reasonably required by the Force Majeure Event; (iii) no obligations of affected Party that arose before the occurrence of the Force Majeure Event causing the suspension of performance shall be excused as a result of such Force Majeure Event, unless and only to the extent that the performance of such obligations is impaired by the Force Majeure Event; (iv) the Party uses diligent best efforts to overcome or mitigate the effects of the Force Majeure Event; and (v) when the Party is able to resume performance of its obligations under this Agreement, such Party shall give the other Party written notice to that effect and shall promptly resume performance hereunder. Notwithstanding the foregoing, a Party will not be relieved of any obligation to pay money in connection with this Agreement, including (without limitation): payment of any Fee by OWE, payment of any Liquidated Damage or reimbursement by Vendor, or any indemnification obligation of either Party.

IN WITNESS WHEREOF, both OWE and Vendor have hereunto accepted and executed this Agreement as of the date indicated below.

[SIGNATURES ON NEXT PAGE]

DocuSign Envelope ID: 2524AADD-A8E4-4ED3-9AA6-C40DE269C809

**DEALER**

Dated: 4/9/2024

By: _____
17B272C217EA466...

Print Name: Eric DeJohn

Its: Owner- EDJ Enterprises


**ONE WORLD ENERGY, LLC**
**D/B/A OUR WORLD ENERGY**

Dated: 4/10/2024

By: Joshua Morton
77E5027FC072424...

Print Name: Joshua Morton

Its: Director of Business Development

**App. 022**



<u>**Schedule 1**</u>

**DEFINITIONS & RULES OF INTERPRETATION**

1.      **DEFINITIONS**.

1.1. "*Account Deductions*" means the Account deductions found on the OWE Dealer Portal; provided that OWE may revise the list of deduction items at any time in its sole and absolute discretion.

1.2. "*Advances*" has the meaning set forth on Exhibit B, and generally means a payment of all or a portion of a Fee by OWE to Vendor before it is completely earned by the Vendor. All payments to a Vendor prior to final completion of all Services and Work with respect of a Project shall be deemed an Advance.

1.3. "*Affiliate*" means, with respect to either Party, a person or entity that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Party. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the engagement and policies of such person or entity, whether through the ownership of voting securities, by contract or otherwise.

1.4. "*Agreement*" means this Sub Dealer Agreement, collectively with the NDA, all Exhibits and Schedules attached hereto, and all other documents incorporated herein by reference.

1.5. "*Ancillary Services Agreement*" "*Ancillary Products Agreement*", "*ASA*", or "*APA*" means OWE's standard form ancillary services or products agreement, between OWE and a Qualified Customer, as may be modified from time to time by OWE in its sole and absolute discretion.

1.6. "*Applicable Law*" means any statute, law, ordinance, regulation, Prudent Industry Practices, rule, code, constitution, treaty, common law, governmental order, or other requirement or rule of law of any governmental authority, including (without limitation): (i) Federal and state privacy, data security and credit reporting laws, such as the Fair Credit Reporting Act, 15 U.S.C. 1681 et seq., and Regulation V, 12 C.F.R. § 1022.1 *et seq.*; (ii) Federal and state unfair, deceptive or abusive acts and practices laws, such as the Dodd-Frank Act, 12 U.S.C. § 5531 *et seq.* and the Federal Trade Commission Act, 15 U.S.C. § 45 *et seq.*; (iii) Federal and  state telecommunications laws, such as the Telephone Consumer Protection Act, 47 U.S.C.§ 227 *et seq.* and implementing regulations, 16 C.F.R. § 310.1 et seq. and 47 C.F.R. § 64.1200; (iv) Federal and state email communication laws, such as the CAN-SPAM Act, 15 U.S.C. § 7701 *et seq.* and implementing regulations, 16 C.F.R. § 316.1 *et seq.* and 47 C.F.R. § 64.3100 *et seq.*; (v)Federal and state advertising and marketing laws, such as the Federal Trade Commission Act, 15

U.S.C. § 41, *et seq.* and associated FTC Guides and Policy Statements; (vi) Federal and state electronic transactions laws and electronic contracting laws, such as state

**App. 023**



Uniform Electronic Transactions Acts and the Electronic Signatures in Global and National Commerce Act, 15
U.S.C. § 7001 *et seq.*; (vii) the SEIA Solar Business Code; (viii) Direct Marketing Association's Business Code Articles 47 and 48; (ix) Federal and state home improvement and solar disclosure laws, such as California's Business and Professions Code § 7159 *et seq.*; and (x) Federal and state door-to-door solicitation laws, such as 16 CFR Part 429 *et seq.*

1.7.  "*Authority Having Jurisdiction*" or "*AHJ*" means a Government Authority responsible for issuance of Permits.

1.8.  "*Bailed Inventory Amount*" means the costs and expenses incurred by OWE in relation to or arising out of the procurement of the Inventory and the bailment thereof to Vendor, including (without limitation): costs of goods, transportation costs, delivery costs, tariffs, taxes, insurance costs, allocated overhead, and allocated general and administrative costs.

1.9.  "*BOS Components*" means all wires, conduit, cables, junction boxes, flashing, sealants, cable management, and other components that are not part of the Major Equipment.

1.10.  "*Business Day*" means any day, other than a U.S. Federal Holiday or a day on which banking institutions in the State of Arizona are authorized or obligated by Applicable Law or executive order to be closed.

1.11.  "*Business Representative*" means the individual appointed by each Party pursuant to Section 2(c) as set forth on Schedule 2.

1.12.  "*Change Order*" means change request by OWE, relating to a previously agreed Work Order, on OWE's standard form.

1.13.  "*Code of Conduct*" means those policies and procedures of OWE, attached hereto as Exhibit A, as may be modified from time to time by OWE in its sole and absolute discretion.

1.14.  "*Commissioning Protocol*" has the meaning set forth on Exhibit C.

1.15.  "*Competitor*" means any person or entity that provides products and/or services that are substantially similar to or competitive with those offered or provided by OWE or any of its Affiliates at any time during the Restricted Period, including (without limitation) companies, persons, or entities in the business of selling (i) residential and commercial photovoltaic or solar thermal products or services; (ii) residential or commercial energy storage and battery products and services; (iii) energy management and home automation; (iv) electric vehicle chargers and services; (v) demand response and other distributed energy resources; and (vi) residential and commercial security and protection related products and services, collectively with  any Affiliates, Vendors, or dealers of any of the foregoing.

1.16.  "*Completion Certificate*" means the Form of Completion Certificate found on the OWE Dealer Portal; provided that OWE may revise the form or Completion Certificate at any time in its sole and absolute discretion.

1.17.  "*Consumer*" means any natural person, including (without limitation): a

2



Customer, an Eligible Customer, and a Qualified Customer.

1.18. "*Contract Price*" has the meaning set forth in the applicable SPA.

1.19. "*Vendor Operations Manual*" means that certain OWE Vendor Operations Manual, as may be updated from time to time by OWE in its sole and absolute discretion.

1.20. "*Credit Authorization*" means (i) in the case of a PPA Project or Lease Project, OWE's standard form of credit authorization form, as may be modified from time to time by OWE in its sole and absolute discretion; and (ii) in the case of a Loan-SPA Project, the applicable financing party's standard form of credit authorization form, as may be modified from time to time by such financing party in its sole and absolute discretion.

1.21. "*Customer*" means each natural person to whom Vendor markets, promotes, solicits, and/or offers for sale the Products, whether or not such person qualifies as a Qualified Customer or executes a Customer Agreement.

1.22. "*Customer Agreements*" means OWE's standard form of Power Purchase Agreement, Solar System Lease Agreement, System Purchase Agreement, Ancillary Products Agreement, Maintenance Services Agreement, or other agreements between OWE and a Qualified Customer, in each case, as may be modified from time to time by OWE in its sole and absolute discretion.

1.23. "*Customer Information*" means the contract information and personal details concerning a Customer, including (without limitation): full legal name, date of birth, property address for the Project, mailing address, e-mail address, telephone number, and other information that may be requested by OWE from time to time.

1.24. "*D&E SOP*" means that certain OWE Design and Engineering Standard Operating Procedures Manual, as may be updated from time to time by OWE in its sole and absolute discretion.

1.25. "*Defect*" means any issue, problem, oversight, or failure in the Work, in the Equipment, in the Inventory, or any other aspect of the Services provided by Vendor that does not strictly comply at any time throughout the Warranty Period with (i) the Specifications; (ii) the Requirements; (iii) Applicable Law; (iv) this Agreement; (v) the Customer Agreement; (vi) any Permit; or (vii) causes any component or all of a System or a Project to fail to operate in the manner intended.

1.26. "*Deliverables*" has the meaning set forth on Exhibit C; provided that OWE may revise the required Deliverables at any time in its sole and absolute discretion.

1.27. "*Eligible Customer*" means a natural person that meets all of the following criteria:

(i) over eighteen (18) years of age; (ii) is a United States citizen; (iii) own the house upon which the System will be Installed; (iv) such house is a single family detached house and is not part of a multi-family dwelling; (v) such house is located in the Territory; (vi) has broadband internet available at the house; (vii) the structure, roof, and electrical distribution systems of the house are in good condition and capable of



supporting the System; (viii) Vendor has no reason to believe that such person will not satisfactorily passed all credit underwriting criteria of OWE and its financing partners; (ix) the house does not use electricity to heat a swimming pool; and (x) is not a Rejected Customer; provided that OWE may revise the required eligibility requirements for a Customer at any time in its sole and absolute discretion.

1.28. "*Eligible Lead*" means a Lead of an Eligible Customer.

1.29. "*EPC Fee*" means the value of the System based on its attributes, as determined by OWE in its sole and absolute discretion.

1.30. "*Equipment*" means Major Equipment, BOS Components, the Products, and any other material, hardware, or component part of a System or a Project.

1.31. "*Fees*" means those amounts owed to Vendor set forth on Exhibit B, as may be reduced by any amount owed by Vendor to OWE, including (without limitation): Liquidated Damages, Bailed Inventory Amounts, Reimbursements, repaid Advances, and indemnification obligations.

1.32. "*Fee Statement*" has the meaning set forth in Exhibit B.

1.33. "*FIN*" or "*Final Inspection Notice*" means a final inspection notice or similar notices or approvals issued by a Government Authority that demonstrates that the design, engineering, installation, and commissioning of the System and all other components of the Project satisfy all Permit requirements, pass the inspection, and comply with Applicable Law.

1.34. "*Force Majeure Event*" means the occurrence of any act or event beyond the reasonable control of the Party affected that prevents the affected Party from performing its obligations under this Agreement, in full or part, if such act or event is beyond the reasonable control of, and not the result of the acts or omissions of, the affected Party and such Party has been unable to overcome such act or event with the exercise of due diligence (including the expenditure of reasonable sums), to the extent caused by flood, earthquake, named storm, fire, lightning, epidemic, war, riot, sabotage, terrorism, or acts of god. Notwithstanding the foregoing, Force Majeure Events shall not include labor strikes or shortages, inclement weather, mechanical or equipment failures, supply shortages or delays, imposition of taxes, tariffs, or other charges, change in Applicable Law or requirements of Government Authorities, or the acts or omissions of a Customer.

1.35. "*Governmental Authority*" means any federal, commonwealth, state, or local regulatory agency or other governmental agency or authority having jurisdiction over a Party, a Representative of a Party, a consumer, a Customer, Qualified Customer, or the transactions contemplated by this Agreement or the Customer Agreement.

1.36. "*Initial Term*" has the meaning set forth on the first page set forth above.

1.37. "*In-Service Date*" means the date upon which all of the following shall have occurred (i) the Project is fully Installed; (ii) the Project has received all Permits and approvals required by any Government Agency; (iii) the Project has passed inspection by the applicable AHJ; (iv) the System has passed all startup



and performance tests, including the Commissioning Protocol and has been Verified as Operational; and (v) the Project has received its PTO Letter from the applicable utility; (vi) the System has been turned on and begun to produce energy; and

(vii) if applicable, billing for the Customer has commenced.

1.38. "*Install*", "*Installed*", or "*Install Complete*" means with respect to a System and Project (i) the System, all Products, and related components are fully and physically installed; (ii) the System is interconnected to the Property's electrical system; (iii) the System has passed the Commissioning Protocol; (iv) the System is communicating with OWE's remote monitoring platform; (v) all Deliverables have been provided to OWE; and (vi) the Project complies in all respects with the Specifications.

1.39. "*Install SOP*" means that certain OWE Installation Standard Operating Procedures Manual, as may be updated from time to time by OWE in its sole and absolute discretion.

1.40. "*Lead*" means an Eligible Customer that has expressed interested in purchasing one or more of the Products, first generated by Vendor in performing the Services under thisAgreement, and provided to OWE

1.41. "*Lien*" means any lien, mortgages, pledge, security interest, restriction, prior assignment, claim, any and all other encumbrances of every kind or character, including the claims of any bank, creditor, or taxing authority.

1.42. "*Liquidated Damage*" or "*LD*" means the payment of money by Vendor upon the occurrence of a specified event or the lapse of time, including (without limitation): delay liquidated damages, termination fees, and other amounts specified on Exhibit B and Exhibit C.

1.43. "*Maintenance Services Agreement*" means OWE's standard form solar systemmaintenance services agreement, between OWE and a Qualified Customer, as may be modified from time to time by OWE in its sole and absolute discretion.

1.44. "*Marketing Guidelines*" means that certain OWE Branding and Marketing Guidelines (as more particularly described on Schedule 4), as may be updated from time to time by OWE in its sole and absolute discretion.

1.45. "*MSA*" has the same meaning as "Agreement".

1.46. "*New Vendor Checklist*" means the checklist found on the OWE Dealer Portal; provided that OWE may revise the checklist items at any time in its sole and absolute discretion.

1.47. "*NTP*" has the meaning set forth on Exhibit C.

1.48. "*O&M SOP*" means that certain OWE Operations and Maintenance Standard Operating Procedures Manual, as may be updated from time to time by OWE in its sole and absolute discretion.

1.49. "*Party*" means each of OWE and Vendor.

1.50. "*Permit*" means an electrical, building, or other permit or approval required and issued by an AHJ in relation to installation of a System or any Product.



1.51. "*Permit Approved*" means the issuance by the applicable government authority of all electrical, building, and other permits and approvals required to install a System or other Products and their receipt by OWE.

1.52. "*Power Purchase Agreement*" or "*PPA*" means OWE's standard form of solar power purchase agreement, between OWE and a Qualified Customer, as may be modified from time to time by OWE in its sole and absolute discretion.

1.53. "*Products*" means a System and such other products made available by OWE to a Customer from time to time, including (without limitation): (i) electrical service upgrades; (ii) structural upgrades; (iii) reroofing; (iv) battery storage systems; and (v) electric vehicle chargers; provided that OWE may revise the eligible Products at any time in its sole and absolute discretion.

1.54. "*Project*" means the System, other Products, and Customer Agreement for a particular Customer at a specific Property.

1.55. "*Project Document*" means all required documentation other than a Customer Agreement required to install, inspect, commission, receive PTO, and activate a Project, including (without limitation): permits, HOA approval, net metering agreements, interconnection agreements, inspection notices, rebate forms, incentive forms, tax credit forms, and SRECdocumentation.

1.56. "*Property*" means the real property upon which the System and other Products will be installed, identified in the applicable Customer Agreement.

1.57. "*Prudent Industry Practices*" means, with respect to each System and Project, (a) the highest and most prudent standards of performance within the residential solar photovoltaic power generation industry in the relevant Territory and throughout the United States; and (b) those practices, methods, acts, equipment, specifications and standards of safety and performance, of which there may be more than one, and as the same may change from time to time, as are used in operating solar energy systems of a type and size similar to the Systems and in the same geographic region as the System that, at a particular time, by highest performing and most prudent participants in the solar industry that, at a particular time, in the exercise of reasonable judgment in light of the facts known or that reasonably should have been known at the time a decision was made, would be expected to accomplish the desired result in a manner consistent with Applicable Law, standards, equipment manufacturer's recommendations, reliability, safety, environmental protection, efficiency, economy and expedition.

1.58. "*PTO Letter*" means the permission to operate granted by the applicable utility orits equivalent.

1.59. "*Qualified Customer*" means an Eligible Customer that (i) meets the minimum credit score and other underwriting criteria that is required by OWE in its sole and absolute discretion; and (ii) is not a Rejected Customer; provided that OWE may revise the qualifications required of a Customer at any time in its sole and absolute discretion.

1.60. "*Qualified Lead*" means a Lead of a Qualified Customer.

6



1.61. "*Reimbursements*" means any and all amounts owed by Vendor to OWE relating to or arising from (i) costs incurred by OWE that should have been paid by Vendor; or (ii) amounts paid by OWE to Vendor that it did not earn, in each case pursuant to the terms of this Agreement, including (without limitation): the repayment of any Advances and all Reimbursements described on Exhibit B.

1.62. "*Rejected Customer*" means a customer that (i) fails to satisfy any of the requirements of a Eligible Customer at the time of originated, submitted, or for which payment was requested by Vendor; (ii) fails to satisfy any of the requirements of a Qualified Customer at the time of originated, submitted, or for which payment was requested by Vendor; (iii) is originated, submitted by Vendor, or for which Vendor requests payment during a time when Vendor was in breach of the Agreement or a Vendor Default had occurred; (iv) the Customer Information is inaccurate, incomplete, unavailable, or disconnected; (v) the Customer is already a Customer of OWE; (vi) the Customer is a duplicate of a Customer previously provided by Vendor; and/or (vii) the Credit Authorization, the Customer Agreement, the Project Documents, or any other Deliverable is incomplete or completed incorrectly; provided that OWE may revise the reason or cause for rejection of a Customer at any time in its sole and absolute discretion.

1.63. "*Representatives*" means, with respect to a Party, such Party's and its Affiliates' employees, officers, directors, managers, equity holders, agents, attorneys, Vendors, third-party advisors, successors, and permitted assigns.

1.64. "*Representative Certificate*" means the Form of Representative Certificate found on the OWE Dealer Portal; provided that OWE may revise the form or Representative Certificate at any time in its sole and absolute discretion.

1.65. "*Requirements*" means any and all terms, conditions, conditions precedent, Deliverables, and other requirements required of Vendor in connection with any Lead, Customer, or Project, including (without limitation) the requirements described and defined on Exhibit C; provided that OWE may revise the Requirements at any time in its sole and absolute discretion.

1.66. "*Restricted Period*" has the meaning set forth on Exhibit D.

1.67. "*SEIA Solar Business Code*" means the Solar Energy Industries Association's Solar Business Code (*available at* https://www.seia.org/initiatives/seia-solar-business-code).

1.68. "*Services*" means the obligations of Vendor under this Agreement as described on Exhibit C.

1.69. "*Set-Off*" means any amount owed by Vendor to OWE under this Agreement that OWE sets-off, deducts, or withholds from any payment by OWE to Vendor, pursuant to Section 3(e).

1.70. "*Signed Credit Authorization*" means a Credit Authorization that (i) all fields are accurately completed by the Qualified Customer, not the Vendor; and (ii) all initials, checkboxes, and signatures have been completed by the Qualified Customer.

App. 029



1.71. "*Signed Customer Agreement*" means a Customer Agreement that (i) all fields are accurately completed by the Qualified Customer and Vendor (as applicable); (ii) all initials, checkboxes, and signatures have been completed by the Qualified Customer; (iii) the applicable licensed Representative of Vendor signed the Customer Agreement; and (iv) the applicable representative of OWE has countersigned the Customer Agreement.

1.72. "*Signed Project Documents*" means any and all Project Documents that (i) all fields are accurately completed by the Qualified Customer, Vendor, or OWE (as applicable); (ii) all initials, checkboxes, and signatures have been completed by the Qualified Customer, Vendor, or OWE (as applicable); and (iii) the applicable licensed representative of Vendor or OWE has signed each Project Document (as applicable).

1.73. "*Software*" means the software, computer systems, and other electronic tools owned or provided by OWE, including the Sales Tools, the D&E Tools, and the Install Tools.

1.74. "*Solar System Lease Agreement*" or "*Lease*" means OWE's standard form of solar system lease agreement, between OWE and a Qualified Customer, as may be modified from time to time by OWE in its sole and absolute discretion.

1.75. "*Solar System Purchase Agreement*" or "*SPA*" means OWE's standard form of solar system purchase agreement, between OWE and a Qualified Customer, as may be modified from time to time by OWE in its sole and absolute discretion.

1.76. "*SOP*" means one or more of OWE's standard operating procedures, including, but not limited to, the Vendor Operations Manual, Marketing Guidelines, D&E SOP, the Install SOP, and the O&M SOP.

1.77. "*Specifications*" means any applicable SOP.

1.78. "*System*" means a photovoltaic system comprised of Major Equipment and BOS Components.

1.79. "*System Size*" means, with respect to a System, the nameplate capacity of such System represented in Watts.

1.80. "*Territory*" has the meaning set forth on the first page set forth above.

1.81. "*Trademarks*" means all trademarks, trade names, corporate names, company names, business names, fictitious business names, Internet domain names, service marks, certification marks, collective marks, logos, other source or business identifiers, designs and general intangibles of OWE, including (without limitation): "One World Energy", "Our World Energy", and "OWE".

1.82. "*Watt*" means watts DC STC or nameplate rating of the applicable System or Solar

Panel.

1.83. "*Work Order*" means a request for Work by OWE including a NTP, on OWE's

standard form, which may be transmitted via e-mail or other electronic means to Vendor.

## 2. RULES OF INTERPRETATION.

8

**App. 030**



2.1. Except as otherwise expressly provided in this Agreement, each Party hereby agrees and acknowledges that the following rules of interpretation shall apply to this Agreement: (i) the singular includes the plural and the plural includes the singular; (ii) the word "or" is not exclusive; (iii) a reference to a law or governmental rule includes any amendment or modification to such law or rule, and all regulations, rulings and other laws promulgated under such law or rule; (iv) a reference to a person includes its successors and permitted assigns; (v) the words "include", "includes", and "including" are not limiting; (vi) the words "hereof," "herein," "hereunder", "hereby", and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement; and (vii) the words "will" and "shall" are used interchangeably with the same meaning. Article, Section and paragraph headings and the footers have been inserted in this Agreement as a matter of convenience for reference only, such are not a part of this Agreement, and shall not be used in the interpretation of any provision of this Agreement.

2.2. The provisions this Agreement, all Exhibits and Schedules, including any amendments thereto, and any other instruments or documents referenced or incorporated herein shall, to the maximum extent possible, be interpreted consistently, and in a manner as to supplement each other and avoid any conflict between them. However, in the event of a conflict or inconsistency, the following order of precedence shall apply: (i) amendments to this Agreement executed by the Parties pursuant to Section 8(h); (ii) the Agreement; (iii) all other Schedules and Exhibits hereto; and (iv) any written communications (including e-mail) after the Effective Date.

## <u>Schedule 2</u>

### INSURANCE REQUIREMENTS

At all times throughout the Restricted Period and for three (3) years thereafter, Vendor shall obtain and maintain, and shall cause of its Representatives (including subVendors (if any)) to obtain and maintain, at its sole cost and expense, insurance meeting the following requirements, in each case in form, substance, and amount acceptable to OWE (in its sole and absolute discretion):

**1.      INSURANCE TYPES AND AMOUNTS.**

1.1. Compliance with Applicable Law. Insurance of the type and in minimum amount required by Applicable Law.

1.2. Workers' Compensation. Workers' compensation and employers' liabilities insurances in amounts not less than $1,000,000.

DocuSign Envelope ID: 2524AADD-A8E4-4ED3-9AA6-C40DE269C809



1.3. Commercial General Liability Insurance. Commercial general liability insurance in amounts not less than $1,000,000 per occurrence and $2,000,000 in the aggregate, covering all of Vendor's operations, including (without limitation): premises and operations liability, products and completed operations liability, blanket contractual liability, personal injury liability, bodily injury and "broad form" property damage coverage, blanket contractual liability, explosion, collapse and underground hazard coverage. Commercial General Liability, including products and completed operations, shall be maintained for a minimum of three (3) years following the Term.

1.4. Property and Casualty Insurance. Property and casualty insurance covering (a) Seller's tools and equipment; (b) each Project during the Warranty Period in an amount equal to the EPC Fee for each Project; and (c) if applicable, one hundred fifty percent (150%) of the Inventory Maximum.

1.5. Excess Umbrella Liability. Excess umbrella liability insurance with a single limit of at least $5,000,000 per occurrence and in the aggregate, in excess of the limits of insurance provided above. Coverage shall be "following form" of the underlying general liability policy.

1.6. Professional Liability. Professional liability (errors and omissions) insurance with a limit of not less than $1,000,000 per occurrence and in $2,000,000 the aggregate. If the policy shall be written on a "claims-made basis" then the policy shall include (1) retroactive date that is no later than the Effective Date, and (2) any time a policy is written on a "claims-made basis" is not renewed or the retroactive date changed Vendor shall obtain or cause to obtain the broadest "tail" or extended reporting coverage commercially available.

2.    **INSURANCE REQUIREMENTS.**

2.1. Underline. General. Each insurance policy shall meet all the following minimum requirements:

2.1.1. be with companies licensed to do business in each state in the Territory;

2.1.2. be with companies with financial ratings not lower than A-VII in AM Best's Insurance Guide;

2.1.3. be of a form, substance, and content satisfactory to OWE (in its sole and absolute discretion);

2.1.4. be written on a per occurrence basis (other than Professional Liability Insurance);

2.1.5. provide that not less than thirty (30) calendar days' prior written notice be given to OWE before any such policies are canceled or substantially changed to reduce the insurance provided thereby; and

2.1.6. be primary and noncontributory as respects any claims, losses or liability arising directly or indirectly from Seller's operations

10

**App. 032**



2.2. <u>Waiver of Subrogation</u>. Each policy shall contain express waivers and endorsements providing that each insurer and underwriter waives all of its rights of recovery by subrogation, by or through Vendor, or otherwise against OWE or any of OWE's Representatives.

2.3. <u>Liability Insurance</u>. Commercial General Liability, Business Automobile Liability and Umbrella Liability policies shall include a severability of interest clause with cross-liability included.

2.4. <u>Deductibles</u>. Any deductible or self-insured retention shall be the responsibility of Vendor.

2.5. <u>Liability of Vendor</u>. The limits of insurance or applicable deductibles shall not limit the liability of Vendor or relieve Vendor of any liability or financial responsibility.

**3.    EVIDENCE OF INSURANCE.**

3.1. Prior to the commencement of any Work or the performance of any Services by Vendor, Vendor shall deliver to OWE certificate(s) of insurance, signed by an authorized insurance company representative, evidencing Vendor's compliance with this Schedule 3.

3.2. Except for Workers' Compensation Insurance and Professional Liability Insurance, each insurance policy of Vendor required hereunder shall name OWE and its Representatives as additional insureds for the Work, the Services, and all other obligations performed under or incidental to the Agreement.

3.3. Property Insurance and Builders' Risk Insurance policies shall name OWE as loss
payee.

**4.    FAILURE TO MAINTAIN**. Vendor understands and agrees that in the event that it or any of its Representatives fails to maintain any insurance required by this Schedule 2, then OWE may (but shall not be required to) obtain such insurance on behalf of Vendor or its Representatives and all premiums, deductibles, and other expenses incurred or payable by OWE in relation thereto shall be paid immediately by Vendor upon demand by OWE and/or OWE may set-off all such amounts pursuant to Section 3(e).

**5.    AMENDMENTS AND MODIFICATIONS**. Pursuant to Section 8(g) of the Agreement, this Schedule 2 may be modified at any time by OWE by delivering a Revised Exhibit to Vendor to its then-current e-mail address on file with OWE. Such Revised Exhibit shall be effective and binding upon Vendor and OWE after seven (7) calendar days of its delivery, unless such Revised Exhibit has a

DocuSign Envelope ID: 2524AADD-A8E4-4ED3-9AA6-C40DE269C809



specifically identified later effective date.

## **Schedule 3**

### **APPROVED**

### **SUBVENDORS**

| SubVendor Name: | State of Formation: | Tax ID No.: | Address: | License No.: | License State: | Issuing Agency for License |
|---|---|---|---|---|---|---|
| **NONE** | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

12

DocuSign Envelope ID: 2524AADD-A8E4-4ED3-9AA6-C40DE269C809



**Exhibit A**

**FEES AND PAYMENTS**

1.      **Payment Details**.

1.1.   Calculation of Payments. Vendor acknowledges and agrees that OWE will calculate the Fees payable to Vendor net of amounts owed by Vendor to OWE, including (without limitation): Liquidated Damages, Reimbursements, repaid Advances, and indemnification obligations.

1.2.   Payment Amount. Because OWE holds the appointment as an authorized dealer for solar manufacturers, the Parties hereby expressly agree that OWE will receive from the manufacturer the total payment for any sales completed by Vendor (the "Payment") and further agree to the following compensation structure for all work performed by Vendor under this Agreement:

1.3 Upon receipt of payment, OWE will hold back as a baseline rate the amount of $ see pricing  per watt installed by OWE plus any applicable Adders pursuant to the Adders Sheet attached hereto as Exhibit A. OWE will provide Vendor three (3) days written notice prior to any changes to Exhibit A.

2.      In connection with each payment, OWE will deliver to Vendor a Fee Statement and Vendor shall be responsible for any and all taxes relating to or arising out of this Agreement (including any transaction privilege, general excise, use, sales or other transaction- based taxes on the Fees or any other payment hereunder). Any Fee to Vendor is contingent upon Vendor's prior satisfaction of each condition precedent, representation, and warranty under this Agreement.  In addition, the Parties agree that OWE will have the right to withhold any commissions owed to Vendor and, instead, make payments directly to Vendor's sales representatives from those commission in the event Vendor fails to make timely payments to its sales representatives.

1.3.   Requirements.  In order to request payment for any Project, Vendor must complete each of the following to the satisfaction of OWE:

1.3.1. *All Prior Milestones:* Vendor has satisfied all prior Milestones.

1.3.2. *Deliverables:* Vendor has provided to OWE all of the Deliverables.

1.3.3. *Representations:* In representing completion of a Milestone, Vendor also represents and warrants that (i) the MSA is in full force and effect; (ii) Vendor is not in breach of



any obligation under the MSA; (iii) all representations and warranties in the MSA and related documents are true and correct in all respects; (iv) all Deliverables are complete and accurate; and (v) the Customer is a Qualified Customer and is not in breach of any obligation under the Customer Agreement.

    1.3.4. *Payment Request:* Vendor has submitted a Payment Request to OWE (if applicable).

    1.4. <u>Timing of Payment</u>. For each Payment Request that satisfies all Requirements in a calendar week, OWE will pay to Vendor the Fees attributable thereto on the following Friday, or if such Friday is not a Business Day, then the next Business Day.

    1.5. <u>Fee Statement</u>. In connection with each payment, OWE will deliver to Vendor an itemized statement of the Fees paid for each Project, the deductions for items such as Set-Offs, and Liquidated Damages, and any applicable taxes in relation therewith (each, a "*Fee Statement*").

    1.6. <u>Set-Off, Reimbursements, Liquated Damages</u>. Notwithstanding any of the forgoing, OWE may (in its sole and absolute discretion) set off, withhold, or otherwise deny payment against any and all unpaid amounts owed by OWE to Vendor for the following reasons:

    1.6.1. *General Set-Off:* For costs, expenses, and other liabilities pursuant to the Parties Agreement;

    1.6.2. *Delay LDs:* For Vendor's failure to achieve a Milestone before the applicable Deadline, then Vendor will be required to pay to OWE the applicable Delay LD described below;

    1.6.3. *Reimbursement:* For Vendor's failure to achieve a Milestone before the applicable Deadline, then Vendor will be required to pay to OWE the Reimbursements for Advances and Fees described below; and

    1.6.4. *Termination LD:* In the event of a termination of a Customer Agreement attributable to or arising from Vendor's acts or omissions, then Vendor will be required to pay to OWE the applicable Termination LD described below.

    1.6.5. *Cancellation Fees:* OWE may (in its sole and absolute discretion) set off, withhold, or otherwise deny payment against any and all unpaid amounts owed by OWE to Vendor, for an amount equal to OWE's costs incurred for any cancelled Customer.

    1.6.6. *System Removal Fees:* In the event a system needs to be removed from a Customer's home, for whatever reason, Vendor will be charged a $5.00 per watt fee ("Removal Fee"). The Removal Fee charge noted herein is in the discretion of OWE and will turn on whether OWE and Customer are able to create a satisfactory experience for Customer.



1.7. <u>Reasonableness of LDs and Reimbursements</u>. The Parties hereby acknowledge and agree that each of the Delay LD, the Reimbursement, the Termination LD, and the Cancellation Fees ie estimate of the actual damages that would be incurred by OWE under such circumstances and in no event do such liquidated damages or reimbursements constitute a penalty. These remedies shall be considered cumulative and OWE shall be entitled to all other rights, remedies, and relief under this Agreement and Applicable Law.

1.8. <u>Effect upon Termination</u>. In the event of any termination of this Agreement, regardless of the reason therefor or the Party initiating such termination, subject to OWE's right to off-set herein, Vendor shall be entitled to receive payment for only those Projects that achieved Welcome Call prior to the effective date of the termination.

2.    **Payment Schedule of Vendor Fees.** Fees will be released to Vendor in accordance with the following payment schedule:

1.    50% of the commission fee, up to $ <u>2,000</u> will be released to Vendor the Friday following NTP.

2.    Balance of the commission fee will be released to Vendor the Friday following installation of Client's system.

3.    In no event will OWE pay more than 50% of total commissions in the pipeline. If the pipeline falls below 50% commissions, then commissions will be held back.

3.    **Cancellations and Vendor Fulfillment to Job:**   In the event of any reversal of funding to OWE, all paid commissions associated with the reversal of such funding will be debited against Vendor's future compensation. Nonetheless, OWE is not responsible for paying Vendor the full amount of any commission until OWE has received funding from the Client for the install. In the event of a client cancellation, Vendor shall refund any funding received as compensation plus 100% of any incurred costs (Plans, permit, MPU, etc.). Refund may be held back from future earning in OWE's sole discretion. Moreover, any charge back made by the installer will be the full responsibility of Vendor and not OWE. Additionally, any draws on projects provided to Vendor will be withdrawn, if there are delays on a project beyond the installer timelines and the installer elects to claw the money back.

4.    **Amendments.** The Vendor Fee Schedule set forth herein are subject further to the additional terms and conditions of the Adders Schedule, which is included below and  is expressly incorporated herein. The Adders Schedule reflects

DocuSign Envelope ID: 2524AADD-A8E4-4ED3-9AA6-C40DE269C809



additional costs and expenses that may impact Vendor's Fee Schedule.  During the terms of this Agreement, the Adders Schedule as well as this Vendor Fee Schedule may be revised from time to time and is, therefore, subject to change. **THESE REVISIONS TO THE ADDERS SCHEDULE MAY IMPACT A VENDOR'S COMMISSION AND VENDOR AGREES TO BE FULLY RESPONSIBLE**

**FOR ANY CHANGES IN THE ADDERS SCHEDULE**. Nonetheless, Vendor hereby expressly agrees to be bound by the Adders Schedule and future revisions thereto, as applicable. Vendor represents and warrants that it has had a chance to fully review the Adders Schedule and this provision, seek advice of counsel regarding same, and expressly agrees to the terms of the Adders Schedule, as revised from time to time, and this provision.

### Adders Schedules

The foregoing charts are intended to simply highlight typical Adders that may apply to a Vendor's transactions; however, the above charts DO NOT include all potential Adders that may apply to a particular transaction and, as such, Vendor hereby acknowledges and agrees that additional Adders may be applicable for a given transaction which may reduce Vendor's overall compensation for a given transaction. Vender hereby acknowledges and agrees that Adder prices shown below do not reflect final amount and that prices are subject to change. Please reach out to your dealer relations manager for an updated list and prices.



**Exhibit B**

**VENDOR OBLIGATIONS**

Throughout the Term, Vendor agrees that it will strictly comply with all of the following
obligations set forth in this Exhibit B. In addition, Vendor shall train and instruct its
employees, agents, and Affiliates to strictly comply with all Vendor Obligations. Vendor
acknowledges and agrees that it shall be liable for any of the acts or omissions of any
employee, agent, or Affiliate in relation to or arising out this Agreement, the Services,
and/or these Vendor Obligations.

1. **GENERAL OBLIGATIONS.**
   1.1. Understand, train all employees on, and comply with the OWE Code of
   Conduct;
   1.2. Comply in all respects with Applicable Law;
   1.3. Comply in all respects with the terms and conditions of the Customer
   Agreement;
and
   1.4. Comply in all respects with the terms, conditions, and requirements of
   the Sub
Dealer Agreement.

2. **AMENDMENTS AND MODIFICATIONS.** This Exhibit B may be modified at any
   time by OWE by delivering a Revised Exhibit to Vendor to its then-current e-mail
   address on file with OWE. Such Revised Exhibit shall be effective and binding
   upon Vendor and OWE after seven (7) calendar days of its delivery, unless such
   Revised Exhibit has a specifically-identified later effective date.

3. **LEAD GENERATION SERVICES.** Vendor agrees to strictly comply with and
   perform the following "*Lead Gen Services*":
   3.1. Required Obligations. Vendor will act as an authorized lead generator for
   OWE. Vendor will be required to perform the following functions:
       3.1.1. All aspects of marketing, advertising, lead generation, solicitation,
       selling, and closing of Qualified Customers;
       3.1.2. Vendor shall ensure that all Customers, including all Qualified
       Customers, understand all terms of the Customer Agreements, the Products, and
       the relationship between Vendor and OWE;
       3.1.3. Obtain a Signed Credit Authorization and a Signed Customer
       Agreement for each Project; and
       3.1.4. Account management of Qualified Customers through Customer
       support as and when requested by OWE throughout the Restricted Period.

18

**App. 039**



4.    **SALES DEALER SERVICES**. Vendor agrees to strictly comply with and perform the following "*Dealer Services*":

4.1.  Required Obligations. Vendor will act as an authorized Sales Dealer for OWE. Vendor will be required to perform the following functions:

4.1.1. All Lead Generation Services;

4.1.2. Vendor shall ensure that all Customers, including all Qualified Customers, understand all terms of the Customer Agreements, the Products, and the relationship between Vendor and OWE;

4.1.3. Account management of Qualified Customers through PTO; and

4.1.4.  Customer support as and when requested by OWE throughout the Restricted Period.

4.2.  Prohibited Activities. Vendor will not perform any of the following services or engage in any of the following activities:

4.2.1. design or engineering services in relation to a Project;

4.2.2. installation and construction services in relation to a Project;

4.2.3. interact in any way with any permitting authority or electric utility in relation to a Project; and

4.2.4. submit and/or apply for any rebate, incentive, SREC, tax credit, or other environmental attribute in relation to a Project.

4.3. Sales Tools. Vendor shall be required to use and strictly adhere to the requirements of OWE's software tools and systems in all aspects of its sales activities (*e.g.,* NEO and Doors; collectively, the "*Sales Tools*"). Vendor acknowledges and agrees that OWE may modify its Sales Tools from time to time, including both functionality and steps required, without notice to Vendor. For the avoidance of doubt, OWE may (in its sole and absolute discretion) amend, modify, alter, or in any way change the Customer Agreements, Project Documents, and other steps and required documentation in the Sales Tools.


## Exhibit C

## CODE OF CONDUCT

At all times, Vendor must strictly comply with this Code of Conduct. OWE reserves the right to amend, supplement, or in any way modify this Code of Conduct at any time in its sole and absolute discretion. Any violation of this Code of Conduct by Vendor shall constitute a Vendor Default.

1.    **RECORDS RETENTION.** Vendor must maintain copies of all pertinent information relating to the Services, including any record of a Customer, and provide said copies/ information promptly to OWE to hold for a period of not less than three (3) years. Vendor must comply with all applicable laws



concerning records and document retention.

2.  **DATA AND CYBER SECURITY.** Vendor must protect, safeguard, and keep confidential all information concerning any customer, OWE, or any of OWE's employees, agents, or other independent Vendors. In the event of any data breach, Vendor must immediately notify OWE.

3.  **TRAINING.** Vendor must successfully complete all required training to the satisfaction of OWE on the content and requirements of the Agreement, the Services, this Code of Conduct, and applicable law. As and when requested by OWE, Vendor must provide copies of training certificates for review.

4.  **ANTICORRUPTION.** Vendor must comply with all applicable anticorruption and antibribery laws such as the United States Foreign Corrupt Practices Act. Vendor must never pay or receive a bribe or receive or provide anything of value to any person (including government officials) in order to improperly influence such person.

5.  **MARKETING GUIDELINES.** Vendor must not use OWE's name, logo, or any trademark without the express written permission of OWE's Marketing and Legal Departments. Any change to marketing materials previously approved must be submitted to OWE for approval.

6.  **TELEMARKETING REQUIREMENTS.** Vendor must comply with all laws and registration requirements relating to telemarketing, including do-not-call requirements. Vendor is not permitted to (a) make any unsolicited call or send text messages to a cell phone number; or (b) make any call through an automated dialer (including any telephony technology that is capable of autodialing).

7.  **SEIA BUSINESS CODE.** Vendor must comply with the Solar Energy Industries Association (SEIA) Business Code, available at https://www.seia.org/initiatives/ seia- solar-business-code.

8.  **ETHICS STANDARDS.** Vendor must strictly comply with OWE's Ethics Standards:

    **8.1.** Creating a False Account. You may not create a false account of any kind. This includes creating an account under a fictitious name or the name of someone who has not expressly agreed to have an account created in their name. All customer agreements must be signed by the homeowner. The homeowner's spouse or domestic partner may also sign a PPA, Lease or Cash SPA, but only if the homeowner also signs. No person who is not a homeowner or homeowner's spouse may sign a customer agreement.



**8.2.** <u>Notice of Cancellation</u>. You must orally notify customers that they have the right to cancel the contract as required by state and federal law. In doing so, you may not state that the contract is "not binding" or anything to that effect; the contract is binding unless the customer exercises his or her right to cancel.

**8.3.** <u>Misrepresentations Regarding Relationships with Utilities</u>. You may not say or do anything that may reasonably cause a customer to believe you or OWE is affiliated with a utility company. You do not work for or in partnership with any utility. Other than net metering and interconnection, there is no relationship between OWE and a utility company.

**8.4.** <u>Forgery</u>. You may not sign a customer agreement or check a signature box in a customer agreement on a customer's behalf. Checking a signature box for a customer, or leading them to believe it means something it doesn't, is the same as forging their signature. Similarly, you may not knowingly allow any person to sign or check a signature box in a customer agreement on behalf of another person.

**8.5.** <u>Running Customer Credit Without Consent</u>. Obtaining a consumer report can negatively impact a customer's credit and, consequently, should only be done with a customer's express authorization, appropriate for the circumstances (or other circumstances expressly approved by OWE). You must never allow another person, even a spouse or partner, to authorize a credit check on behalf of someone else.

**8.6.** <u>Providing False Information</u>. You may not provide false or inaccurate information concerning any customer in order to progress an account. You must use the customer's correct email address and may not use personal or company devices to access that account. If a customer does not have an email address, they must create one on their own device and be capable of accessing it without our assistance. It is also unethical to submit incorrect usage, utility, or payment information.

**8.7.** <u>Contract Terms</u>. You may not promise customers anything that contradicts the terms of their agreement, including any promise concerning: (a) energy production (except in a lease); (b) a customer's ability to terminate the agreement after the system is installed; and/or (c) the cost to remove the system temporarily. You may not enter into side deals with customers that are not memorialized in written agreements approved by OWE. And nothing is free!

**8.8.** <u>Sharing Confidential Information</u>. You may not share confidential

**App. 042**



information with anyone outside of OWE or allow anyone to do work on your behalf without the prior written consent of OWE. This includes allowing anyone to access OWE's information technology systems using our log-in information.

     **8.9.**  <u>Misrepresentations Regarding Competition and Utilities</u>. You may not make untrue or misleading statements about a competitor or a utility company. For example, you may not represent that a utility's or competitor's rates will increase without data to support your claim and approval by OWE.

     **8.10.**  <u>Elderly Customers</u>. You need to treat elderly customers (individuals over 65 years old) with extra care to ensure that they understand OWE's products and services. This includes not taking advantage of an older customer's inexperience with or lack of access to technology, or unfamiliarity with utility rates and usage.

     **8.11.**  <u>Sales Presentation Language</u>. You cannot speak with any consumer in any language other than English and Spanish. If you would like to use Spanish in your sales presentation, then you must use a Spanish customer agreement. The same is true for English speaking customers.

     **8.12.**  <u>Savings</u>. You may not promise any customers that they will save money through any of the products OWE offers. As a result, we must be extremely careful when discussing potential savings with consumers. You may not say or do anything to make a consumer believe that they are guaranteed to save money. OWE does not promise the availability of or eligibility for any local, state, or federal incentives or tax credits.

9.    **AMENDMENTS AND MODIFICATIONS.** This Exhibit may be modified at any time by OWE by delivering a revised exhibit to Vendor to its then-current e-mail address on file with OWE. Such revised exhibit shall be effective and binding upon Vendor and OWE after seven (7) calendar days of its delivery, unless such revised exhibit has a specifically-identified later effective date.

**Exhibit D**

**MARKETING REQUIREMENTS**

At all times throughout the Term, Vendor shall strictly comply with the requirements set forth in this Exhibit (collectively, the "Marketing Requirements").

1.    **RELATIONSHIP WITH OWE.** At all times throughout the Term, Vendor shall

**App. 043**



disclose in a clear and conspicuous manner the independent Vendor relationship between OWE and Vendor in a manner consistent with the terms of this Agreement. Vendor shall ensure that each Consumer and Customer understands the independent Vendor relationships between Vendor and OWE.

2.    **GENERAL MARKETING**. All marketing materials used by Vendor must comply in all respects with this Agreement, the Code of Conduct, the SEIA Business Code, and all applicable law. In addition, Vendor agrees that it shall, at all times throughout the Term, strictly adhere to OWE's marketing guidelines and practices.

3.    **OWE MATERIALS.** Vendor and all of its Representatives are required to use only the written marketing materials prepared and provided by OWE. Vendor shall not (i) use any other written marketing materials; (ii) remove any logos, copyrights, or other markings from OWE Materials; or (iii) modify, alter, or in any way change the OWE Materials.

4.    **TRADEMARKS.** Vendor acknowledges and agrees that it has no interest in any OWE- related trademarks and that OWE will remain the sole and exclusive owner of all right, title, and interest in the trademarks.  Vendor acknowledges and agrees that Vendor's use of the trademarks, and any goodwill in the trademarks resulting from Vendor's use, will inure solely to the benefit of OWE and will not create any right, title or interest for Vendor in such marks. Vendor shall not contest, oppose, or challenge ownership of the Trademarks.

5.    **INTERNET-BASED MARKETING.** Vendor agrees that it will not bid on any OWE- branded key words in connection with any internet search, social media, or display advertising campaign (whether alone or in combination).

6.    **LIABILITY; INDEMNIFICATION; VENDOR DEFAULTS.** Vendor acknowledges and agrees that it shall be strictly liable for its failure to comply with all terms of these Marketing Requirements. Vendor shall indemnify, defend, and hold OWE harmless for any and all claims, lawsuits, losses, lost profits, or damages that may arise from, relate to,

or are in any way caused by the acts or omissions of Vendor arising from this Exhibit. Any violation of these Marketing Guidelines shall constitute a Vendor Default.

7.    **AMENDMENTS AND MODIFICATIONS.** This Exhibit may be modified at any time by OWE by delivering a revised exhibit to Vendor to its then-current e-mail address on file with OWE. Such revised exhibit shall be effective and binding upon Vendor and OWE after seven (7) calendar days of its delivery, unless such

**App. 044**

DocuSign Envelope ID: 2524AADD-A8E4-4ED3-9AA6-C40DE269C809



revised exhibit has a specifically-identified later effective date.

## Exhibit E

## RESTRICTIVE COVENANTS

1.    **DEFINITIONS.**    The following terms used herein, including in the preamble and recitals, shall have the following meanings:

1.1.    "*Competitor*" means any person or entity that provides products and/or services that are substantially similar to or competitive with those offered or provided by OWE or any of its Affiliates at any time during the Restricted Period, including (without limitation) companies, persons, or entities in the business of selling (i) residential and commercial photovoltaic or solar thermal products or services; (ii) residential or commercial energy storage and battery products and services; (iii) energy management and home automation; (iv) electric vehicle chargers and services; (v) demand response and other distributed energy resources; and (vi) residential and commercial security and protection related products and services, collectively with any Affiliates, Vendors, or dealers of any of the foregoing.

1.2.    "*Confidential Information*" means any and all information (whether written, electronic, or oral) furnished at any time by a Disclosing Party or its Representatives to a Receiving Party or its Representatives and all analyses, compilations, forecasts, studies or other documents (whether written or electronic) prepared by a Receiving Party or its Representatives which contain or reflect any such information; provided, however, the following shall not be considered "Confidential Information" for purposes hereof: (1) information that was already in Receiving Party's possession by legitimate means prior to receipt from Disclosing Party, (2) information that is or becomes publicly available provided, that, the source of such information or material was not bound by a contractual, legal or fiduciary obligation of confidentiality to the Receiving Party or any other party with respect thereto, or other than as a result of a disclosure by Receiving Party or its Representatives in violation of this Agreement, (3) information that is independently developed by Receiving Party or its Representatives without reference to or use of other elements of the Confidential Information, (4) information that is generally made available by Disclosing Party to third parties without restriction, and (5) information that is provided by Disclosing Party to Receiving Party with express prior written approval that such Confidential Information is approved for public

24

**App. 045**

DocuSign Envelope ID: 2524AADD-A8E4-4ED3-9AA6-C40DE269C809



dissemination.

1.3. "***Disclosing Party***" means a Party or its Representative that sends (by any means) any Confidential Information to Receiving Party.

1.4. "***Receiving Party***" means that Party or its Representatives to whom any Confidential Information is sent by a Disclosing Party.

1.5. "***TPO Services***" means the Services performed by Vendor under the Agreement relating to or arising from Customers that have or will enter into Customer Agreements.

## 2.    CONFIDENTIALITY.

2.1. <u>Obligations of Receiving Party</u>.

2.1.1. Each Receiving Party shall: (i) keep and safeguard all the Confidential Information as confidential; (ii) not disclose any Confidential Information in any manner whatsoever, except as required by applicable law pursuant to <u>Section 3</u> below; and (iii) not use any Confidential Information for its own financial gain or benefit.

2.1.2. Notwithstanding the foregoing, a Receiving Party may reveal the Confidential Information to its Representatives (i) who are informed by Receiving Party of the confidential nature of the Confidential Information; and (ii) who agree to strictly abide by the terms of this Agreement, or are under a duty of confidentiality to the Receiving Party no less strict than the terms of this Agreement.

2.1.3. Each Party shall cause its Representatives to observe the terms of this Agreement. Neither Party may remove any proprietary, copyright, confidential, trade secret or other legend from any of the other Party's Confidential Information.

2.2. <u>Required Disclosures</u>. In the event that a Receiving Party is requested or required by a court of competent jurisdiction (whether by interrogatory, request for information or documents, subpoena, deposition, court order, or other process) to disclose any Confidential Information (the "Required Disclosure"), Receiving Party shall, to the extent permitted by applicable law, provide prompt written notice to Disclosing Party concerning such Required Disclosure. If Receiving Party determines that such notice is

25

**App. 046**



permitted by law, Receiving Party shall cooperate with Disclosing Party in seeking an appropriate protective order. If the Required Disclosure is required by applicable law, then Receiving Party shall ensure that no additional Confidential Information than strictly necessary is disclosed in complying with any such request or requirement. In any event, Receiving Party will not oppose any action by Disclosing Party to obtain an appropriate protective order, injunction, or other reliable assurance that confidential treatment will be accorded the Confidential Information.

2.3.    <u>Destruction or Erasure of Confidential Information</u>. To the fullest extent permitted by applicable law, and to the extent reasonably practicable, Receiving Party agrees that it will, upon Disclosing Party's written request:

2.3.1.    Promptly destroy all copies of the written Confidential Information in Receiving Party's possession and provide written notice of such destruction to Disclosing Party in writing;

2.3.2.    Take reasonable steps to delete, erase, and remove electronic Confidential Information in Receiving Party's computer systems and provide written notice of such deletion and removal to Disclosing Party in writing; and/or

2.3.3.    Promptly deliver to Disclosing Party, at Receiving Party's sole expense, all copies of the written Confidential Information in Receiving Party's possession.

Receiving Party shall be permitted to retain copies of the Confidential Information to the extent required to comply with any law or court order to which Receiving Party is subject. Notwithstanding anything to the contrary contained herein, any Confidential Information, or copy or portion thereof, that is retained by a Receiving Party shall be maintained in accordance with the confidentiality obligations of this Agreement for so long as such Confidential Information is held.

2.4.    <u>United States Securities Laws</u>. Vendor hereby acknowledges that it is aware that the United States securities laws prohibit any person who has material non-public information concerning OWE from purchasing or selling securities of OWE (including options, warrants, or other derivative or synthetic securities that derive their value based on other securities of OWE) and from communicating such information to any other person under circumstances in which it is reasonably foreseeable that such person, including, without limitation, any of its Representatives, is likely to purchase or sell such securities. Vendor agrees that, to the extent that it

**App. 047**



has actually received Confidential Information pursuant to this Agreement that constitutes material non-public information, it will not trade any securities of OWE while in possession of such information and that it will not use any Confidential Information in contravention of the United States securities laws.

3.   **NON-DISPARAGEMENT.** Neither Party will make any statement (whether truthful or not) to another person or entity that could in any way adversely affect the reputation, brand, or image of the other Party.

4.   **NO REMARKETING.** At all times during the Restricted Period and throughout the Territory, Vendor will not (whether directly or indirectly, either through itself or any Representative) after providing a Customer to OWE (i) sell, remarket, attempt to sell or remarket, or offer to another person a Lead, a Qualified Customer, or the Project; or (ii) sell, promote, solicit interest, or refer any other product or service of another person to a Qualified Customer other than the Products.

5.   **NON-SOLICITATION.** For a period of three (3) years, Vendor shall not, directly or indirectly, for any reason whatsoever: (a) solicit, sell, promote, or induce, or attempt to solicit, sell, promote, or induce any Customer to terminate, cancel, not renew a contract, or in any way cease to do business with OWE; (b) solicit, induce, or attempt to solicit or induce any employee of OWE to terminate their employment with OWE; (c) induce, solicit, or in any way cause any dealer, lead gen provider, or Vendor that Vendor knows or has reason to know provides such services to OWE to terminate, cancel, or not renew (in whole or in part) its relationship with OWE; or (d) any retail store owner or operator, home builder, or other channel partner to terminate, cancel, or not renew (in whole or in part) its relationship with OWE; (d) engage with any retail store owner or operator, home builder, or other channel partner to terminate, cancel, or not renew (in whole or in part) its relationship with OWE; or (e) engage with any inbound communication, including but not limited to email, phone, mail, or in-person, where another person or entity approaches Vendor seeking employment, i.e., No-hire Clause with Vendor, whereby the result would be employment during the three (3) years as set forth herein.

6.   **REMEDIES.** Vendor hereby acknowledges and agrees that any action taken by Vendor or its Representatives in violation of these Restrictive Covenants set forth on this <u>Exhibit E</u> would result in substantial damages to OWE and/or its Representatives, and that such damages would be difficult to determine as a result of the direct and indirect harm to OWE, its Representatives, and their respective businesses. Vendor further acknowledges and agrees that any breach

**App. 048**



or violation of this <u>Exhibit E</u> by Vendor or any of its Representatives will result in irreparable harm to OWE, its Representatives, and their respective business interests and goodwill. If there is a violation of the No-hire Clause with Vendor, as noted in section 5 above in this Exhibit E, there will be $150,000 charge per person.

7.  **NON-EXCLUSIVITY OF OWE.** Nothing in this Agreement shall restrict the right of OWE to engage, directly or indirectly, in the same activities as Vendor, whether for its own account or otherwise.

8.  **SEVERABILITY.** Each of the Parties hereby expressly acknowledge and agree that all restrictive covenants set forth in this <u>Exhibit E</u> should be enforced to the maximum extent permitted by applicable law. In the event that any time period, scope, or term of any provision in this <u>Exhibit E</u> is declared by a court of competent jurisdiction to exceed the maximum time period, scope, or term that such court deems enforceable, then such court

    shall reduce the time period, scope, or term to the maximum time period, scope, or term permitted by Applicable Law.

9.  **AMENDMENTS AND MODIFICATIONS.** This Exhibit may be modified at any time by OWE by delivering a revised exhibit to Vendor to its then-current e-mail address on file with OWE. Such revised exhibit shall be effective and binding upon Vendor and OWE after seven (7) calendar days of its delivery, unless such revised exhibit has a specifically-identified later effective date.

10. **NON-CIRCUMVENTION.** Vender hereby expressly acknowledges and agrees that, during the term of the Parties Agreement, Vender, itself or through its sales partners, will not work directly with OWE's financing partners, suppliers, or other of OWE's strategic partners, without the express written permission of OWE.

[SIGNATURES ON NEXT PAGE]

**App. 049**



Dated: 4/9/2024 _____

By:  _____
17B272C217EA466...

Print Name: EDJ Enterprises Inc _____

Its: Owner- EDJ Enterprises _____

**ONE WORLD ENERGY, LLC D/B/A OUR WORLD ENERGY**

Dated: 4/10/2024 _____

By: *Joshua Morton* _____
77E5027FC072424...

Print Name: Our World Energy _____

Its: Director of Business Development _____

29

**Exhibit**
**B-2**

**Sub Dealer Agreement**

This Sub Dealer Agreement (the "Agreement") is made and entered into by and between One World Energy, LLC d/b/a Our World Energy ("OWE"), and <u>EDJ Enterprises Inc</u> ("Vendor"), both of which are collectively referred to herein as the "Parties" or, individually, as the "Party." This Agreement is effective as of the Parties' signatures hereto (the "Effective Date").

**RECITALS**

**A.    WHEREAS,** OWE holds a license through the Registrar of Vendors to perform residential and commercial electrical work under license number 326134 and has the experience and expertise to perform residential and commercial electrical installations for residential solar systems;

**B.    WHEREAS,** Vendor desires to obtain the benefit of the services and experience of OWE in the installation of electrical systems for residential solar systems Vendor sells; and

**C.    WHEREAS**, the Parties desire that this Agreement supersede and replace any prior agreements entered into between the parties;

**NOW, THEREFORE**, in consideration of the mutual promises, covenants and conditions contained herein, in reliance upon the representations and warranties set forth herein, and for other good and valuable consideration, the Parties hereto agree as follows:

**AGREEMENT**

**1**.    **DEFINITIONS AND RULES OF INTERPRETATION.**

    **(a)    Definitions.** Any capitalized term used but not defined in this Agreement shall have the meaning ascribed to such term in <u>Schedule 1.</u>

**2.    THE SERVICES:**

        **(a)    Conditions Precedent**. Before Vendor may commence any Services on behalf of OWE, the following conditions precedent must first be satisfied to the satisfaction of OWE (in its sole and absolute discretion): (i) complete execution of this Agreement by all Parties and delivery of a fully executed copy of this Agreement to OWE; (ii) delivery to OWE by Vendor of all licenses, certificates, and other documents required under this Agreement; (iii) completion of the new Vendor checklist and delivery to OWE of any and all materials, information, documentation required thereunder; and (iv) completion of any and all required training under the terms of this Agreement. This Agreement will not be in force and Vendor will

not be entitled to any of the benefits hereunder, unless and until said Conditions Precedent have been met.

  **(b)**   <u>**Services.**</u> Both Parties hereto agree further that a monthly meeting between Vendor and Dealer Relations Manager will occur at a mutually convenient time for both Parties to discuss the progression of Vendor's growth.

  **(c)**   <u>**Status as Independent Contractor.**</u> Nothing contained in this Agreement shall be construed as creating a joint venture, partnership, employment or franchise relationship between the Parties, and no Party shall have the right, power or authority to create any obligations or duty, express or implied, on behalf of the other Party. Vendor's status under this Agreement is that of an independent Vendor and shall in no way be deemed to be any other status, including (without limitation) that of an agent or employee of OWE or its Affiliates. Vendor shall not refer to itself, hold itself out as, or knowingly permit any person to believe Vendor is anything other than an independent Vendor, including (without limitation): agent, Affiliate, employee, partner, or franchisee of OWE. OWE may, in its sole and absolute discretion, (i) contract for services with other parties even though they may be similar or identical to the Services hereunder, inside or outside the Territory; (ii) sell the Products through any other person; and (iii) offer pricing, terms, conditions, or other benefits to other persons different from or superior to those offered to Vendor hereunder.

**3.**   **PAYMENT FOR SERVICES:**

  **(a)**   <u>**Fees and Payments.**</u> See Exhibit A.

  **(b)**   <u>**Requirements.**</u> The Requirements described in the Exhibits and elsewhere in this Agreement are and at all times shall remain subject to OWE's policies and procedures that may apply to the Customers, the Services, the Work, or any Project. From time to time, OWE may (in its sole and absolute discretion) change, modify, eliminate, or add to the Requirements. If OWE makes any changes to the Requirements, then OWE shall notify Vendor in writing and use commercially reasonable efforts to provide Vendor with written notice prior to implementation of such changes.

  **(c)**   <u>**Verification and Rejection.**</u> Vendor acknowledges and agrees that OWE will independently verify and determine whether all Requirements are satisfied by Vendor prior to any payment of Fees under this Agreement. In the event OWE discovers that any Requirement was not satisfied by Vendor, then OWE may, in its sole and absolute discretion, withhold and set-off any applicable amount from the Fees owed to Vendor. Upon the request of Vendor, OWE will provide to Vendor an explanation for any such rejection.

  **(d)**   <u>**Payment Dispute.**</u> Any and all disputes concerning any payment of Fees must be delivered in writing to OWE no later than thirty (30) calendar days after the date of the applicable Fee Statement or payment. If Vendor fails to deliver a notice of any dispute within such time period, then Vendor will be (i) deemed to have accepted the Fee Statement and related

payments as complete and accurate; and (ii) forever barred from bringing any claim or suit for miscalculation or underpayment of Fees or any payment of moneys by OWE with respect to such Fee Statement and payments.

(e)    **Right to Set-Off.**    Vendor hereby agrees that OWE may set-off, withhold, or otherwise deny payment against any and all unpaid amounts owed by OWE to Vendor in an amount equal to (i) the aggregate amount of any damages OWE or any of its Representatives has suffered or incurred as a result of Vendor's violation of any term of this Agreement; and (ii) any amounts owed by Vendor to OWE for any reason, including Vendor's duty to indemnify OWE under this Agreement, in each case as reasonably determined and the amounts reasonably estimated by OWE in good faith.   In the event OWE incorrectly sets-off, withholds, or denies payment in a manner not permitted by this Agreement, then OWE agrees it shall promptly correct such mistake and make appropriate payment to Vendor.

(f)    **Security Interest.**   Vendor hereby grants to OWE a first priority security interest in all (i) leads, prospective customers, customer lists, Customers, Customer Agreements, Eligible Customers, Qualified Customers, and Rejected Customers; (ii) work, tools, supplies, equipment, and other materials used, supplied by, or furnished to Vendor or any of its Representatives in connection with the Services contemplated by this Agreement; and (iii) any property relating thereto, including (in each case), any proceeds of the foregoing, either existing as of the Effective Date or arising at any point throughout the Term.   Vendor hereby authorizes OWE to take any action it deems required to perfect such security interest and Vendor agrees it shall take such further action as reasonably requested by OWE in connection with perfecting its security interest.

**4.    REPRESENTATIONS, WARRANTIES, AND COVENANTS OF VENDOR:**  As of the Effective Date and at all times throughout the Term, Vendor will and does hereby (i) represent and warrant to OWE and its Representatives; and (ii) covenants, agrees, and shall do the following:

(a)    **Organization, Power, and Qualification.**    (i) Vendor is and shall remain qualified and licensed to perform the Services and do business and is in good standing in every jurisdiction where such qualification and licensing is required; (ii) Vendor has and shall maintain the full right, power and authority to enter into this Agreement and all other documents to be delivered in connection herewith, to grant the rights and licenses granted under this Agreement and to perform its obligations hereunder and thereunder; and (iii) the execution of this Agreement and all other documents to be delivered in connection herewith by the person whose signature is set forth at the end hereof has been and will continue to be duly authorized by all necessary action of Vendor.

(b)    **Fully informed.**    Prior to executing this Agreement, Vendor has had the opportunity to ask OWE any and all questions Vendor may have in relation to the Services, the Fee, this Agreement, Vendor's obligations hereunder, and the contemplated relationship between the Parties.  Vendor hereby acknowledges and represents that Vendor has had an opportunity to retain legal counsel to advise and review this Agreement.

**(c)      Enforceability.**  This Agreement and any other documents delivered by Vendor to OWE hereunder constitute the legal, valid and binding obligations of Vendor, enforceable in accordance with their respective terms.

**(d)      No Conflict.**      The execution, delivery and performance by Vendor of this Agreement and any other documents delivered by Vendor to OWE in connection with this Agreement, and the consummation of the transactions contemplated hereby and thereby, do not and will not conflict with or result in any breach of any of the provisions of, constitute a default under, result in a violation of, result in the creation of any Lien upon any Customer, Customer Agreement, or any of the Services, give any third party the right to accelerate any obligation under, or require any authorization, consent, approval, exemption or other action by or notice to, any court, other governmental body, or other third party under, the provisions of Vendor's governing documents or any indenture, mortgage, loan agreement, lease or other agreement or instrument to which Vendor or any entity that is an Affiliate or Representative of Vendor is a party or to which any of Vendor's respective properties are subject, or any Law, judgment or decree to which Vendor is subject.

(a)              **(e)      Licensure and Registration.**  Vendor currently holds and will continue to maintain at all times throughout the Term, any and all licenses, certificates, consents, certifications, waivers, permits, registrations, orders, approvals and other authorizations of any governmental or regulatory body necessary for Vendor to conduct its business, generally, and provide the Services required by this Agreement, and/or required by applicable law.  Vendor has provided to OWE true and correct copies of the licenses set forth herein, and evidence of registration, all of which are current, in good standing, and not subject to any investigation, enforcement action, or other disputes with the applicable licensing authority.  Vendor agrees that Vendor shall update, maintain, and not let expire any of the licenses.

**(f)      Litigation and Judgments.**  There is no outstanding criminal or administrative matter, order, writ, injunction, fine, citation, penalty, decree or unsatisfied judgment of any court, or any claims or litigation pending or threatened against Vendor which may affect in any way Vendor's ability to perform the duties and obligations under this Agreement or the Services required by this Agreement.  Neither is Vendor a party to, or the subject of, or threatened with, any claim, suit, action, arbitration, investigation, audit, administrative or other proceeding of any character which may affect in any way Vendor's ability to perform the duties and obligations under this Agreement or the Services required by this Agreement.  Vendor has no knowledge of any facts or circumstances which could result in a valid claim, suit, action, audit, investigation or proceeding against Vendor.

**(g)      No Adverse Actions and Release of Claims.**  Vendor has no knowledge (based on due inquiry) of any facts or circumstances which could result in a claim, suit, action, audit, investigation, or proceeding by Vendor against OWE or any of its Representatives or Affiliates. Vendor hereby irrevocably and unconditionally releases, acquits, and forever discharges OWE

and its Representatives from any and all claims, actions, causes of action, rights, demands, debts, obligations, or damages of whatever nature or kind, known or unknown, at law or in equity (each a "Claim"), which Vendor or its Representatives have, may have, or may have had, against OWE and its Representatives, or one or more of them, arising or occurring prior to the Effective Date of this Agreement. Vendor further covenants and agrees not to initiate or participate individually or as a member of a class in any action, litigation, appeal, proceeding, charge or complaint before any local, state or federal agency or court against OWE or any of its Representatives pertaining to any Claim arising out of or by reason of any actions, omissions, transactions, or events occurring prior to the Effective Date of this Agreement except as may be required by court order.

(h)    **Solvency.** Vendor is solvent and able to pay its outstanding debts as they mature. Vendor will not be rendered insolvent by performing its Services under the Agreement. Vendor agrees that it will maintain its solvency at all times throughout the Term and not initiate any bankruptcy proceedings, nor permit any bankruptcy proceedings (whether voluntary or involuntary) to be initiated on its behalf.

(i)    **Compliance with Laws.** Vendor is and will continue to comply in all respects with all applicable state and federal law in providing the Services under this Agreement and all other aspects of this Agreement and Vendor's operations thereunder. Vendor is in compliance and, at all times throughout the Term, shall continue to comply in all respects with (i) Applicable Laws; (ii) the Code of Conduct; (iii) this Agreement; and (iv) the Customer Agreement.

(j)    **Conduct and Practices.** Vendor has read and understands the Code of Conduct included herewith as Exhibit C and agrees to strictly comply with the Code of Conduct (as may be revised from time to time by OWE in its sole and absolute discretion) at all times throughout the Term. Vendor agrees that it shall (i) perform the Services and all other obligations under this Agreement and the Customer Agreements in accordance with the highest standards of professional and ethical conduct, with the degree of care and skill exercised by persons providing similar services under similar circumstances; and (ii) will not take any action or fail to take any action that could in any way damage or impugn the brand, reputation, or integrity of OWE or its Representatives or Affiliates.

(k)    **Accurate and Complete Information.** Any and all information, documents, instruments, certificates, exhibits, schedules, and all other materials furnished, provided, or delivered by Vendor to OWE at any time in connection with this Agreement or the transactions contemplated by this Agreement does not and will not include any untrue statement of a material fact or any omission of a material fact necessary to make the statements of facts contained therein, in light of the circumstances under which they are made, not misleading. Vendor shall never mislead, misstate, misrepresent, engage in any deceptive activity with respect to any Customer or any Representative of OWE.

(l)    **Territory.** Vendor will provide the Services only in the permitted Territory.

**(m)** **Insurance**.  As of the Effective Date and at all times through the Term of this Agreement, Vendor has and agrees to maintain and carry, at its own expense, in full force and effective all types and amounts of insurance required by applicable law and as set forth in Schedule 2.

**(n)** **Records.**  Vendor shall prepare and maintain accurate books and records ("Records") of:  (i) all written materials used in connection with its Services and other obligations hereunder; (ii) Vendor's current address and telephone number; (iii) documentation concerning all Customers, the products marketed, promoted, and sold to such Customers; (iv) information and documentation that Vendor is required to maintain pursuant to applicable law; (v) all correspondence and written materials relating to any license; (vi) all correspondence and written materials provided by or to any government agency relating to the Services, this Agreement, any Customer, or any Customer Agreement; and (vii) all other information necessary and helpful to permit OWE to determine and verify Vendor's compliance with this Agreement, the Customer Agreements, and applicable law. Vendor shall retain the Records for such time as required by applicable law.

**(o)** **No Default.**  Vendor is not in breach of and has not breached any obligation under this Agreement and no Vendor default has occurred or is continuing in any respect.

**(p)** **Compliance Reviews.**  Upon the reasonable request of OWE, Vendor will (i) provide, or make copies available to OWE for review, any and all Records; (ii) deliver to OWE true and correct copies of all applicable policies and procedures; (iii) make yourself available to OWE to be interviewed; and (iv) allow OWE and its Representatives to observe, inspect, shadow, or otherwise review the conduct of Vendor in their performing of the Services and any other obligation under the Agreement (collectively, a "Review").  OWE will, to the maximum extent possible, limit all Reviews to customary business hours and use commercially reasonable efforts to minimize any disruption to Vendor.  If any mistake, violation, discrepancy, or issue is identified or disclosed as a result of a Review, then Vendor shall (as soon as reasonably practicable) rectify, resolve, and cure such concern to reasonable satisfaction of OWE.  Any failure by Vendor to cooperate in any Review and/or timely resolve any concerns identified in a Review, in each case as determined by OWE in its sole and absolute discretion, shall be a Vendor default under this Agreement.

**(q)** **Instructions and Further Assurances.**  Upon the request of OWE, Vendor shall immediately (i) comply with any and all instructions and requests of OWE or its Representatives in relation to the Services, (ii) cease any activity under this Agreement; and (iii) provide any information, deliver any documents or other materials, sign any documents or instruments in furtherance of this Agreement.

**(r)** **Information Security.**  As of the Effective Date and at all times throughout the Term, Vendor has and will continue to implement appropriate and reasonable administrative, physical, and technical safeguards designed to: ensure the security and confidentiality of

**App. 056**

Confidential Information, including the private personal information of any Customer or employee of any Party ("Personal Information"; and together with Confidential Information, "Information").  Vendor will ensure that it has security policies and procedures that protect and safeguard all Information in its possession, custody, or control, including the exchange and transmission of any Information by and between Vendor and OWE.   Vendor has and will continue to (i) use the highest quality of technology and data security software and mechanisms to protect against anticipated threats or hazards to the security or integrity of the Information; (ii) protect against unauthorized access to, use, or breach of the Information; and (iii) detect, prevent, and mitigate the risk of identity theft.  Vendor will not disclose any Information to a third party except as permitted under this Agreement, the Customer Agreement, and applicable law.   Vendor shall respond promptly and thoroughly respond to any request of OWE for information concerning the information security measures implemented by Vendor.  In the event Vendor discovers or is made aware of a breach involving any Information, Vendor shall, at its sole cost and expense:  (1) notify OWE in writing within forty-eight (48) hours of discovery of such disclosure or breach; (2) take all such actions as may be necessary or requested by OWE to address the breach, minimize the disclosure and problem, and mitigate against the risks associated therewith; and (3) cooperate in all respects with OWE to notify affected individuals and government agencies as may be required by applicable law.

(s)     **Marketing, Publicity, and Trademarks.**   Vendor shall be required to comply with the Marketing Requirements set forth on Exhibit D.

(t)     **Reporting.**   Vendor shall immediately inform and provide notice to OWE upon the occurrence of any of the following:  (i) receipt by Vendor of a complaint from any Customer; (ii) after becoming aware of any material dispute, threat of dispute, or Claim by any Customer; (iii) any investigation, inquiry, demand, subpoena, or other regulatory process initiated by any government authority in relation to any Customer, any Customer Agreement, the Services, any license of Vendor, this Agreement, or any other activities of Vendor related to this Agreement; and (iv) any actual or threatened expiration, suspension, revocation, or enforcement action with respect to any license of Vendor.  Vendor understands that upon receipt of such notice, OWE will be entitled, in its sole and absolute discretion, to immediately perform a Review in accordance with this Agreement.

(u)     **Representatives.**   As of the Effective Date, and at all times throughout the Term, Vendor represents, warrants, and covenants that Vendor shall not use any person, entity, group, association, subVendor, individual, Vendor or any other representative in the performance of the Services or any of Vendor's obligations under this Agreement.  Vendor acknowledges and agrees that it shall be fully responsible for its acts, omissions, breaches of this Agreement, and violations of law and hereby agrees to indemnify, defend, and hold OWE harmless for its acts and omissions, including negligence, arising out of Vendor's performance of its duties and obligations under this Agreement.

(v)     **No SubVendors.**   Other than the subVendors listed on Schedule 3 or specifically authorized by OWE in writing after the Effective Date (each, an "*Approved SubVendor*"), Vendor

shall not use any person, entity, group, association, subVendor, or any other Representative in the performance of the Services or any of its obligations under this Agreement unless such person is a natural person and an agent of Vendor. Other than Approved SubVendors, Vendor shall not and shall ensure none of its Representatives solicits, entices, or contracts with any third-party to perform any aspect of the Services or any other obligation of Vendor in this Agreement. Vendor acknowledges and agrees that it shall be fully responsible for the acts, omissions, breaches of this Agreement, and violations of law of all Representatives, Approved SubVendors, or any other person or entity performing any activities on behalf of Vendor. Vendor hereby agrees to indemnify, defend, and hold OWE harmless for the acts and omissions of all of its Representatives, including all Approved SubVendors.

      **(w)**   **<u>Telephone and Text Messaging Communications.</u>**  To the extent that Vendor engages in any activity involving telephone or text messaging communication with a Consumer, Vendor agrees that it will first obtain the express written consent of each consumer before it initiates any communication over or through the telephone or text messaging. Vendor agrees that it will strictly comply with all applicable laws, including Federal and state do-not-call laws. Vendor will strictly comply with OWE's written policies and procedures regarding the foregoing. Vendor will never use an automatic telephone dialing system to call or send a text message to any Consumer unless first approved in a writing by OWE.

      **(x)**   **<u>Liens.</u>**  Vendor agrees that it will not file a Lien and it will not permit any of its Representatives to file a Lien, on or against any jobsite, Customer's property, the System, OWE, or any of OWE's Affiliates. If any Lien is filed in violation of this Agreement, then Vendor agrees that it will indemnify, defend, and hold harmless for any and all Losses incurred by OWE, Customer, or any other affected party. As a condition of OWE's obligation to make any payment to Vendor under this Agreement, including pursuant to any Work Order, Vendor shall execute and deliver to OWE one or more Lien release and waivers on the form found on the OWE Dealer Portal, or otherwise acceptable to OWE (each, a "*Lien Waiver*"). OWE may withhold any and all payments under this Agreement to the extent Vendor fails to deliver a Lien Waiver as required hereunder or reasonably requested by OWE. Within five (5) Business Days following payment by OWE for a Work Order (subject to OWE's setoff rights under this Agreement), Vendor shall deliver to OWE an Unconditional Waiver and Release Upon Final Payment, on a form acceptable to OWE.

**5.**    **RESTRICTIVE COVENANTS:** Each of the restrictive covenants set forth in <u>Exhibit E</u> shall apply to Vendor and OWE, as applicable.

**6.**    **REPRESENTATIONS, WARRANTIES, AND COVENANTS OF OWE:** On the Effective Date and throughout the Term of this Agreement, OWE hereby represents, warrants, and covenants as follows:

      **(b)**      **(a)**   **<u>Organization, Power and Qualification.</u>**  (i) OWE is a limited liability company duly organized, validly existing, and in good standing in the

jurisdiction of its formation; (ii) OWE is qualified and licensed to do business and is in good standing in every jurisdiction where such qualification and licensing is required; (iii) OWE has the full right, power and authority to enter into this Agreement and the other documents to be delivered in  connection herewith, to grant the rights and licenses granted hereunder and thereunder and to perform its obligations under this Agreement and the other documents to be delivered in connection herewith; and (iv) the execution of this Agreement by the person whose signature is set forth at the end hereof and thereof has been duly authorized by all necessary action of OWE.

**(b)      Authorization; No Breach.**    The execution, delivery and performance of this Agreement, and any other documents delivered by OWE to Vendor hereunder, and the consummation of the transactions contemplated herein and therein, have been duly authorized by all necessary action on the part of OWE.  This Agreement and any other documents delivered by OWE to Vendor hereunder constitute legal, valid and binding obligations of OWE, enforceable in accordance with their respective terms.   The execution, delivery and performance by OWE of this Agreement and any other documents delivered by OWE to Vendor hereunder, and the consummation of the transactions contemplated hereby and thereby, do not and will not conflict with or result in any breach of any of the provisions of, constitute a default under, result in a violation of, give any third party the right to accelerate any obligation under, or require any authorization, consent, approval, exemption or other action by or notice to, any court, other governmental body, or other third party under, the provisions of OWE's governing documents or any indenture, mortgage, loan agreement, lease or other agreement or instrument to which OWE is a party or to which any of OWE's respective properties are subject, or any applicable law, judgment or decree to which OWE is subject.

**(c)      Licensure and Registrations.**    OWE currently holds, and will continue to maintain during the Term, any and all Licenses necessary for it to conduct its business.

**(d)      Compliance with Laws.**    OWE has complied and will continue to comply, in all material respects, with applicable law.

**(e)      Support.**    OWE will (i) provide training and training materials for Vendor; (ii) provide Vendor with access to information technology of OWE necessary to perform the Services; and (iii) provide Vendor with customer and account management support during normal business hours.

**7.      TERM AND TERMINATION**

**(a)      Term.**    This Agreement shall commence as of the Effective Date and shall continue for a period of one year, which will automatically extend for successive periods of the same length (each, a "Renewal Term"), subject to the early termination rights of either Party set forth in this Agreement (the "Term").    Either Party may terminate this Agreement for convenience upon thirty (30) calendar days' prior written notice to the other Party.  OWE may

**App. 059**

terminate this Agreement immediately upon the occurrence of a Vendor Default.  In the event this Agreement is terminated for whatever reason, OWE shall be allowed, at its option, to withhold any and all commissions owed to Vendor until PTO has been completed.

**(b)** **Vendor Defaults.**  Each of the following shall be considered a "Vendor Default" under the terms of this Agreement:  (i) Vendor failing to maintain in good standing any required license or other government approval required to perform the Services; (ii) Vendor's material breach of this Agreement that remains uncured after ten (10) calendar days prior written notice; (iii) Vendor's fraud, willful misconduct or gross negligence in performance of its obligations under this Agreement; (iv) Vendor's failure to pass a drug test pursuant to OWE's rights hereunder to perform said testing; or (v) Vendor's attempt to make or makes any assignment of the rights under this Agreement.

**(c)** **Remedies.**  Upon the occurrence of a Vendor Default, OWE may (in its sole and absolute discretion) exercise any of the following remedies:  (i) immediately suspend Vendor's access to any and all software used by Vendor; (ii) terminate this Agreement; (iii) withhold any amounts due and owing by OWE to Vendor hereunder, and offset, to the extent of any damages and expenses of OWE resulting from, or relating to, such Vendor Default; (iv) demand that Vendor pay Liquidated Damages; and/or (v) exercise any other remedy available to OWE under applicable law.

**(d)** **Vendor's Obligations upon Expiration or Termination.**  Upon the expiration (or earlier termination of this Agreement) or notice of termination, Vendor shall immediately (i) cease to perform any of the Services; (ii) cease to represent itself as affiliated in any way with OWE; (iii) cease the marketing, promotion, selling, or acquiring of new customers in relation to the Products for or on behalf of OWE; (iv) return to OWE any and all documents and tangible materials (including any copies thereof) containing, reflecting, incorporating, or based on any information provided or made available to Vendor by OWE; and (v) cease and terminate all use of any kind whatsoever of OWE trademarks or other copyrighted and/or protected materials.

**(e)** **Survival of Terms.**  All terms and conditions set forth in this Agreement, which by their terms, are intended to, or in order to give proper effect to their intent should, survive the termination or expiration of this Agreement, shall survive such termination and expiration.

**(f)** **Cumulative Remedies.**  All rights and remedies provided in this Agreement are cumulative and not exclusive, and the exercise by either Party of any right or remedy does not preclude the exercise of any other rights or remedies that may now or subsequently be available at law, in equity, by statute, in any other agreement between the Parties, or otherwise.

**(g)** **Equitable Remedies.**  Vendor acknowledges and agrees that (i) a breach or threatened breach by Vendor of any of the obligations under the Agreement, including (without limitation) the Restrictive Covenants set forth on Exhibit E, would give rise to irreparable harm to OWE and its Affiliates for which monetary damages would not be an adequate remedy; (ii) in the event of a breach or a threatened breach by Vendor of any such obligations, OWE shall, in

addition to any and all other rights and remedies that may be available to OWE at law, at equity, or otherwise in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance, and any other relief that may be available from a court of competent jurisdiction, without any requirement to post a bond or other security, and without any requirement to prove actual damages or that monetary damages will not afford an adequate remedy; and (iii) Vendor shall be liable for all costs, expenses and fees (including court costs and attorneys' fees) in connection with any action instituted by OWE or any of its Affiliates seeking to remedy, enforce its rights, and/or enjoin any violation of this Agreement. Vendor acknowledges and agrees that it will not oppose or otherwise challenge the appropriateness of equitable relief or the entry by a court of competent jurisdiction of an order granting equitable relief, in either case, consistent with the terms of this paragraph.

(h)    **Liquidated Damages**: If Vendor fails to comply substantially with the terms and conditions of the Non-Solicitation Paragraph within this Agreement, Contractor, at its option and as its sole remedy, may terminate this Agreement and obtain $15,000 from Vendor as Contractor's liquidated damages. The $15,000 liquidated damages amount will be on a per breach basis such that Vendor will pay to Contractor as liquidated damages $15,000 for each time it breached the Non-Solicitation Paragraph within this Agreement.

THE PARTIES AGREE THAT THE ACTUAL DAMAGES INCURRED BY CONTRACTOR FOR VENDOR'S BREACH OF THE NON-SOLICITATION PROVISION ARE DIFFICULT TO ESTIMATE IN ADVANCE AND THAT $15,000 PER BREACH CONSTITUTES A REASONABLE ESTIMATE OF CONTRACTOR'S DAMAGES FOR A BREACH BY VENDOR AND SHALL CONSTITUE CONTRACTOR'S LIQUIDATED DAMAGES AND NOT A PENALTY. CONTRACTOR HEREBY EXPRESSLY WAIVES ALL OTHER CLAIMS FOR DAMAGES OR RELIEF AT LAW OR IN EQUITY FOR BREACH OF THE NON-SOLICITATION PROVISION AND AGREES THAT CONTRACTOR'S SOLE AND EXCLUSIVE REMEDY FOR VENDOR'S BREACH OF THE NON-SOLICITATION PROVISION UNDER THIS CONTRACT SHALL BE OBTAINING THE LIQUIDATED DAMAGES PROVIDED ABOVE.

8.    **GENERAL PROVISIONS:**

(a)    **Indemnification.**  Vendor shall indemnify, defend, and hold harmless OWE and its Affiliates, their respective Representatives, designees and their successors and assigns (collectively, the "OWE Indemnified Parties", and each, a "OWE Indemnified Party"), from and against, any and all losses, damages, liabilities, deficiencies, claims, actions, judgments, settlements, interest, awards, fees, penalties, fines, costs (including costs for experts and investigations), or expenses of whatever kind, including attorneys' fees, fees and the costs of enforcing any right to indemnification under this Agreement, and the cost of pursuing any insurance providers (collectively "Losses"), incurred by any OWE Indemnified Party, relating to, arising out of, or resulting from:   (i) any act or omission by Vendor; (ii) any breach of the Agreement by Vendor; (iii) any negligence or willful misconduct by Vendor; (iv) any actual or

threatened violation of applicable law by Vendor; (v) any infringement, misuse, or misappropriation of any intellectual property of another person; and (vi) any failure by Vendor to obtain and maintain at all times in good standing all required licenses. Vendor's duty to indemnify hereunder includes the duty to indemnify OWE Indemnified Parties for all Losses incurred by any OWE Indemnified Party in connection with the matter that is the subject of the indemnification.

Moreover, without limiting the foregoing subsection 8(a), the Parties hereby agree that, in the event of a dispute of any kind against OWE arising out of any act or omission by Vendor, including negligence, willful or grossly negligent act, or otherwise, in addition to the foregoing defense and indemnity provision, OWE will also be permitted to withhold commissions from Vendor in an amount representative of the amount in dispute and use the withheld commission to pay and/or resolve any pending dispute. Any funds withheld that are not used to resolve the pending dispute will be promptly turned over to Vendor after the dispute is resolved.

**(b)** **Drug Testing.** Vendor acknowledges and agrees that it may be required to submit to random drug and/or alcohol screening test while performing the Services under this Agreement. Vendor agrees that, upon the request of OWE, Vendor will promptly, without notice, submit to testing for the use of drugs, alcohol and/or controlled substances. Vendor agrees that the results of any blood and/or urine sample test results may be revealed to OWE for its use and evaluation. Vendor acknowledges and understands that any refusal by Vendor to submit to such testing can be grounds for immediate termination. Additionally, a positive test result from any drug and/or alcohol test may be grounds for immediate termination.

**(c)** **Assignment.** Vendor's obligations under this Agreement may not be assigned or transferred to any other person, firm, or corporation without the prior written consent of OWE.

**(d)** **Limitation of Liability.** Except for Vendor's indemnification obligations under this Agreement, and/any breach or violation of the restrictive covenants set forth in this Agreement by Vendor, and/or a Party's gross negligence or willful misconduct, in no event shall either Party, its Affiliates, or their respective Representatives be liable for: consequential, indirect, incidental, special, exemplary, punitive, or enhanced damages, lost profits or revenues or diminution in value, arising out of or relating to any breach of this Agreement, regardless of (1) whether such damages were foreseeable, (2) whether or not it was advised of the possibility of such damages, and (3) the legal or equitable theory upon which the claim is based, and notwithstanding the failure of any agreed or other remedy of its essential purpose. Except for OWE's gross negligence or willful misconduct, to the maximum extent permitted under applicable law, OWE's aggregate liability arising out of or relating to this Agreement, whether arising out of or relating to breach of contract, tort, or otherwise, shall not exceed the total of the amounts actually paid by OWE to Vendor pursuant to this Agreement.

1.      **(e)** **Notices.** All notices, requests, demands, and other communications required or permitted to be given under this Agreement by any Party shall be in writing delivered to the following addresses:

IF for OWE:
ONE WORLD ENERGY, LLC D/B/A OUR WORLD ENERGY
20809 N. 19th Ave, Suite 1
Phoenix, AZ 85027

IF for Vendor: (please enter your name and mailing address)

Name: EDJ Enterprises Inc

Address: 1340 Gulf Blvd

Clearwater, FL 33767

or to such other address as any Party may designate from time to time by written notice to the other Party.  Each such notice, request, demand, or other communication shall be deemed given and effective, as follows: (i) if sent by hand delivery, upon delivery; (ii) if sent by first-class U.S. Mail, postage prepaid, upon the earlier to occur of receipt or three (3) Business Days after deposit in the U.S. Mail; (iii) if sent by a recognized prepaid overnight courier service, one (1) day after the date it is given to such service; (iv) if sent by facsimile, upon receipt of confirmation of successful transmission by the facsimile machine; and (v) if sent by email, upon acknowledgement of receipt.

**(f)** **Work Product/Intellectual Property.**   Vendor hereby agrees to grant, release, and assign to OWE, all right, title, and interest in all copyrights, patents, trade secrets, and other intellectual property arising out of the Services, including, but not limited to, all patentable and non-patentable inventions, discoveries, ideas, processes, and materials, created under this Agreement; that is, for avoidance of uncertainty, all products or inventions created by Vendor arising from or reasonably related to Vendor's Services under this Agreement, shall be and become irrevocably the property of OWE.  Upon written notice by OWE, Vendor will provide, execute, and return to OWE whatever documents, information, and materials are in Vendor's possession or reasonably available to Vendor to enable OWE to protect its copyrights, patents, trade secrets, and other intellectual property rights in any materials produced as a result of this Agreement.   Any equipment, software (including relevant passwords and codes), parking or other passes, badges, or key cards that were provided to Vendor by OWE for use under the terms of this Agreement will also be returned to OWE within five (5) business days after termination of this AGREEMENT.

**(g)** **Confidential Information:**   Vendor acknowledges that during the term of this Agreement, Vendor will have access to various trade secrets, inventions, processes, information, records, and products owned by OWE and/or used by OWE in connection with the operation of its business including, without limitation, customer lists, accounts, software and procedures. Vendor agrees that Vendor will not disclose any of these materials or information, directly or indirectly, or use any of them in any manner, either during the term of this Agreement or at any time thereafter, except as required in the course of this Agreement with OWE for OWE's benefit.

**(h)** <u>**Warranties and Liabilities of Vendor.**</u>   In performing the Services under this Agreement, Vendor shall only use authorized materials created by or for use by OWE, and shall not use the copyrighted works of third-parties. Vendor shall defend, indemnify and hold OWE harmless from liability that OWE is exposed to as a result of Vendor knowingly or unknowingly using unauthorized materials in the performance of the Services under this Agreement.

**(i)** <u>**Expenses.**</u>   Each Party will bear the costs and expenses incurred by such Party in negotiating and executing this Agreement. Unless otherwise provided herein, Vendor will be responsible for all costs related to the Services, Work, equipment, uniforms, training, project management, call centers, customer care, information technology systems, software, and all other of its obligations under this Agreement.

**(j)** <u>**Binding Effect.**</u>   This Agreement shall be binding upon, and inure to the benefit of, the Parties to this Agreement and their respective heirs, executors, administrators, agents, representatives, successors, assigns, beneficiaries, trustees, family members, and affiliates (meaning any family relation of or entity owned or controlled by the preceding entity or individuals).

**(k)** <u>**Waiver.**</u>   No breach of any provision hereof can be waived unless in writing by the Party against whom enforcement of the waiver is sought.  Waiver of any one breach of any provision(s) hereof shall not be deemed to be a waiver of any other breach of the same or any other provision(s) hereof.   Failure on the part of any Party hereto to complain of any act or failure to act of any other Party or to declare any Party in default hereunder, irrespective of how long such failure continues, shall not constitute a waiver of the rights of such Party hereunder.

**(l)** <u>**Severability.**</u>   If any provision of this Agreement is ultimately held to be invalid, illegal, or unenforceable, the validity, legality, and enforceability of the remaining provisions shall not be in any way affected or impaired thereby.

**(m)** <u>**Amendments.**</u>   This Agreement may be amended or modified only by an instrument in writing, signed by all the Parties.

**(n)** <u>**Applicability and Incorporation of Schedules and Exhibits.**</u>   Each of the Exhibits referenced herein is hereby incorporated by reference and shall each and collectively form an integral part of this Agreement.

**(o)** <u>**Entire Agreement.**</u> This Agreement constitutes the entire agreement among the Parties and supersedes all prior oral and written negotiations, communications, discussions and correspondence pertaining to the subject matter hereof.

**(p)** <u>**Choice of Law.**</u>   This Agreement shall be construed in accordance with, and be governed by, the laws of the State of Arizona.

**(q)** **No presumption Against the Drafter.** The Parties have cooperated in the drafting and preparation of this Agreement.  In any construction to be made of this Agreement, no presumption shall arise to any Party by virtue of participation in the drafting hereof.

**(r)** **Submission to Jurisdiction.** Each Party irrevocably consents and agrees that any action, proceeding, or other litigation by or against the other Party with respect to any claim or cause of action based upon or arising out of or related to this Agreement, shall be brought and tried exclusively in the federal or state courts located in the State of Arizona, and any such legal action or proceeding may be removed to the aforesaid courts. By execution and delivery of the Agreement, each Party accepts, for itself and in respect of its property, generally and unconditionally, the exclusive jurisdiction of the aforesaid courts. Each Party hereby irrevocably waives (i) any objection which it may now or hereafter have to the laying of venue with respect any such action, proceeding, or litigation arising out of or in connection with this Agreement brought in the aforesaid courts; and (ii) any right to stay or dismiss any such action, proceeding, or litigation brought before the aforesaid courts on the basis of forum *nonconveniens*. Each Party further agrees that personal jurisdiction over it may be affected by service of process by certified mail, postage prepaid, addressed as provided in Section 8(e) of this Agreement, and when so made shall be as if served upon it personally within the State of Arizona.

**(s)** **Jury Waiver.** TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, EACH PARTY HEREBY WAIVES ITS RIGHTS TO A TRIAL BY JURY WITH RESPECT TO ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF OR RELATED TO THIS AGREEMENT, IN ANY ACTION, PROCEEDING OR OTHER LITIGATION OF ANY TYPE BROUGHT BY ANY PARTY AGAINST THE OTHER PARTY, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS, OR OTHERWISE. EACH PARTY HEREBY AGREES THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE TRIED BY A COURT TRIAL WITHOUT A JURY. WITHOUT LIMITING THE FOREGOING, THE PARTIES FURTHER AGREE THAT THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY IS WAIVED BY OPERATION OF THIS SECTION 8(s) AS TO ANY ACTION, COUNTERCLAIM OR OTHER PROCEEDING WHICH SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY OF THIS AGREEMENT, OR ANY PROVISION HEREOF. THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS, OR MODIFICATIONS TO THIS AGREEMENT.

**(t)** **Advice of Counsel.** The Parties to this Agreement acknowledge and represent that they have consulted with legal counsel of their choosing, or they have had the opportunity to consult with legal counsel of their choosing, before executing this Agreement, that they understand the meaning of this Agreement, and that they expressly consent that this Agreement shall be given full force and effect according to each and all of its express terms and provisions, including, without limitation, those relating to the release of unknown and unsuspected claims, demands, and causes of action.

**(u)    Counterparts.**    The Parties may execute this Agreement in counterparts, and when each Party has signed and delivered one such counterpart or copy thereof, each counterpart or copy shall be deemed an original and, when taken together with the other signed counterparts or copies, shall constitute one integrated contract, which shall be binding upon and effective as to all Parties.  PDF signatures of the Parties shall have the same effect as original signatures.

**(v)    Attorneys' Fees and Costs.**  The Parties understand and agree that in the event a dispute arises between the parties relating, in any way, to this Agreement or the performance of the Agreement, including issues of interpretation or claimed breach, then the prevailing party in such proceeding shall be entitled to an award of reasonable attorneys' fees and costs, including expert witness fees and costs, relating to that litigation.

**(w)    Force Majeure.**    Upon the occurrence and during the continuance of a Force Majeure Event, a Party will be excused from performance and shall not be considered to be in breach or default with respect to any obligation hereunder; so long as: (i) such Party gives the other Party prompt written notice describing the details of the Force Majeure Event as soon as is reasonably practicable after becoming aware of the occurrence of the Force Majeure Event; (ii) the suspension of performance is of no greater scope and of no longer duration than is reasonably required by the Force Majeure Event; (iii) no obligations of affected Party that arose before the occurrence of the Force Majeure Event causing the suspension of performance shall be excused as a result of such Force Majeure Event, unless and only to the extent that the performance of such obligations is impaired by the Force Majeure Event; (iv) the Party uses diligent best efforts to overcome or mitigate the effects of the Force Majeure Event; and (v) when the Party is able to resume performance of its obligations under this Agreement, such Party shall give the other Party written notice to that effect and shall promptly resume performance hereunder. Notwithstanding the foregoing, a Party will not be relieved of any obligation to pay money in connection with this Agreement, including (without limitation): payment of any Fee by OWE, payment of any Liquidated Damage or reimbursement by Vendor, or any indemnification obligation of either Party.

IN WITNESS WHEREOF, both OWE and Vendor have hereunto accepted and executed this Agreement as of the date indicated below.

[SIGNATURES ON NEXT PAGE]

**DEALER**

Dated: 1/7/2025

By: _____

Print Name: Eric DeJohn

Its: Owner


**ONE WORLD ENERGY, LLC
D/B/A OUR WORLD ENERGY**

Dated: 1/9/2025

By: _Joshua Morton_____

Print Name: Joshua Morton

Its: Director of Business Development



<u>**Schedule 1**</u>

**DEFINITIONS & RULES OF INTERPRETATION**

1.    **DEFINITIONS**.

    1.1.    "*Account Deductions*" means the Account deductions found on the OWE Dealer Portal; provided that OWE may revise the list of deduction items at any time in its sole and absolute discretion.

    1.2.    "*Advances*" has the meaning set forth on Exhibit B, and generally means a payment of all or a portion of a Fee by OWE to Vendor before it is completely earned by the Vendor. All payments to a Vendor prior to final completion of all Services and Work with respect of a Project shall be deemed an Advance.

    1.3.    "*Affiliate*" means, with respect to either Party, a person or entity that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Party. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the engagement and policies of such person or entity, whether through the ownership of voting securities, by contract or otherwise.

    1.4.    "*Agreement*" means this Sub Dealer Agreement, collectively with the NDA, all Exhibits and Schedules attached hereto, and all other documents incorporated herein by reference.

    1.5.    "*Ancillary Services Agreement*" "*Ancillary Products Agreement*", "*ASA*", or "*APA*" means OWE's standard form ancillary services or products agreement, between OWE and a Qualified Customer, as may be modified from time to time by OWE in its sole and absolute discretion.

    1.6.    "*Applicable Law*" means any statute, law, ordinance, regulation, Prudent Industry Practices, rule, code, constitution, treaty, common law, governmental order, or other requirement or rule of law of any governmental authority, including (without limitation): (i) Federal and state privacy, data security and credit reporting laws, such as the Fair Credit Reporting Act, 15 U.S.C. 1681 et seq., and Regulation V, 12 C.F.R. § 1022.1 *et seq.*; (ii) Federal and state unfair, deceptive or abusive acts and practices laws, such as the Dodd-Frank Act, 12 U.S.C. § 5531 *et seq.* and the Federal Trade Commission Act, 15 U.S.C. § 45 *et seq.*; (iii) Federal and state telecommunications laws, such as the Telephone Consumer Protection Act, 47 U.S.C.§ 227 *et seq.* and implementing regulations, 16 C.F.R. § 310.1 et seq. and 47 C.F.R. § 64.1200; (iv) Federal and state email communication laws, such as the CAN-SPAM Act, 15 U.S.C. § 7701 *et seq.* and implementing regulations, 16 C.F.R. § 316.1 *et seq.* and 47 C.F.R. § 64.3100 *et seq.*; (v) Federal and state advertising and marketing laws, such as the Federal Trade Commission Act, 15 U.S.C. § 41, *et seq.* and associated FTC Guides and Policy Statements; (vi) Federal and state electronic transactions laws and

1

**App. 069**



electronic contracting laws, such as state Uniform Electronic Transactions Acts and the Electronic Signatures in Global and

National Commerce Act, 15

U.S.C. § 7001 *et seq.*; (vii) the SEIA Solar Business Code; (viii) Direct Marketing Association's Business Code Articles 47 and 48; (ix) Federal and state home improvement and solar disclosure laws, such as California's Business and Professions Code § 7159 *et seq.*; and (x) Federal and state door-to-door solicitation laws, such as 16 CFR Part 429 *et seq.*

1.7.    "*Authority Having Jurisdiction*" or "*AHJ*" means a Government Authority responsible for issuance of Permits.

1.8.    "*Bailed Inventory Amount*" means the costs and expenses incurred by OWE in relation to or arising out of the procurement of the Inventory and the bailment thereof to Vendor, including (without limitation): costs of goods, transportation costs, delivery costs, tariffs, taxes, insurance costs, allocated overhead, and allocated general and administrative costs.

1.9.    "*BOS Components*" means all wires, conduit, cables, junction boxes, flashing, sealants, cable management, and other components that are not part of the Major Equipment.

1.10.    "*Business Day*" means any day, other than a U.S. Federal Holiday or a day on which banking institutions in the State of Arizona are authorized or obligated by Applicable Law or executive order to be closed.

1.11.    "*Business Representative*" means the individual appointed by each Party pursuant to Section 2(c) as set forth on Schedule 2.

1.12.    "*Change Order*" means change request by OWE, relating to a previously agreed Work Order, on OWE's standard form.

1.13.    "*Code of Conduct*" means those policies and procedures of OWE, attached hereto as Exhibit A, as may be modified from time to time by OWE in its sole and absolute discretion.

1.14.    "*Commissioning Protocol*" has the meaning set forth on Exhibit C.

1.15.    "*Competitor*" means any person or entity that provides products and/or services that are substantially similar to or competitive with those offered or provided by OWE or any of its Affiliates at any time during the Restricted Period, including (without limitation) companies, persons, or entities in the business of selling (i) residential and commercial photovoltaic or solar thermal products or services; (ii) residential or commercial energy storage and battery products and services; (iii) energy management and home automation; (iv) electric vehicle chargers and services; (v) demand response and other distributed energy resources; and (vi) residential and commercial security and protection related products and services, collectively with any Affiliates, Vendors, or dealers of any of the foregoing.

1.16.    "*Completion Certificate*" means the Form of Completion Certificate found on the OWE Dealer Portal; provided that OWE may revise the form or Completion Certificate at any time in its sole and absolute discretion.



1.17. "*Consumer*" means any natural person, including (without limitation): a Customer, an Eligible Customer, and a Qualified Customer.

1.18. "*Contract Price*" has the meaning set forth in the applicable SPA.

1.19. "*Vendor Operations Manual*" means that certain OWE Vendor Operations Manual, as may be updated from time to time by OWE in its sole and absolute discretion.

1.20. "*Credit Authorization*" means (i) in the case of a PPA Project or Lease Project, OWE's standard form of credit authorization form, as may be modified from time to time by OWE in its sole and absolute discretion; and (ii) in the case of a Loan-SPA Project, the applicable financing party's standard form of credit authorization form, as may be modified from time to time by such financing party in its sole and absolute discretion.

1.21. "*Customer*" means each natural person to whom Vendor markets, promotes, solicits, and/or offers for sale the Products, whether or not such person qualifies as a Qualified Customer or executes a Customer Agreement.

1.22. "*Customer Agreements*" means OWE's standard form of Power Purchase Agreement, Solar System Lease Agreement, System Purchase Agreement, Ancillary Products Agreement, Maintenance Services Agreement, or other agreements between OWE and a Qualified Customer, in each case, as may be modified from time to time by OWE in its sole and absolute discretion.

1.23. "*Customer Information*" means the contract information and personal details concerning a Customer, including (without limitation): full legal name, date of birth, property address for the Project, mailing address, e-mail address, telephone number, and other information that may be requested by OWE from time to time.

1.24. "*D&E SOP*" means that certain OWE Design and Engineering Standard Operating Procedures Manual, as may be updated from time to time by OWE in its sole and absolute discretion.

1.25. "*Defect*" means any issue, problem, oversight, or failure in the Work, in the Equipment, in the Inventory, or any other aspect of the Services provided by Vendor that does not strictly comply at any time throughout the Warranty Period with (i) the Specifications; (ii) the Requirements; (iii) Applicable Law; (iv) this Agreement; (v) the Customer Agreement; (vi) any Permit; or (vii) causes any component or all of a System or a Project to fail to operate in the manner intended.

1.26. "*Deliverables*" has the meaning set forth on Exhibit B; provided that OWE may revise the required Deliverables at any time in its sole and absolute discretion.

1.27. "*Eligible Customer*" means a natural person that meets all of the following criteria: (i) over eighteen (18) years of age; (ii) is a United States citizen; (iii) own the house upon which the System will be Installed; (iv) such house is a single family detached house and is not part of a multi-family dwelling; (v) such house is located in the Territory; (vi) has broadband internet available at the house; (vii) the structure, roof, and electrical distribution systems of the house are in good condition and capable of supporting the System; (viii) Vendor has no reason to believe that such



person will not satisfactorily passed all credit underwriting criteria of OWE and its financing partners; (ix) the house does not use electricity to heat a swimming pool; and (x) is not a Rejected Customer; provided that OWE may revise the required eligibility requirements for a Customer at any time in its sole and absolute discretion.

1.28. "*Eligible Lead*" means a Lead of an Eligible Customer.

1.29. "*EPC Fee*" means the value of the System based on its attributes, as determined by OWE in its sole and absolute discretion.

1.30. "*Equipment*" means Major Equipment, BOS Components, the Products, and any other material, hardware, or component part of a System or a Project.

1.31. "*Fees*" means those amounts owed to Vendor set forth on Exhibit B, as may be reduced by any amount owed by Vendor to OWE, including (without limitation): Liquidated Damages, Bailed Inventory Amounts, Reimbursements, repaid Advances, and indemnification obligations.

1.32. "*Fee Statement*" has the meaning set forth in Exhibit B.

1.33. *FIN*" or "*Final Inspection Notice*" means a final inspection notice or similar notices or approvals issued by a Government Authority that demonstrates that the design, engineering, installation, and commissioning of the System and all other components of the Project satisfy all Permit requirements, pass the inspection, and comply with Applicable Law.

1.34. "*Force Majeure Event*" means the occurrence of any act or event beyond the reasonable control of the Party affected that prevents the affected Party from performing its obligations under this Agreement, in full or part, if such act or event is beyond the reasonable control of, and not the result of the acts or omissions of, the affected Party and such Party has been unable to overcome such act or event with the exercise of due diligence (including the expenditure of reasonable sums), to the extent caused by flood, earthquake, named storm, fire, lightning, epidemic, war, riot, sabotage, terrorism, or acts of god. Notwithstanding the foregoing, Force Majeure Events shall not include labor strikes or shortages, inclement weather, mechanical or equipment failures, supply shortages or delays, imposition of taxes, tariffs, or other charges, change in Applicable Law or requirements of Government Authorities, or the acts or omissions of a Customer.

1.35. "*Governmental Authority*" means any federal, commonwealth, state, or local regulatory agency or other governmental agency or authority having jurisdiction over a Party, a Representative of a Party, a consumer, a Customer, Qualified Customer, or the transactions contemplated by this Agreement or the Customer Agreement.

1.36. "*Initial Term*" has the meaning set forth on the first page set forth above.

1.37. "*In-Service Date*" means the date upon which all of the following shall have occurred (i) the Project is fully Installed; (ii) the Project has received all Permits and approvals required by any Government Agency; (iii) the Project has passed inspection by the applicable AHJ; (iv) the System has passed all startup and performance tests, including the Commissioning Protocol and has been Verified as Operational; and (v) the Project has received its PTO Letter from the applicable utility; (vi) the System has



been turned on and begun to produce energy; and (vii) if applicable, billing for the Customer has commenced.

1.38. "*Install*", "*Installed*", or "*Install Complete*" means with respect to a System and Project (i) the System, all Products, and related components are fully and physically installed; (ii) the System is interconnected to the Property's electrical system; (iii) the System has passed the Commissioning Protocol; (iv) the System is communicating with OWE's remote monitoring platform; (v) all Deliverables have been provided to OWE; and (vi) the Project complies in all respects with the Specifications.

1.39. "*Install SOP*" means that certain OWE Installation Standard Operating Procedures Manual, as may be updated from time to time by OWE in its sole and absolute discretion.

1.40. *Lead*" means an Eligible Customer that has expressed interested in purchasing one or more of the Products, first generated by Vendor in performing the Services under this Agreement, and provided to OWE

1.41. "*Lien*" means any lien, mortgages, pledge, security interest, restriction, prior assignment, claim, any and all other encumbrances of every kind or character, including the claims of any bank, creditor, or taxing authority.

1.42. "*Liquidated Damage*" or "*LD*" means the payment of money by Vendor upon the occurrence of a specified event or the lapse of time, including (without limitation): delay liquidated damages, termination fees, and other amounts specified on Exhibit B and Exhibit C.

1.43. "*Maintenance Services Agreement*" means OWE's standard form solar system maintenance services agreement, between OWE and a Qualified Customer, as may be modified from time to time by OWE in its sole and absolute discretion.

1.44. "*Marketing Guidelines*" means that certain OWE Branding and Marketing Guidelines (as more particularly described on Schedule 4), as may be updated from time to time by OWE in its sole and absolute discretion.

1.45. "*Milestones*" mean specific process steps that indicate significant progress on a job tied to payment release.

1.45.1    *NTP* = Notice to Proceed, an acknowledgment from the financer or installer that the project is complete and ready to move forward. NTP Funding: 20% of Balance of the commission fee will be released to Vendor the Friday following NTP by financier and site survey approval by OWE of Client's system.

1.45.2    *Install* = Panels on the roof. Install Funding: 90% of Balance of the commission fee will be released to Vendor the Friday following installation approval by finance company of Client's system.

1.45.3    *PTO* = Permission to Operate, all necessary approvals from all relevant parties to activate a system have been acquired. PTO Funding: 100% of Balance of the commission fee will be released to Vendor the Friday following PTO approval by finance company of Client's system.

1.46. "*MSA*" has the same meaning as "Agreement".



1.47. "*New Vendor Checklist*" means the checklist found on the OWE Dealer Portal; provided that OWE may revise the checklist items at any time in its sole and absolute discretion.

1.48. "*NTP*" has the meaning set forth on Exhibit C.

1.49. "*O&M SOP*" means that certain OWE Operations and Maintenance Standard Operating Procedures Manual, as may be updated from time to time by OWE in its sole and absolute discretion.

1.50. "*Party*" means each of OWE and Vendor.

1.51. "*Permit*" means an electrical, building, or other permit or approval required and issued by an AHJ in relation to installation of a System or any Product.

1.52. "*Permit Approved*" means the issuance by the applicable government authority of all electrical, building, and other permits and approvals required to install a System or other Products and their receipt by OWE.

1.53. "*Power Purchase Agreement*" or "*PPA*" means OWE's standard form of solar power purchase agreement, between OWE and a Qualified Customer, as may be modified from time to time by OWE in its sole and absolute discretion.

1.54. "*Products*" means a System and such other products made available by OWE to a Customer from time to time, including (without limitation): (i) electrical service upgrades; (ii) structural upgrades; (iii) reroofing; (iv) battery storage systems; and (v) electric vehicle chargers; provided that OWE may revise the eligible Products at any time in its sole and absolute discretion.

1.55. "*Project*" means the System, other Products, and Customer Agreement for a particular Customer at a specific Property.

1.56. "*Project Document*" means all required documentation other than a Customer Agreement required to install, inspect, commission, receive PTO, and activate a Project, including (without limitation): permits, HOA approval, net metering agreements, interconnection agreements, inspection notices, rebate forms, incentive forms, tax credit forms, and SREC documentation.

1.57. "*Property*" means the real property upon which the System and other Products will be installed, identified in the applicable Customer Agreement.

1.58. "*Prudent Industry Practices*" means, with respect to each System and Project, (a) the highest and most prudent standards of performance within the residential solar photovoltaic power generation industry in the relevant Territory and throughout the United States; and (b) those practices, methods, acts, equipment, specifications and standards of safety and performance, of which there may be more than one, and as the same may change from time to time, as are used in operating solar energy systems of a type and size similar to the Systems and in the same geographic region as the System that, at a particular time, by highest performing and most prudent participants in the solar industry that, at a particular time, in the exercise of reasonable judgment in light of the facts known or that reasonably should have been known at the time a decision was made, would be expected to accomplish the desired result in a manner consistent with Applicable Law, standards, equipment



manufacturer's recommendations, reliability, safety, environmental protection, efficiency, economy and expedition.

1.59. "*PTO Letter*" means the permission to operate granted by the applicable utility or its equivalent.

1.60. "*Qualified Customer*" means an Eligible Customer that (i) meets the minimum credit score and other underwriting criteria that is required by OWE in its sole and absolute discretion; and (ii) is not a Rejected Customer; provided that OWE may revise the qualifications required of a customer at any time in its sole and absolute discretion.

1.61. "*Qualified Lead*" means a Lead of a Qualified Customer.

1.62. "*Reimbursements*" means any and all amounts owed by Vendor to OWE relating to or arising from (i) costs incurred by OWE that should have been paid by Vendor; or (ii) amounts paid by OWE to Vendor that it did not earn, in each case pursuant to the terms of this Agreement, including (without limitation): the repayment of any Advances and all Reimbursements described on Exhibit B.

1.63. "*Rejected Customer*" means a customer that (i) fails to satisfy any of the requirements of a Eligible Customer at the time of originated, submitted, or for which payment was requested by Vendor; (ii) fails to satisfy any of the requirements of a Qualified Customer at the time of originated, submitted, or for which payment was requested by Vendor; (iii) is originated, submitted by Vendor, or for which Vendor requests payment during a time when Vendor was in breach of the Agreement or a Vendor Default had occurred; (iv) the Customer Information is inaccurate, incomplete, unavailable, or disconnected; (v) the Customer is already a Customer of OWE; (vi) the Customer is a duplicate of a Customer previously provided by Vendor; and/or (vii) the Credit Authorization, the Customer Agreement, the Project Documents, or any other Deliverable is incomplete or completed incorrectly; provided that OWE may revise the reason or cause for rejection of a Customer at any time in its sole and absolute discretion.

1.64. "*Representatives*" means, with respect to a Party, such Party's and its Affiliates' employees, officers, directors, managers, equity holders, agents, attorneys, Vendors, third-party advisors, successors, and permitted assigns.

1.65. "*Representative Certificate*" means the Form of Representative Certificate found on the OWE Dealer Portal; provided that OWE may revise the form or Representative Certificate at any time in its sole and absolute discretion.

1.66. "*Requirements*" means any and all terms, conditions, conditions precedent, Deliverables, and other requirements required of Vendor in connection with any Lead, Customer, or Project, including (without limitation) the requirements described and defined on Exhibit C; provided that OWE may revise the Requirements at any time in its sole and absolute discretion.

1.67. "*Restricted Period*" has the meaning set forth on Exhibit D.



1.68. "*SEIA Solar Business Code*" means the Solar Energy Industries Association's Solar Business Code (*available at* https://www.seia.org/initiatives/seiasolar-business-code).

1.69. "*Services*" means the obligations of Vendor under this Agreement as described on Exhibit C.

1.70. "*Set-Off*" means any amount owed by Vendor to OWE under this Agreement that OWE sets-off, deducts, or withholds from any payment by OWE to Vendor, pursuant to Section 3(e).

1.71. "*Signed Credit Authorization*" means a Credit Authorization that (i) all fields are accurately completed by the Qualified Customer, not the Vendor; and (ii) all initials, checkboxes, and signatures have been completed by the Qualified Customer.

1.72. "*Signed Customer Agreement*" means a Customer Agreement that (i) all fields are accurately completed by the Qualified Customer and Vendor (as applicable); (ii) all initials, checkboxes, and signatures have been completed by the Qualified Customer; (iii) the applicable licensed Representative of Vendor signed the Customer Agreement; and (iv) the applicable representative of OWE has countersigned the Customer Agreement.

1.73. "*Signed Project Documents*" means any and all Project Documents that (i) all fields are accurately completed by the Qualified Customer, Vendor, or OWE (as applicable); (ii) all initials, checkboxes, and signatures have been completed by the Qualified Customer, Vendor, or OWE (as applicable); and (iii) the applicable licensed representative of Vendor or OWE has signed each Project Document (as applicable).

1.74. "*Software*" means the software, computer systems, and other electronic tools owned or provided by OWE, including the Sales Tools, the D&E Tools, and the Install Tools.

1.75. "*Solar System Lease Agreement*" or "*Lease*" means OWE's standard form of solar system lease agreement, between OWE and a Qualified Customer, as may be modified from time to time by OWE in its sole and absolute discretion.

1.76. "*Solar System Purchase Agreement*" or "*SPA*" means OWE's standard form of solar system purchase agreement, between OWE and a Qualified Customer, as may be modified from time to time by OWE in its sole and absolute discretion.

1.77. "*SOP*" means one or more of OWE's standard operating procedures, including, but not limited to, the Vendor Operations Manual, Marketing Guidelines, D&E SOP, the Install SOP, and the O&M SOP.

1.78. "*Specifications*" means any applicable SOP.

1.79. "*System*" means a photovoltaic system comprised of Major Equipment and BOS Components.

1.80. "*System Size*" means, with respect to a System, the nameplate capacity of such System represented in Watts.

1.81. "*Territory*" has the meaning set forth on the first page set forth above.

1.82. "*Trademarks*" means all trademarks, trade names, corporate names, company names, business names, fictitious business names, Internet domain



names, service marks, certification marks, collective marks, logos, other source or business identifiers, designs and general intangibles of OWE, including (without limitation): "One World Energy", "Our World Energy", and "OWE".

    1.83. "*Watt*" means watts DC STC or nameplate rating of the applicable System or Solar Panel.

    1.84. "*Work Order*" means a request for Work by OWE including a NTP, on

    1.85. OWE's standard form, which may be transmitted via e-mail or other electronic means to Vendor.

## 2.    RULES OF INTERPRETATION.

    2.1.    Except as otherwise expressly provided in this Agreement, each Party hereby agrees and acknowledges that the following rules of interpretation shall apply to this Agreement: (i) the singular includes the plural and the plural includes the singular; (ii) the word "or" is not exclusive; (iii) a reference to a law or governmental rule includes any amendment or modification to such law or rule, and all regulations, rulings and other laws promulgated under such law or rule; (iv) a reference to a person includes its successors and permitted assigns; (v) the words "include", "includes", and "including" are not limiting; (vi) the words "hereof," "herein," "hereunder", "hereby", and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement; and (vii) the words "will" and "shall" are used interchangeably with the same meaning. Article, Section and paragraph headings and the footers have been inserted in this Agreement as a matter of convenience for reference only, such are not a part of this Agreement, and shall not be used in the interpretation of any provision of this Agreement.

    2.2.    The provisions this Agreement, all Exhibits and Schedules, including any amendments thereto, and any other instruments or documents referenced or incorporated herein shall, to the maximum extent possible, be interpreted consistently, and in a manner as to supplement each other and avoid any conflict between them. However, in the event of a conflict or inconsistency, the following order of precedence shall apply: (i) amendments to this Agreement executed by the Parties pursuant to Section 8(h); (ii) the Agreement; (iii) all other Schedules and Exhibits hereto; and (iv) any written communications (including e-mail) after the Effective Date.

## <u>Schedule 2</u>

## INSURANCE REQUIREMENTS

At all times throughout the Restricted Period and for three (3) years thereafter, Vendor shall obtain and maintain, and shall cause of its Representatives (including sub-Vendors



(if any)) to obtain and maintain, at its sole cost and expense, insurance meeting the following requirements, in each case in form, substance, and amount acceptable to OWE (in its sole and absolute discretion):

1.    **INSURANCE TYPES AND AMOUNTS.**

1.1.    Compliance with Applicable Law. Insurance of the type and in minimum amount required by Applicable Law.

1.2.    Workers' Compensation. Workers' compensation and employers' liabilities insurances in amounts not less than $1,000,000.

1.3.    Commercial General Liability Insurance. Commercial general liability insurance in amounts not less than $1,000,000 per occurrence and $2,000,000 in the aggregate, covering all of Vendor's operations, including (without limitation): premises and operations liability, products and completed operations liability, blanket contractual liability, personal injury liability, bodily injury and "broad form" property damage coverage, blanket contractual liability, explosion, collapse and underground hazard coverage. Commercial General Liability, including products and completed operations, shall be maintained for a minimum of three (3) years following the Term.

1.4.    Property and Casualty Insurance. Property and casualty insurance covering (a) Seller's tools and equipment; (b) each Project during the Warranty Period in an amount equal to the EPC Fee for each Project; and (c) if applicable, one hundred fifty percent (150%) of the Inventory Maximum.

1.5.    Excess Umbrella Liability. Excess umbrella liability insurance with a single limit of at least $5,000,000 per occurrence and in the aggregate, in excess of the limits of insurance provided above. Coverage shall be "following form" of the underlying general liability policy.

1.6.    Professional Liability. Professional liability (errors and omissions) insurance with a limit of not less than $1,000,000 per occurrence and in $2,000,000 the aggregate. If the policy shall be written on a "claims-made basis" then the policy shall include (1) retroactive date that is no later than the Effective Date, and (2) any time a policy is written on a "claims-made basis" is not renewed or the retroactive date changed Vendor shall obtain or cause to obtain the broadest "tail" or extended reporting coverage commercially available.

2.    **INSURANCE REQUIREMENTS.**

2.1.    <u>General</u>. Each insurance policy shall meet all the following minimum requirements:

2.1.1.    Be with companies licensed to do business in each state in the Territory;

2.1.2.    Be with companies with financial ratings not lower than A-VII in AM Best's Insurance Guide;

2.1.3.    Be of a form, substance, and content satisfactory to OWE (in its sole and absolute discretion);



2.1.4.    Be written on a per occurrence basis (other than Professional Liability Insurance);

2.1.5.    Provide that no less than thirty (30) calendar days' prior written notice be given to OWE before any such policies are canceled or substantially changed to reduce the insurance provided thereby; and

2.1.6.    Be primary and noncontributory as respects any claims, losses or liability arising directly or indirectly from Seller's operations

2.2.    <u>Waiver of Subrogation</u>. Each policy shall contain express waivers and endorsements providing that each insurer and underwriter waives all of its rights of recovery by subrogation, by or through Vendor, or otherwise against OWE or any of OWE's Representatives.

2.3.    <u>Liability Insurance</u>. Commercial General Liability, Business Automobile Liability and Umbrella Liability policies shall include a severability of interest clause with cross-liability included.

2.4.    <u>Deductibles</u>. Any deductible or self-insured retention shall be the responsibility of Vendor.

2.5.    <u>Liability of Vendor</u>. The limits of insurance or applicable deductibles shall not limit the liability of Vendor or relieve Vendor of any liability or financial responsibility.

**3.    EVIDENCE OF INSURANCE.**

3.1.    Prior to the commencement of any Work or the performance of any Services by Vendor, Vendor shall deliver to OWE certificate(s) of insurance, signed by an authorized insurance company representative, evidencing Vendor's compliance with this Schedule 3.

3.2.    Except for Workers' Compensation Insurance and Professional Liability Insurance, each insurance policy of Vendor required hereunder shall name OWE and its Representatives as additional insureds for the Work, the Services, and all other obligations performed under or incidental to the Agreement.

3.3.    Property Insurance and Builders' Risk Insurance policies shall name OWE as loss payee.

**4.    FAILURE TO MAINTAIN.**

4.1.    Vendor understands and agrees that in the event that it or any of its Representatives fails to maintain any insurance required by this Schedule 2, then OWE may (but shall not be required to) obtain such insurance on behalf of Vendor or its Representatives and all premiums, deductibles, and other expenses incurred or payable by OWE in relation thereto shall be paid immediately by Vendor upon demand by OWE and/or OWE may set-off all such amounts pursuant to Section 3(e).

**5.    AMENDMENTS AND MODIFICATIONS.**

**App. 079**



5.1.    Pursuant to Section 8(g) of the Agreement, this Schedule 2 may be modified at any time by OWE by delivering a Revised Exhibit to Vendor to its then-current e-mail address on file with OWE. Such Revised Exhibit shall be effective and binding upon Vendor and OWE after seven (7) calendar days of its delivery, unless such Revised Exhibit has a specifically identified later effective date.

**Schedule 3**

**APPROVED**

**SUBVENDORS**

| Sub Vendor Name: | State of Formation: | Tax ID No.: | Address: | License No.: | License State: | Issuing Agency for License |
|---|---|---|---|---|---|---|
| **NONE** | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

**App. 080**

Docusign Envelope ID: 1327963A-43E0-4B56-AD8F-5D4533432A66



**Exhibit A**

**FEES AND PAYMENTS**

1.     **Payment Details**.

    1.1.   <u>Calculation of Payments.</u> Vendor acknowledges and agrees that OWE will calculate the Fees payable to Vendor net of amounts owed by Vendor to OWE, including (without limitation): Liquidated Damages, Reimbursements, repaid Advances, and indemnification obligations.

    1.2.   <u>Payment Amount.</u> Because OWE holds the appointment as an authorized dealer for solar manufacturers, the Parties hereby expressly agree that OWE will receive from the manufacturer the total payment for any sales completed by Vendor (the "Payment") and further agree to the following compensation structure for all work performed by Vendor under this Agreement:

        1.2.1     Upon receipt of payment, OWE will hold back as a baseline rate the amount of $_____ per watt installed by OWE plus any applicable Adders pursuant to the Adders Sheet attached hereto as Exhibit A. OWE will provide Vendor three (3) days written notice prior to any changes to Exhibit A.

see pricing

        1.2.2     In connection with each payment, OWE will deliver to Vendor a Fee Statement and Vendor shall be responsible for any and all taxes relating to or arising out of this Agreement (including any transaction privilege, general excise, use, sales or other transaction- based taxes on the Fees or any other payment hereunder). Any Fee to Vendor is contingent upon Vendor's prior satisfaction of each condition precedent, representation, and warranty under this Agreement. In addition, the Parties agree that OWE will have the right to withhold any commissions owed to Vendor and, instead, make payments directly to Vendor's sales representatives from those commission in the event Vendor fails to make timely payments to its sales representatives.

    1.3.   <u>Requirements.</u> In order to request payment for any Project, Vendor must complete each of the following to the satisfaction of OWE:

        1.3.1.     *All Prior Milestones:* Vendor has satisfied all prior Milestones.

        1.3.2.     *Deliverables:* Vendor has provided to OWE all of the Deliverables.

        1.3.3.     *Representations:* In representing completion of a Milestone, Vendor also represents and warrants that (i) the MSA is in full force and effect; (ii) Vendor is not in breach of any obligation under the MSA; (iii) all representations and warranties in the MSA and related documents are true and correct in all respects; (iv) all Deliverables are complete and accurate; and (v) the Customer is a Qualified Customer and is not in breach of any obligation under the Customer Agreement.

        1.3.4.     *Payment Request:* Vendor has submitted a Payment Request to OWE (if applicable).



1.4.  <u>Timing of Payment</u>. For each Payment Request that satisfies all Requirements in a calendar week, OWE will pay to Vendor the Fees attributable thereto on the following Friday, or if such Friday is not a Business Day, then the next Business Day.

1.5.  <u>Fee Statement</u>. In connection with each payment, OWE will deliver to Vendor an itemized statement of the Fees paid for each Project, the deductions for items such as Set-Offs, and Liquidated Damages, and any applicable taxes in relation therewith (each, a "*Fee Statement*").

1.6.  <u>Set-Off, Reimbursements, Liquated Damages</u>. Notwithstanding any of the forgoing, OWE may (in its sole and absolute discretion) set off, withhold, or otherwise deny payment against any and all unpaid amounts owed by OWE to Vendor for the following reasons:

1.6.1.  *General Set-Off:* For costs, expenses, and other liabilities pursuant to the Parties Agreement;

1.6.2.  *Delay LDs:* For Vendor's failure to achieve a Milestone before the applicable Deadline, then Vendor will be required to pay to OWE the applicable Delay LD described below;

1.6.3.  *Reimbursement:* For Vendor's failure to achieve a Milestone before the applicable Deadline, then Vendor will be required to pay to OWE the Reimbursements for Advances and Fees described below; and

1.6.4.  *Termination LD:* In the event of a termination of a Customer Agreement attributable to or arising from Vendor's acts or omissions, then Vendor will be required to pay to OWE the applicable Termination LD described below.

1.6.5.  *Cancellation Fees:* OWE may (in its sole and absolute discretion) set off, withhold, or otherwise deny payment against any and all unpaid amounts owed by OWE to Vendor, for an amount equal to OWE's costs incurred for any cancelled Customer.

1.6.6.  *System Removal Fees:*  In the event a system needs to be removed from a Customer's home, for whatever reason, Vendor will be charged a $5.00 per watt fee ("Removal Fee"). The Removal Fee charge noted herein is in the discretion of OWE and will turn on whether OWE and Customer are able to create a satisfactory experience for Customer.

1.7.  <u>Reasonableness of LDs and Reimbursements</u>. The Parties hereby acknowledge and agree that each of the Delay LD, the Reimbursement, the Termination LD, and the Cancellation Fees ie estimate of the actual damages that would be incurred by OWE under such circumstances and in no event do such liquidated damages or reimbursements constitute a penalty. These remedies shall be considered cumulative and OWE shall be entitled to all other rights, remedies, and relief under this Agreement and Applicable Law.

1.8.  <u>Effect upon Termination</u>. In the event of any termination of this Agreement, regardless of the reason therefor or the Party initiating such termination, subject to



OWE's right to off-set herein, Vendor shall be entitled to receive payment for only those Projects that achieved Welcome Call prior to the effective date of the termination.

## 2. **Payment Schedule of Vendor Fees.**

2.1. Fees will be released to Vendor in accordance with the following payment schedule:

2.1.1. 50% of the commission fee, up to $ _____ will be released to Vendor the Friday following NTP.

2.1.2. Balance of the commission fee will be released to Vendor the Friday following installation of Client's system.

2.1.3. In no event will OWE pay more than 50% of total commissions in the pipeline. If the pipeline falls below 50% commissions, then commissions will be held back.

## 3. **Cancellations and Vendor Fulfillment to Job.**

3.1. In the event of any reversal of funding to OWE, all paid commissions associated with the reversal of such funding will be debited against Vendor's future compensation. Nonetheless, OWE is not responsible for paying Vendor the full amount of any commission until OWE has received funding from the Client for the install. In the event of a client cancellation, Vendor shall refund any funding received as compensation plus 100% of any incurred costs (Plans, permit, MPU, etc.). Refund may be held back from future earning in OWE's sole discretion. Moreover, any charge back made by the installer will be the full responsibility of Vendor and not OWE. Additionally, any draws on projects provided to Vendor will be withdrawn, if there are delays on a project beyond the installer timelines and the installer elects to claw the money back.

## 4. **Outstanding Amounts Owed**

4.1 Interest: Any outstanding balances will accrue interest at an annual percentage rate (APR) of 15%, calculated monthly. Interest will continue to accrue until the balance is paid in full. Payments made will first apply to the accrued interest and then to the outstanding principal.

4.2 Third-Party Collection Agency: If the balance remains unpaid, 60 days from the invoice date the account will be referred to A.R.M. Solutions for further collection efforts.

4.3 Legal Action: If the outstanding balance remains unresolved, we may take legal action, including referral to external collection agencies and potential reporting to credit bureaus. We reserve all rights to take legal action to recover the outstanding balance.

## 5. **Amendments.**

15

**App. 083**



5.1.  The Vendor Fee Schedule set forth herein are subject further to the additional terms and conditions of the Adders Schedule, which is included below and is expressly incorporated herein. The Adders Schedule reflects additional costs and expenses that may impact Vendor's Fee Schedule. During the terms of this Agreement, the Adders Schedule as well as this Vendor Fee Schedule may be revised from time to time and is, therefore, subject to change.

**THESE REVISIONS TO THE ADDERS SCHEDULE MAY IMPACT A VENDOR'S COMMISSION AND VENDOR AGREES TO BE FULLY RESPONSIBLE**

**FOR ANY CHANGES IN THE ADDERS SCHEDULE**. Nonetheless, Vendor hereby expressly agrees to be bound by the Adders Schedule and future revisions thereto, as applicable. Vendor represents and warrants that it has had a chance to fully review the Adders Schedule and this provision, seek advice of counsel regarding same, and expressly agrees to the terms of the Adders Schedule, as revised from time to time, and this provision.

### Adders Schedules

The foregoing charts are intended to simply highlight typical Adders that may apply to a Vendor's transactions; however, the above charts DO NOT include all potential Adders that may apply to a particular transaction and, as such, Vendor hereby acknowledges and agrees that additional Adders may be applicable for a given transaction which may reduce Vendor's overall compensation for a given transaction. Vender hereby acknowledges and agrees that Adder prices shown below do not reflect final amount and that prices are subject to change. Please reach out to your dealer relations manager for an updated list and prices.

**App. 084**



**Exhibit B**

**VENDOR OBLIGATIONS**

Throughout the Term, Vendor agrees that it will strictly comply with all of the following obligations set forth in this Exhibit B. In addition, Vendor shall train and instruct its employees, agents, and Affiliates to strictly comply with all Vendor Obligations. Vendor acknowledges and agrees that it shall be liable for any of the acts or omissions of any employee, agent, or Affiliate in relation to or arising out this Agreement, the Services, and/or these Vendor Obligations.

**1.      GENERAL OBLIGATIONS.**

1.1.    Understand, train all employees on, and comply with the OWE Code of Conduct;

1.2.    Comply in all respects with Applicable Law;

1.3.    Comply in all respects with the terms and conditions of the Customer Agreement; and

1.4.    Comply in all respects with the terms, conditions, and requirements of the Sub Dealer Agreement.

**2.      AMENDMENTS AND MODIFICATIONS.**

2.1.    This Exhibit B may be modified at any time by OWE by delivering a Revised Exhibit to Vendor to its then-current e-mail address on file with OWE. Such Revised Exhibit shall be effective and binding upon Vendor and OWE after seven (7) calendar days of its delivery, unless such Revised Exhibit has a specifically identified later effective date.

**3.      LEAD GENERATION SERVICES.**

Vendor agrees to strictly comply with and perform the following "*Lead Gen Services*":

3.1.    Required Obligations. Vendor will act as an authorized lead generator for OWE. Vendor will be required to perform the following functions:

3.1.1.    All aspects of marketing, advertising, lead generation, solicitation, selling, and closing of Qualified Customers;

3.1.2.    Vendor shall ensure that all Customers, including all Qualified Customers, understand all terms of the Customer Agreements, the Products, and the relationship between Vendor and OWE;

3.1.3.    Obtain a Signed Credit Authorization and a Signed Customer Agreement for each Project; and

3.1.4.    Account management of Qualified Customers through Customer support as and when requested by OWE throughout the Restricted Period.

18

**App. 085**



3.2.    Any outstanding balances owed by Vendor will accrue interest at an annual percentage rate (APR) of 15%, calculated on a monthly basis. Interest will continue to accrue until the balance owed by Vendor is paid in full. Any payments made by Vendor or withheld by OWE will be applied first to unpaid accrued interest and then to the outstanding balance owed by Vendor.

4.    **SALES DEALER SERVICES**. Vendor agrees to strictly comply with and perform the following "*Dealer Services*":

4.1.    Required Obligations. Vendor will act as an authorized Sales Dealer for OWE. Vendor will be required to perform the following functions:

4.1.1.    All Lead Generation Services;

4.1.2.    Vendor shall ensure that all Customers, including all Qualified Customers, understand all terms of the Customer Agreements, the Products, and the relationship between Vendor and OWE;

4.1.3.    Account management of Qualified Customers through PTO; and

4.1.4.    Customer support as and when requested by OWE throughout the Restricted Period.

4.2.    Prohibited Activities. Vendor will not perform any of the following services or engage in any of the following activities:

4.2.1.    Design or engineering services in relation to a Project;

4.2.2.    Installation and construction services in relation to a Project;

4.2.3.    Interact in any way with any permitting authority or electric utility in relation to a Project; and

4.2.4.    Submit and/or apply for any rebate, incentive, SREC, tax credit, or other environmental attribute in relation to a Project.

4.3.    Sales Tools. Vendor shall be required to use and strictly adhere to the requirements of OWE's software tools and systems in all aspects of its sales activities (*e.g.,* NEO and Doors; collectively, the "*Sales Tools*"). Vendor acknowledges and agrees that OWE may modify its Sales Tools from time to time, including both functionality and steps required, without notice to Vendor. For the avoidance of doubt, OWE may (in its sole and absolute discretion) amend, modify, alter, or in any way change the Customer Agreements, Project Documents, and other steps and required documentation in the Sales Tools.



**Exhibit C**

**CODE OF CONDUCT**

At all times, Vendor must strictly comply with this Code of Conduct. OWE reserves the right to amend, supplement, or in any way modify this Code of Conduct at any time in its sole and absolute discretion. Any violation of this Code of Conduct by Vendor shall constitute a Vendor Default.

1.  **RECORDS RETENTION.** Vendor must maintain copies of all pertinent information relating to the Services, including any record of a Customer, and provide said copies/ information promptly to OWE to hold for a period of not less than three (3) years. Vendor must comply with all applicable laws concerning records and document retention.

2.  **DATA AND CYBER SECURITY.** Vendor must protect, safeguard, and keep confidential all information concerning any customer, OWE, or any of OWE's employees, agents, or other independent Vendors. In the event of any data breach, Vendor must immediately notify OWE.

3.  **TRAINING.** Vendor must successfully complete all required training to the satisfaction of OWE on the content and requirements of the Agreement, the Services, this Code of Conduct, and applicable law. As and when requested by OWE, Vendor must provide copies of training certificates for review.

4.  **ANTICORRUPTION.** Vendor must comply with all applicable anticorruption and antibribery laws such as the United States Foreign Corrupt Practices Act. Vendor must never pay or receive a bribe or receive or provide anything of value to any person (including government officials) in order to improperly influence such person.

5.  **MARKETING GUIDELINES.** Vendor must not use OWE's name, logo, or any trademark without the express written permission of OWE's Marketing and Legal Departments. Any change to marketing materials previously approved must be submitted to OWE for approval.

6.  **TELEMARKETING REQUIREMENTS.** Vendor must comply with all laws and registration requirements relating to telemarketing and TCPA, including TCPA one-to-one consent rule, and  do-not-call requirements. Vendor is not permitted to (a) make any unsolicited call or send text messages to a cell phone number; or (b) make any call through an automated dialer (including any telephony technology that is capable of autodialing).

20



7.  **SEIA BUSINESS CODE.** Vendor must comply with the Solar Energy Industries Association (SEIA) Business Code, available at https://www.seia.org/initiatives/ seia- solar-business-code.

8.  **ETHICS STANDARDS.** Vendor must strictly comply with OWE's Ethics Standards:

    **8.1.** <u>Creating a False Account</u>. You may not create a false account of any kind. This includes creating an account under a fictitious name or the name of someone who has not expressly agreed to have an account created in their name. All customer agreements must be signed by the homeowner. The homeowner's spouse or domestic partner may also sign a PPA, Lease or Cash SPA, but only if the homeowner also signs. No person who is not a homeowner or homeowner's spouse may sign a customer agreement.

    **8.2.** <u>Notice of Cancellation</u>. You must orally notify customers that they have the right to cancel the contract as required by state and federal law. In doing so, you may not state that the contract is "not binding" or anything to that effect; the contract is binding unless the customer exercises his or her right to cancel.

    **8.3.** <u>Misrepresentations Regarding Relationships with Utilities</u>. You may not say or do anything that may reasonably cause a customer to believe you or OWE is affiliated with a utility company. You do not work for or in partnership with any utility. Other than net metering and interconnection, there is no relationship between OWE and a utility company.

    **8.4.** <u>Forgery</u>. You may not sign a customer agreement or check a signature box in a customer agreement on a customer's behalf. Checking a signature box for a customer or leading them to believe it means something it doesn't, is the same as forging their signature. Similarly, you may not knowingly allow any person to sign or check a signature box in a customer agreement on behalf of another person.

    **8.5.** <u>Running Customer Credit Without Consent</u>. Obtaining a consumer report can negatively impact a customer's credit and, consequently, should only be done with a customer's express authorization, appropriate for the circumstances (or other circumstances expressly approved by OWE). You must never allow another person, even a spouse or partner, to authorize a credit check on behalf of someone else.

    **8.6.** <u>Providing False Information</u>. You may not provide false or inaccurate information concerning any customer in order to progress an account. You must use the customer's correct email address and may not use personal or company devices to access that account. If a customer does not have an email address, they must create one on their own device and be capable of accessing it without our assistance. It is also unethical to submit incorrect usage, utility, or payment information.



**8.7.** Contract Terms. You may not promise customers anything that contradicts the terms of their agreement, including any promise concerning: (a) energy production (except in a lease); (b) a customer's ability to terminate the agreement after the system is installed; and/or (c) the cost to remove the system temporarily. You may not enter into side deals with customers that are not memorialized in written agreements approved by OWE. And nothing is free!

**8.8.** Sharing Confidential Information. You may not share confidential information with anyone outside of OWE or allow anyone to do work on your behalf without the prior written consent of OWE. This includes allowing anyone to access OWE's information technology systems using our log-in information.

**8.9.** Misrepresentations Regarding Competition and Utilities. You may not make untrue or misleading statements about a competitor or a utility company. For example, you may not represent that a utility's or competitor's rates will increase without data to support your claim and approval by OWE.

**8.10.** Elderly Customers. You need to treat elderly customers (individuals over 65 years old) with extra care to ensure that they understand OWE's products and services. This includes not taking advantage of an older customer's inexperience with or lack of access to technology, or unfamiliarity with utility rates and usage.

**8.11.** Sales Presentation Language. You cannot speak with any consumer in any language other than English and Spanish. If you would like to use Spanish in your sales presentation, then you must use a Spanish customer agreement. The same is true for English speaking customers.

**8.12.** Savings. You may not promise any customers that they will save money through any of the products OWE offers. As a result, we must be extremely careful when discussing potential savings with consumers. You may not say or do anything to make a consumer believe that they are guaranteed to save money. OWE does not promise the availability of or eligibility for any local, state, or federal incentives or tax credits.

9. **AMENDMENTS AND MODIFICATIONS.** This Exhibit may be modified at any time by OWE by delivering a revised exhibit to Vendor to its then-current e-mail address on file with OWE. Such revised exhibit shall be effective and binding upon Vendor and OWE after seven (7) calendar days of its delivery, unless such revised exhibit has a specifically identified later effective date.

**Exhibit D**

**App. 089**

Docusign Envelope ID: 1327963A-43E0-4B56-AD8F-5D4533432A66



## MARKETING REQUIREMENTS

At all times throughout the Term, Vendor shall strictly comply with the requirements set forth in this Exhibit (collectively, the "Marketing Requirements").

1.  **RELATIONSHIP WITH OWE.** At all times throughout the Term, Vendor shall disclose in a clear and conspicuous manner the independent Vendor relationship between OWE and Vendor in a manner consistent with the terms of this Agreement. Vendor shall ensure that each Consumer and Customer understands the independent Vendor relationships between Vendor and OWE.

2.  **GENERAL MARKETING.** All marketing materials used by Vendor must comply in all respects with this Agreement, the Code of Conduct, the SEIA Business Code, and all applicable law. In addition, Vendor agrees that it shall, at all times throughout the Term, strictly adhere to OWE's marketing guidelines and practices.

3.  **OWE MATERIALS.** Vendor and all of its Representatives are required to use only the written marketing materials prepared and provided by OWE. Vendor shall not (i) use any other written marketing materials; (ii) remove any logos, copyrights, or other markings from OWE Materials; or (iii) modify, alter, or in any way change the OWE Materials.

4.  **TRADEMARKS.** Vendor acknowledges and agrees that it has no interest in any OWE- related trademarks and that OWE will remain the sole and exclusive owner of all right, title, and interest in the trademarks. Vendor acknowledges and agrees that Vendor's use of the trademarks, and any goodwill in the trademarks resulting from Vendor's use, will inure solely to the benefit of OWE and will not create any right, title or interest for Vendor in such marks. Vendor shall not contest, oppose, or challenge ownership of the Trademarks.

5.  **INTERNET-BASED MARKETING.** Vendor agrees that it will not bid on any OWE-branded key words in connection with any internet search, social media, or display advertising campaign (whether alone or in combination).

6.  **LIABILITY; INDEMNIFICATION; VENDOR DEFAULTS.** Vendor acknowledges and agrees that it shall be strictly liable for its failure to comply with all terms of these Marketing Requirements. Vendor shall indemnify, defend, and hold OWE harmless for any and all claims, lawsuits, losses, lost profits, or damages that may arise from, relate to,



or are in any way caused by the acts or omissions of Vendor arising from this Exhibit. Any violation of these Marketing Guidelines shall constitute a Vendor Default.

7.   **AMENDMENTS AND MODIFICATIONS.** This Exhibit may be modified at any time by OWE by delivering a revised exhibit to Vendor to its then-current e-mail address on file with OWE. Such revised exhibit shall be effective and binding upon Vendor and OWE after seven (7) calendar days of its delivery, unless such revised exhibit has a specifically identified later effective date.


**Exhibit E**

**RESTRICTIVE COVENANTS**

1.   **DEFINITIONS.** The following terms used herein, including in the preamble and recitals, shall have the following meanings:

1.1.       "***Competitor***" means any person or entity that provides products and/or services that are substantially similar to or competitive with those offered or provided by OWE or any of its Affiliates at any time during the Restricted Period, including (without limitation) companies, persons, or entities in the business of selling (i) residential and commercial photovoltaic or solar thermal products or services; (ii) residential or commercial energy storage and battery products and services; (iii) energy management and home automation; (iv) electric vehicle chargers and services; (v) demand response and other distributed energy resources; and (vi) residential and commercial security and protection related products and services, collectively with any Affiliates, Vendors, or dealers of any of the foregoing.

1.2.       "***Confidential Information***" means any and all information (whether written, electronic, or oral) furnished at any time by a Disclosing Party or its Representatives to a Receiving Party or its Representatives and all analyses, compilations, forecasts, studies or other documents (whether written or electronic) prepared by a Receiving Party or its Representatives which contain or reflect any such information; provided, however, the following shall not be considered "Confidential Information" for purposes hereof: (1) information that was already in Receiving Party's possession by legitimate means prior to receipt from Disclosing Party, (2) information that is or becomes publicly available provided, that, the source of such information or material was not bound by a contractual, legal or fiduciary obligation of confidentiality to the Receiving Party or any other party with respect thereto, or other than as a result of a disclosure by Receiving Party or its Representatives in violation of this Agreement, (3) information that is independently developed by Receiving Party or its Representatives without reference to or use of other elements of the Confidential Information, (4) information that is generally made available by Disclosing Party to third parties without restriction,



and (5) information that is provided by Disclosing Party to Receiving Party with express prior written approval that such Confidential Information is approved for public dissemination.

1.3.    "***Disclosing Party***" means a Party or its Representative that sends (by any means) any Confidential Information to Receiving Party.

1.4.    "***Receiving Party***" means that Party or its Representatives to whom any Confidential Information is sent by a Disclosing Party.

1.5.    "***TPO Services***" means the Services performed by Vendor under the Agreement relating to or arising from Customers that have or will enter into Customer Agreements.

2.    **CONFIDENTIALITY.**

2.1.    <u>Obligations of Receiving Party</u>.

2.1.1.    Each Receiving Party shall: (i) keep and safeguard all the Confidential Information as confidential; (ii) not disclose any Confidential Information in any manner whatsoever, except as required by applicable law pursuant to <u>Section 3</u> below; and (iii) not use any Confidential Information for its own financial gain or benefit.

2.1.2.    Notwithstanding the foregoing, a Receiving Party may reveal the Confidential Information to its Representatives (i) who are informed by Receiving Party of the confidential nature of the Confidential Information; and (ii) who agree to strictly abide by the terms of this Agreement or are under a duty of confidentiality to the Receiving Party no less strict than the terms of this Agreement.

2.1.3.    Each Party shall cause its Representatives to observe the terms of this Agreement. Neither Party may remove any proprietary, copyright, confidential, trade secret or other legend from any of the other Party's Confidential Information.

2.2.    <u>Required Disclosures</u>. In the event that a Receiving Party is requested or required by a court of competent jurisdiction (whether by interrogatory, request for information or documents, subpoena, deposition, court order, or other process) to disclose any Confidential Information (the "Required Disclosure"), Receiving Party shall, to the extent permitted by applicable law, provide prompt written notice to Disclosing Party concerning such Required Disclosure. If Receiving Party determines that such notice is permitted by law, Receiving Party shall cooperate with Disclosing Party in seeking an appropriate protective order. If the Required Disclosure is required by applicable law, then Receiving Party shall ensure that no additional Confidential Information than strictly necessary is disclosed in complying with any such request or requirement. In any event, Receiving Party will not oppose any action by Disclosing Party to obtain an appropriate protective order, injunction, or other reliable assurance that confidential treatment will be accorded the Confidential Information.

2.3.    <u>Destruction or Erasure of Confidential Information</u>. To the fullest extent permitted by applicable law, and to the extent reasonably practicable, Receiving Party agrees that it will, upon Disclosing Party's written request:

25



2.3.1.  Promptly destroy all copies of the written Confidential Information in Receiving Party's possession and provide written notice of such destruction to Disclosing Party in writing;

2.3.2.  Take reasonable steps to delete, erase, and remove electronic Confidential Information in Receiving Party's computer systems and provide written notice of such deletion and removal to Disclosing Party in writing; and/or

2.3.3.  Promptly deliver to Disclosing Party, at Receiving Party's sole expense, all copies of the written Confidential Information in Receiving Party's possession.

Receiving Party shall be permitted to retain copies of the Confidential Information to the extent required to comply with any law or court order to which Receiving Party is subject. Notwithstanding anything to the contrary contained herein, any Confidential Information, or copy or portion thereof, that is retained by a Receiving Party shall be maintained in accordance with the confidentiality obligations of this Agreement for so long as such Confidential Information is held.

2.4.    United States Securities Laws. Vendor hereby acknowledges that it is aware that the United States securities laws prohibit any person who has material non-public information concerning OWE from purchasing or selling securities of OWE (including options, warrants, or other derivative or synthetic securities that derive their value based on other securities of OWE) and from communicating such information to any other person under circumstances in which it is reasonably foreseeable that such person, including, without limitation, any of its Representatives, is likely to purchase or sell such securities. Vendor agrees that, to the extent that it has actually received Confidential Information pursuant to this Agreement that constitutes material non-public information, it will not trade any securities of OWE while in possession of such information and that it will not use any Confidential Information in contravention of the United States securities laws.

3.    **NON-DISPARAGEMENT.** Neither Party will make any statement (whether truthful or not) to another person or entity that could in any way adversely affect the reputation, brand, or image of the other Party.

4.    **NO REMARKETING.** At all times during the Restricted Period and throughout the Territory, Vendor will not (whether directly or indirectly, either through itself or any Representative) after providing a Customer to OWE (i) sell, remarket, attempt to sell or remarket, or offer to another person a Lead, a Qualified Customer, or the Project; or (ii) sell, promote, solicit interest, or refer any other product or service of another person to a Qualified Customer other than the Products.

5.    **NON-SOLICITATION.** For a period of three (3) years, Vendor shall not, directly or indirectly, for any reason whatsoever: (a) solicit, sell, promote, or induce, or attempt to solicit, sell, promote, or induce any Customer to terminate, cancel, not renew a contract, or in any way cease to do business with OWE; (b) solicit, induce, or

**App. 093**



attempt to solicit or induce any employee of OWE to terminate their employment with OWE; (c) induce, solicit, or in any way cause any dealer, lead gen provider, or Vendor that Vendor knows or has reason to know provides such services to OWE to terminate, cancel, or not renew (in whole or in part) its relationship with OWE; or (d) any retail store owner or operator, home builder, or other channel partner to terminate, cancel, or not renew (in whole or in part) its relationship with OWE; (d) engage with any retail store owner or operator, home builder, or other channel partner to terminate, cancel, or not renew (in whole or in part)  its relationship with OWE; or (e) engage with any inbound communication, including but not limited to email, phone, mail, or in-person, where another person or entity approaches Vendor seeking employment, i.e., No-hire Clause with Vendor, whereby the result would be employment during the three (3) years as set forth herein.

6.     **REMEDIES.** Vendor hereby acknowledges and agrees that any action taken by Vendor or its Representatives in violation of these Restrictive Covenants set forth on this <u>Exhibit E</u> would result in substantial damages to OWE and/or its Representatives, and that such damages would be difficult to determine as a result of the direct and indirect harm to OWE, its Representatives, and their respective businesses. Vendor further acknowledges and agrees that any breach
or violation of this <u>Exhibit E</u> by Vendor or any of its Representatives will result in irreparable harm to OWE, its Representatives, and their respective business interests and goodwill. If there is a violation of the No-hire Clause with Vendor, as noted in section 5 above in this Exhibit E, there will be $150,000 charge per person.

7.     **NON-EXCLUSIVITY OF OWE.** Nothing in this Agreement shall restrict the right of OWE to engage, directly or indirectly, in the same activities as Vendor, whether for its own account or otherwise.

8.     **SEVERABILITY.** Each of the Parties hereby expressly acknowledge and agree that all restrictive covenants set forth in this <u>Exhibit E</u> should be enforced to the maximum extent permitted by applicable law. In the event that any time period, scope, or term of any provision in this <u>Exhibit E</u> is declared by a court of competent jurisdiction to exceed the maximum time period, scope, or term that such court deems enforceable, then such court shall reduce the time period, scope, or term to the maximum time period, scope, or term permitted by Applicable Law.

9.     **AMENDMENTS AND MODIFICATIONS.** This Exhibit may be modified at any time by OWE by delivering a revised exhibit to Vendor to its then-current e-mail address on file with OWE. Such revised exhibit shall be effective and binding upon Vendor and OWE after seven (7) calendar days of its delivery, unless such revised exhibit has a specifically identified later effective date.

**App. 094**

Docusign Envelope ID: 1327963A-43E0-4B56-AD8F-5D4533432A66



10.     **NON-CIRCUMVENTION.** Vender hereby expressly acknowledges and agrees that, during the term of the Parties Agreement, Vender, itself or through its sales partners, will not work directly with OWE's financing partners, suppliers, or other of OWE's strategic partners, without the express written permission of OWE.

[SIGNATURES ON NEXT PAGE]

28

**App. 095**



By signing below, the undersigned acknowledges that they have read, understood, and agree to the terms and conditions set forth in this agreement. The undersigned further represents and warrants that they are signing this document with full capacity, free from any undue influence, impairment, or mental incapacity, including but not limited to any brain injuries or cognitive impairments. The undersigned understands that this agreement is legally binding and has had the opportunity to seek independent legal advice prior to signing.

Dated: 1/7/2025

By: _____
Signed by:
17B272C217EA466...

Print Name: EDJ Enterprises Inc

Its: Owner

**ONE WORLD ENERGY, LLC D/B/ A OUR WORLD ENERGY**

Dated: 1/9/2025

By: Joshua Morton
DocuSigned by:
77E3027FC072424...

Print Name: Our World Energy

Its: Director of Business Development

29

**App. 096**